**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 19-34508 (MI) |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*, | § | Chapter 11 |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

**OBJECTION TO MOTION FOR AUTHORITY TO OBTAIN POSTPETITION CREDIT AND RESERVATION OF RIGHTS OF AD HOC GROUP OF UNSECURED NOTEHOLDERS CONCERNING DEBTORS' OTHER FIRST DAY PLEADINGS**

The ad hoc group of certain unaffiliated holders (the "Ad Hoc Group") of more than 65% of the aggregate amount of (i) 7.75% senior notes and (ii) 6.125% senior notes, issued pursuant to indentures dated June 13, 2013 and June 27, 2014, respectively (the "Unsecured Notes"), by Sanchez Energy Corporation ("Sanchez Energy", and with its affiliated debtors in possession, the "Debtors") hereby objects to the Debtors' motion for authority to obtain postpetition financing (ECF No. 26, the "Motion") and reserves its rights to object to the Debtors' other first day pleadings and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     Few bankruptcy estates demand close judicial supervision under the Bankruptcy Code as these Debtors' estates do.[2] Beginning in December 2018, and for more than seven months,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2]  11 U.S.C. §§ 363, 1109(b).

the Ad Hoc Group repeatedly requested that the Debtors engage meaningfully with the Ad Hoc Group—so that losses could be curtailed and value maximized without paying any creditor more than full compensation for its claims and without leakage to insiders, affiliates, and/or opportunistic third-parties.  At first, the Debtors ignored the Ad Hoc Group's requests (literally— for three months), and then deflected, while significant and egregious sums of cash were paid on account of executive compensation (in a fashion that could never have been approved under section 503(c) of the Bankruptcy Code) and to affiliates who appear to have happily capitalized on Sanchez Energy's financial distress and conflicted governance.

2.      During this same period prior to the filing of these chapter 11 cases, the holders of the Debtors' 7.25% Senior Secured First Lien Notes due 2023 ("First Lien Notes") also took certain actions.  Most notably, on June 26, 2019—squarely within the § 547, 90-day preference period and when all parties understood that bankruptcy was inevitable—the First Lien Noteholders sought to improve significantly their position relative to all other creditors.  When the Debtors refused to facilitate the transfer, the First Lien Noteholders acted unilaterally, causing their collateral agent to attempt an involuntary transfer of eight oil, gas, and mineral leases for which any lien securing the First Lien Notes was unperfected.  This action takes on particular significance because included in those eight leases is Debtor SN Catarina's single most valuable lease—the "HIL" lease.  The Ad Hoc Group believes this unilateral step was of no legal effect, *see* TEX. PROP. CODE ANN. § 5.030, but assuming that an involuntary transfer of property actually occurred, the transfer was not in the "ordinary course of business" and is avoidable under section 547(e)(2)(B) of the Bankruptcy Code.  *See In re Black Elk Energy Offshore Ops., LLC*, Case No. 15-34287, 2019 WL 3450747 at *7 (Bankr. S.D. Tex. July 30, 2019) ("Circuits agree that preference actions prevent creditors from rushing to seize a debtor's assets prior to the petition date and ensuring fair

and equal treatment among all creditors….”); *In re Apex Long Term Acute Care—Katy, LP*, 465 B.R. 452, 463 (Bankr. S.D. Tex. 2011) (“Preferences are avoidable precisely because they enable some creditors to receive more than their fair distribution under the Bankruptcy Code.”).  For this reason alone, among others, the Debtors’ request to approve debtor in possession financing from these same parties requires close scrutiny.

3.      Through this all, as the estates’ residual stakeholders, the Ad Hoc Group stood ready and willing to support a fair and reasonable restructuring.  The Ad Hoc Group proposed to address the Debtors’ capital needs in order to maximize value and offered very generous treatment to the First Lien Noteholders in order to minimize the administrative burn of lengthy and contested chapter 11 cases.  The Ad Hoc Group’s efforts to do so, captured in proposals sent to the Debtors on May 7 and July 12, and to the First Lien Noteholders on July 10 and July 26, proved unsuccessful.  The First Lien Noteholders—their screaming collateral shortcomings and exposure to avoidance actions notwithstanding—demanded a greater paydown, and while the Debtors now have the ability to restructure favorably the First Lien Noteholders’ obligations, *see In re Texas Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 336 (5th Cir. 2013) (*Till* approach is “the default rule in Chapter 11 bankruptcies”), the Debtors have showed no inclination to do so, focusing instead on entrenching, and procuring releases for, management.

4.      The prepetition process devolved into a complete failure.  Now all parties enter these chapter 11 cases with a heavy lift before them.  Significant issues need to be investigated and resolved with redress against various parties.  By way of example:

- ***Secured Noteholders***.  In addition to plainly unencumbered oil and gas properties and unencumbered cash balances that clearly fall outside of their collateral

package,[3] as discussed above, the First Lien Noteholders' collateral agent purported to amend—via a unilaterally-filed "correction affidavit" dated June 26—their deficient April 2018 Amended and Restated Deeds of Trust, affecting eight of the Debtors' most valuable leases.[4] This unilateral action was invalid under Texas law, and even if it were not, it is avoidable under section 547 of the Bankruptcy Code. Thus, the Debtors' most valuable lease, among others, will likely be unencumbered in these chapter 11 cases.

> o   In addition, the recent incurrence of the First Lien Notes—issued on February 14, 2018—may be avoidable, in large part, as constructively fraudulent incurrences of various subsidiary guarantors that did not receive reasonably equivalent value on account of their upstream guarantees.  *In re TOUSA, Inc*., 680 F.3d 1298 (11th Cir. 2012).

- ***Executive Officers***.  On the eve of bankruptcy, the Debtors' executives awarded themselves excessive bonuses and golden parachutes in a (conservative—ignoring targeted compensation) estimated dollar amount of $36.6 million—approximately $16.9 million in bonuses and $19.6 million in golden parachutes—that countermand section 503(c) of the Bankruptcy Code.[5]

- ***Sanchez Midstream Partners ("SNMP")***.  Sanchez Energy, inexplicably, twice agreed to pay increased tariffs in 2019 without receiving any fair consideration in exchange for the incremental amounts imposed on it by its affiliate SNMP.[6]  In addition, in 2018, Sanchez Energy dedicated Comanche acreage to the affiliated

---

[3]   Declaration of C. George ¶ 38 (ECF No. 16) ("liens were required to cover not less than 85% of such properties with proved reserves [and collateral excludes] among other things, deposit accounts, oil and natural gas properties with no proved reserves, equity interests in SN UnSub…."); Mot. at 10 ($62.5 million of cash not even alleged to be cash collateral).

[4]   *See* Correction Affidavit Under § 5.028, TEX. PROP. CODE ANN., June 26, 2019 (correcting various expiration dates, book, page and instrument numbers, counties, but failing to correct certain lease numbers and incorrectly referring to exhibits to 2018 Amended and Restated Deed of Trust).

[5]   Sanchez Energy May 9, 2019 Form 8-K (disclosing out of the ordinary course executive compensation packages).  Targeted compensation totals $48 million including $34 million in severance and $14 million in bonuses.

[6]   SNMP May 9, 2019 Form 10-Q.

Carnero JV without receiving fair consideration, allowing SNMP to sustain its 50% ownership therein.

- **Sanchez Oil & Gas ("SOG") (Sanchez Jr. and Sanchez III)**.  For years, including while insolvent, Sanchez Energy paid 100% of the executive compensation of Mssrs. Sanchez Jr. and Sanchez III, even though those individuals held director and officer roles at several affiliated and non-affiliated entities and managed assets for affiliates UnSub and Gavilan.[7]  In other words, Sanchez Energy paid all of the costs for work performed for its affiliates.

- **SOG (UnSub, and Gavilan)**.  Sanchez Energy has been forced to overpay G&A expenses to SOG, effectively subsidizing UnSub and Gavilan—*i.e.*, "the entit[ies] for whose benefit such transfers were made" under section 550—that have each enjoyed contractual limitations on the amount of G&A that SOG agreed to charge.[8]

- **SOG.**  Sanchez Energy has stated that the "2D and 3D seismic data used for our exploration and development projects as well as the well logs, LAS files, scanned well documents and other well documents and software that are necessary for our daily activities"[9] are owned by SOG.  We disagree.  The intellectual property is owned by Sanchez Energy and subject to turnover under § 542 of the Bankruptcy Code.  *See Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 570 (5th Cir. 2000) (ownership of seismic data is "incidental" to exercise of exclusive "right to explore and produce oil and gas under the lease").  To the extent such property has been transferred pursuant to agreement between Sanchez Energy and SOG—and the so-called Services Agreement does not provide for such a transfer—such transfers are likely avoidable following the deterioration of Sanchez Energy's

---

[7]  Sanchez Energy Apr. 9, 2019 Form 10-K/A.

[8]  *Sawyer v. Hoag*, 84 U.S. 610, 21 L. Ed. 731 (1873) ("Nor do we think the relation of the appellant in this case to the corporation is without weight in the solution of the question before us…. It is, therefore, but just that when the interest of the public, or of strangers dealing with this corporation is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to a rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him.").

[9]  Sanchez Energy Mar. 1, 2019 Form 10-K.

financial condition. *See also Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928 (Tex. App. 1993) (intangible property qualifies as property under fraudulent transfer statutes).

- ***UnSub***. In connection with the Comanche Acquisition, the majority of the then-proved developed non-producing and proved undeveloped properties were acquired by Debtor SN Maverick.[10] As those properties became producing properties, the Ad Hoc Group understands that the allocation as between the Debtors and UnSub may not have properly accounted for the true and accurate incremental production allocable to the Debtors.

5.    The foregoing is an incomplete list, and indeed the dealings between the Debtors, their affiliates, and the Sanchez family are too numerous to set forth here. Critically, this case demands that all matters be properly investigated, if not by the Ad Hoc Group, then pursuant to section 1103(c)(2) (creditors' committee) or 1106 (examiner or trustee) of the Bankruptcy Code—as may be appropriate—but *not* by the debtor in possession.[11]

6.    One thing is clear: the incumbency of purportedly independent directors, Mssrs. Eugene Davis and Adam Zylman—appointed in the wake of a shareholder suit being filed against Sanchez Energy for excessive director compensation—has proven utterly futile.[12] Indeed, many

---

[10]   Declaration of C. George ¶ 19 (ECF No. 16.)

[11]   *See, In re Texas Extrusion Corp.,* 844 F.2d 1142, 1159 (5th Cir. 1988) ("It must be remembered that in the bankruptcy context, the interests of creditors not the debtors are paramount."); *In re Emergency Networks, Inc.*, 188 B.R. 227, 233 (N.D. Tex. 1995) ("While trustees and debtors in possession share many duties and powers, the two often operate with different agendas. A debtor in possession seeking to reorganize its business may be more likely to make compromises in order to develop a plan of reorganization that is acceptable to creditors. Under these circumstances, the debtor in possession may elect to relinquish preference actions in order to effect plan confirmation. In contrast, the chapter 11 trustee should seek to maximize the return for the estate's creditors, and therefore may be more diligent in pursuing claims for preferential or fraudulent transfers…. And, unlike the debtor in possession, the trustee is required by the Code to investigate the affairs of the debtor in search of such causes of action.").

[12]   Sanchez Energy Nov. 1, 2018 Form 8-K; C. George Dec. ¶ 62.

The shareholder action remains pending in the Court of Chancery of the State of Delaware. *See Armato v. Sanchez*, No. 2018-0642 (breach of fiduciary duty, unjust enrichment and waste of corporate assets

of the occurrences described above—including the "eve of bankruptcy" executive compensation and passively allowing SNMP to unilaterally jack up midstream tariffs—took place **after** the appointment of such individuals.[13]   Under no circumstances should this purported "Special Committee" be allowed to "investigate, pursue, settle, and/or otherwise resolve any and all potential claims or causes of action the Debtors may have related to SOG, SNMP, or any of their respective affiliates or joint ventures" as the Debtors have positioned them to do.[14]   *See In re Foster Mortg. Corp.*, 68 F.3d 914 (5th Cir. 1996) (proper deference must be given to views of creditors when affiliates propose to settle disputes).

7.     With this backdrop, the Ad Hoc Group identifies the following objections to the Motion and reserves its right to raise additional objections as it reviews the Debtors' other requests for first day relief.

## OBJECTION TO DIP FINANCING

8.     ***No Emergency Need for DIP Financing***.   Under Bankruptcy Rule 4001, the Debtors are entitled to obtain credit "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."   FED.R.BANKR.P. 4001(c)(2).   Here, no emergency exists and there will be no showing at the hearing of "immediate and irreparable harm."

9.     No one credibly alleges that the Debtors require DIP financing in the period between the interim hearing and the final hearing, which the Debtors have requested be scheduled no later than 40 days from the Petition Date.   Indeed, the Debtors concede that they do not actually *need* DIP financing until January 2020 (at the earliest).   Mot. ¶¶ 12, 27; *see also* C. George Dec. ¶

---

against directors of the Company based on purportedly excessive compensation of Sanchez Energy's non-employee directors).

[13]   *See In re Ira Haupt & Co*., 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

[14]   C. George Dec. ¶ 63.

74 (Debtors "will have insufficient cash by January 2020 absent postpetition financing"); Koetting

Dec. (ECF No. 26-2) ¶ 12 (Debtors "will fall below minimum liquidity levels needed to safely

operate by January 2020 absent postpetition financing").

10.     Consistent with the foregoing, the Initial DIP Budget reflects that operating cash

will not drop below $76 million through October 4—well past 40 days from the Petition Date.

(ECF No. 26-1 at 173/173).   Indeed, at times during that period, the Debtors' cash position is

forecast to be as high as $174 million.  *Id.*

11.     The Debtors do not need even need permission to utilize cash collateral—which

they easily could have negotiated for in any event.  The Debtors assert that there "likely would

have been a dispute as to the extent to which the Debtors' cash balances constituted traceable

proceeds of Prepetition Collateral."  Mot. at ¶ 7.  But this statement addresses only a fractional

portion of the Debtors' cash (which funds, the Debtors concede, sit in deposit accounts that are not

collateral).  At a minimum, however, and in any event, the Debtors sit on at least $62.5 million of

unencumbered cash held by SN UR Holdings.  *See* C. George Dec. ¶ 10; Koetting Dec. ¶ 10; Mot.

at 10 (noting that the Prepetition Secured Parties do not even allege that "any cash held by SN UR

Holdings, LLC" is collateral); Interim Order ¶ 4(d) (same).  This is more than enough to bridge

through a Final Hearing.

12.     The Debtors suggest that "even the appearance of inadequacy of capital, could

cause substantial uncertainty among the Debtors' vendors and other business partners."  Koetting

Dec. ¶ 17.  And, they state that a "positive, and credible, message" must be sent "to the Debtors'

workforce and commercial counterparties."  *Id.*  This statement fails to prove irreparable harm.

But, assuming *arguendo* that this proposed DIP Financing—offensive $175 million roll-up and

all—does in fact send a "positive" message, the Motion can still be heard at the Final Hearing

(after discovery and the formation of an official creditors committee, among other things). Moreover, the Debtors have it backwards:  that the Debtors hold $62.5 million in unencumbered cash rendering both emergency borrowing and cash collateral use unnecessary is itself a positive message.

13.     Finally, the Initial DIP Budget reflects that whether the $50 million interim draw is made or not will convey no "message" at all.  After all, the immediate $50 million draw is ultimately immaterial to operations.  The amount is to be used to pay $8.9 million in "DIP Interest and fees" (which would otherwise not be incurred) and refinance $7.9 million of the amount outstanding under the Prepetition Credit Agreement and cash collateralize $17.1 million of Prepetition L/C (which does not need to be done in view of section 362).  The amount of the $50 million interim draw that actually makes itself available to the Debtors operations is close to $16 million—which, as stated above, the Debtors do not need.

14.     Ironically, the Debtors' estates are better served by allowing the Prepetition Credit Agreement to remain outstanding.  The interest rate (~7.4%), even at the default rate, is lower than the rate proposed for the DIP Financing (~10.2%).  And, there is yet another reason to leave the Prepetition Credit Agreement outstanding.  As stated in the Motion, until the Prepetition Credit Agreement is paid off, the First Lien Noteholders cannot "seek relief from the stay…. [indeed, many of their rights] are limited to those afforded to unsecured creditors."  Mot. ¶ 25.  In other words, obtaining the DIP Financing on an interim basis and paying off the Prepetition Credit Agreement (which does not need to be done) empowers the First Lien Noteholders.  *See* B. Latif Dec. ¶ 16 ("For example, the Secured Notes Ad Hoc Group considered the Discharge of First-Out Obligations as a critical component of the DIP Facility.  The Secured Notes Ad Hoc Group also identified the inclusion of the Roll-Up Loans as another necessary term of the DIP Facility.").  The

Debtors, as the current trustee of these estates, should not be gratuitously strengthening the position of their secured creditors, particularly at the expense of their other creditor constituencies.

15.     At bottom, the Debtors simply do not establish any threat of immediate or irreparable harm.  They establish the opposite.  To the extent the First Lien Noteholders move for adequate protection during the interim period, the $62.5 million of unencumbered cash is more than sufficient to provide as much.

16.     ***Dangerous Case Milestones.***   Drawing on the interim $50 million is not only unnecessary and expensive, it hinders the outlook of these chapter 11 cases.  As noted in the Motion, if the Interim Order is entered, the DIP Credit Agreement threatens to default if the final order is not entered by the Court in 40 days.  Mot. at 11; DIP Credit Agreement §5.15 at 68 (ECF No. 26-1).  It is highly likely the final order will not be entered, because it includes many highly objectionable provisions, including a $175 million "roll-up."  So there is no good reason to subject the estates to an impending default.

17.     And the same is true if an "Acceptable Plan of Reorganization" is not filed within 110 days.  *Id.*  These provisions do not appear to be "subject to entry of a final order" and should be stricken.  The Court's Procedures for Complex Chapter 11 Cases (Bankr. S.D. Tex.) ("<u>Complex Case Procedures</u>") require an "extraordinary showing at any interim hearing" to justify any "provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law", but the Debtors offer no such showing.

18.     ***Unencumbered Assets Should Remain Unencumbered.***   The Complex Case Procedures provide that, at the initial financing hearing, "[t]he Court will presumptively grant replacement liens on post-petition collateral to secure the Initial Financing *on the same types of collateral and to the same extent as the pre-petition lender has on the pre-petition collateral*."

(emphasis added.)  The Debtors do not purport to provide recourse to Avoidance Actions until the Final Hearing, Interim Order § 10(a), but they do otherwise seek to pledge all "Unencumbered Property." *Id.*  No extraordinary showing can be made to justify this provision.

19.     ***Estate Claims and Causes of Action Must Not Be Prejudiced.***  The Interim Order proposes a "challenge period" of merely 60 days, which provision does *not* appear to be subject to the Final Order.  Interim Order § 23(a).  Similarly, the Interim Order provides for a $50,000 limit on the use of DIP Collateral (*which specifically includes Unencumbered Property*, as stated above) for the "investigation" (but not prosecution) of estate causes of action against the First Lien Noteholders, which is ridiculously small given the size of these cases, the complexity of the collateral, and the issues with the First Lien Noteholders' liens that already have been identified.

20.     These provisions are highly objectionable.  Again, the Complex Case Procedures require an "extraordinary showing at any interim hearing" to justify any "provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law." *See also, id.* (requiring "extraordinary showing at any interim hearing" to justify "[l]imitations on fees for advisors to official committees").

21.     Ensuring that estate claims and causes of action against the First Lien Noteholders could not be more important in these chapter 11 cases where significantly valuable chapter 5 claims exist against the First Lien Noteholders.  The Motion may thwart these lien challenges totaling hundreds of millions of dollars in exchange for a few million dollars in added liquidity that the Debtors do not need.

## RESERVATION OF RIGHTS

22.     The Ad Hoc Group reserves its rights to object or respond to the first day motions on any grounds whatsoever, including the right to raise objections at the hearing on the first day

motions.  In addition, to the extent the Debtors request the opportunity to present background information to the Court, the Ad Hoc Group requests it be granted the same opportunity.

Respectfully submitted this 13th day of August, 2019.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ *Patricia B. Tomasco*
Patricia B. Tomasco  (SBN 01797600)
Christopher Porter
Devin van der Hahn
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100

-and-

Benjamin I. Finestone (*pro hac vice* pending)
Daniel Holzman (*pro hac vice* pending)
Kate Scherling (*pro hac vice* pending)
Jordan Harap (*pro hac vice* pending)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2019, a copy of the foregoing statement was served through the Court's CM/ECF notification system to all parties who have appeared in this case through counsel or who have submitted a request for service by CM/ECF.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco