## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Case No. 19-34508 (MI) |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*, | § | Chapter 11 |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## OBJECTION OF THE AD HOC GROUP OF UNSECURED NOTEHOLDERS
## TO THE DEBTORS' MOTION TO OBTAIN POST-PETITION FINANCING
[Relates to ECF Nos. 26, 144]

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

The ad hoc group of certain unaffiliated holders (the "Ad Hoc Group") of more than 65% of the aggregate amount of (i) 7.75% senior notes and (ii) 6.125% senior notes, issued pursuant to indentures dated June 13, 2013 and June 27, 2014, respectively, by Sanchez Energy Corporation ("Sanchez Energy", and with its affiliated debtors in possession, the "Debtors"), hereby objects to the Debtors' motion for authority to obtain post-petition financing (ECF No. 26, the "Motion"), and respectfully states as follows:

## I. **PRELIMINARY STATEMENT**[2]

1.      At the "first day" hearing, the Debtors filed and prosecuted an "emergency" motion for post-petition financing (the "Currently Proposed DIP Financing") even though the Debtors did not need the money and did not need the consent of any party to use sufficient cash collateral.  The filing of the Motion was not in the estates' best interests.  The estates faced no "immediate and irreparable harm"—at least not until the Debtors filed their Motion.  The Court approved the Motion on an interim basis, rescuing the estates from the threat of the Debtors' self-imposed harm.

2.      Now, at the "second day" hearing, the Debtors are requesting approval, on a final basis, of post-petition financing that seeks to satisfy $200 million of prepetition claims, including by "rolling-up" into superpriority status $175 million of prepetition claims held by the putative DIP Lenders.  The Debtors do not know if prosecution of the Motion maximizes the value of the estates, and they have done zero analysis of the impact this "roll-up" threatens to prospects for a successful reorganization.  And yet they proceed apace.

3.      The Debtors' determination is particularly unacceptable in view of the fact that a superior alternative post-petition financing was offered to the Debtors by the Ad Hoc Group (the

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings given to them below or in the   Debtors' Motion.

"Alternative DIP Financing").  The Debtors refused to alter course.  Once again, the Debtors' conduct fell short of what is required of a debtor remaining in possession of its assets under chapter 11.  *In re Hughes*, 704 F.2d 820, 822 (5th Cir. 1983) ("A debtor-in-possession … does not operate the business as it did before the filing of the petition, unfettered and without restraint.  Rather, a debtor in possession holds its powers in trust for the benefit of creditors.  The creditors have the right to require the debtor in possession to exercise those powers for their benefit.").

4.      The Alternative DIP Financing offered significant incremental value to the Debtors' estates.  No roll-up.  No waiver of valuable estate powers under sections 506(c) and 552(b) of the Bankruptcy Code.  No payment of the Secured Notes' professional fees and expenses.  No restrictive "challenge period" or limitation on use of proceeds to challenge the Secured Noteholders' claims—especially important in these cases where exceedingly valuable claims exist, a fact conceded by the Secured Noteholders themselves on at least two occasions.

5.      Nevertheless, the Debtors cited "uncertainty" concerning whether the Court would approve the Alternative DIP Financing were the Debtors to adopt it.  But, if the Debtors were unable to get the Alternative DIP Financing approved in *these* chapter 11 cases, then the concept of a priming facility under section 364(d) should be written out of the Bankruptcy Code altogether.  There will be no "priming fight."  As the Court already understands, the Secured Noteholders are silenced with respect to the Prepetition Collateral under the Collateral Trust Agreement ("CTA"), and cannot object.  RBC, as "first-out" lender, will be refinanced, and the Alternative DIP lenders will step into RBC's shoes as the "controlling" lender under the Collateral Trust Agreement.

6.      Thus, an adequate protection finding would likely be unopposed.  But even assuming the Secured Noteholders could oppose the request, it would not matter.  The Secured Noteholders have already agreed that funding the Debtors' business plan is value maximizing to

their collateral, protecting against losses that the Secured Noteholders and the Debtors believe they would otherwise suffer.  The Secured Noteholders were not compelled to agree to finance these cases; they never believed the Debtors would prime their Prepetition Collateral with third-party financing; they never sought to foreclose or threatened to seek stay relief.  So any chance of collateral diminution is remote at best.

7.      In any event, to the extent the Secured Noteholders' determination proves wrong that their (putative) property interests are best served by funding the Debtors' business plan—and the Secured Noteholders do sustain (legally cognizable) collateral diminution—there are significant unencumbered assets which can fund the payment of section 507(b) claims.  In addition, the Debtors would have the ability to pay the Secured Notes post-petition interest under the Alternative DIP Financing just as they would under the Currently Proposed DIP Financing.

8.      At a bare minimum, no roll-up should be approved.  Assuming roll-ups are lawful and authorized under the Bankruptcy Code (and the Ad Hoc Group does not believe they are), the Currently Proposed DIP Financing cannot meet any sort of "necessity" standard.  The Motion should be denied.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  THE DEBTORS' PURPORTEDLY SECURED PREPETITION INDEBTEDNESS

#### 1.  First-Out Senior Secured Revolving Credit Facility

9.      Sanchez Energy and all but one of the other Debtors are parties to the Third Amended And Restated Credit Agreement, dated as of February 14, 2018 (the "Senior Credit Agreement"), with Royal Bank of Canada ("RBC") as agent (the "Senior Credit Agreement Agent").  As of the Petition Date, there was outstanding under the Senior Credit Agreement:

(a) approximately $7.9 million in principal amount; and (b) a $17.1 million undrawn standby letter of credit issued by RBC (together, the "First-Out Obligations").[3]

### 2.   The Secured Notes

10.   On February 14, 2018, Sanchez Energy issued $500 million in principal amount of 7.25% senior secured first lien notes due February 2023 (the "Secured Notes") under the Secured Notes Indenture.  The Prepetition Secured Parties include the Secured Noteholders and RBC, in all of its capacities under any of the First-Out Documents (as defined in the Collateral Trust Agreement).

11.   As of the Petition Date, there was $500 million in principal amount of Secured Notes outstanding.  Pursuant to the Collateral Trust Agreement, the Secured Notes' liens are shared with, but effectively junior to, the First-Out Obligations.

### B.   CURRENTLY PROPOSED DIP FINANCING

12.   Prepetition, on July 12, consistent with proposals previously sent to the Debtors, the Ad Hoc Group sent a restructuring proposal "provid[ing] for a [$200 million] new money capital injection … and the equitization of the entirety of $1.75 billion of Sanchez Notes."  The Ad Hoc Group did not believe the Debtors required post-petition financing—at least not immediately—stating that "if there are additional administrative costs necessary to implement the restructuring provided for in the Term Sheet, the Ad Hoc Group and the Company *can address those issues at the appropriate time with debtor-in-possession financing as may prove to be necessary*."  The Debtors refused to seriously negotiate with the Ad Hoc Group, believing instead that an *immediate* need existed for $175 million of postpetition financing.

---

[3]   According to the Debtors, the First-Out Obligations also include certain hedging obligations including, as of the Petition Date, approximately $400,000 in obligations under cash-settled commodity hedging arrangements (the "First-Out Hedging Obligations") with certain hedging counterparties (the "Hedging Counterparties").  Mot. ¶ 20.

13.     With respect to postpetition financing, the Debtors claim that they "engaged in an extensive marketing process for debtor in possession financing from third party sources, including traditional banks and financial institutions."  Mot. ¶ 3.  However, the Debtors did not seriously pursue post-petition financing on a priming basis from any party other than the Secured Noteholders due to the Debtors' perception of "the legal and practical difficulties of engaging in a 'priming fight' with secured creditors on the first day of these cases."  Mot. ¶ 33.

14.     The Debtors' determination was not based on any substantive analysis of the difficulty or likelihood of success of prevailing in a "priming fight."  The Debtors did not conduct a valuation of their unencumbered assets nor did they adequately consider the fact that, pursuant to the plain terms of the CTA, the Secured Noteholders could not object to any motion for authorization to obtain superpriority post-petition financing from a third-party.  Rather, the Debtors took what they perceived to be the path of least resistance and focused their efforts on negotiating with the Secured Notes Ad Hoc Group, never seriously exploring the possibility of obtaining priming financing from a third-party source on terms better than those offered by the Secured Notes Ad Hoc Group.

15.     Thus, it is not surprising that, negotiating from a position of practical and perceived exclusivity, the Secured Notes Ad Hoc Group was able to extract favorable terms from the Debtors for its extension of post-petition financing.

16.     Of the $350 million principal proposed to be extended under the Currently Proposed DIP Facility, only $175 million is in the form of "new money."  The remaining $175 million is a "refinancing" of $175 million of the outstanding Secured Notes Obligations (the "Roll-Up").  The effect of the Roll-Up is that $175 million of prepetition secured debt will become, upon

entry of the Final Order, post-petition superpriority administrative claims that must be paid in full in cash under a chapter 11 plan.

17.     In addition, the terms of the Currently Proposed DIP Financing include, among other things, a waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code, a 60-day limit to the Challenge Period, a $50,000 limit of the use of DIP Collateral for the investigation of claims against the DIP Lenders or the Prepetition Secured Parties or challenges to the amount, validity, perfection, or priority of their claims and liens, and payment of post-petition interest on account of the Secured Notes (the "Post-Petition Interest Payments").[4]

## C.     AD HOC GROUP'S ALTERNATIVE DIP FINANCING PROPOSAL

18.     On August 21, 2019, the Ad Hoc Group sent a letter to the Debtors presenting the Debtors with the Alternative DIP Financing, along with a term sheet.[5]  Importantly, just like the Currently Proposed DIP Financing, the alternative facility provides $175 million of liquidity to the Debtors' estates at the same interest rate and for the same term.

19.     The Alternative DIP Financing diverges from the Currently Proposed DIP Financing only in *beneficial* ways:  (a) no Roll-Up; (b) no waiver of the Debtors' rights under sections 552 and 506(c) of the Bankruptcy Code; (c) the Debtors will not have to pay the Secured Notes Ad Hoc Group's and the Collateral Trustee's professional fees; (d) there is no limitation on the duration of the Challenge Period or restriction on the use of proceeds of the Alternative DIP Financing to investigate or prosecute valuable estate claims and causes of action against the Prepetition Secured Parties—which claims all parties in interest, including the Secured Noteholders themselves, understand exist in these chapter 11 cases; and (e) the Debtors will not

---

[4]     The complete terms of the Currently Proposed DIP Financing can be found in the Motion, including the DIP Documents attached thereto.

[5]     The August 21, 2019 letter, which attached a summary term sheet redlined to the term sheet for the Currently Proposed DIP Financing included in the Motion, is attached hereto as Exhibit A.

be required to make the Post-Petition Interest Payments to the Secured Noteholders (although the Debtors will have the right to do so) (collectively, the "Incremental Value").

20.     The Alternative DIP Financing is comprised of two components.  *First*, an $8 million "Refinancing Credit Facility" ("Facility A"), which will replace and become the "Senior Credit Facility" under the CTA.[6]  The proceeds of Facility A will be used to repay in full in cash all amounts due and owing as of the Petition Date under the Senior Credit Agreement, just as provided under the Currently Proposed DIP Financing.  *Second*, a $167 million superpriority, priming, senior secured delayed-draw term loan credit facility ("Facility B").  The proceeds of Facility B will be used (a) to satisfy the existing $25 million interim draw under the Currently Proposed DIP Financing, (b) to cash collateralize approximately $17 million of Prepetition L/C, and (b) for general working purposes consistent with the Currently Proposed DIP Financing.

21.     Other than the Incremental Value, the terms of Facilities A and B are consistent with those in the Currently Proposed DIP Financing.

22.     On September 5, 2019, the Ad Hoc Group sent a form commitment letter to the Debtors, requesting any comments.  None were received.

23.     On September 6, 2019, the Debtors informed the Ad Hoc Group that they would not be moving forward with the Alternative DIP Financing, and that the estates would not realize the Incremental Value, because they were concerned about the "risks associated with … the nonconsensual priming/adequate protection litigation."

---

[6]     *See* CTA § 1.1 at 16-17.

D.     LIMITATIONS ON PREPETITION COLLATERAL

    1.     **The Prepetition Secured Parties' Collateral Package Does Not Concern All Of The Debtors' Assets**

24.     The Secured Notes are only secured by certain of the Debtors' assets (the "Prepetition Collateral").  Among other things, the Prepetition Collateral does ***not*** include:  (i) 15-20% of the Debtors' total proved oil and natural gas reserves,[7] and does not include any oil and natural gas properties with no proved reserves; (ii) deposit accounts; and (iii) equity interests in unrestricted subsidiaries.  (George Dec. ¶ 38).[8]  These assets, unencumbered by the Prepetition Secured Parties' liens (the "Prepetition Liens"), are of appreciable value.  In addition, it is undisputed that not less than $60 million of cash was unencumbered by any Prepetition Liens.  *See* George Dec. ¶ 10.

    2.     **Additional Unencumbered Assets Exist In The Form Of Chapter 5 Claims**

25.     On April 13, 2018, several Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Productions (the "Deeds of Trust") were executed by the Debtors and RBC, as Collateral Trustee.  The Deeds of Trust contain numerous infirmities, including incorrect lease numbers, lease descriptions, and recording information with respect to at least eight of the Debtors' most valuable oil, gas, and mineral leases. Solely by way of example, included in those eight leases is Debtor SN Catarina, LLC's most valuable lease—the Harrison Interests, Ltd. lease (the "Harrison Lease")—which comprises most of the value of SN Catarina's estate.

---

[7]     *See* George Decl. ¶ 38 ("liens were required to cover not less than 85% of [oil and natural gas] properties with proved reserves").

[8]     The Second Amended and Restated Security and Pledge Agreement, dated as of February 14, 2018 (the "Security Agreement") contains the full list of categories of assets that are not Prepetition Collateral.  The Secured Notes Indenture includes a similar list of assets that are not Prepetition Collateral.

26.     More specifically, there are several, material, infirmities/issues with respect to the Harrison Lease Deed of Trust, which, at a minimum, would insufficiently describe the Harrison Lease to any bona fide purchaser ("BFP") would be unable to identify the real property with substantial certainty, such as SN Catarina's estate under section 544(a) of the Bankruptcy Code:

(a)     La Salle County and Webb County are not included on the Deed of Trust even though the lease spans across those two counties and Dimmit County, misleading any BFP and, at best for the Secured Noteholders, indicating an intent, based on the plain language of the Deed of Trust, to release any lien on properties located in La Salle and Webb Counties;

(b)     The Deed of Trust references incorrect recording data for Dimmit County, such that were a BFP to seek to locate and find the Harrison Lease, based on the very particular information provided to it in the Deed of Trust, it would be mislead and its diligent inquiry would come up empty;

(c)     The Deed of Trust includes a lease number that is not found anywhere on the face of the lease itself and is distinct from the lease number actually on the lease, further misleading a BFP; and

(d)     The Deed of Trust includes an incorrect expiration date.

27.     In view of these substantial deficiencies, on the eve of bankruptcy, the Secured Noteholders sought to improve their position.  As noted at the "first day" hearing, the Secured Noteholders asked the Debtors to "mak[e] some corrections."  8/13 Tr. at 108:4.  When the Debtors refused, the Secured Noteholders acted unilaterally.

28.     On June 26, 2019, the Secured Noteholders caused the unilateral filing of certain correction affidavits (the "Correction Affidavits").  The Correction Affidavits purport to remedy the issues described above, but because neither the Debtors nor RBC, as Collateral Trustee, executed the Correction Affidavits, they are of no legal significance.  Moreover, even if the Correction Affidavits were legally effective, they comprise obvious preferential transfers.  In addition, even the Correction Affidavits themselves, *which are filed "upon oath" and pursuant to deposition*, contain several misstatements.  Merely by way of example, the Correction Affidavits:

(a)   Continue to provide a lease number for the Harrison Lease which cannot be found on the face of the lease itself;

(b)   Incorrectly state that the Deeds of Trust provide that the termination date for the Harrison Lease is May 2013; and

(c)   With respect to another valuable lease, described as Lease No. T0616002-002, incorrectly state that the Deeds of Trust describe that the lease concerns LaSalle County, where the Deeds of Trust provide that the lease concerns Dimmit County.

29.   The Ad Hoc Group has learned that, following the filing of the Correction Affidavits, the Secured Noteholders asked the Debtors to delay filing for chapter 11 to allow for the 90-day period provided for under section 547 to lapse.  The request was appropriately denied.

30.   The Secured Noteholders next offered financing to the Debtors to enable the Debtors to delay their filing and make interest payments on their unsecured bonds.  There was no legitimate corporate purpose for this proposal—other than to try and eviscerate the corrective hand of section 547.  Again, the request was appropriate denied.

31.   Thus, on two occasions—the filing of the Correction Affidavits and the improper attempts to delay the bankruptcy filings—the Secured Noteholders have conceded the existence of powerful chapter 5 causes of action possessed by the estates against the Secured Noteholders.

**E.   The Secured Noteholders Are "Silent" With Respect To The Prepetition Collateral**

32.   The rights of the various Prepetition Secured Parties with respect to the Prepetition Collateral are governed by the CTA.  The CTA provides that the Collateral Trustee (*i.e.*, RBC) has the authority to act on behalf of the Prepetition Secured Parties.  And RBC, as the Controlling Party Lien Representative, has the *sole right*—*i.e.*, to the exclusion of all Secured Noteholders—to direct the Collateral Trustee (*i.e.*, RBC) with respect to virtually all matters relating to the Prepetition Collateral.  For example, the CTA provides:

- "No Priority Lien Secured Party (other than the Priority Lien Representative acting as the Controlling Priority Lien Representative) shall or shall instruct the Collateral Trustee to … *exercise any right, remedy, or power with respect to (including any Enforcement Action) or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Collateral*, *whether under any Security Document, applicable law or otherwise*, it being agreed that only the Collateral Trustee, acting on the written instructions of the Controlling Priority Lien Representative and in accordance with the applicable Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to the Collateral, including an Enforcement Action…."   CTA § 3.3(a)(iii).

- "The Collateral Trustee shall act or refrain from acting with respect to the Collateral, only on the written instructions of the Controlling Priority Lien Representative."  CTA § 3.3(a)(i).

- "The Collateral Trustee shall not follow any instructions with respect to the Collateral from any Priority Lien Secured Party other than the Controlling Priority Lien Representative."  CTA § 3.3(a)(ii).

## III.  OBJECTION

### A.  STANDARDS APPLICABLE TO POST-PETITION FINANCING REQUESTS

33.     In seeking approval of secured post-petition financing, a debtor bears the burden of proving, among other things, that: (i) the proposed financing is an exercise of sound and reasonable business judgment; (ii) the financing is in the best interests of the estate and its creditors; (iii) no alternative financing is available on any other basis; and (iv) "as a corollary to the first three points," better financing opportunities are also not available.  *See, e.g.*, *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003) (listing these four factors, noting "[t]wo additional considerations," including that the financing is necessary to preserve the assets of the estate and that the terms of the transaction are fair and reasonable).  Stated in the inverse, courts will not approve DIP financing where it is designed to favor the lender at the expense of other creditors, and is not in the best interests of the estate.  *See In re Laffite's Harbor Dev. I, LP*, 2018 WL

272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (rejecting approval of DIP financing, noting that bankruptcy courts "do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender").

34.    Courts examining DIP financing proposals must assess whether "the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets so as to unduly prejudice the rights of other parties in interest." *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("While certain favorable financing terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender."). A DIP financing will not be approved when "a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit." *General Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine)*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992).

35.    The Debtors will not be able to carry their burden with respect to the Currently Proposed DIP Financing. The Currently Proposed DIP Financing is not an exercise of sound and reasonable business judgment, and certainly is not in the best interests of the estates and their creditors (other than the Secured Noteholders). Among other things, the Secured Notes Ad Hoc Group's conditioning of the financing on the roll-up of $175 million of prepetition Secured Notes into post-petition administrative expenses conflicts with the Bankruptcy Code, and eliminates one of the Debtors' most powerful tools in these cases—their ability to restructure favorably the

Secured Notes Obligations pursuant to section 1129(b) of the Bankruptcy Code. And, as discussed below, the Ad Hoc Group has offered the Debtors a better financing opportunity. The Motion should be denied.

**B.    "ROLL-UP" OF PREPETITION SECURED NOTES INTO SUPERPRIORITY ADMINISTRATIVE CLAIMS IS NOT JUSTIFIED**

36.    The Motion asks the Court to approve the "roll-up" of prepetition debt into post-petition, superpriority administrative expense claims. Assuming *arguendo* this sort of extraordinary relief may be permitted in certain limited circumstances, this certainly is not such a case.

37.    As an initial matter, the permissibility of roll-ups under the Bankruptcy Code is, at best, uncertain. As observed by the Court of Appeals for the Eleventh Circuit, "[b]y their express terms, sections 364(c) and (d) apply only to future—*i.e.*, post-petition—extensions of credit. They do not authorize the granting of liens to secure [or awarding administrative expense status to] prepetition loans." *Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.)*, 963 F.2d 1490, 1495 (11th Cir. 1992); *see also In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993) (noting that no Bankruptcy Code provision authorizes the payment of post-petition funds to satisfy prepetition claims); *cf. Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code).

38.    Lower courts, in certain circumstances, have authorized the post-petition payment of prepetition obligations, but, as even the Debtors acknowledge, only "where necessary to protect and preserve the estate." Mot. ¶ 40 (citing *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to the "doctrine of necessity"); *In re Equalnet Comm'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000)

(business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation)); *see also Berry Good*, 400 B.R. at 747 ("A clean line must be drawn between pre- and post-petition debt, and it is unlawful to blur those lines, *except in rare and exceptional circumstances*, such as with wage claimants.") (emphasis added); *cf. Czyzewski v. Jevic Holding Corp.*, -- U.S. --, 137 S. Ct. 973, 985 (2017) (noting that courts that have approved roll-ups have found that "the distributions at issue *would enable* a successful reorganization and make even the disfavored creditors better off") (emphasis added and internal quotation marks omitted).  Here, the Roll-Up is not *necessary* to protect and preserve the estate.

39.     As a corollary to the doctrine of necessity, a proposed roll-up must not harm the "general creditor body."  *See In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983) (cross-collateralization feature of proposed DIP financing must be "in the best interests of the general creditor body"); *Jevic*, 137 S. Ct. at 985 (noting that courts that have authorized roll-ups have required that "even the disfavored creditors [be] better off").   This Roll-Up significantly harms all creditors (other than the Secured Noteholders), by hindering greatly the ability of the Debtors to emerge from bankruptcy, and therefore cannot be approved.

40.     The Roll-Up threatens to significantly impede the Debtors from achieving a confirmable chapter 11 plan of reorganization.  Once the Roll-Up is completed, the Debtors (or other potential plan proponents such as the Ad Hoc Group) will no longer be able to "cram down" the Secured Noteholders under section 1129(b) of the Bankruptcy Code and, absent the Secured Noteholders' consent, no plan of reorganization could be confirmed unless the Secured Noteholders will be paid their entire administrative expense DIP Superpriority Claims in cash upon the Debtors' emergence from these cases.

41.     The Debtors' Motion uses the word "liquidity" no less than twelve times—touting the liquidity that the Currently Proposed DIP Financing provides the Debtors' estates.  But, with great irony, if approved, the Currently Proposed DIP Financing threatens to impair liquidity at plan confirmation by the very same dollar amount—$175 million—that it offers.

42.     Nor can the Debtors argue that the Roll-Up is adequate protection.  Under the Bankruptcy Code, adequate protection may be provided by "the realization…of the **_indubitable_** **_equivalent_** of such entity's interest in such property."  11 U.S.C. § 361(3) (emphasis added).  That is expressly what section 1129(b) provides—confirming a plan over the objection of a class of secured creditors if the plan provides for, among other things, the realization by the secured creditors of the "_indubitable equivalent of [their] claims._"  11 U.S.C. § 1129(b)(2)(A)(iii) (emphasis added).[9]  Therefore, one cannot argue that stripping the Debtors' estates of the ability to provide indubitable equivalence to the Secured Noteholders at confirmation is adequate protection.  _Cf. United Sav. Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd._, 484 U.S. 365, 377 (1988) (secured creditor is entitled to the indubitable equivalent of its collateral, not immediately, "but only upon completion of the [case]").

43.     The Roll-Up therefore must be denied because it would do the opposite of enable a successful reorganization and would not benefit the "creditor body in general."

C.     **THE ALTERNATIVE DIP FINANCING**

1.     **Alternative DIP Financing Would Provide Significant Incremental Value To The Estates**

44.     "In [the] extension of debt financing under section 364….[o]ften the debtor in possession will be able to obtain only onerous terms, which the bankruptcy court must balance

---

[9]     The phrase "indubitable equivalent" must be interpreted the same under both sections 361(3) and 1129(b)(2)(A)(iii).  _See Law v. Siegel_, 571 U.S. 415, 422 (2013) (same phrase in different provisions of the Bankruptcy Code should be interpreted the same way).

against the debtor in possession's apparent lack of alternatives." *In re Fleetwood Enterprises, Inc.*, 471 B.R. 319, 2012 WL 2017952, at *ll (9th Cir. B.A.P. June 5, 2012) (quoting 3 COLLIER ON BANKRUPTCY ¶ 364.04[2][d] (Alan N. Resnick & Henry J. Sommer, eds., 16 ed. 2011)). Fortunately, that is not the case here. The Debtors need not have accepted the Currently Proposed DIP Financing's onerous terms, as the Ad Hoc Group has offered a plainly superior alternative.

45.    The Alternative DIP Financing would provide the same amount of "new money" to the Debtors on largely the same financing terms as would the Currently Proposed DIP Financing while also providing significant Incremental Value to Debtors' estates.

46.    *First*, the Alternative DIP Financing does not contemplate any roll-up of prepetition debt into superpriority administrative claims. Among other benefits, this will provide the Debtors with greater flexibility in formulating a confirmable plan of reorganization by allowing them to preserve their ability to invoke section 1129(b) in order to restructure the Secured Notes. *See In re Texas Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 336 (5th Cir. 2013) (*Till* approach is "the default rule in Chapter 11 bankruptcies"). On the other hand, the Roll-Up would require the Debtors to pay $175 million of cash to the Secured Noteholders as a prerequisite to emergence from these chapter 11 cases—in addition to whatever actual new money draws are made on a post-petition basis.

47.    *Second*, the Debtors would not be forced to pay the fees and expenses of the Secured Notes Ad Hoc Group's legal and financial advisory firms, which undoubtedly will save the estates tens of millions of dollars.

48.    *Third*, the Alternative DIP Financing would not limit the duration of the Challenge Period, in contrast to the Currently Proposed DIP Financing, which limits the Challenge Period to 60 days. Nor does the Alternative DIP Financing contemplate any limitation on the use of its

proceeds to fund the investigation or challenge of the Prepetition Secured Parties' purported liens. Preserving the estate claims and causes of action against the Prepetition Secured Parties is critical in these chapter 11 cases, where significantly valuable chapter 5 claims exist against the Secured Noteholders.  For example, the Correction Affidavits, which were unilaterally filed on June 26, 2019 and purported to perfect the Prepetition Secured Parties' liens on valuable Debtor assets, were invalid under Texas law such that the liens are avoidable under section 544 of the Bankruptcy Code.  And even if the filings were of legal import, the Correction Affidavits were filed within the 90-day preference period and therefore are avoidable preferences under section 547 of the Bankruptcy Code.

49.     *Fourth*, the Debtors would not have to waive their ability to surcharge the Prepetition Collateral "for the reasonable, necessary costs and expenses" of preserving such collateral, 11 U.S.C. § 506(c), nor will they be forced to waive (assuming *arguendo* it were possible) their right to assert that "the equities of the case" warrant a limitation or elimination of any continued validity of the Prepetition Secured Parties' liens on the proceeds, products, offspring, or profits of their Prepetition Collateral, 11 U.S.C. § 552(b).

50.     *Fifth*, the Debtors would not be forced to make the Post-Petition Interest Payments on the Senior Notes Obligations, although they will possess the right to do so.

### 2.     There Would Be No "Priming Fight" Because The Secured Noteholders Could Not Block The Alternative DIP Financing

51.     The all-too-frequent reason why debtors refuse to prosecute the most favorable post-petition financing does not exist in these cases.  There would be no "priming fight."

52.     The Debtors admit that a primary reason that they did not pursue any alternative source of post-petition financing is because they did not want to engage in a "priming fight."  Mot. ¶ 33.  Meanwhile, the Debtors acknowledge in their Motion that RBC "exercises substantial

control over the Prepetition Collateral" and "holds the right to direct the Collateral Trustee (which is also [RBC])."  Mot. ¶ 25.  In fact, the Debtors admit that, "if there is no Discharge of First-Out Obligations, the existing debt structure would, in effect, leave the Secured Noteholders…unable to direct the Collateral Trustee with respect to the Prepetition Collateral and their Prepetition Liens and, potentially, unable to exercise discretion to even prime the Secured Noteholders' own liens." *Id.* ¶ 46; *see also id.* ¶ 25 ("[M]any of the rights of [the Secured Noteholders] are limited to those afforded to unsecured creditors.").[10]

53.    Indeed, the CTA expressly provides that "no [Secured Noteholder] shall or shall instruct the Collateral Trustee to…attempt any action to…exercise any right, remedy or power with respect to…or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Collateral, *whether under any Security Document, applicable law or otherwise, it being agreed that the Collateral Trustee, acting on the written instructions of the Controlling Priority Lien Representative and in accordance with the applicable Security Documents, shall be entitled to take any such actions or exercise any such remedies* …." *Id.* § 3.3(a)(iii) (emphasis added).

54.    Moreover, the CTA also provides that no Secured Noteholder can challenge— whether by judicial proceedings or otherwise—the enforceability of any provision of the CTA.  *Id.* § 3.3(c)(iii); *see also* 11 U.S.C. § 510(a) (subordination agreements are enforceable in bankruptcy cases "to the same extent that such agreement is enforceable under applicable nonbankruptcy law").[11]

---

[10]    The Debtors' contractual rights vis-à-vis the Secured Noteholders under the CTA are estate assets that should be utilized—not released for no value as currently proposed.  *See In re Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993) (contract rights are property of the estate).

[11]    *See also* 8/13/19 Tr. at 42:5-9 ("So there are intercreditor obligations under the collateral trust agreement.  Those obligations are enforceable under the terms of the Bankruptcy Code…."  THE COURT: "Right.").

55.     Therefore, the Secured Noteholders *are contractually prohibited* from mounting a "priming fight"; under the plain terms of the CTA, RBC, for the benefit of itself, is the sole party that has that ability.  And the administrative agent for the Alternative DIP Financing's Facility A would become the Senior Credit Agreement Agent and, in turn, the Controlling Lien Representative.  As a result, there would be no priming fight.

### 3.     The Secured Noteholders Would Be Adequately Protected

(a)     <u>The Secured Noteholders Have Implicitly Conceded That They Would Be Adequately Protected</u>

56.     Even if the Secured Noteholders were not contractually prohibited from engaging in a priming fight in connection with the Alternative DIP Financing, they would lose that fight because they would be adequately protected, just as they would have been under the Currently Proposed DIP Financing.

57.     The Secured Notes Ad Hoc Group was not forced to provide $175 million of new money post-petition financing to the Debtors.  Because the Debtors refused to explore that option, there was no threat of a third-party priming.

58.     Rather, the Secured Notes Ad Hoc Group voluntarily agreed to provide $175 million of new money to the Debtors because they felt it was the best way to maximize the value of their collateral.  This was no charitable gesture; rather, the Secured Notes Ad Hoc Group determined, under no duress, that funding the Debtors' business plan (the "<u>Business Plan</u>") was in their own best interests to preserve the value of their purported property interests.  The Secured Notes Ad Hoc Group never threatened to foreclose and never threatened to move for relief from the automatic stay.

59.     Therefore, the Alternative DIP Financing, which would provide the debtors with the same amount of new money, on the same or better terms, would similarly be beneficial to the Secured Noteholders.

60.     The Debtors agree, asserting that the "significant cash infusion" contemplated by the Currently Proposed DIP Financing "is critical to the continued operation of the Debtors' businesses and the preservation of going concern value."  Mot. ¶ 5.  Moreover, the $175 million of new money will "fund the Debtors' operations, stabilize the Debtors' business during the pendency of these chapter 11 cases, and ensure that the Debtors have sufficient runway to continue negotiations with stakeholders during these cases to implement a value-maximizing restructuring." *Id.* ¶ 35; *see also* Latif Decl. ¶ 17 ("The Debtors' access to the proposed DIP Facility will enable the Debtors to preserve more value as a going concern by having access to necessary liquidity under terms that allow for the prospect of completing a comprehensive reorganization that preserves more value for all parties.").

61.     These purported value-maximizing benefits to the Secured Notes' collateral would be achieved equally under the Alternative DIP Financing.  Therefore, the Secured Noteholders' collateral value will be more than adequately protected under the Alternative DIP Financing.  *See In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D. N.H. 1993) ("[T]he concept [of adequate protection] consists of stability in collateral value rather than any particular level of value.") (internal citation omitted); *VWI Properties, LLC v. Mt. Olive Hospitality, LLC (In re Mt. Olive Hospitality, LLC)*, 2014 WL 1309953, at *4 (D.N.J. Mar. 31, 2014) (affirming bankruptcy court's finding that creditor was adequately protected where its cash collateral was used to fund renovations of the debtor's hotel, thereby protecting against a decrease in the hotel's value); *Federal Nat. Mort. v. Dacon Bolingbrook Assoc.*, 153 B.R. 204, 214 (N.D. Ill. 1993) (security

interest adequately protected where debtor reinvested rents in operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased).

    (b)    <u>Additional Adequate Protection Provided Through Section 507(b) Of The Bankruptcy Code With Recourse To The Debtors' Significant Unencumbered Assets</u>

62.    Even if the Debtors' and the Secured Notes Ad Hoc Group's shared determination that funding the Business Plan maximizes the value of the Prepetition Collateral (avoiding the losses that would otherwise be suffered by the Secured Noteholders' property interests) is ultimately proved wrong, any collateral diminution can be remedied by the provision of a superpriority claim under section 507(b) of the Bankruptcy Code. *See* 11 U.S.C. 507(b) (providing that a secured creditor to whom the trustee has provided adequate protection under section 362, 363, or 364(d) may have a superpriority claim for any loss or shortfall not covered by adequate protection).

63.    In these chapter 11 cases, this protection is not illusory. To the contrary, a significant amount of the Debtors' assets are unencumbered by any Prepetition Liens, or are not subject to a properly perfected Prepetition Lien. Among these unencumbered or unperfected assets are cash, bank deposits accounts, real property where there are no proved reserves, and a portion of the real property where there are proved reserves. *See* II.B.1, *supra*. Specifically, the Debtors have $60-90 million of unencumbered cash. Additionally, there is no lien on approximately 10-20% of the Debtors' oil and gas properties.

64.    There are also very valuable chapter 5 claims. Among the Secured Notes' infirm liens were the eight oil, gas, and mineral leases that were the subject of the Correction Affidavits, which were unilaterally filed by the Prepetition Secured Parties within 90 days of the Petition Date. These unilateral filings, however, were themselves invalid. *See* TEX. PROP. CODE ANN. § 5.029

(requiring that "[a] correction instrument [for material corrections] must be … executed by each party to the recorded original instrument"). And, even if the Correction Affidavits did effect a transfer of perfected liens from the Debtors to the Prepetition Secured Parties, such transfer was not in the "ordinary course of business" and is avoidable as a preference under section 547 of the Bankruptcy Code. *See In re Black Elk Energy Offshore Ops., LLC*, 2019 WL 3450747, at *7 (Bankr. S.D. Tex. Jul. 30, 2019) ("Circuits agree that preference actions prevent creditors from rushing to seize a debtor's assets prior to the petition date and ensuring fair and equal treatment of all creditors….").

65. The invalidity of the Correction Affidavits, or the avoidance of any transfer effected thereby, takes on particular significance because included in the subject leases is the Debtors' single most valuable lease—the Harrison Lease. Indeed, separate and apart from avoidance under the Bankruptcy Code, it may be that the Harrison Lease Deed of Trust released any and all Prepetition Liens on acreage in La Salle and Webb Counties.

66. The Ad Hoc Group is confident that an investigation of the purported Prepetition Liens will uncover even more unencumbered assets, which assets could be available to collateralize the Secured Noteholders' superpriority claims under section 507(b).

67. Finally, although unnecessary, to the extent the Debtors wish to provide additional adequate protection to the Secured Noteholders, the Alternative DIP Financing gives them the flexibility to make the Post-Petition Interest Payments that are currently contemplated under the Currently Proposed DIP Financing.

**D.    THE CURRENTLY PROPOSED DIP CONTAINS OTHER OVERREACHING TERMS**

68. In the event that the Court approves the Currently Proposed DIP Facility (it should not), it should be stripped of the numerous provisions that not only forfeit valuable estate rights but that are also designed to disarm the Committee, the Ad Hoc Group, and other parties in interest

from challenging the claims and liens of the Prepetition Secured Parties. *See, e.g.*, *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("The debtor and its secured creditor do not constitute a legislature. Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to statutory rights of third parties.").

69.     With respect to the overreaching terms contained in the Currently Proposed DIP Financing, the Ad Hoc Group adopts and incorporates the arguments made in the Committee's objection to the Motion. Among these overreaching terms (in addition to the improper Roll-Up, as discussed in Section III.B) are:

- ***Encumbrance on Avoidance Action Proceeds.*** The Secured Noteholders' adequate protection package should not include proceeds of avoidance actions. Avoidance actions and their proceeds are intended to benefit ***unsecured*** creditors and therefore should not be pledged for the benefit of ***secured*** creditors.[12]

- ***Limitations of Challenge Period and Use of Proceeds to Investigate and Prosecute Claims and Causes of Action Against the Prepetition Secured Parties.*** The Interim Order (and presumably, the Final Order) limits not only the duration

---

[12]   Avoidance actions under chapter 5 of the Bankruptcy Code are intended to benefit unsecured creditors and facilitate distributions among them, and therefore should not be consumed by secured creditors. *See Official Comm. of Unsecured Creditors v. Chinery* (*In re Cybergenics Corp.*), 330 F.3d 548, 573 (3d Cir. 2000) ("avoidance actions are designed to protect" the interests of "unsecured creditors"); *Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366 at *3-4 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order granting security interests in preference actions so as not to "frustrate the policy of equal treatment of creditors under the Code"). Notably, the Court's Procedures for Complex Chapter 11 Bankruptcy Cases specifically provides that a DIP financing may provide liens on avoidance actions *only* in "extraordinary circumstances." *In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018).

The fact that the DIP Lenders limited their grab to the "proceeds" of avoidance actions (rather than the actions themselves) should not alter the analysis. Indeed, the Fifth Circuit has repeatedly refused to "elevate form over substance" when ruling on issues of bankruptcy law. *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1359 (5th Cir. 1986) (analyzing chapter 5 claim); *see also Matter of Joseph*, 16 F.3d 86, 88 (5th Cir. 1994) (analyzing claim for propriety of section 523(a)(5) discharge); *Matter of Young*, 806 F.2d 1303, 1305 (5th Cir. 1987) ("We cannot countenance such a wooden application of the Bankruptcy Rules.").

of the Challenge Period, but also effectively prohibits the use of the Currently Proposed DIP Facility's proceeds to pay the fees and expenses of the Committee's investigation of claims against the DIP Lenders or the Prepetition Secured Parties, or challenge to the amount, validity, perfection, or priority of their claims and liens. These limitations are particularly problematic in this case, where viable claims and challenges undoubtedly exist.

- ***Section 552(b) Waiver.***  The Debtors, as debtors in possession, do not have the authority to waive the so-called "equities of the case" exception under section 552(b) of the Bankruptcy Code, which permits "***the court***" to deny a lien on post-petition "proceeds, products, offspring, or profits" of prepetition collateral based on the "equities of the case."  11 U.S.C. § 552(b) (emphasis added).  Where "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted) ("Here, the statute appears quite plain in specifying who may use § 506(c)—'[t]he trustee.'").

- ***Section 506(c) Waiver.***  The Debtors' waiver of their rights under section 506(c) of the Bankruptcy Code is objectionable in view of the fact that the use of Cash Collateral will "allow[] the Debtors to preserve the going-concern value of the estates…."  Mot. ¶ 30.  Such limitations on the surcharge of a lender's collateral under section 506(c) are disfavored.  *See In re Laffite's Harbor*, 2018 WL 272781, at *3.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court enter an

Order denying the Motion and granting such other and further relief as may be just and proper.

Respectfully submitted this 12th day of September, 2019.

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: /s/ *Patricia B. Tomasco*

Patricia B. Tomasco  (SBN 01797600)
Christopher Porter (SBN 24070437)
Devin van der Hahn  (SBN 24104047)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100

-and-

Benjamin I. Finestone (*pro hac vice*)
Daniel Holzman (*pro hac vice*)
Kate Scherling (*pro hac vice*)
Jordan Harap (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

*Counsel to the Ad Hoc Group of Unsecured
Noteholders*

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on September 12, 2019, a copy of the foregoing statement was served through the Court's CM/ECF notification system to all parties who have appeared in this case through counsel or who have submitted a request for service by CM/ECF.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco
