## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34508 (MI) |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Chapter 11 |
| | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |

**AD HOC GROUP OF UNSECURED NOTEHOLDERS' EMERGENCY
MOTION, PURSUANT TO SECTIONS 105(a), 1104(c), 1106(b), AND 1107(a)
OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY
PROCEDURE 2007.1, FOR ENTRY OF AN ORDER APPOINTING
AN EXAMINER WITH POWER TO PROSECUTE**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE
CONDUCTED ON THIS MATTER ON DECEMBER 6, 2019, AT 1:00 PM IN
COURTROOM 404, 4TH FLOOR, BOB CASEY UNITED STATES
COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002. IF YOU
OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST
EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE
PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE
PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN DECEMBER 6, 2019.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102).  The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................................1

II.  JURISDICTION AND VENUE .........................................................................3

III. RELEVANT FACTUAL BACKGROUND.........................................................3

    A.   THERE EXISTS SIGNIFICANT OVERLAP OF INTERESTS BETWEEN SANCHEZ ENERGY AND OTHER SANCHEZ FAMILY-OWNED ENTITIES .......................................3

    B.   SANCHEZ FAMILY CAUSES SANCHEZ ENERGY TO ENTER INTO SERVICES AND LICENSE AGREEMENTS WITH SANCHEZ FAMILY-OWNED SOG WHICH TREAT SANCHEZ ENERGY UNFAIRLY ..............................................6

    C.   GATHERING AND PROCESSING AGREEMENTS WITH SNMP....................10

    D.   SANCHEZ ENERGY PAYS SOG FOR RECREATIONAL USE OF HUNTING LEASE ........12

    E.   EXCESSIVE EXECUTIVE COMPENSATION................................................12

    F.   THE SPECIAL COMMITTEE HAS FAILED TO SERVE DUTIFULLY...............16

    G.   POST-PETITION EVENTS SHOW CONTINUED CORPORATE GOVERNANCE FAILURE.............................................................23

        1.   Denial of Debtors' Motion for Post-Petition Financing ...........................23

        2.   Negotiations of Revised DIP and Selection of a CRO .............................24

IV.  ARGUMENT .................................................................................................27

    A.   APPOINTMENT OF AN EXAMINER IS REQUIRED IN THESE CASES.............27

        1.   Section 1104(c)(2) Mandates Appointment of an Examiner ...................28

        2.   The Interests of the Debtors' Creditors Also Require the Appointment of an Examiner..............................................29

    B.   THE COURT SHOULD PROVIDE THE EXAMINER WITH A BROAD MANDATE.............33

        1.   Examination of the Investigation Topics is Warranted.............................33

        2.   The Examiner Should be Authorized to Initiate, Prosecute, and/or Settle Causes of Action for the Benefit of the Estates ...............................34

V.   BASIS FOR EMERGENCY RELIEF .............................................................36

VI.  NOTICE........................................................................................................36

VII. CONCLUSION..............................................................................................37

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re 1243 20th St. Inc.*,
   6 B.R. 683 (Bankr. D.D.C. 1980) ........................................................................ 29

*In re Agent Sys., Inc.*,
   289 B.R. 828 (Bankr. N.D. Tex. 2002) ................................................................ 35

*In re Apex Oil Co.*,
   111 B.R. 235 (Bankr. E.D. Mo. 1990), *rev'd on other grounds*, 132 B.R. 613 (E.D.
   Mo. 1991) ............................................................................................................ 36

*In re Carnegie Int'l Corp.*,
   51 B.R. 252 (Bankr. S.D. Ind. 1984) ................................................................... 36

*Caspian Select Credit Master Fund Ltd. v. Gohl*,
   No. CV 10244-VCN, 2015 WL 5718592 (Del. Ch. Sept. 28, 2015) ................. 17, 18

*Davis v. Gutierrez*,
   No. 17–cv–147–JL, 2018 WL 1514869 (D.N.H. Mar. 27, 2018) ........................ 25

*In re DBSI, Inc.*,
   Case No. 08-12687 (CSS) (Bankr. D. Del.) .......................................................... 33

*In re Dynegy Holdings, LLC*,
   Case No. 11-38111 (CGM) (Bankr. S.D.N.Y.) ..................................................... 34

*In re Enron Corp.*,
   No. 01-16034, 2003 WL 22218328 (Bankr. S.D.N.Y. June 2, 2003) ................... 34

*In re Euro-American Lodging Corp.*,
   365 B.R. 421 (Bankr. S.D.N.Y. 2007) .............................................................. 32, 33

*In re Franklin-Lee Homes, Inc.*,
   102 B.R. 477 (E.D.N.C. 1989) ............................................................................. 35

*In re Gilman Services, Inc.*,
   46 B.R. 322 (Bankr. D. Mass. 1985) ................................................................. 29, 30

*In re GT Advanced Techs., Inc., et al.*,
   Case No. 14-11916 (HJB) (Bankr. D.N.H.) .......................................................... 25

*In re GTI Capital Holdings, L.L.C.*,
   No. AZ–05–1045–SKMo, 2006 WL 6810997 (B.A.P. 9th Cir. Sept. 7, 2006) ...... 35

*In re Granite Partners, L.P.*,
   219 B.R. 22 (Bankr. S.D.N.Y. 1998) ................................................................... 32

*In re Hughes*,
   704 F.2d 820 (5th Cir. 1983) ................................................................................. 2

*In re Ira Haupt & Co.*,
  361 F.2d 164 (2d Cir. 1966)...................................................................................... 2

*In re Keene Corp.*,
  164 B.R. 844 (Bankr. S.D.N.Y. 1994) ..................................................................... 29

*Law v. Siegel*,
  571 U.S. 415 (2014).................................................................................................. 31

*Midwest Generation EME, LLC v. Continuum Chem. Corp.*,
  768 F. Supp. 2d 939 (N.D. Ill. 2010) ...................................................................... 32

*In re Mirant Corp.*,
  314 B.R. 555 (Bankr. N.D. Tex. 2004)..................................................................... 35

*Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*,
  898 F.2d 498 (6th Cir. 1990) ............................................................................. 28, 33

*In re Patton's Busy Bee Disposal Serv., Inc.*,
  182 B.R. 681 (Bankr. W.D.N.Y. 1995) .................................................................... 35

*RBC Capital Markets, LLC v. Jervis*,
  129 A.3d 816 (Del. 2015) ......................................................................................... 18

*In re Schepps Food Stores, Inc.*,
  148 B.R. 27 (S.D. Tex. 1992) ................................................................................... 28

*In re Stratesec, Inc.*,
  324 B.R. 158 (Bankr. D.D.C. 2004) ......................................................................... 31

*In re Sunbum5 Enters., LLC*,
  Nos. 6:10–cv–1268–Orl–28, 2011 WL 4529648 (M.D. Fla. Sept. 30, 2011) ......... 32

*West v. Flores (In re St. Marie Clinic PA)*,
  No. 10–70802, 2013 WL 5221055 (Bankr. S.D. Tex. Sept. 17, 2013) ..................... 34

## Rules / Statutes

11 U.S.C. § 104(c) ................................................................................................................ 1

11 U.S.C. § 105(a) ...................................................................................................... 1, 3, 31

11 U.S.C. § 323 .................................................................................................................... 35

11 U.S.C. § 1104 ............................................................................................. 3, 27, 28, 29, 31

11 U.S.C. § 1106 ....................................................................................... 1, 3, 31, 33, 34

11 U.S.C. § 1107 ................................................................................................................ 31

11 U.S.C. § 1109(b) ........................................................................................................... 28

11 U.S.C. § 1112 ................................................................................................................ 31

28 U.S.C. § 1408 .................................................................................................................. 3

28 U.S.C. § 1409 ................................................................................................................ 3

28 U.S.C. § 157 .................................................................................................................. 3

Fed. R. Bankr. P. 2002 ...................................................................................................... 36

Fed. R. Bankr. P. 2007.1 ............................................................................................. 1, 36

Fed. R. Bankr. P. 9013-1(i) .............................................................................................. 35

## Other Authorities

Martin J. Bienenstock, *Bankruptcy Reorganization* 299 (1987) .................................... 29

Jay R. Indyke et al.*, Are The Foxes Guarding The Henhouse?,* TURNAROUND
    MANAGEMENT ASSOCIATION (June 2019), *https://turnaround.org/jcr/2019/06/are-*
    *foxes-guarding-henhouse* .......................................................................................... 32

*Richard E. Newsted and John J. Ray III Appointed to GT Advanced Technologies Board of*
    *Directors*, BLOOMBERG BUSINESS (November 25, 2014 2:18 PM),
    *https://www.bloomberg.com/press-releases/2014-11-25/richard-e-newsted-and-john-j-ray-iii-*
    *appointed-to-gt-advanced-technologies-board-of-directors* ......................................... 25

The ad hoc group (the "Ad Hoc Group") of holders of unsecured notes issued by Debtor Sanchez Energy Corporation ("Sanchez Energy" or "SN" and with its affiliated debtors in possession, the "Debtors") moves for the entry of an order appointing an examiner with power to prosecute certain claims and causes of action, pursuant to sections 105(a), 1104(c), 1106(b), and 1107(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2007.1.  In support hereof, the Ad Hoc Group respectfully states as follows:

## I.    **PRELIMINARY STATEMENT**

1.      The need for an independent examiner with the power to investigate and prosecute insider claims is clear.  Since long before the petition date, Sanchez Energy has been operated for the benefit of the Sanchez family, who have saddled the company with a myriad of unfair and burdensome practices and obligations.  Although the Sanchez family no longer owns most of Sanchez Energy's stock, they have retained their control through board and senior management positions, and have further cemented that control through shared services, gathering, and other oppressive contracts with affiliates owned and/or controlled by the Sanchezes.  Millions of dollars have been—and continue to be—sucked out of insolvent Sanchez Energy to pay bloated executive compensation, fund other Sanchez family businesses, and satisfy over-market contractual obligations.

2.      Even the company (or at least its restructuring professionals) recognized the need for the appearance of oversight, and appointed a so-called "Special Committee" of "independent" directors more than a year ago.  But it has become readily apparent that this measure has done nothing to stop the bleeding or to recover anything that had already been drained.  The "independent" directors appear to have no idea as to what their "independent" counsel is "investigating," and have taken no apparent action to protect the interests of creditors vis-à-vis those of the Sanchez family and affiliates, which remain firmly in control.

3.      The Court's denial of the company's proposed debtor in possession financing *should have been* a watershed moment in this case, and a wake-up call for the Debtors that they must be responsive to the concerns of their creditors.  *See In re Hughes*, 704 F.2d 820, 822 (5th Cir. 1983) (debtor-in-possession "both enjoys the rights and must fulfill the duties of a trustee").  But the Debtors have instead continued to ignore the preferences and interests of their creditors.  Indeed, the Debtors brazenly rejected a truly independent Chief Restructuring Officer who was supported by *every principal creditor group* (secured, unsecured, statutory committee), insisting instead on hand-picking their own, whom the Special Committee believed would cause the most "voluntary cooperation" from the Debtors' conflicted CEO—Mr. Sanchez III.  Just like the appointment of the company's "independent" directors, appointment of this hand-picked CRO will do nothing to address the rampant conflicts of interest plaguing these cases.  Instead, the CRO will report directly to the current board, including the Sanchezes, be advised by their counsel, and be prohibited from conducting any investigation of his or her own.  Nothing will change, except that the estates will be paying for even more professionals controlled by the Sanchezes.

4.      "The conduct of bankruptcy proceedings not only should be right but must seem right."  *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J.).  Allowing the Sanchezes and their hand-picked directors to select their own CRO does not seem right— particularly over the objection of their creditor body—and is not right.  The only viable solution at this point—short of the appointment of a chapter 11 trustee—is the appointment of an examiner with the power to investigate and prosecute insider claims.  The Sanchezes and the Special Committee have had more than enough opportunities to show that they are able to respond to and address creditors' concerns, and have refused to do so at every turn.  The Ad Hoc Group thus respectfully requests that a truly independent examiner be appointed—not by the current directors,

who are at the very heart of the insider claims that must be investigated—but by the United States Trustee after consultation with all interested parties, including, most importantly, the creditors of these estates. Moreover, given the depth of insider transactions that are already clear, the examiner should be granted special and exclusive powers to pursue insider claims as he or she sees fit, as expressly authorized by Bankruptcy Code sections 1106(b) and 1107(a).

5.      The Debtors' creditors have displayed enormous patience. The time for a truly independent investigation of the Debtors' insiders is long overdue.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are 11 U.S.C. §§ 105(a), 1104(c), 1106(b), and 1107(a).

## III.      RELEVANT FACTUAL BACKGROUND

### A.      THERE EXISTS SIGNIFICANT OVERLAP OF INTERESTS BETWEEN SANCHEZ ENERGY AND OTHER SANCHEZ FAMILY-OWNED ENTITIES

9.      Sanchez Energy was formed in August 2011 and was taken public in December of 2011.[2] Until December 2011, Antonio R. Sanchez III ("Sanchez III") was the sole member of Sanchez Energy's board of directors (the "SN Board").[3] Approximately one week before Sanchez Energy's initial public offering (the "IPO"), Sanchez III caused Sanchez Energy to amend and restate its certificate of incorporation to broadly permit the Sanchez family to compete directly

---

[2]      *Declaration of Cameron W. George, Executive Vice President and Chief Financial Officer of Sanchez Energy Corporation, in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 16] (the "First Day Declaration") ¶ 12.

[3]      Sanchez Energy Amendment No. 4 to Registration Statement on Form S-1, dated Nov. 30, 2011, at 93.

with the company.[4]  Specifically, the amended charter provides that (1) Sanchez family businesses "have the right to engage (and shall have no duty to refrain from engaging) in the same or similar activities or lines of business as the Corporation" and (2) "if [Sanchez Energy's affiliates] acquire knowledge of a potential Business Opportunity that may be deemed a corporate opportunity of both the Corporation and any of the [Sanchez Energy affiliates], then such [parties] shall have no duty to communicate or offer such Business Opportunity…to the Corporation."[5]

10.     The Sanchez family owned the majority of Sanchez Energy stock only for a relatively brief time following the IPO.[6]  By April 2013, the Sanchez family had reduced (*i.e.*, further monetized) its collective ownership interest to approximately 20%,[7] which had further declined to approximately 10% by the time of the Debtors' bankruptcy filing.[8]

11.     While the Sanchez family has retained only a relatively small portion of Sanchez Energy equity, as shown in the diagram below, the Sanchez family members—Antonio Sanchez, Jr. ("Sanchez Jr."), his three sons, Sanchez III, Patricio Sanchez, and Eduardo Sanchez, and his daughter, Anna Sanchez—have retained ownership and/or serve as directors and officers of two of Sanchez Energy's primary contractual counterparties: (1) Sanchez Oil & Gas Corporation ("SOG"), a private company wholly-owned by members of the Sanchez family;[9] and (2) Sanchez

---

[4]     Amended and Restated Certificate of Incorporation §§ 9.2, 9.3.

[5]     *Id.*

[6]     S*ee* Sanchez Energy Corporation Proxy Statement, dated Apr. 25, 2012, at 12.

[7]     *Id.* at 18.

[8]     *See* Sanchez Energy 2018 Annual Report filed on Form 10-K/A, dated Apr. 29, 2019 ("Sanchez Energy 2018 10-K/A") at 26.

[9]     *See* Sanchez Energy 2018 Annual Report filed on Form 10-K, dated Mar. 1, 2019 ("Sanchez Energy 2018 10-K") at F-40.

Midstream Partners LP ("SNMP"), a publicly traded limited partnership whose general partner,

Sanchez Midstream Partners GP LLC ("SNMP GP"), is wholly-owned by the Sanchez family.[10]



*Source: Sanchez Energy 2018 10-K-A at 1-4; 2018 10-K at F-40, F-41.*

12.     The impact of these conflicts of interest is readily apparent.  As discussed below,

at the time of the IPO, the Sanchez family caused Sanchez Energy to enter into the following

agreements with SOG: (i) a services agreement (the "Services Agreement"), pursuant to which

---

[10]     *See* SNMP 2018 Annual Report filed on Form 10-K, dated Mar. 7, 2019 ("SNMP 2018 10-K") at 42.

Sanchez Energy shoulders an outsized portion of executive compensation and shared services costs;[11] (ii) a license agreement (the "License Agreement"), pursuant to which SOG now improperly asserts ownership over the Debtors' valuable seismic data;[12] and (iii) a lease participation agreement (the "LPA"), pursuant to which Sanchez Energy pays the vast majority of costs associated with a recreational lease kept for the enjoyment of SOG employees.[13]  Sanchez Energy also agreed to pay increased rates to SNMP under the parties' midstream gathering agreements in 2017, for seemingly no value in return.  There is no conceivable explanation for Sanchez Energy's agreement to do so, other than that Sanchez Energy is controlled by members of the Sanchez family who benefit from this arrangement by virtue of their ownership interest in SNMP.

### B.    SANCHEZ FAMILY CAUSES SANCHEZ ENERGY TO ENTER INTO SERVICES AND LICENSE AGREEMENTS WITH SANCHEZ FAMILY-OWNED SOG WHICH TREAT SANCHEZ ENERGY UNFAIRLY

13.    Contemporaneously with the Sanchez Energy IPO, the Sanchez family caused Sanchez Energy to enter into the Services Agreement with Sanchez family-owned SOG.  Pursuant to the Services Agreement, SOG allocates to the Debtors their purported share of the costs for various services, including "the allocable portion of salary, bonus, incentive compensation and other amounts paid to Persons who provide Services."[14]  As a result of this arrangement, Sanchez Energy has no employees of its own.[15]

---

[11]    The Services Agreement is attached at Exhibit A to the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Shared Services Arrangements* [ECF No. 10] (the "Services Motion").

[12]    The License Agreement, which is entitled The Geophysical Seismic Data Use License Agreement, dated December 19, 2011, is also attached at Exhibit A to the Services Motion.

[13]    The LPA is also attached at Exhibit A to the Services Motion.

[14]    Services Agreement § 4(a).

[15]    Sanchez Energy 2018 10-K at 28.

14.     Pursuant to the Services Agreement, Sanchez Energy reimburses SOG for *100%* of the base salaries and annual bonuses received by its Executive Officers (other than Patricio Sanchez, for whom Sanchez Energy reimburses 43% )[16] despite the fact that "all of [Sanchez Energy's] executive officers are [also] employed by SOG and provide services to both [Sanchez Energy] and other affiliates of SOG."[17]

15.     For example, Sanchez Energy pays 100% of Sanchez III's compensation even though Sanchez III is a director of SNMP's general partner and the Ad Hoc Group understands that, for all intents and purposes, Sanchez III controls SNMP.

16.     In addition, Sanchez Energy pays 100% of the salaries of Sanchez Jr. and Sanchez III notwithstanding the fact that these individuals serve contemporaneously as Chief Executive Officer and Co-President of SOG and, in that second capacity, are acting *adverse* to the Debtors' estates—far from an innocuous "pass through."[18]  Sanchez Energy and SOG are counterparties "to various agreements (the '<u>SOG Agreements</u>') and other arrangements that have developed over time."[19]  One such agreement is the License Agreement.  Pursuant to the License Agreement, in 2011, SOG agreed to provide to Sanchez Energy a "non-exclusive, perpetual, non-terminable ... royalty free license to use" "Data" that SOG claims it owns,[20] which specifically includes seismic

---

[16]   Sanchez Energy 2018 10-K/A at 5.

[17]   *Id.*

[18]   Services Mot. ¶¶ 9, 12, 18 (describing "technological database owned and maintained by SOG" which "includes seismic data [] licensed by SOG and used by the Debtors in connection with their exploration and development projects [which] is critical for the continued operation of the Debtors' businesses."); *Debtors' Reply in Support of Ropes & Gray Retention* [ECF No. 491] ¶ 24 ("strongly disput[ing]" creditor allegations that the Debtors, and not SOG, own the seismic data).

[19]   Services Mot. n. 4.

[20]   License Agreement § 1.  The License Agreement defines "Data" as "seismic, geophysical and geological information, including without limitation, all processed and reprocessed data, regardless of the form or medium on which it is displayed or stored," but limits the definition to "only such seismic, geophysical and geological information relating to the Oil and Gas Properties of the Companies that is

data that "is critical for the continued operation of the Debtors' businesses."[21]   But it is *the Debtors—not SOG*, that are the counterparties to the leases granting the right to explore and produce oil and gas.  And nothing in the Services Agreement or the License Agreement purports to transfer the Debtors' ownership interest in Data to SOG such that, at the very least, all Data created after 2011 belongs to the Debtors.[22]   Nevertheless, SOG—acting through the Sanchezes funded entirely by Sanchez Energy—has repeatedly cited to the License Agreement as enabling it to assert an adverse ownership interest in all Data generated on the Debtors' properties.

17.   Executive compensation is not the only cost misallocated to Sanchez Energy.  To the contrary, Sanchez Energy also pays an outsized share of costs for G&A services rendered by SOG.  Indeed, Sanchez Energy is not the only entity to which SOG provides services; according to the Debtors, "SOG also provides services to certain non-Debtor affiliates and third parties, including SN EF Unsub LP… and [SNMP]."[23]

18.   For example, in connection with the purchase of the Comanche Assets[24] in March 2017 by two of Sanchez Energy's subsidiaries, SN UnSub and SN EF Maverick, along with

---

proprietary to SOG and the use of which is unrestricted by agreements SOG has with landowners or seismic data vendors." *Id.* ¶ 2.

[21]   Services Mot. ¶ 18.

[22]   While the Services Agreement provides that SOG "either owns or has valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information to be used in connection with the Services to be provided hereunder for the benefit and use by [the Debtors]," Services Agreement § 5(f)(i), there is no provision in either agreement explicitly providing for the transfer of the Debtors' ownership interests in Data to SOG.

[23]   Services Mot. n. 7.

[24]   The "Comanche Assets" are the 49% average working interest in approximately 318,000 gross (155,000 net) acres purchased by SN EF UnSub, LP ("SN UnSub") and SN EF Maverick, LLC ("SN EF Maverick") in conjunction with Gavilan Resources, LLC ("Gavilan") for approximately $2.1 billion.  *See* Sanchez Energy 2018 10-K at 4.

Gavilan, an entity controlled by The Blackstone Group, L.P., SOG entered into two separate agreements to provide management services for those assets.[25]

19.     With respect to the portion of the Comanche Assets acquired by SN UnSub, SOG entered into a Management Services Agreement with SN UnSub (the "UnSub MSA").[26]  The terms of the UnSub MSA expressly prohibit SOG from allocating G&A costs to SN UnSub in excess of $5 million per calendar year until March 1, 2019, after which it could not allocate costs to SN UnSub in excess of $10 million per calendar year.[27]

20.     With respect to the portion of the Comanche Assets owned by Gavilan, Gavilan entered into its own Management Services Agreement (the "Gavilan MSA") with SN Comanche Manager, LLC ("SN Comanche").[28]  SN Comanche contemporaneously entered into a pass-through letter agreement with SOG (the "Pass-Through Agreement"), pursuant to which SOG assumed SN Comanche's responsibilities under the Gavilan MSA "on substantially the same terms and conditions."[29]  Pursuant to those agreements, SOG is contractually prohibited from allocating more than $500,000 of G&A costs per month to Gavilan.[30]

21.     Because SOG has contractually agreed to limitations on the amount of G&A costs that it can charge to SN UnSub and Gavilan, it appears Sanchez Energy is forced to pay the balance of whatever SOG charges, even if such underlying costs were incurred for the benefit of other entities.

---

[25]   *Id.* at F-44 to F-45.

[26]   *Id.* at F-45.

[27]   *Id.*

[28]   *Id.* at F-44.

[29]   *Id.* at F-44 to F-45.

[30]   *Id.* at F-44.

22.     In point of fact, during fiscal years 2017 and 2018, Sanchez Energy paid SOG $73.3 million and $64.9 million, respectively, on account of G&A costs.[31]  Meanwhile, SN UnSub paid SOG only $5.4 million and $5.5 million in fiscal years 2017 and 2018, respectively, for G&A expenses, while Gavilan paid SOG only $4.6 million and $6 million in 2017 and 2018, respectively.[32]

C.     GATHERING AND PROCESSING AGREEMENTS WITH SNMP

23.     Another way in which the Sanchez family improperly profits from the Debtors is through gathering and processing agreements between the Debtors and non-Debtor affiliate SNMP, which, like SOG, is controlled by the Sanchez family.  *See supra*, ¶ 11.  SNMP generates profits through its "ownership stakes in oil and natural gas gathering systems, natural gas pipelines and natural gas processing facilities," including the Western Catarina Midstream gathering system.[33]

24.     The Western Catarina Midstream gathering system was sold by Sanchez Energy to SNMP in October of 2015, and SNMP uses the gathering system solely to support the gathering, processing, and transportation of oil and natural gas produced by Sanchez Energy pursuant to the Firm Gathering and Processing Agreement dated on or about October, 14, 2015 (the "Catarina

---

[31]  *Id.* at F-41; Sanchez Energy 2018 10-K/A at 30.

[32]  *See* Sanchez Energy Proxy Statement dated March 28, 2018 at 59; Sanchez Energy 2018 10-K/A at 30-31.  It is unclear, based on the public information presently-available to the Ad Hoc Group, whether the $73.3 million and $64.9 million paid by Sanchez Energy includes amounts paid by SN UnSub and Gavilan (through SN Comanche).  In any event, the G&A expenses borne by Sanchez Energy are vastly disproportionate to the payments made by unrestricted subsidiaries and affiliated entities.

[33]  SNMP 2018 10-K at 6.  The Western Catarina Midstream consists of approximately 150 miles of gathering pipelines, four main gathering and processing facilities, including stabilizers, storage tanks, compressors and dehydration units, and other related assets in Western Catarina, located in Dimmit and Webb counties, Texas, and services upstream production from assets located in the Eagle Ford Shale in South Texas.

Gathering Agreement").[34]  Under the terms of the Catarina Gathering Agreement, Sanchez Energy

paid SNMP approximately $52.8 and $57.9 million in 2017 and 2018, respectively.[35]

25.     Notably, on June 30, 2017, the Catarina Gathering Agreement was amended to add

an incremental infrastructure fee to be paid by Sanchez Energy to SNMP "based on water that is

delivered through the gathering system,"[36] despite the fact that the Catarina Gathering Agreement

already provided for the receipt and storage of water by SNMP (without the payment of these

additional fees to SNMP—*i.e.*, this appears to have been a unilateral re-trade).[37]  Moreover, SNMP

twice increased the tariff rate in 2019 with respect to certain volumes of hydrocarbons, first in

January and again in April.[38]  The 2019 tariff hikes have already cost Sanchez Energy millions of

dollars, over and above the original tariff costs.[39]  Remarkably, the Special Committee did nothing

in response.

26.     Sanchez Energy is also party to a gathering agreement with Seco Pipeline, LLC

("Seco Pipeline"), a wholly owned subsidiary of SNMP, whereby Seco Pipeline transports certain

quantities of natural gas belonging to Sanchez Energy.  This agreement had an initial term of one

month that expired on September 30, 2017, but the agreement continues month-to-month unless

terminated by either party.[40]  In 2018, Sanchez Energy paid SNMP $7.2 million under the Seco

---

[34]   *Id.*; *see also* Catarina Gathering Agreement arts. II, III.  The Catarina Gathering Agreement was executed between Debtor SN Catarina LLC, a wholly owned subsidiary of Sanchez Energy, and Catarina Midstream LLC, a wholly owned subsidiary of SNMP.

[35]   SNMP 2018 10-K at 85.

[36]   SNMP Quarterly Report filed on Form 10-Q, dated Nov. 14, 2017 ("SNMP 2017 3Q 10-Q") at 22.

[37]   Catarina Gathering Agreement §§ 3.2; 5.3; Ex. B.

[38]   SNMP Quarterly Report filed on Form 10-Q, dated May 9, 2019 ("SNMP 2019 1Q 10-Q") at 21, 26.

[39]   *Id.* at 28.

[40]   SNMP 2018 10-K at 59.

Pipeline agreement.[41]   Sanchez Energy does not use the Seco Pipeline, but continues to incur charges for minimum volume commitments.[42]   Yet Sanchez Energy has not taken any steps to reject the agreement and realize significant savings.

> ### D.   SANCHEZ ENERGY PAYS SOG FOR RECREATIONAL USE OF HUNTING LEASE

27.     In addition to the Services Agreement, Sanchez Energy and SOG have entered into the LPA whereby Sanchez Energy shoulders 90% of the payments under a "recreational" real property lease that SOG employees use for "hunting, fishing, grazing and recreational purposes."[43] The Debtors plan to continue making these payments post-petition (brazenly, without Court approval), but have given no legitimate business justification for doing so.[44]   The Ad Hoc Group expects there are many more similar charges the continued payment of which are inappropriate for a debtor in possession.

> ### E.   EXCESSIVE EXECUTIVE COMPENSATION

28.     As discussed above, Sanchez Energy has been forced to pay 100% of the compensation of all but one of its Executive Officers, despite the fact that these executives provide substantial services to other non-Debtor entities owned by the Sanchez family, including SNMP and SOG.   What is more, however, is the exorbitant *amount* of compensation that Sanchez Energy has paid to its Executive Officers and directors, which has only increased in the years leading up

---

[41]   *Id.* at 85.

[42]   For instance, during the three months ended March 31, 2019, Sanchez Energy only transported approximately 7.5 MMcf/d of natural gas through the Seco Pipeline.  SNMP 2019 1Q 10-Q at 27 & 43. In the second quarter of 2019, Sanchez Energy was transporting only 0.2 Mcf/d of natural gas through the Seco Pipeline.  SNMP Quarterly Report filed on Form 10-Q, dated Aug. 8, 2019 at 29.  In the third quarter of 2019, SN was transporting *zero* gas through the Seco Pipeline.  SNMP Quarterly Report filed on Form 10-Q, dated Nov. 8, 2019 ("SNMP 2019 3Q 10-Q") at 29.

[43]   LPA §§ 1, 3.

[44]   Services Mot. ¶ 11, n. 8.

to its bankruptcy filing as shareholders and creditors have suffered hundreds of millions of dollars of losses.

29.    On August 29, 2018, minority stockholders filed a derivative lawsuit challenging Sanchez Energy's director compensation and asserting claims for breach of fiduciary duty, unjust enrichment, and corporate waste.[45]  As set forth in that complaint, the six non-employee directors on the Board at that time—namely, T. Brian Carney, M. Gregory Colvin, Gilbert Garcia, Alan Jackson, Sean Maher, and Robert Nelson III—were paid an average of $354,872 per director, a sum significantly higher than amounts paid to directors of similarly-sized companies.[46]  During that period, Sanchez Energy had a market capitalization of only approximately $200 million.[47]  By contrast, directors of S&P 500 companies and large-cap companies were paid an average of $288,909 and $274,000, respectively.[48]  Average director compensation for companies with market capitalizations below $1 billion was approximately $150,000 and for microcap companies like Sanchez Energy, the average was approximately $120,000.[49]  To justify paying its directors more than three times what its peers' directors are paid, Sanchez Energy created an unrepresentative "peer" group of 17 companies that consisted of six companies with a market capitalization above $5 billion, six between $1 billion and $5 billion, and only one with a smaller market capitalization than Sanchez Energy.

---

[45]    *See Verified Shareholder Derivative Complaint* (the "Shareholder Complaint"), *Armato v. Sanchez, Jr. et al.*, Case No. 2018-0642 (Del. Ch.).

[46]    Shareholder Complaint ¶ 18.

[47]    *Id.* ¶ 19.

[48]    *Id.* ¶ 18.

[49]    *Id.* ¶ 20.

30.     The lawsuit, which has been stayed pending the Debtors' bankruptcy filing, has not chastened Sanchez Energy's efforts to pay inflated compensation.[50]   Rather, Sanchez Energy continues to use a wholly unrepresentative peer group consisting of much larger companies in order to justify its bloated director salaries.[51]

31.     Sanchez Energy also grossly overpays its Executive Officers.  Between 2016 and 2018, Sanchez Jr.'s and Sanchez III's total compensation (all paid by Sanchez Energy) increased from approximately $14 million in the aggregate to approximately $19 million in the aggregate—a more than *35% increase*.[52]   And during that same period, Sanchez Energy's stock price plummeted from $14.24 per share to $0.26 per share—a more than *98% decrease*.[53]   In total, Sanchez Energy paid more than $55 million in executive compensation in 2016 through 2018 alone.[54]

32.     On February 20, 2019, the New York Stock Exchange suspended trading in Sanchez Energy's common stock and notified Sanchez Energy that its stock was subject to delisting proceedings.[55]   Nevertheless, that same month, Sanchez Energy, acting through a "Compensation Committee," elected to "increase the base salary levels for [its] Executive Chairman, President and Chief Executive Officer, Executive Vice President and Chief Financial Officer and Executive Vice President, General Counsel and Secretary," including Sanchez Jr.,

---

[50]   *Id.* ¶¶ 22-23.  "On August 16, 2019 a suggestion of bankruptcy was filed in the Derivative Action by the Company, and there has been no activity in the case since that time."  Sanchez Energy Quarterly Report filed on Form 10-Q, dated Nov. 8, 2019 ("Sanchez Energy 2019 3Q 10-Q") at 43.

[51]   Sanchez Energy 2018 10-K/A at 8.

[52]   *Id.* at 14 (executive compensation table 2016-2018).

[53]   Yahoo! Finance, Sanchez Energy Corporation (SNECQ) Summary, https://finance.yahoo.com/quote/SNECQ/ (from January 23, 2017 to December 31, 2018, SNECQ stock price fell from $14.24 per share to $.26 per share).

[54]   Sanchez Energy 2018 10-K/A at 14.

[55]   Sanchez Energy 2018 10-K at 40.

Sanchez III, and the Debtors' current Chief Financial Officer, Cameron George,[56] by more than $500,000 in the aggregate.[57]  Sanchez Energy again justified these salary increases in relation to the unrepresentative "peer group."[58]

33.     That was not enough.  Just three months later (and a mere three months before the petition date), in May 2019, Sanchez Energy's "Special Committee" approved *additional* salary increases for the Executive Officers under certain Executive Services Agreements, which purportedly provide the Executive Officers with, among other things, massive golden parachutes, including "a lump-sum cash payment equal to two times the annual base salary and two times the largest annual bonus paid (or due to be paid) to the executive for the year in which the termination occurs or any year in the three calendar year period immediately preceding the date of termination" in the event the Executive Officer is terminated  for "good reason."[59]  The Special Committee also approved an egregious 2019 Executive Incentive Plan, which targets payouts over a three-quarter period of approximately $10 million and as high as $20 million.[60]  On top of those payments, the plan called for the *immediate* payment of additional retention amounts of over $4 million in "upfront" bonuses.[61]

34.     The new compensation scheme approved by the Special Committee in 2019 is set forth below:

---

[56]   Sanchez Energy 2018 10-K/A at 8.

[57]   Sanchez Energy Current Report on Form 8-K, dated May 9, 2019, at 2.

[58]   *Id.*; Sanchez Energy 2018 10-K/A at 9.  Notably, Sanchez Jr.'s, Sanchez III, Mr. George, and Mr. Kopel's total compensation packages in 2018 were approximately $9.5 million, $9.6 million, $3.3 million, and $2.6 million, respectively.

[59]   Sanchez Energy Current Report on Form 8-K, dated May 9, 2019, at 2.

[60]   *Id.* at 2-3.

[61]   *Id.* at 3 (disclosing out of the ordinary course executive compensation packages with targeted compensation totals of $48 million, including $35 million in severance and $14 million in bonuses).

### 2018-19 Executive Officer Summary Compensation Table.

| | 2018 | Feb. 2019 | Special Committee-approved May 2019 Scheme | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Base Salary | Base Salary | Base Salary | Up-Front Bonus | Add'l Bonus (target amount) | May 2019 Total | Golden Parachute | Total (incl. Golden Parachute) |
| Sanchez, Jr. Executive Chairman of Board | $650,000 | $750,000 | $820,000 | $1,353,000 | $3,157,000 | $5,330,000 | $6,040,000 | $11,370,000 |
| Sanchez III President & Chief Executive Officer | $650,000 | $750,000 | $820,000 | $1,353,000 | $3,157,000 | $5,330,000 | $6,040,000 | $11,370,000 |
| P. Sanchez Executive Vice President | $300,000 | $300,000 | $300,000 | $252,000 | $1,000,000 | $1,552,000 | $3,100,000 | $4,652,000 |
| Cameron W. George Executive Vice President and Chief Financial Officer | $425,000 | $475,000 | $550,000 | $676,500 | $1,578,500 | $2,805,000 | $2,400,000 | $5,205,000 |
| Gregory B. Kopel Executive Vice President, General Counsel, and Secretary | $393,750 | $412,000 | $500,000 | $442,500 | $1,032,500 | $1,975,000 | $2,000,000 | $3,975,000 |
| Total Compensation | $2,418,750 | $2,687,000 | $2,990,000 | $4,077,000 | $9,925,000 | $16,992,000 | $19,580,000 | $36,572,000 |

### F. THE SPECIAL COMMITTEE HAS FAILED TO SERVE DUTIFULLY

35.     On or around October 26, 2018, Eugene Davis was appointed to serve on the SN Board.[62]  Another director, Adam Zylman, was also appointed, but it was always contemplated that Mr. Davis would serve as chair of a restructuring committee, *i.e.*, the Special Committee.[63]

36.     Mr. Davis was initially approached about serving in this capacity by Sanchez III—not by a purportedly independent director—and he did not speak to any creditors regarding the situation.[64]

37.     Mr. Davis understood that certain of the Debtors' extant directors had been sued in a lawsuit alleging they were beholden to the Sanchez family, but he did not perform any diligence on the lawsuit, beyond reviewing the description of the litigation in certain SEC filings.[65]  Mr. Davis does not know which directors were alleged to be particularly close with the Sanchez

---

[62]   Oral Deposition of Eugene I. Davis, Oct. 22, 2019 ("Davis Depo. Tr."), at 6:19-25.  The Ad Hoc Group will provide a copy of the Davis Depo. Tr. to the Court upon request.

[63]   *Id.* at 8:16-25, 9:2-9, 10:16-18.

[64]   *Id.* at 25:15-25; 31:14-23.

[65]   *Id.* at 32:17-33:11.

family,[66] or which directors were the subject of the Delaware Supreme Court's conclusion that there is "a reasonable doubt that [such director] can act impartially in a matter of economic importance to Sanchez personally."[67]  Mr. Davis also has no understanding of whether the action was settled or how it was resolved.[68]

38.     The Debtors' prior CFO (Mr. George's predecessor) resigned on the same day that Mr. Davis was appointed to the SN Board, but Mr. Davis does not know why the CFO resigned, and did not know that he was paid a $1 million severance payment.[69]

39.     Mr. Davis also has no idea if the Debtors performed any due diligence on him, and does not recall being asked about the fact that he used to be a lawyer at Akin Gump, the Debtors' restructuring counsel, which previously represented SOG, SNMP, and the Sanchez family.[70]

40.     Mr. Davis has no memory of anyone asking him how many boards he sat on.[71] And, worse, Mr. Davis does not remember if he sat on more or less than forty boards at the time.[72]

41.     No one at the Debtors asked Mr. Davis about the fact that he was sued in a case captioned *Caspian Select Credit Master Fund Ltd. v. Terrence Gohl, Jonathan Ball, Eugene I. Davis, Dr. Reiner Beutel, Donald C. Campion, Christopher E. Keenan, Wayzata Inv. Partners LLC*, C.A. No. 10244-VCN (Del. Ch. Ct.).[73]   In that case, claims questioning Mr. Davis' independence on the basis that Mr. Davis "enjoyed advantageous business affiliations with

---

[66]   *Id.* at 33:12-15.

[67]   *Id.* at 33:20-34:11, 37:17-18.

[68]   *Id.* at 37:21-23.

[69]   *Id.* at 16:13-18, 12:4-9.

[70]   *Id.* at 38:7-15, 40:11-14.

[71]   *Id.* at 38:16-19.

[72]   *Id.* at 38:20-39:5.

[73]   Davis Depo. Tr. at 40:15-21.

Wayzata Partners and one can reasonably infer that [he and another director] expect those favorable relations to continue" survived a motion to dismiss.[74]  Mr. Davis never informed the Debtors' board about this lawsuit.[75]

42.    Similarly, no one at the Debtors asked Mr. Davis about the fact that he was sued in another case captioned *RBC Capital Markets, LLC v. Jervis*, Case No. 6350-VCL (Del. Ch.).[76]  In that case, the trial court found that Mr. Davis "had personal circumstances that inclined [him] towards a near-term sale" of the company's assets.[77]  Mr. Davis' "personal circumstances" included the fact that Mr. Davis was "over-boarded," which Institutional Shareholder Services required to be addressed by Mr. Davis resigning from certain board roles, and also that Mr. Davis stood "to realize $200,000 in the Company's equity, which would vest upon a change of control and which he would otherwise have to leave on the table if Rural did not change hands prior to April 2011."[78]

43.    After conducting an "independent review of the record," the Supreme Court of Delaware confirmed that such findings were supported by the evidence.[79]  The trial court also found that Mr. Davis "was largely an absentee director."[80]  Mr. Davis never informed the Debtors' board about this lawsuit.[81]

---

[74]    *Caspian Select Credit Master Fund Ltd. v. Gohl*, No. CV 10244-VCN, 2015 WL 5718592, at *6 (Del. Ch. Sept. 28, 2015).

[75]    Davis Depo. Tr. at 42:2-4.

[76]    *Id.* at 42:5-7.

[77]    *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 826 (Del. 2015).

[78]    *Id.* at 826, n. 8.

[79]    *Id*. at 828.

[80]     *Id.* at 835.

[81]    Davis Depo. Tr. at 49:19-23.

44.     Mr. Davis negotiated a $31,000 per month compensation package (double the amount that Mr. Zylman and other board members are paid),[82] with Sanchez III and with Akin Gump—not face to face with any independent board members.[83]

45.     The Special Committee is supposed to be independent, but for five months, until March 2019, Mr. Davis used Akin Gump as counsel.[84]   Mr. Davis did not understand that Akin Gump previously represented Sanchez III and Sanchez Jr.[85]   Indeed, even at the time of his deposition, Mr. Davis had no clear understanding of this fact.[86]   Similarly, Mr. Davis refuses to provide his understanding of whether Akin Gump did or did not represent SOG.[87]   Mr. Davis is also not certain whether Akin Gump previously represented SNMP.[88]

46.     Mr. Davis refused to take consideration in stock, because he did not believe equity was going to be the fulcrum security,[89] and thus believed the debtors were insolvent. Notwithstanding this view, Mr. Davis never consulted with any creditors about his fee.[90]   In fact,

---

[82]   *See Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Compensation Obligations; (II) Authorizing Payment of Postpetition Compensation Obligations in the Ordinary Course of Business; and (III) Granting Related Relief* [ECF No. 9], at Schedule 1 (disclosing that Mr. Davis earns a monthly salary of more than $31,000, as compared to the average monthly compensation of non-executive board members, including Special Committee member Mr. Adam C. Zylman, of approximately $15,000); Aug. 13 Hr'g Tr., Vol. I at 89:15-23 (Counsel: "[Mr. Davis is paid twice as much as other board members because of his] particular experience in the restructuring context.").

[83]   Davis Depo. Tr. at 53:4, 53:7-8.

[84]   *Id.* at 21:13-22:24.

[85]   *Id.* at 53:25-54:5, 55:2-56:13.

[86]   *Id.* at 54:8-9, 56:13.

[87]   *Id.* at 75:10-19, 75:23, 76:22-77:3.

[88]   *Id.* at 82:24-83:5.

[89]   *Id.* at 58:22-59:7.

[90]   *Id.* at 59:8-11.

Mr. Davis never consulted with any creditors during the entire period leading up to the commencement of the bankruptcy cases about anything.[91]

47.     Alarmingly, Mr. Davis was unable to describe with any particularity or substance the scope of the Special Committee's mandate.[92]  According to the Debtors' first day declaration of their Chief Financial Officer, Cameron George:

> *[T]he Board delegated to the Special Committee the exclusive power and authority to investigate, pursue, settle, and/or otherwise resolve any and all potential claims or causes of action the Debtors may have related to SOG, SNMP, or any of their respective affiliates or joint ventures in which any of the foregoing are a partner or member* in connection with any actual or potential related party transaction.  In furtherance of that delegated authority, in March 2019, the ***Special Committee hired Ropes & Gray LLP as counsel responsible for assisting the Special Committee in conducting its investigation***.[93]

48.     Notwithstanding the Debtors' sworn representation, it is clear that the Special Committee is not overseeing any investigation, and was providing little, if any, oversight for Ropes & Gray—the law firm retained by they Special Committee to conduct an investigation into the Debtors' relationships with its affiliates.  Thus, Ropes & Gray, effectively on its own, carried out a $5.3 million investigation into affiliate transactions.[94]  No officer has been overseeing Ropes & Gray's investigation, and Mr. Davis conceded that there is not any officer of the Debtors that would be appropriate to serve that function.[95]  In addition, Ropes & Gray was not teamed with any

---

[91]  *Id.* at 92:4-12.

[92]  *Id.* at 18:6-23.

[93]  First Day Decl. ¶ 63 (emphasis added).

[94]  *Debtors' Reply in Support of Ropes & Gray Retention* [ECF No. 491] ¶ 8-9.

[95]  Davis Depo. Tr. at 68:13-17, 72:9-12.

independent financial advisor.[96]  Mr. Davis has no idea what Ropes & Gray has done about seeking financial advice.[97]

49.     As described above, in February 2019, "the Compensation Committee elected to increase the base salary levels for [their] Executive Chairman, President and Chief Executive Officer, Executive Vice President and Chief Financial Officer and Executive Vice President, General Counsel and Secretary from 2018…."[98]  Mr. Davis did not know that this occurred.[99]  Nor does Mr. Davis know the identity of the members of the Compensation Committee.[100]  Nevertheless, just a month or two later, Mr. Davis approved *additional* raises for Messrs. Sanchez, Jr., Sanchez III, and George.[101]  Mr. Davis never asked any attorney whether these compensation packages were lawful under the Bankruptcy Code.[102]

50.     Since the Debtors filed their bankruptcy petitions, Mr. Davis has not taken any steps to ensure that Akin Gump does not represent the Debtors adverse to SOG.[103]  Specifically, Mr. Davis has done nothing about the fact that Akin Gump has been representing the Debtors in connection with their motion to seek to continue performing "in the ordinary course" under the Shared Services Agreement with SOG.[104]

---

[96]  *Id.* at 70:20-25.

[97]  *Id.* at 70:8-13.

[98]  Sanchez Energy 2018 Form 10-K/A at 8.

[99]  Davis Depo. Tr. at 101:25-102:4, 104:18-22.

[100]  *Id.* at 95:16-25.

[101]  *Id.* at 106:24-107:1.

[102]  *Id.* at 109:9-19.

[103]  *Id.* at 77:4-20, 78:16-24, 80:18-25.

[104]  *Id.* at 81:18-82:9.

51.    Mr. Davis understands that SOG asserts an adverse ownership claim over certain seismic data incidental to the Debtors' oil and gas reserves.[105]  But, Mr. Davis has not taken any steps to ensure that the Debtors are not funding the salaries of SOG executives who are acting adverse to the Debtors.[106]

52.    Similarly, Mr. Davis has not taken any steps to ensure that Akin Gump does not represent the Debtors adverse to SNMP in connection with the Debtors' midstream contracts.[107]  Indeed, prior to the commencement of the chapter 11 cases, in January 2019, when SNMP sought to unilaterally raise tariffs on Debtors SN Catarina's gathering agreement, Mr. Davis did not consult with any independent counsel.[108]  Mr. Davis relied upon Akin Gump.[109]  A few months later, when SNMP sought to raise the rate, again, Mr. Davis took no steps to ensure that Ropes & Gray, not Akin Gump, advised the board.[110]

53.    It has been disclosed in these chapter 11 cases that Mr. Davis "is or was" a corporate governor for, "among others," more than twenty-six entities "to which Akin Gump serves or served as counsel."[111]  And there are several other similar matters, including among others, *Verso*, *ALST Casino Holdco, LLC*, *Genco Shipping & Trading Limited*, *Goodrich Petroleum Corp.*, *Titan Energy*, *Elk Petroleum*, and *U.S. Concrete*, for which Mr. Davis serves or has served as a corporate

---

[105]   *Id.* at 112:20-23.

[106]   *Id.* at 114:24-115:15.

[107]   *Id.* at 82:11-82:21.

[108]   *Id.* at 84:12-85:11.

[109]   *Id.* at 84:23-85:4.

[110]   *Id.* at 86:15-18.

[111]   *Debtors' Application to Employ Akin Gump Strauss Hauer & Feld LLP as Counsel to the Debtors and Debtors in Possession* [ECF No. 268] at Ex. A (Declaration of Ira S. Dizengoff) ¶ 49.

governor and for which Akin Gump represented the company or a powerful creditor party that had influence in appointing directors.[112]

### G.   POST-PETITION EVENTS SHOW CONTINUED CORPORATE GOVERNANCE FAILURES

#### 1.   Denial of Debtors' Motion for Post-Petition Financing

54.    The Debtors commenced these chapter 11 cases on August 11, 2019.  At the first day hearing, the Debtors asked for emergency relief concerning an alleged need for post-petition financing.  Donald Koetting, a financial advisor retained by the Debtors, testified that "[t]he Debtors have a critical need to use the DIP proceeds and Cash Collateral to operate their business and preserve the going concern value of the Debtors."[113]  Mr. Koetting further testified that "[w]ithout access to the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate their business as a going concern and preserve and maximize the value of their assets for the benefit of all stakeholders."[114]  The Debtors' CFO, Mr. George, also testified that "[a]bsent the DIP Financing, the Debtors would be unable to fund their capital expenditures program during the course of these chapter 11 cases, which program is essential to maintaining the Debtors' asset base for the benefit of all of the Debtors' stakeholders."[115]

55.    The Ad Hoc Group objected.  The Court found that, the Debtors' assertions notwithstanding, "the debtor clearly doesn't need the money before we can get to a [final] hearing."[116]

---

[112]   Davis Depo. Tr. at 133:1-138:25.

[113]   *Declaration of Donald Koetting* [ECF No. 26-2] ¶ 15.

[114]   *Id.* ¶ 18.

[115]   First Day Decl. ¶ 70.

[116]   Aug. 13 Hr'g Tr., Vol. II at 117:18-20.

56.     At the final hearing, the Debtors once again sought approval of post-petition financing, again asserting a dire need to incur credit.  Once again, after considering the evidence, the Court determined that "there is no urgency for new money."[117]  Moreover, the Court also found that the Debtors failed to duly consider an alternative DIP merely "to avoid the priming fight" notwithstanding that the Debtors' proposed DIP contained a litany of provisions that were "substantially harmful to the estate."[118]

57.     More than a month later, the Debtors reported to the Court that "the Debtors' business operations are going smoothly," notwithstanding the absence of the post-petition financing the Debtors asserted they so urgently required.[119]

### 2.     Negotiations of Revised DIP and Selection of a CRO

58.     Following the final DIP hearing, negotiations ensued between the ad hoc group of secured noteholders, the Official Creditors' Committee, and the Ad Hoc Group (the "Creditor Parties").  The Creditor Parties determined that appointment of an independent Chief Restructuring Officer ("CRO") was necessary given the rampant conflicts of interest that exist within the Debtors' current management (as described above).

59.     On October 7 and 14, the Creditor Parties submitted proposed orders requiring that each Creditor Party have consent rights over the identity of the CRO.

60.     On October 15, the Creditor Parties interviewed several candidates for CRO.  The Creditor Parties unanimously selected John J. Ray III, senior managing director at Greylock Partners, LLC, and informed the Debtors of their determination.

---

[117]   Sept. 19 Hr'g Tr. at 274:11-12.

[118]   *Id.* at 274:15-22.

[119]   Oct. 23 Hr'g Tr. at 7:9-10.

61.     Mr. Davis, upon learning of the Creditor Parties' selection, but before interviewing Mr. Ray, asked the Debtors' professionals, "[d]id we figure out the GTAT angle on this guy[?]" "[n]ot sure how I can recommend him knowing what I know about GTAT."  Mr. Davis' response shows that he was never going to agree to the Creditor Parties' selection.  "GTAT" refers to GT Advanced Technologies, an unrelated company that filed for chapter 11 in 2014.[120]  But Mr. Ray was not appointed to the "GTAT" board until November 11, 2014, *after* the company filed for bankruptcy filing, and had no role whatsoever in the company's downfall.[121]  Moreover, *Mr. Davis himself* was appointed as an independent manager to one of the GTAT debtors—GT Advanced Equipment Holding—*before* Mr. Ray, and *prior to* the commencement of GTAT's chapter 11 cases on October 6, 2014.[122]

62.     On October 20, Mr. Davis, Mr. Zylman, and Akin Gump interviewed Mr. Ray telephonically, and  Mr. Ray spoke with Sanchez III the next day.  The Debtors then reported to the Creditor Parties that the Debtors would not accept Mr. Ray, although they offered no substantive reason for their decision.

63.     On November 15, 2019, the Debtors filed their "emergency" motion to appoint Mohsin Meghji as CRO [ECF No. 593] (the "CRO Motion").  The CRO Motion suggests that the genesis of the CRO's appointment was that "the stakeholders expressed their view that the Debtors' chapter 11 cases could benefit from the appointment of a chief restructuring officer with

---

[120]  *See In re GT Advanced Technologies, Inc., et al.*, Case No. 14-11916 (HJB) (Bankr. D.N.H.).

[121]  *Richard E. Newsted and John J. Ray III Appointed to GT Advanced Technologies Board of Directors*, BLOOMBERG BUSINESS (November 25, 2014 2:18 PM), *https://www.bloomberg.com/press-releases/2014-11-25/richard-e-newsted-and-john-j-ray-iii-appointed-to-gt-advanced-technologies-board-of-directors*; *see also Davis v. Gutierrez*, No. 17–cv–147–JL, 2018 WL 1514869 (D.N.H. Mar. 27, 2018) (suit brought against two officers for purportedly misleading the board regarding conduct that caused GTAT to "collapse[] into bankruptcy less than one year" later).

[122]  *See In re GT Advanced Technologies, Inc., et al.*, Case No. 14-11916 (HJB) (Bankr. D.N.H.).

a focused scope limited to certain restructuring-related issues."[123]  That is half true.  The Debtors failed to explain that the creditors' principal concern in seeking the appointment of a CRO was to ensure the involvement of a truly independent fiduciary who was trusted by creditors to protect all stakeholders' interests.

64.    Notably, Mr. Meghji's services will be "subject to the ultimate oversight, direction and decision making authority of the SN Board or (as to matters delegated to it) by the Special Committee."[124]  The topics over which Mr. Meghji will have nominal oversight include (i) SOG, including the Services and License Agreements, and (ii) Catarina Midstream, LLC, SNMP, and any of their respective non-Debtor affiliates, including matters relating to the Catarina Gathering Agreement.[125]

65.    While the CRO Motion contemplates that the CRO will provide "oversight and direction," subject to "ultimate" oversight, direction, and decision-making by the SN Board and the Special Committee (together, the "Governing Body"), the CRO is expressly prohibited from conducting an investigation with respect to "prepetition transactions between the Debtors, SOG, Catarina Midstream or SNMP, to the extent such investigation has already been conducted independently by the Special Committee consistent with such Special Committee's fiduciary duties."[126]  The CRO may investigate these matters *only if* the Governing Body or the Court "determines that a conflict may exist between any of the Debtors, on the one hand, and any of SOG, Catarina Midstream, SNMP, or any existing directors or officers, on the other hand."[127]

---

[123]   *Id.* ¶ 2.

[124]   *Id.* ¶ 17(a).

[125]   *Id.*

[126]   *Id.*

[127]   *Id.* ¶ 17(b).

66.     In short, Mr. Meghji is just a different version of the existing Special Committee. He is not a member of the Sanchez family, but he will report to the Sanchez family and other officers and directors who owe their positions to the Sanchez family.  And instead of bringing needed independence, he is proposing to bring another team of restructuring professionals from his own firm, M-III, who will be doing what the Special Committee and existing professionals are supposed to be doing, including "[w]ork[ing] with management and the Debtors' other advisors with respect to the development, negotiation and filing of any chapter 11 plan, disclosure statement or motion to dismiss or convert the Debtors' bankruptcy cases."[128]

## IV.     ARGUMENT

### A.     APPOINTMENT OF AN EXAMINER IS REQUIRED IN THESE CASES

67.     Section 1104(c) of the Bankruptcy Code provides that if no trustee has been appointed, then at any time prior to confirmation, upon the request of a party in interest:

> the court ***shall*** order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> (1) such appointment is in the interests of the creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

68.     Here, there is no question that the threshold predicates for the appointment of an examiner exist:  no trustee has been appointed; no plan has been confirmed; and the Ad Hoc Group

---

[128] *Id.* ¶ 17(c).

is clearly a "party in interest," as it comprises creditors holding significant claims against the Debtors. *See* 11 U.S.C. § 1109(b) ("party in interest" includes "a creditor"). Moreover, not only does the Debtors' qualifying unsecured debt far exceed $5 million, but appointment of an examiner in these cases is demonstrably in the interests of their creditors. Indeed, a comprehensive investigation into the complex web of Sanchez family-owned companies, the intercompany contracts they have entered into, and the millions of dollars that have flowed between them is an inevitable and integral part of these chapter 11 cases, and should be undertaken by a truly independent examiner. And, as further discussed below, the examiner's scope should be broad, affording him or her standing to initiate, prosecute, and/or settle claims that he or she identifies in the course of his or her investigation.

### 1.	Section 1104(c)(2) Mandates Appointment of an Examiner

69.	The District Court for the Southern District of Texas has joined the numerous courts holding that the appointment an examiner under section 1104(c)(2) "is mandatory" where it is sought by a party in interest for a debtor with the threshold amount of qualifying debt. *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 31 (S.D. Tex. 1992) (holding that "[t]he section on appointment of an examiner at the request of a party in interest is mandatory"); *see also Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990) (noting that section 1104(c)(2) of the Bankruptcy Code "plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million, if [a party in interest] requests one").

70.	Here, there is no question that the Debtors' fixed, liquidated, unsecured debts exceed $5 million. The Ad Hoc Group alone holds more than $1 billion of unsecured bond claims against the Debtors. As such, section 1104(c)(2) mandates the appointment of an examiner to conduct an appropriate investigation of the Debtors.

### 2. The Interests of the Debtors' Creditors Also Require the Appointment of an Examiner

71.     While the appointment of an examiner is plainly required under section 1104(c)(2), it is also clear that the appointment of an examiner in these cases is in the interests of the Debtors' creditors, and their estates in general.  *See* 11 U.S.C. § 1104(c)(1) (a court shall appoint an examiner where "such appointment is in the interests of the creditors … and other interests of the estate").

72.     Section 1104(c) expressly contemplates an examiner's investigation of "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by the current or former management of the debtor." 11 U.S.C. § 1104(c).  Appointment of an examiner is particularly appropriate and in the interests of creditors where related parties engaged in prepetition transfers of assets about which "there are unanswered questions concerning the transaction and interrelationships of the parties involved." *In re Gilman Servs., Inc.*, 46 B.R. 322, 327 (Bankr. D. Mass. 1985); *see also In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (appointing an examiner to review multiple transfers from the debtor to affiliates) (citing Martin J. Bienenstock, *Bankruptcy Reorganization* 299 (1987) ("Often, appointment of an examiner is warranted when the debtor's transactions with affiliates should be investigated")); *In re 1243 20th St. Inc.*, 6 B.R. 683, 685 (Bankr. D.D.C. 1980) (finding that pre-petition transfers made by debtor while it was insolvent to an entity sharing the same president and directors provided "the factual basis for the appointment of an examiner" under section 1104(c)(1)).

73.     Here, there can be no question that a truly independent investigation into the pre-petition transactions between Sanchez Energy and its affiliated Sanchez entities is necessary.  The overlap of ownership and directors and officers between Sanchez Energy and its two primary

contractual counterparties, SOG and SNMP, alone warrants an investigation into their pre-petition dealings. And this is especially the case, given, among other things, (i) that Sanchez Energy (x) funded SOG's and SNMP's executive compensation and other costs, and (y) funded egregious executive compensation packages, including on the eve of bankruptcy, after the Compensation Committee already approved raises, which could never have been approved under chapter 5 of the Bankruptcy Code, (ii) that SOG, acting through the Debtors' own officers and directors, is improperly asserting adverse ownership interests over the Data, (iii) the unilateral and unfavorable (for Sanchez Energy) amendments to and/or tariff raises under midstream contracts with SNMP, and (iv) Sanchez Energy's payment of disproportional costs associated with recreational land use under the LPA. An independent examiner must determine whether these or other transactions give rise to any causes of action that will inure to the benefit of the Debtors' creditors and estates. *See Gilman Servs.*, 46 B.R. at 328 ("One of the functions of an examiner is to investigate potential causes of action available to the estate.").

74.     No other party can meet these requirements. The Special Committee has already shown itself to be incapable of carrying out an objective or adequate investigation. The chairman of the two-member Special Committee, Mr. Eugene Davis, was handpicked by Sanchez III, a director, officer, and equity holder who inevitably will be at the heart of the investigation. And while the Special Committee was supposed to be independent, as described above, it failed miserably in its duties. The investigation carried out by the Special Committee's subsequent counsel, Ropes & Gray, was performed without effective oversight or the benefit of financial advisors—a defect the Debtors have finally conceded, but fail to remedy given their proposed CRO is not authorized to investigate anything Ropes & Gray already investigated.

75.     Moreover, even if the Debtors were authorizing the CRO to conduct a full investigation (and they are not), Mr. Meghji still would not be the best party to undertake such an investigation.  *First*, he was hand-picked by the Debtors, who inexplicably rejected the Creditor Parties' unanimous choice for CRO.  *Second*, and crucially, he will report to the very same conflicted SN Board and ineffective Special Committee whose conflicts, decisions, and acts are one of the subjects of the proposed investigation.  *Third*, he is currently acting for two administratively insolvent bankrupt estates—*Sears* and *Barney's*—calling into question his time and availability.

76.     Although the Bankruptcy Code permits chapter 11 debtors to remain in possession, 11 U.S.C. § 1107, it also sets express limits on that through conversion, (*id*. § 1112), or the appointment of a trustee or examiner, (*id*. §§ 1104, 1106).  Nothing in the Bankruptcy Code permits a debtor or its insiders to avoid these results by self-selecting their own pseudo-independent fiduciary.  *See In re Stratesec, Inc.*, 324 B.R. 158, 160-61 (Bankr. D.D.C. 2004) (receiver for chapter 11 debtor corporation not appointed as responsible officer where proof did not exist that all creditors, among others, supported motion and one creditor objected).  A debtor and its insiders cannot create an alternative fiduciary position that the Bankruptcy Code does not recognize in an attempt to evade the Code's express provisions.  *See Law v. Siegel*, 571 U.S. 415, 421 (2014) (holding that "[i]t is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code" (internal quotations omitted)).

77.     Debtors are not permitted to pick their own trustees or examiners, and for good reason.  No matter how impartial that person may appear, he or she nonetheless owes their appointment to the parties being investigated.  The inescapable fact is that any compensation, business connections, and other benefits of the positions ultimately result from their appointment

by the debtor and its insiders.  "No matter how thoroughly or fairly [they] conducted the investigation, the question will always linger whether [they] held back, or failed to bite the hand that feeds [them] quite as hard as the circumstances warranted." *In re Sunbum5 Enters., LLC*, Nos. 6:10–cv–1268–Orl–28, 2011 WL 4529648, at \*25 (M.D. Fla. Sept. 30, 2011) (quoting *In re Granite Partners, L.P.*, 219 B.R. 22, 38 (Bankr. S.D.N.Y. 1998)); *see also Midwest Generation EME, LLC v. Continuum Chem. Corp.*, 768 F. Supp. 2d 939, 943 (N.D. Ill. 2010) ("Under a realistic appraisal of psychological tendencies and human weakness, where [a] relationship involves a system of referrals, bias is inherent and inescapable, for getting and keeping customers, is, of course, the life blood of any business.") (internal quotation marks and citations omitted).

78.    An examiner, conversely, is statutorily required to conduct an investigation and would not be burdened by any questions about allegiance to the Sanchezes, the very parties who need to be investigated.  *See* Jay R. Indyke *et al.*, *Are The Foxes Guarding The Henhouse?*, Turnaround Management Association (June 2019), *https://turnaround.org/jcr/2019/06/are-foxes-guarding-henhouse* (discussing the use of "independent" directors and special committees to "short-circuit the investigation process" by, among other things, retaining "professional directors who may not be truly independent," and that accordingly "there is a significant risk that the special committee may reach a below-market settlement or discount valuable insider litigation").

79.    Moreover, the involvement of the U.S. Trustee in the selection of an examiner ensures that interests beyond those of the debtor and its insiders are being addressed and protected. "If someone must be hired to report to the Court, the United States Trustee rather than the Debtor should select the new fiduciary." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr.

S.D.N.Y. 2007). Congress has entrusted the U. S. Trustee with the authority to select independent fiduciaries with only one purpose in mind – to fulfill the requirements of the Bankruptcy Code.

80. In the absence of a trustee, a duly-appointed examiner is the only entirely disinterested party capable of carrying out an investigation that is both objective and perceived as such.

**B.    THE COURT SHOULD PROVIDE THE EXAMINER WITH A BROAD MANDATE**

**1.    Examination of the Investigation Topics is Warranted**

81. The Court has discretion to determine the scope and duration of the examiner's investigation. *See Revco*, 898 F.2d at 501. The Ad Hoc Group respectfully requests that the examiner investigate: (i) transactions and transfers between and among the Debtors and any non-Debtor affiliates; (ii) transactions and transfers between and among the Debtors and any insiders, officers, directors, or principals of the Debtors; and (iii) the Debtors' inter-company transactions and transfers (collectively, the "Investigation Topics"). These Investigation Topics are well within an examiner's statutory authority under section 1106(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1106(b) (specifying the responsibilities of an examiner to include two of the seven duties assigned to a trustee under section 1106(a), including to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operations of the debtor's business…and any other matter relevant to the case or the formulation of a plan" under section 1106(a)(3)); *see also In re DBSI, Inc.*, Case No. 08-12687 (PJW) (Bankr. D. Del.) [ECF No. 2974] ¶ 2 (directing the examiner to "investigate the circumstances surrounding (i) any and all of the Debtors' inter-company transactions and transfers, (ii) any and all transactions and transfers between and among the Debtors any non-debtor affiliates, and (iii) any and all transactions and transfers between and among the Debtors and any insiders, officers, directors and principals of the Debtors….").

82.     To facilitate the examiner's investigation, the Proposed Order directs the Debtors, their affiliates, and their officers and directors, to cooperate in the investigation.  The Proposed Order also empowers the examiner to review communications subject to the Debtors' privilege and to retain outside counsel and any other advisors that are necessary for the examiner to complete the investigation.  *See In re Dynegy Holdings, LLC, et al.*, Case No. 11-38111 (CGM) (Bankr. S.D.N.Y.) [ECF No. 276] at 2-6 (ordering examiner to conduct an "***unfettered***" investigation, and prohibiting Debtors and their directors, officers, employees, and professionals from asserting privilege over documents or information sought by the examiner) (emphasis in original); *In re Enron Corp.*, No. 01-16034, 2003 WL 22218328, at *3 (Bankr. S.D.N.Y. June 2, 2003) (ordering that "the ENA Examiner shall have the power to waive, on an issue-by-issue basis, the attorney-client privilege of the Debtors' estates with respect to prepetition communications relating to matters to be investigated by the ENA Examiner concerning the Identified Entities; *provided, however*, that, in making any such determination, the ENA Examiner shall act in the best interests of the Debtors' estates" after consultation with the certain parties in interest).

### 2.     The Examiner Should be Authorized to Initiate, Prosecute, and/or Settle Causes of Action for the Benefit of the Estates

83.     Given the blatant conflicts of interest that undoubtedly would preclude the SN Board and its Special Committee not only from conducting an unbiased investigation, but also from determining whether to prosecute claims uncovered through such investigation, the Court should authorize and grant the examiner exclusive authority to commence, prosecute, and/or settle estate causes of action that he or she identifies in the course of the investigation.  *See, e.g.*, *West v. Flores (In re St. Marie Clinic PA)*, No. 10–70802, 2013 WL 5221055, at *1 (Bankr. S.D. Tex. Sept. 17, 2013) (noting that court had "expanded Mr. Schmidt's powers as Examiner, vesting him with the sole authority to investigate, compromise, initiate, and pursue litigation").

84.     Section 1106(b) provides that, in addition to conducting an investigation and filing a statement of such investigation, an examiner shall, except as the court orders otherwise, perform "any other duties of the trustee that the court orders the debtor in possession not to perform."  11 U.S.C. § 1106(b).  Section 1107(a), in turn, authorizes the Court to prescribe limitations on the debtor in possession's duties.  11 U.S.C. § 1107(a).  These provisions "permit[] a designer approach to assignments given examiners."  *In re Mirant Corp.*, 314 B.R. 555, 557 (Bankr. N.D. Tex. 2004) (citing cases and concluding that an examiner may be granted the participatory rights of a party in interest and, if appropriate, rights or duties beyond those of most parties in interest).

85.     Among a trustee's rights and duties is the authority and standing to prosecute estate claims.  *See, e.g.*, 11 U.S.C. §§ 323(a), (b).  Where, as here, no trustee has been appointed and there is "concern that the debtor-in-possession might not commence [the] litigation, particularly insofar as [the litigation would seek] recovery from insiders", the court may "preempt the debtor's administration of these causes of action and thereby assign that responsibility to the examiner."  *In re Patton's Busy Bee Disposal Serv., Inc.*, 182 B.R. 681, 686 (Bankr. W.D.N.Y. 1995) (examiner authorized to initiate adversary proceedings to enforce avoidance powers); *see also In re GTI Capital Holdings, L.L.C.*, No. AZ–05–1045–SKMo, 2006 WL 6810997, at *4-5 (B.A.P. 9th Cir. Sept. 7, 2006) (affirming holding that examiner had standing to bring adversary proceeding under section 544(b)); *In re Agent Sys., Inc.*, 289 B.R. 828, 832-33 (Bankr. N.D. Tex. 2002) ("If the debtor has an apparent conflict, as, for example, where a cause of action could be pursued against management, it is common for a bankruptcy court to direct that a party other than the debtor in possession to handle the litigation."); *In re Franklin-Lee Homes, Inc.*, 102 B.R. 477, 481 (E.D.N.C. 1989) (noting that "[c]ase law is replete with examples of such grants of authority [to examiners]…to institute adversary proceedings on behalf of the debtor-in-possession," and citing

cases); *In re Carnegie Int'l Corp.*, 51 B.R. 252, 256-57 (Bankr. S.D. Ind. 1984) (expanding scope of examiner's duties to include the prosecution of actions in the name of the debtors in possession and for the benefit of the estates).   Similarly, courts have authorized examiners to facilitate settlements and issue resolutions.  *See In re Apex Oil Co.*, 111 B.R. 235, 237 (Bankr. E.D. Mo. 1990), *rev'd on other grounds*, 132 B.R. 613 (E.D. Mo. 1991).

## V.      BASIS FOR EMERGENCY RELIEF

86.      The Debtors assert that emergency consideration of their CRO Motion is necessary "to ensure that the Debtors' restructuring efforts continue to advance efficiently and expeditiously…."  CRO Mot. ¶ 37.  These cases cannot effectively progress, however, until the transactions and transfers that are overshadowing these cases are investigated by a truly independent party with the authority to commence, prosecute, and/or settle any potential causes of actions uncovered as a result of his or her investigation.

## VI.      NOTICE

87.      Notice of this Motion has been provided by ECF, email, or first class mail to: (i) the Office of the United States Trustee for the Southern District of Texas, in accordance with Bankruptcy Rule 2007.1; (ii) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP; (iii) counsel to the Creditor's Committee, Millbank LLP; (iv) counsel to the Royal Bank of Canada, Thompson & Knight LLP; (v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP; (vi) counsel to the Secured Notes Ad Hoc Group, Morrison & Foerster LLP; (vii) counsel to Sanchez Oil & Gas Corporation, Haynes and Boone, LLP; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) the Internal Revenue Service; (x) the United States Securities and Exchange Commission; (xi) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (xii) the state attorneys general for the states in which the Debtors conduct business; and (xiii) any party

that has requires notice pursuant to Bankruptcy Rule 2002.  The Ad Hoc Group submits that no other or further notice be given.

## VII.   <u>CONCLUSION</u>

88.     For the foregoing reasons, the Ad Hoc Group respectfully requests the entry of an order (a) approving and directing the appointment of an independent examiner for the purposes of investigating and reporting to the Court and parties in interest with respect to the Investigation Topics, (b) providing the examiner with exclusive authority to commence, prosecute, and/or settle any estate causes of action identified in the course of his or her investigation, and (c) granting such other relief as the Court deems just and proper.

Respectfully submitted this 26th day of November, 2019.

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: /s/ *Patricia B. Tomasco*

Patricia B. Tomasco  (SBN 01797600)
Christopher Porter
Devin van der Hahn
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100

-and-

Benjamin I. Finestone (*pro hac vice*)
Kate Scherling (*pro hac vice*)
Zachary Russell (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

-and-

K. John Shaffer (*pro hac vice*)
865 S Figueroa St.
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (212) 443-3100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 26, 2019, a copy of the foregoing Emergency Motion was served through the Court's CM/ECF notification system and/or first class mail, postage prepaid on all parties on the attached master service list.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

In re:  Sanchez Energy Corporation , et al. ,
Core/2002
Case No. 19-34508 (MI)

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to Kingsley Constructors, Inc. and Bottom Line Services, LLC | Akerman LLP | Attn: D. Brett Marks | Las Olas Centre II, Suite 1600 | 350 East Las Olas Boulevard | Fort Lauderdale | FL | 33301 | | 954-463-2700 | 954-463-2224 | brett.marks@akerman.com |
| Counsel to Tulsa Inspection Resources LLC | Akerman LLP | Attn: David W. Parham | 2001 Ross Avenue | Ste. 3600 | Dallas | TX | 75201 | | 214-720-4345 | 214-981-9339 | david.parham@akerman.com |
| Counsel to Tulsa Inspection Resources LLC | Akerman LLP | Attn: James Rogers | 1300 Post Oak Boulevard, Suite 2500 | | Houston | TX | 77056 | | 713-968-3861 | 713-960-1527 | james.rogers@akerman.com |
| Counsel to Kingsley Constructors, Inc. and Bottom Line Services, LLC | Akerman LLP | Attn: Scott D. Lawrence | 2001 Ross Avenue | Ste. 3600 | Dallas | TX | 75201 | | 214-720-4300 | 214-981-9339 | scott.lawrence@akerman.com |
| Counsel to the Debtors and Debtors in Possession | Akin Gump Strauss Hauer & Feld LLP | Attn: Ira S. Dizengoff, Jason P. Rubin, Naomi Moss | One Bryant Park | | New York | NY | 10036 | | 212-872-1000 | 212-872-1002 | idizengoff@akingump.com jrubin@akingump.com nmoss@akingump.com |
| Counsel to the Debtors and Debtors in Possession | Akin Gump Strauss Hauer & Feld LLP | Attn: James Savin | 2001 K Street, N.W. | | Washington | DC | 20006 | | 202-887-4000 | 202-887-4288 | jsavin@akingump.com |
| Counsel to the Debtors and Debtors in Possession | Akin Gump Strauss Hauer & Feld LLP | Attn: Marty L. Brimmage, Jr., Lacy M. Lawrence | 2300 N. Field Street, | Suite 1800 | Dallas | TX | 75201 | | 214-969-2800 | 214-969-4343 | mbrimmage@akingump.com llawrence@akingump.com |
| Counsel to Archrock Partners Operating LLC and Archrock Services LP | ANDERSON LEHRMAN BARRE & MARAIST, LLP | Attn: Kevin M. Maraist | Gaslight Square | 1001 Third Street, Ste. 1 | Corpus Christi | TX | 78404 | | | 361-884-1286 | kmaraist@albmlaw.com |
| Counsel to Dimension Energy Services, LLC | Andrews Myers, P.C. | Attn: Lisa M. Norman | 1885 Saint James Place | 15th Floor | Houston | TX | 77056 | | 713-850-4200 | 713-850-4211 | lnorman@andrewsmyers.com |
| Counsel to Delaware Trust Company, in its capacity as Successor Indenture Trustee | ARENT FOX LLP | Attn: Andrew I. Silfen, Jordana L. Renert, & Robert M. Hirsh | 1301 Avenue of the Americas | Floor 42 | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | andrew.silfen@arentfox.com jordana.renert@arentfox.com robert.hirsh@arentfox.com |
| Counsel to Wilmington Savings Fund Society | Arnold & Porter Kaye Scholer LLP | Attn: Ginger Clements | 70 West Madison Street, Suite 4200 | | Chicago | IL | 60602-4231 | | 312-583-2300 | 312-583-2360 | ginger.clements@arnoldporter.com |
| Counsel to Wilmington Savings Fund Society | Arnold & Porter Kaye Scholer LLP | Attn: Jonathan I. Levine | 250 West 55th Street | | New York | NY | 10019-9710 | | 212-836-8000 | 212-836-8689 | jonathan.levine@arnoldporter.com |
| Counsel to DIP Agent Wilmington Savings Fund Society FSB | Arnold & Porter Kaye Scholer LLP | Attn: Jonathan Levine | 250 West 55th Street | | New York | NY | 10019 | | | | jonathan.levine@arnoldporter.com |
| Counsel to M. Light Acomb Minerals LLC | Barnet B. Skelton, Jr., P.C. | Attn: Barnet B. Skelton, Jr. | 815 Walker, Suite 1502 | | Houston | TX | 77002 | | 713-516-7450 | 713-659-8764 | barnetbjr@msn.com |
| Counsel to Marathon Oil Company | Bonds Ellis Eppich Schafer Jones LLP | Attn: Clay M. Taylor, Joshua N. Eppich & Bryan C. Assink | 420 Throckmorton Street | Suite 1000 | Fort Worth | TX | 76102 | | 817-405-6900 | | clay.taylor@bondsellis.com joshua@bondsellis.com Bryan.Assink@bondsellis.com |
| Counsel to Maxum Enterprises LLC, Pilot Thomas Logistics LLC, Simons Petroleum Logistics LLC, and Petroleum Products LLC | BONDS ELLIS EPPICH SCHAFER JONES LLP | Attn: Joshua N. Eppich | 420 Throckmorton Street, Suite 1000 | | Fort Worth | TX | 76102 | | 817-405-6900 | 817-405-6902 | joshua@bondsellis.com |
| Counsel to RUSCO OPERATING, LLC | BROWN FOX PLLC | Attn: Eric C. Wood | 8111 Preston Road, Suite 300 | | Dallas | TX | 75225 | | 214-327-5000 | 214-327-5001 | eric@brownfoxlaw.com |
| Counsel to Marco Valdez | Butch Boyd Law Firm | Attn: Jeremy R. Stone, Ernest W. Boyd | 2905 Sackett Street | | Houston | TX | 77098 | | 713-589-8477; 713-589-8563 | 713-589-8563 | jeremystone@butchboydlawfirm.com butchboyd@butchboydlaw.com |
| Counsel to Trans-Tech Energy LLC | Carain, Caton & James, P.C. | Attn: H. Miles Cohn | 1401 McKinney Street 17th Floor | Five Houston Center | Houston | TX | 77010-4035 | | 713-752-8668 | 713-658-1921 | mcohn@craincaton.com |
| Counsel to Seitel Data, Ltd. | CLARK HILL STRASBURGER | Attn: Duane J. Brescia | 720 Brazos, Suite 700 | | Austin | TX | 78701 | | 512-499-3647 | 512-499-3660 | duane.brescia@clarkhillstrasburger.com carrie.douglas@clarkhillstrasburger.com |
| Counsel to Wilmington Savings Fund Society | Cole Schotz, P.C. | Attn: Michael D. Warner, Esquire | 301 Commerce Street, Suite 1700 | | Fort Worth | TX | 76102 | | 817-810-5265 | 817-977-1611 | mwarner@coleschotz.com |
| Counsel To Barnhart Ranch Minerals LP | Crady Jewett Mcculley & Houren LLP | Attn: Shelley Bush Marmon | 2727 Allen Parkway | Suite 1700 | Houston | TX | 77019-2125 | | 713-739-7007 | 713-739-8403 | smarmon@cjmhlaw.com |
| Counsel to Halliburton Energy Services, Inc. | Doré Rothberg McKay, P.C. | Attn: Carl Doré, Jr. & Zachary S. McKay | 17171 Park Row | Suite 160 | Houston | TX | 77084 | | 281-829-1555 | 281-200-0751 | carl@dorelawgroup.net zmckay@dorelawgroup.net |
| Environmental Protection Agency - Headquarters | Environmental Protection Agency | Attn: Bankruptcy Division | 1200 Pennsylvania Avenue N.W. | | Washington | DC | 20004 | | 202-564-4700 | | |
| Environmental Protection Agency - Region 4 (AL, FL, GA, KY, MS, NC, SC, TN) | Environmental Protection Agency - Region 4 | Attn: Bankruptcy Division | 61 Forsyth Street | | Atlanta | GA | 30303 | | 404-562-9900 | 404-562-8174 | |

In re: Sanchez Energy Corporation , *et al.* ,
Core/2002
Case No. 19-34508 (MI)

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Environmental Protection Agency - Region 6 (AR, LA, NM, OK, TX) | Environmental Protection Agency - Region 6 | Attn: Bankruptcy Division | 1445 Ross Avenue | Ste. 1200 | Dallas | TX | 75202 | | 214-665-6444 | 214-665-2146 | |
| Attorney General | Federal US Attorney General | Attn: William Barr | 950 Pennsylvania Avenue, NW | | Washington | DC | 20530-0001 | | 202-353-1555 | | |
| Attorneys for the AD Hoc Group of Holders of 7.25% Senior Secured First Lien Notes Due 2023 | Foley Gardere Goley & Lardner LLP | Attn: John P. Melko | 1000 Louisiana | Suite 2000 | Houston | TX | 77002-5011 | | 713-276-5727 | | jmelko@foley.com |
| Counsel for Arguindegui Oil Company II, Ltd. | Gardner Law | Attn: Bethany F. Beck & Thomas J. Walthall | 745 East Mulberry Avenue | Suite 500 | San Antonio | TX | 78212 | | 210-733-8191 | 210-733-5538 | bbeck@gardnertx.com twalthall@gardnertx.com |
| Counsel for WesternGeco LLC | GIEGER, LABORDE & LAPEROUSE, L.L.C. | Attn: ANDREW A. BRAUN | Suite 4800, 701 Poydras Street | | New Orleans | LA | 70139-4800 | | 504-561-0400 | 504-561-0100 | abraun@glllaw.com |
| Counsel to Conocophillips Company and Burlington Resources Oil & Gas Company LP | GRAY REED & MCGRAW LLP | Attn: Micheal W. Bishop and Amber M. Carson | 1601 Elm Street, Suite 4600 | | Dallas | TX | 75201 | | 214-954-4135 | 214-953-1332 | mbishop@grayreed.com acarson@grayreed.com |
| Counsel to SANCHEZ OIL & GAS CORPORATION | HAYNES AND BOONE, LLP | Attn: Charles A. Beckham, Jr. and Martha Wyrick | 1221 McKinney | Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | charles.beckham@haynesboone.com martha.wyrick@haynesboone.com |
| Counsel to Sanchez Oil & Gas Corporation | Haynes and Boone, LLP | Attn: Charles Beckham, Jr | 1221 McKinney Street | Suite 2100 | Houston | TX | 77010 | | 713-547-2243 | 713-236-5638 | charles.beckham@haynesboone.com |
| Counsel to SANCHEZ OIL & GAS CORPORATION | HAYNES AND BOONE, LLP | Attn: Ian T. Peck | 2323 Victory Avenue | Suite 700 | Dallas | TX | 75219 | | 214-651-5000 | 214-651-5940 | ian.peck@haynesboone.com |
| Attorneys for Innovex Downhole Solutions, Inc | Hughes Arrell Kinchen, LLP | Attn: Robert Lemus & John Kinchen | 1221 McKinney | Suite 3150 | Houston | TX | 77010 | | 713-942-2255 | 713-568-1747 | jkinchen@hakllp.com rlemus@hakllp.com |
| Counsel to Sanchez Midstream Partners LP ("SNMP") | HUNTON ANDREWS KURTH LLP | Attn: Timothy A. ("Tad") Davidson II & Edward A. Clarkson, III | 600 Travis Street | Suite 4200 | Houston | TX | 77002 | | 713-220-4200 | 713-220-4285 | taddavidson@HuntonAK.com edwardclarkson@HuntonAK.com |
| IRS Insolvency Section | Internal Revenue Service | Centralized Insolvency Operation | 2970 Market St. | | Philadelphia | PA | 19104-5016 | | 800-973-0424 | 855-235-6787 | |
| IRS Insolvency Section | Internal Revenue Service | Centralized Insolvency Operation | PO Box 7346 | | Philadelphia | PA | 19101-7346 | | 800-973-0424 | 855-235-6787 | |
| Counsel to the Debtors and Debtors in Possession | Jackson Walker L.L.P. | Attn: Matthew D. Cavenaugh | 1401 McKinney Street | Suite 1900 | Houston | TX | 77010 | | 713-752-4284 | 713-308-4184 | mcavenaugh@jw.com |
| Counsel to Danos, LLC | Jones Walker, LLP | Attn: Joseph E. Bain & Megan Young-John | 811 Main St. | Ste. 2900 | Houston | TX | 77002 | | 713-437-1800 | 713-437-1801 | jbain@joneswalker.com myoungjohn@joneswalker.com |
| Counsel to Monarch Silica | KILMER CROSBY & QUADROS PLLC | Attn: Brian A. Kilmer | 712 Main Street | Ste. 1100 | Houston | TX | 77002 | | 713-300-9662 | 214-731-3117 | bkilmer@kcq-lawfirm.com |
| Attorney for Plains South Texas Gathering | Law Office of Patricia Williams Prewitt | Attn: Patricia Williams Prewit | 10953 Vista Lake Court | | Navasota | TX | 77868 | | 936-825-8705 | 713-583-2833 | pwp@pattiprewittlaw.com |
| Counsel to Eagle Ford Gathering, LLC, Kinder Morgan Crude & Condensate, LLC | Law Office of Patricia Williams Prewitt | Attn: Patricia Williams Prewitt | 10953 Vista Lake Court | | Navasota | TX | 77868 | | 936-825-8705 | | pwp@pattiprewittlaw.com |
| Counsel to Bee County, Goliad ISD, Lasara ISD, Raymondville ISD, Willacy County, Jim Wells CAD, Cameron County, Duval County, Hidalgo County, Starr County, Dewitt County, Roma ISD, Jackson County, Goliad County, Kenedy County , Freer ISD | LINEBARGER GOGGAN BLAIR & SAMPSON, LLP | Attn: Diane W. Sanders | PO Box 17428 | | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com |
| Counsel to Atascosa County | LINEBARGER GOGGAN BLAIR & SAMPSON, LLP | Attn: Don Stecker | 711 Navarro Street | Ste 300 | San Antonio | TX | 78205 | | 210-225-6763 | 210-225-6410 | sanantonio.bankruptcy@publicans.com |
| Counsel to Smith County | Linebarger Goggan Blair & Sampson, LLP | Attn: Elizabeth Weller | 2777 N. Stemmons Freeway | Suite 1000 | Dallas | TX | 75207 | | 214-880-0089 | 469-221-5003 | dallas.bankruptcy@publicans.com |
| Counsel to Harris County & Matagorda County | LINEBARGER GOGGAN BLAIR & SAMPSON, LLP | Attn: Tara L. Grundemeier | PO Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3400 | 713-844-3503 | houston_bankruptcy@publicans.com |
| Proposed Counsel to the Official Committee of Unsecured Creditors | LOCKE LORD LLP | Attn: Philip G. Eisenberg, Esquire, Elizabeth M. Guffy, Esquire & Simon R. Mayer, Esquire | 600 Travis Street | Suite 2800 | Houston | TX | 77002 | | 713-226-1200 | 713-223-3717 | peisenberg@lockelord.com eguffy@lockelord.com simon.mayer@lockelord.com |

In re:  Sanchez Energy Corporation , *et al.* ,
Core/2002
Case No. 19-34508 (MI)

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to Crescent Drilling & Production, Inc. | Lugenbuhl, Wheaton, Peck, Rankin & Hubbard | Attn: Benjamin W. Kadden | 601 Poydras St. | Suite 2775 | New Orleans | LA | 70130 | | 504-568-1990 | 504-310-9195 | bkadden@lawla.com |
| Counsel to Elliott Electric Supply, Inc. | Matthews, Shiels, Knott, Eden, Davis & Beanland, L.L.P. | Attn: Misti L. Beanland & Christen C. Paquin | 8131 LBJ Freeway | Suite 700 | Dallas | TX | 75251 | | 972-234-3400 | 972-234-1750 | beanland@mssattorneys.com cpaquin@mssattorneys.com |
| Counsel for McKinsey Recovery & Transformation Services U.S., LLC | MCKINSEY & COMPANY, INC. | Attn: Justin Sommers, Associate General Counsel | 55 East 52nd Street | 27th Floor | New York | NY | 10022 | | 212-415-1922 | | Justin_sommers@mckinsey.com |
| Proposed Counsel to the Official Committee of Unsecured Creditors | MILBANK LLP | Attn: Dennis F. Dunne, Esquire, Evan R. Fleck, Esquire & Benjamin M. Schak, Esquire | 55 Hudson Yards | | New York | NY | 10001 | | 212-530-5000 | 212-530-5219 | efleck@milbank.com ddunne@milbank.com bschak@milbank.com |
| Counsel to Eagle Ford TX LP ("EFTX") | Morgan, Lewis & Bockius LLP | Attn: Amy L. Kyle, Julia Frost-Davies, Laura M. McCarthy | One Federal Street | | Boston | MA | 02110 | | 617-341-7700 | 617-341-7701 | amy.kyle@morganlewis.com julia.frost-davies@morganlewis.com laura.mccarthy@morganlewis.com |
| Counsel to Eagle Ford TX LP ("EFTX") | Morgan, Lewis & Bockius LLP | Attn: T. Cullen Wallace | 1000 Louisiana Street | Suite 4000 | Houston | TX | 77002-5005 | | 713-890-5000 | 713-890-5001 | cullen.wallace@morganlewis.com |
| Counsel to the Ad Hoc Group of First Lien Noteholders | Morrison & Foerster LLP | Attn: Dennis Jenkins | 250 West 55th Street | | New York | NY | 10019 | | 212-468-8023 | 212-468-7900 | djenkins@mofo.com |
| United States Trustee Southern District of Texas | Office of the United States Trustee | Attn: Hector Duran, Jr & Stephen Douglas Statham | 515 Rusk Ave. | Ste. 3516 | Houston | TX | 77002 | | 713-718-4650 | 713-718-4670 | Hector.Duran.Jr@usdoj.gov stephen.statham@usdoj.gov |
| COUNSEL FOR KODIAK GAS SERVICES, LLC | OKIN ADAMS LLP | Attn: Matthew S. Okin, Christopher Adams, & John Thomas Oldham | 1113 Vine St. | Suite 240 | Houston | TX | 77002 | | 713-228-4100 | 888-865-2118 | mokin@okinadams.com cadams@okinadams.com joldham@okinadams.com |
| Counsel to B. C. Henderson Construction, Inc. | Patrick Kelley, PLLC | Attn: Patrick Kelley | 112 E. Line Street | Suite 203 | Tyler | TX | 75702 | | 903-630-5151 | 903-630-5760 | pat@patkelleylaw.com |
| Counsel to GSO Capital Partners LP and certain affiliates (collectively, "GSO") | Paul, Weiss, Rifkind, Wharton & Garrison LLP | Attn: Paul M. Basta, Alice Belisle Eaton, Sean A. Mitchell | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-373-3000 | 212-757-3990 | pbasta@paulweiss.com aeaton@paulweiss.com smitchell@paulweiss.com |
| Counsel to Dimmit County, Maverick County, and La Pryor Independent School District | Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: Carkis Arce | 613 NW Loop 410 | Suite 550 | San Antonio | TX | 78216 | | 210-998-3230 | 210-998-3231 | carce@pbfcm.com |
| Counsel to the Delta Lake Irrigation District | Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: John T. Banks | 3301 Northland Drive | Suite 505 | Austin | TX | 78731 | | 512-302-0190 | 512-302-1802 | jbanks@pbfcm.com |
| Counsel to Dimmit County, Maverick County, Maverick County Hospital District and LA Pryor ISD | Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: Owen M. Sonik | 1235 North Loop West | Suite 600 | Houston | TX | 77008 | | 713-862-1860 | 713-862-1429 | osonik@pbfcm.com |
| Counsel to GSO Capital Partners LP and certain affiliates (collectively, "GSO") | Porter Hedges LLP | Attn: John F. Higgins, Eric M. English, Genevieve M. Graham | 1000 Main Street | 36th Floor | Houston | TX | 77002-2764 | | 713-226-6000 | 713-226-6248 | jhiggins@porterhedges.com eenglish@porterhedges.com ggraham@porterhedges.com |
| Claims Agent | Prime Clerk, LLC | Attn: David Malo | One Grand Central Place | 60 East 42nd Street, Suite 1440 | New York | NY | 10165 | | 212-257-5450 | 646-328-2851 | sanchezteam@primeclerk.com serviceqa@primeclerk.com |
| Counsel for McKinsey Recovery & Transformation Services U.S., LLC | PROSKAUER ROSE LLP | Attn: Ehud Barak & Daniel Desatnik | Eleven Times Square | | New York | NY | 10036-8299 | | 212-969-3000 | 212-969-2900 | ebarak@proskauer.com ddesatnik@proskauer.com |
| Counsel to the Ad Hoc Group of Unsecured Noteholders | Quinn Emanuel Urquhart & Sullivan LLP | Attn: Benjamin Finestone | 51 Madison Ave | 22nd Floor | New York | NY | 10010 | | 212-849-7341 | 212-849-7100 | benjaminfinestone@quinnemanuel.com |
| COUNSEL TO THE AD HOC GROUP OF UNSECURED NOTEHOLDERS | QUINN EMANUEL URQUHART & SULLIVAN, LLP | Attn: Benjamin I. Finestone, Daniel S. Holzman, Katherine Scherling, & Jordan Harap | 51 Madison Avenue, 22nd Floor | | New York | NY | 10010 | | 212-849-7000 | 212-849-7100 | benjaminfinestone@quinnemanuel.com jordanharap@quinnemanuel.com |
| COUNSEL TO THE AD HOC GROUP OF UNSECURED NOTEHOLDERS | QUINN EMANUEL URQUHART & SULLIVAN, LLP | Attn: Patricia B. Tomasco, Christopher Porter, Devin van der Hahn | 711 Louisiana Street, Suite 500 | | Houston | TX | 77002 | | 713-221-7000 | 713-221-7100 | pattytomasco@quinnemanuel.com chrisporter@quinnemanuel.com devinvanderhahn@quinnemanuel.com |
| Counsel for Stevens Transport, Inc. and Stevens Tanker Division, LLC | Rapp & Krock, PC | Attn: Henry Flores, Melissa A. Fuller | 1980 Post Oak Blvd, Suite 1200 | | Houston | TX | 77056 | | 713-759-9977 | 713-759-9967 | hflores@rappandkrock.com mfuller@rappandkrock.com |
| Counsel to Moreno Ranch, Ltd. & C.Y.A Enterprises, L.L.C | Ross Molina Oliveros, P.C. | Attn: Patrick J. Oegerle | 4118 Pond Hill Road | Suite 100 | San Antonio | TX | 78231 | | 210-249-3200 | 210-428-6379 | poegerle@rmolawfirm.com |
| Debtors | Sanchez Energy Corporation | Attn: President or General Counsel | 1000 Main Street | Suite 3000 | Houston | TX | 77002 | | | | |

In re:  Sanchez Energy Corporation , *et al.* ,
Core/2002
Case No. 19-34508 (MI)

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to Othon Ruiz Najera, Fernando Canales Stelzer, Yukali LP, Soda Spring Limited 2, and Vigo International Ventures Limited | Schlanger, Silver, Barg & Paine, L.L.P. | Attn: Julia A. Cook | 109 North Post Oak Lane | Suite 300 | Houston | TX | 77024 | | 713-785-1700 | 713-785-2091 | jcook@ssbplaw.com |
| Securities and Exchange Commission - Headquarters | Securities & Exchange Commission | Secretary of the Treasury | 100 F St NE | | Washington | DC | 20549 | | 202-942-8088 | | secbankruptcy@sec.gov NYRObankruptcy@sec.gov |
| Securities and Exchange Commission - Regional Office | Securities & Exchange Commission - Fort Worth Office | David Woodcock Regional Director | Burnett Plaza | 801 Cherry St., Ste. 1900 Unit 18 | Fort Worth | TX | 76102 | | | | |
| Securities and Exchange Commission - Regional Office | Securities & Exchange Commission - NY Office | Attn: Bankruptcy Department | Brookfield Place | 200 Vesey Street Ste 400 | New York | NY | 10281-1022 | | 212-336-1100 | | bankruptcynoticeschr@sec.gov |
| Counsel to DJH Minerals LP | Shearman and Sterling LLP | Attn: C. Luckey McDowell | 1100 Louisiana St #3300 | | Houston | TX | 77002 | | 713-354-4875 | | luckey.mcdowell@shearman.com |
| Counsel to DJH Minerals LP | Shearman and Sterling LLP | Attn: Jordan A. Wishnew | 599 Lexington Avenue | | New York | NY | 10022 | | 212-848-4000 | 646-848-7179 | jordan.wishnew@shearman.com |
| Counsel to Excalibur Rentals, Inc. | SPROUSE SHRADER SMITH PLLC | Attn: John Massouh | 701 S. Taylor, Suite 500 | P.O. Box 15008 | Amarillo | TX | 79105-5008 | | 806-468-3300 | 806-373-3454 | john.massouh@sprouselaw.com |
| Counsel to 1000 MAIN, LLC, a Delaware limited liability company | SSL Law Firm LLP | Attn: Ivo Keller, Esq. | 575 Market Street, Suite 2700 | | San Francisco | CA | 94105 | | 415-814-6400 | 415-814-6401 | ivo@ssllawfirm.com |
| Attorney General | State of Delaware Attorney General | Attention Bankruptcy Dept | 820 N. French St. | | Wilmington | DE | 19801 | | 302-577-8400 | | |
| Attorney General | State of Louisiana Attorney General | Attention Bankruptcy Dept | 1885 N 3rd St | | Baton Rouge | LA | 70802 | | 225-326-6079 | | |
| Attorney General | State of Mississippi Attorney General | Attention Bankruptcy Dept | 550 High Street | Suite 1200 | Jackson | MS | 39205 | | 601-359-3680 | | |
| Attorney General | State of Texas Attorney General | Attention Bankruptcy Dept | Capitol Station | PO Box 12548 | Austin | TX | 78711-2548 | | 512-475-4868 | 512-475-2994 | public.information@oag.state.tx.us |
| Counsel for Stevens Transport, Inc. and Stevens Tanker Division, LLC | Stevens Transport, Inc. | Attn: Bruce L. Dean | 9757 Military Parkway | | Dallas | TX | 75227 | | 976-216-9000 | 976-289-2187 | bdean@stevenstransport.com |
| Counsel to Railroad Commission of Texas | Texas Attorney General's Office | Attn: Todd B. Headden, Assistant Attorneys General | Bankruptcy & Collections Division | P. O. Box 12548- MC 008 | Austin | TX | 78711-2548 | | 512-463-2173 | 513-936-1409 | todd.headden@oag.texas.gov |
| Counsel to Tax Consultants of Texas ("TCoT") | The Law Office of Kay B. Walker | Attn: Kay B. Walker | 615 Leopard | Suite 635 | Corpus Christi | TX | 78401 | | 361-533-2476 | | kaywalker@kaywalkerlaw.com |
| Counsel to Royal Bank of Canada | Thompson & Knight LLP | Attn: Robert C. Shearer, Tye C. Hancock, Anthony F. Pirraglia | 811 Main Street | Suite 2500 | Houston | TX | 77002 | | 713-951-5896 | 832-397-8056 | Robert.shearer@tklaw.com Tye.hancock@tklaw.com Tye.Hancock@tklaw.com Anthony.Pirraglia@tklaw.com |
| Counsel to Royal Bank of Canada | Thompson & Knight LLP | Attn: Steven J. Levitt | One Arts Plaza | 1722 Routh Street, Suite 1500 | Dallas | TX | 75201 | | 214-969-1700 | 214-969-1751 | steven.levitt@tklaw.com |
| Counsel to Sunbelt Tractor & Equipment Contpany | TIMOTHY R. PLOCH, P.C. | Attn: James Louis Hordern Jr. | 730 N. Post Oak, Suite 100 | | Houston | TX | 77024 | | 713-862-4300 | 713-862-7575 | jhordern@plochlaw.com |
| Union Pacific Railroad Company | Union Pacific Railroad Company | Attn: Tonya W. Conley, Lila L. Howe | 1400 Douglas Street | STOP 1580 | Omaha | NE | 68179 | | 402-544-3015 | | bankruptcynotices@up.com |
| Counsel to USA Department of Interior | United States Attorney's Office | Attn: Richard A. Kincheloe | Southern District of Texas | 1000 Louisiana St., Suite 2300 | Houston | TX | 77002 | | 713-567-9422 | 713- 718-3033 | Richard.Kincheloe@usdoj.gov |
| US Attorney for the Southern District of Texas | US Attorney for Southern District of Texas | Attn: Ryan K. Patrick | 1000 Louisiana | Ste. 2300 | Houston | TX | 77002 | | 713-567-9000 | 713-718-3300 | |
| Counsel to Gavilan Resources, LLC | Vinson & Elkins LLP | Attn: David S. Meyer, Jessica C. Peet | 666 Fifth Avenue | 26th Floor | New York | NY | 10103-0040 | | 212-237-0000 | 212-237-0100 | dmeyer@velaw.com jpeet@velaw.com |
| Counsel to Gavilan Resources, LLC | Vinson & Elkins LLP | Attn: Matthew R. Stammel, Jordan W. Leu | 2001 Ross Avenue | Suite 3900 | Dallas | TX | 75201 | | 214-220-7700 | 214-220-7716 | jleu@velaw.com mstammel@velaw.com |
| Counsel to Gavilan Resources, LLC | Vinson & Elkins LLP | Attn:James D. Thompson III, Andrew J. Geppert | 1001 Fannin | Suite 2500 | Houston | TX | 77002 | | 713-758-2222 | 713-758-2346 | ageppert@velaw.com |
| Counsel to Cathexis Royalties & Minerals, LP ("Cathexis") | Vorys, Sater, Seymour and Pease LLP | Attn: John J. Sparacino | 909 Fannin | Suite 2700 | Houston | TX | 77010 | | 713-588-7038 | 713-588-7080 | jjsparacino@vorys.com |
| Counsel to Gavilan Resources, LLC | Weil, Gotshal & Manges LLP | Attn: Alfredo R. Pérez, Brenda Funk | 700 Louisiana Street | Suite 1700 | Houston | TX | 77002 | | 713-546-5000 | 713-224-9511 | Alfredo.Perez@weil.com Brenda.Funk@weil.com |

In re:  Sanchez Energy Corporation , *et al.* ,
Core/2002
Case No. 19-34508 (MI)

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to Gavilan Resources, LLC | Weil, Gotshal & Manges LLP | | 767 Fifth Avenue | | New York | NY | 10153 | | 212-310-8000 | 212-310-8007 | Garrett.Fail@weil.com |
| Counsel to Mutual of Omaha Bank | WINSTEAD PC | Attn: Phillip Lamberson | 500 Winstead Building | 2728 N. Harwood Street | Dallas | TX | 75201 | | 214-745-5400 | 214-745-5390 | plamberson@winstead.com |
| Counsel to COMERICA BANK | WINSTEAD PC | Attn: Sean B. Davis | 600 Travis Street | Suite 5200 | Houston | TX | 77002 | | 713-650-8400 | 713-650-2400 | sbdavis@winstead.com |