**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) Case No. 19-34508 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**OBJECTION OF ROYAL BANK OF CANADA TO AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**
[Relates to Dkt. No. 1149]

Royal Bank of Canada, as administrative agent, as lender under the Revolving Credit Facility,[2] and as predecessor Collateral Trustee (in such capacities, "RBC"), files this objection (the "Objection") to the *Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Dkt. No. 1149] (the "Plan") and respectfully states the following:

**Preliminary Statement**

1.      The Plan cannot be confirmed as proposed, as it would unlawfully circumvent the protections, rights, and priorities granted by Court order to RBC in these chapter 11 cases. Specifically, the Plan purports to modify, impair, and discharge "First-Out Obligations" and many

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102).  The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

of the protections afforded RBC under the Final DIP Order (defined below), including indemnifications, in direct contravention of the Final DIP Order and the applicable loan and collateral documents.

2.      Accordingly, and for the reasons more fully set forth below, the Debtors cannot satisfy their burden under section 1129 of the Bankruptcy Code.

### Relevant Background

## I.      The Debtors' Prepetition Secured Debt

3.      In early 2018, the Debtors recapitalized their businesses through (i) the issuance of $500 million of secured notes ("Secured Notes") pursuant to that certain Secured Notes Indenture (the "Indenture"), and (ii) entry into that certain Third Amended and Restated Credit Agreement dated as of February 14, 2018 (the "Prepetition Credit Agreement") with RBC.  Proceeds of the Secured Notes were used, in part, to prepay outstanding borrowings under the Second Amended and Rested Credit Agreement dated June 30, 2014 (the "Prior Credit Agreement").  And, in connection with the Indenture and issuance of the Secured Notes, the existing mortgages and security instruments held by RBC as agent (the "Original Mortgages"), were assigned to RBC, in its capacity as collateral trustee ("Collateral Trustee") under that certain Collateral Trust Agreement dated as of February 14, 2018 (the "Collateral Trust Agreement").

4.      The obligations under the Indenture and the Prepetition Credit Agreement were secured by first-priority liens on (i) the Debtors' oil and natural gas properties; (ii) the equity interests of the Prepetition Debt Guarantors; and (iii) the Debtors' other material personal property (collectively, the "Prepetition Collateral"), pursuant to (i) that certain Second Amended and Restated Security and Pledge Agreement, dated as of February 14, 2018, and (ii) those certain Amended and Restated Mortgages, Deeds of Trust, Security Agreements, Financing Statements, and Assignments of Production, effective as of April 13, 2018 (the "Amended Mortgages"). Under

the Collateral Trust Agreement, the Collateral Trustee held the liens that were granted pursuant to the Original Mortgages, Amended Mortgages and other security documents and held the right to enforce the same.  As more fully described below, the Amended Mortgages were prepared by the Debtors, together with the initial note purchaser and lead underwriter under the Indenture, and contained a number of immaterial clerical errors, which are now the subject of pending litigation initiated by the Debtors.[3]

5.      Prior to the entry of the Interim DIP Order and Final DIP Order, the secured lenders' rights and priorities relating to the Prepetition Collateral were dictated by the Collateral Trust Agreement.  The Collateral Trust Agreement dictates, among other things, a payment priority in favor of a category of obligations known as the "First-Out Obligations," which generally consists of all obligations to RBC arising under the Prepetition Credit Agreement and associated collateral documents (including the Collateral Trust Agreement), as well as, certain hedging obligations - the "First-Out Hedging Obligations."[4]  In addition to the issued and outstanding debt under the Prepetition Credit Agreement, the First-Out Obligations included substantial indemnity protections and limitations of liability under both the Prepetition Credit Agreement and Collateral

---

[3]   The Original Mortgages securing the Credit Agreement did not contain the clerical errors at issue in the lien-related litigation.  *See* Answer (defined below) at ¶¶ 141–92.

[4]   *See* Collateral Trust Agreement § 1.1 at pp. 9-13 (detailing definitions of "First-Out Obligations," "First-Out Debt," "Senior Credit Facility," "First-Out Document," "Obligations"); *Id.* at § 3.4 (dictating payment priorities). A copy of the Collateral Trust Agreement is attached hereto as **Exhibit A**.

217569.000174 23418525.12

Trust Agreement.[5]  Obligations under the Indenture in favor of the holders of the Secured Notes had a junior payment priority.[6]

6.       Importantly, until a "Discharge of First-Out Obligations" (as defined in the Collateral Trust Agreement), RBC controlled rights of enforcement with respect to the liens it held as Collateral Trustee.[7]  After a "Discharge of First-Out Obligations," the Notes Trustee under the Indenture would assume control of the right to enforce as Controlling Priority Lien Representative.[8]

7.       Despite RBC's rights of enforcement, certain holders of the Secured Notes began engaging the Debtors in restructuring discussions, negotiating DIP financing, and taking other actions, without involving RBC, including the filing of certain correction affidavits in connection with the immaterial clerical errors to the Amended Mortgages.

## II.       The Bankruptcy Cases

8.       On August 11, 2019 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

---

[5]   These include indemnifications from the Debtors and rights to payment in connection therewith.  *See, e.g.*, Collateral Trust Agreement § 7.9(a) ("The Grantors jointly and severally agree to defend, indemnify, pay and hold harmless the Collateral Trustee . . . and each of their respective affiliates and each and all of the directors, officers, partners, trustees, employees, attorneys and agents, and (in each case) their respective heirs, representatives, successors and assigns . . . from and against any and all Indemnified Liabilities . . . ." ); *Id.* at § 3.5(b) ("No Priority Lien Representative or holder of Priority Lien Obligations (other than the Collateral Trustee) will have any liability whatsoever for any act or omission of the Collateral Trustee, and the Collateral Trustee will have no liability whatsoever for any act or omission of any Priority Lien Representative or any holder of Priority Lien Obligations."); *see also* Credit Agreement § 12.03; Collateral Trust Agreement §§ 5.5, 5.10, 7.8.

[6]   *See* Collateral Trust Agreement § 3.4 (dictating payment priority).

[7]   *See, e.g.*, Collateral Trust Agreement § 1.1 at pp. 4, 17 (defining Controlling Priority Lien Representative and Senior Credit Facility Agent); Collateral Trust Agreement § 3.3(a).

[8]   *See, e.g.*, Collateral Trust Agreement § 1.1 at pp. 4, 15 (defining Controlling Priority Lien Representative and Priority Lien Representative).

4

9. On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Limited Use of Cash Collateral; (ii) Obtaining Postpetition Credit Secured by Senior Liens; (iii) Granting Adequate Protection; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Dkt. No. 26] (the "<u>DIP Motion</u>"), seeking postpetition financing from certain holders of the Secured Notes (the "<u>Ad Hoc 1L Group</u>"), while (1) preserving the relative payment priority with respect to the First-Out Obligations vis-à-vis the DIP Lenders and DIP Obligations, (2) effecting a "Discharge of the First-Out Obligations" in accordance with the Collateral Trust Agreement, and (3) priming the Secured Notes' debt.

10. On August 15, 2019, the Court entered the *Interim Order (i) Authorizing Debtors (a) to Obtain Postpetition Financing Pursuant to Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b), and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Dkt. No. 144] (the "<u>Interim DIP Order</u>").  Notably, although RBC participated in the negotiation of the Interim DIP Order and was initially supportive of interim approval of the DIP Financing, RBC ultimately objected to the DIP Financing on August 13, 2019 because, *inter alia*, a Discharge of First-Out Obligations was not authorized as a condition to the interim DIP Financing.  *See, e.g.*, First Day Hr'g Tr. vol. 2, 131:10-132:19, Aug. 13, 2019.  The DIP Lenders' decision to proceed with the DIP Financing (in a position priming the Secured Notes' debt) without effecting a Discharge of First-Out Obligations, breached the Collateral Trust Agreement.[9]

11. On August 26, 2019, the U.S. Trustee appointed an official committee of unsecured creditors.

---

[9]    All rights of RBC under the Collateral Trust Agreement were expressly preserved under the Interim DIP Order.

217569.000174 23418525.12

12.     On January 22, 2020, the Court entered the *Final Order (i) Authorizing Debtors (a) to Obtain Postpetition Financing Pursuant to Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Dkt. No. 865] (the "Final DIP Order").  Although the Final DIP Order effected a "Discharge of First-Out Obligations"[10] and effected the replacement of RBC with Wilmington Trust N.A. ("WTNA") as Collateral Trustee, it recognized that certain First-Out Obligations remained outstanding and continued to accrue under the various First-Out Documents including the First-Out Hedging Obligations and the various indemnities and rights under the Prepetition Credit Agreement and Collateral Trust Agreement.  Further, the Final DIP Order preserved the relative payment priority of these obligations in a position senior to the DIP Obligations and other adequate protection liens and claims.  Specifically, the Final DIP Order granted RBC various rights and protections, including that:

a.     DIP Liens are subject and subordinate in payment to the First-Out Obligations (*see, e.g.*, Final DIP Order at ¶¶ H, 5(c), 7, 9(a), 10, 13-14, 16-17, 19, 22, 34);

b.     First-Out Obligations (including indemnity obligations) maintain their priority vis-à-vis the DIP Lenders and are unaffected by the DIP Order or DIP Documents (*Id.*);

c.     DIP Super Priority Claims (including recourse to avoidance action proceeds) are subordinate and subject to the payment of the First-Out Obligations (Final DIP Order at ¶ 9);

---

[10]   Final DIP Order at ¶ 7.  The "Discharge of First-Out Obligations" is defined in the Collateral Trust Agreement. In short, a Discharge of First-Out Obligations means the occurrence of (i) the termination of all commitments to extent loans and letters of credit that would constitute First-Out Obligations, (ii) payment in full in cash of all First-Out Obligations that are outstanding and unpaid at the time, (iii) discharge or cash collateralization of the Prepetition L/C, and (iv) collateralization of the First-Out Hedging Obligations that is substantially similar, or of substantially equal value, to the Prepetition Collateral.  *See* Collateral Trust Agreement § 1.1 at pp. 5-6.

217569.000174 23418525.12

d.      All payments and proceeds remitted to the DIP Agent are subject to the payment of the First-Out Obligations (Final DIP Order at ¶¶ 16-17);

e.      RBC was designated the "predecessor Collateral Trustee" under the Collateral Trust Agreement and granted the right to enforce all rights and privileges relating thereto, as well as, the rights granted under the Interim DIP Order and Final DIP Order (Final DIP Order at ¶ 7); and

f.      Any payments relating to the Discharge of First-Out Obligations were explicitly not subject to Challenges (Final DIP Order at ¶ 23(a)).

13.      Accordingly, the limitations of liability set forth in Sections 5.5 and 3.5(b) of the Collateral Trust Agreement,  the right to payment of compensation and expenses as set forth in Section 7.8 of the Collateral Trust Agreement,[11] the indemnity obligations under Section 7.9 of the Collateral Trust Agreement, the indemnity obligations set forth in Section 12.03 of the Prepetition Credit Agreement, and the First-Out Hedging Obligations continue to accrue (as First-Out Obligations) and are secured under the Final DIP Order, in a position senior to the DIP Obligations.

14.      Additionally, the Final DIP Order provides that the Debtors shall pay the fees and expenses of Thompson & Knight LLP ("TK"), as counsel to RBC, after receipt of a duly served invoice and a ten (10) day review period, and without further order of the Court.  *See* Final DIP Order at ¶19(e).[12]

15.      Finally, the Final DIP Order expressly states that the rights and remedies of RBC, among others, cannot be altered by the Plan:

Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the

---

[11]   Such right to payment includes payment of reasonable fees, costs, expenses and disbursements to the Collateral Trustee and/or its agents, including attorneys, for certain services provided under or relating to the Collateral Trust Agreement, as further detailed in section 7.8 of the Collateral Trust Agreement.

[12]   The Debtors are currently in default under the payment provision of the Final DIP Order.  Although the Debtors paid the fees and expenses of RBC for a significant portion of these chapter 11 cases, the Debtors have disregarded their obligation to pay TK's invoices since filing the Complaint on March 10.  Specifically, two invoices, totaling $160,625.22, are past due: (1) TK's invoice submitted March 10, for $23,345.55, became payable after the objection deadline ran on March 20; and (2) TK's invoice submitted March 31, for $137,279.67, became payable after the objection deadline ran on April 10.

> Adequate Protection and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties[13] granted by the provisions of the Interim Order, this Final Order, and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: . . . (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection.

Final DIP Order at ¶ 22(e) (footnote and emphasis added).

## III. The Lien-Related Litigation

16. On March 10, 2020, the Debtors filed an adversary complaint (the "Complaint") captioned *Sanchez Energy Corporation, et. al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association* (Adv. Pro. No. 20-03057) thereby commencing litigation (the "Adversary Proceeding," which compromises a portion of the Lien-Related Litigation (as defined in the Plan)) seeking to, among other things, challenge various liens that secure the Prepetition Credit Agreement and Secured Notes.  While numerous claims were asserted in the Complaint, the central claims relate to the Debtors' challenge of the validity, perfection, and priority of the Prepetition Secured Parties' liens on certain leases (the "Challenged Leases").  Notably, the Debtors falsely assert that the clerical errors or omissions in the Amended Mortgages were caused by RBC.[14]

17. On April 10, 2020, RBC filed its *Answer and Counterclaims* [Adv. Pro. Dkt. No. 7] (the "Answer") in the Adversary Proceeding.  As more fully described in the Answer, the Complaint is based on the false premise that immaterial omissions or discrepancies in a description

---

[13] The Final DIP Order definition of "Prepetition Secured Parties" includes "Royal Bank of Canada, in any and all of Royal Bank of Canada's capacities under any of the First-Out Documents."  *See* Final DIP Order at ¶ 4(a).

[14] Complaint at ¶¶ 31-32.

of certain leases, invalidates the mortgages on such leases notwithstanding the other terms of the Amended Mortgages and the Original Mortgages.

18.     Notably, the Challenged Leases were described with absolute precision in the Original Mortgages, and the Original Mortgages and Amended Mortgages were properly filed in the real property records of all relevant counties.  *See* Answer at ¶¶ 141–192.  When the Original Mortgages were amended and restated in connection with the issuance of the Secured Notes, RBC did not negotiate, draft, or participate in the negotiation or drafting of the amended and restated mortgages.  It was not the responsibility of RBC under the terms of the Collateral Trust Agreement to prepare the Amended Mortgages.   Specifically, the Collateral Trust Agreement dictated the responsibilities in connection with lien perfection issues, and it granted broad protections in favor of RBC.  For example, the Collateral Trust Agreement states, among other things:

a.     "Beyond the exercise of reasonable care in the **custody** of the Collateral in its possession, the Collateral Trustee will have *no duty as to any Collateral* in its possession or control . . . [and] will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times *or otherwise perfecting or maintaining the perfection of any Liens on the Collateral*."  Collateral Trust Agreement § 5.12 (emphasis added).

b.     "[T]he Collateral Trustee will execute, file or record . . . if it shall receive a specific written request . . . by the Controlling Priority Lien Representative . . . *it being understood that the Company and/or the applicable Grantor shall be responsible for all filings required in connection with any Security Document and the continuation, maintenance and/or perfection of any such filing* or the lien and security interest granted in connection therewith."  *Id.* (emphasis added).

c.     "The Collateral Trustee *will not be responsible or liable for any action taken or omitted to be taken by it hereunder* or under any other Security Document, except for its own gross negligence, bad faith or willful misconduct as determined in the final non-appealable judgment of a court of competent jurisdiction."  Collateral Trust Agreement § 5.5 (emphasis added).

217569.000174 23418525.12

19.     The Debtors and the original note purchaser and lead underwriter, <u>not</u> RBC, handled the negotiations and drafting of the amended and restated mortgages.

20.     Moreover, as the Debtors admit in the Complaint, case law is clear that a property description is sufficient if the writing "furnishes within itself, <u>or by reference to some other existing writing, the means or data</u> by which the particular land to be conveyed may be identified with reasonable certainty."  Complaint at ¶ 64, n. 10 (quoting *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008)) (emphasis added).[15]

21.     On April 14, 2020, the Court entered an Order [Adv. Dkt. No. 9] abating the Lien-Related Litigation.  Wilmington Savings Fund Society ("<u>WSFS</u>") and WTNA have not filed an answer or asserted counterclaims or cross-claims.  However, based upon the Debtors' allegations and the surrounding circumstances, WSFS and WTNA may attempt to assert claims against RBC in connection with the Adversary Proceeding or otherwise.  But for the improper attempt to discharge (i) the continuing First-Out Obligations and (ii) RBC's claims and defenses through the Plan, RBC would retain a "first-out" position with respect to the Debtors' assets, and the immunity and indemnification provisions of the Collateral Trust Agreement, which survive as part of such obligations under the Final DIP Order.

## IV.   The Plan

22.     On April 9, 2020, the Debtors filed the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Dkt. No. 1120] (the "<u>Disclosure Statement</u>") and the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy*

---

[15]   Thus, even without the information contained in the Correction Instruments, a simple grantor-grantee index search based solely on the description of the Challenged Leases in the applicable mortgage documents would have put a reasonably prudent bona fide purchaser on constructive and inquiry notice of the liens on the Challenged Leases held for the benefit of the Prepetition Secured Parties, as the relevant mortgage documents and certain other documents incorporated by reference contained all of the means and/or data to identify the Challenged Leases with reasonable (if not absolute) certainty.  *See* Answer at ¶¶ 141–192.

*Corporation and Its Debtor Affiliates* [Dkt. No. 1119], which is the "product of a negotiated settlement reached through mediation." Disclosure Statement § III(R), p. 15. (However, RBC was not privy to such mediation.)

23.     On or about April 20, 2020, RBC received notice of its non-voting status with respect to unimpaired classes under the Plan.

24.     On April 26, 2020, the Debtors filed the Plan.

25.     The Plan does not classify (or address) the First-Out Obligations, despite the fact that such claims have priority over any other claims, and therefore are substantially different from other claims. Moreover, the Plan contains numerous provisions that conflict with the rights and protections granted RBC under the Final DIP Order (collectively, the "Conflicting Plan Provisions"), which include the following.

     a.    "[A]ll notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest," which would presumably include, among others things, the Collateral Trust Agreement and Final DIP Order "shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed discharged." Plan at Art. IV(P). However, paragraph 22(e) of the Final DIP Order provides that the protections granted to RBC (including the immunity and indemnity provisions relevant to the Lien-Related Litigation) "shall not be modified, impaired or discharged" by any plan.

     b.    The "DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect ***solely*** to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the

DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date." Plan at Art. IV(P) (emphasis added). While this provision protects the successor trustees (WSFS and WTNA), it provides no similar protection for RBC and purports to terminate RBC's rights under the Collateral Trust Agreement and the Final DIP Order.

c.      The DIP Agent shall be entitled to the continued payment of fees and expenses (Plan at Art. IV(R)) but no such provision is made for the continued payment of RBC's fees and expenses even though the payment of the DIP Agent's fees and expenses is subordinate to the payment of First-Out Obligations (including RBC's fees, expenses, and entitlement to indemnification) under the Final DIP Order.

d.      "All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; provided that in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement." Plan at Art. IV(D). While this provision protects the payment of the DIP Lenders' and DIP Agent's fees, no such provision is made for the continued payment of RBC's fees and expenses.

e.      "Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved." Plan at Art. IV(D). While this provision protects the rights, claims and defenses of the holders of the DIP Claims, it does not provide for the protection of RBC's rights, claims, and defenses.

      f.     Upon the Effective Date, "all property in each Estate, all Causes of Action, and any property . . . shall vest . . . free and clear of all Liens, Claims, charges, or other encumbrances." Plan at Art. IV(G).[16]

26.     Further, other Plan provisions infringe on RBC's due process rights by unilaterally establishing procedural and scheduling limitations in the Lien-Related Litigation. Despite being party to the Lien-Related Litigation, RBC was not consulted and did not agree to the schedule, procedures, and other limitations, which impact parties' substantive rights to prepare and present a full defense of any asserted claims.[17]

## Objection

27.     Section 1129 of the Bankruptcy Code contains the requirements for confirming a plan. The plan proponent "has the burden of proving that all elements of [section 1129] are satisfied . . . by a preponderance of evidence." *In re Cypresswood Land Partners, Inc.*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *see also In re Briscoe Enters., Ltd*., 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under [section] 1129(a) and in a cramdown.").

---

[16]   To the extent that RBC's rights under the Final DIP Order and Collateral Trust Agreement are not expressly preserved, the discharge, injunction, and release provisions also conflict with the Final DIP Order. *See* Plan at Art. VIII.

[17]   Plan at Art. IV(D) ("[P]arties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to determine the interpretation of the Final DIP Order. . . . in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Confirmation Date. . . . If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. . . . Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. . . . The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section.").

28.     The Debtors have not, and cannot, meet this burden, absent conforming changes to preserve RBC's rights and priorities as granted under the Final DIP Order.  Otherwise, the Plan must not be confirmed.

**I.      The Plan Improperly Classifies RBC's Claims and Deems Such Claims as Unimpaired.**

29.     The proposed classification and treatment of RBC's claims does not comport with the provisions of title 11, and precludes confirmation of the Plan.  *See* 11 U.S.C. § 1129(a)(1)-(2) (providing the court may only confirm a plan if the plan and plan proponent comply "with the applicable provisions of this title").

30.     First, the Plan appears to improperly classify a fragment of the First-Out Obligations as an Administrative Claim.  Plan at Art. I(A)(4) (defining "Administrative Claim" to include "any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses ***for services rendered*** in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement" (emphasis added)). [18]  However, RBC's accrued fees and expenses "for services" are secured under the Final DIP Order—with priority over all other DIP liens and claims—and the plan proponents may not avoid the protections afforded to RBC simply by improperly classifying its claim.  Moreover, while the proposed Administrative Claim afforded RBC would relate to fees and expenses "for services rendered," such claim does not properly address RBC's accruing fees, expenses, and indemnities which constitute First-Out Obligations. [19]

---

[18]   It is unclear what this phrase is intended to mean, as it is inconsistent with the terms of the Final DIP Order and Collateral Trust Agreement.  Obviously, RBC did not "render services" to the Debtors.

[19]   Further, the Plan purports to improperly discharge the obligation to pay RBC's fees and expenses as of the Effective Date.

31.     Second, the remaining portion of RBC's claim appears to have been improperly designated as unimpaired "Class 1—Other Secured Claims."  *See* Plan § I(A)(94) (defining "Other Secured Claims" as "any Secured Claim other than the DIP Claims and the Secured Notes Claims"); *but see* Disclosure Statement at p. 5 (projecting the amount of claims in Class 1 as "$0"). As an initial matter, the claims of RBC, constituting First-Out Obligations, have priority over all other claims, including the claims of the DIP Lenders, and are not subject to discharge; therefore, such claims are not substantially similar to any other claims and may not be classified with other claims.  *See* 11 U.S.C. § 1122(a) ("[A] plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."). Moreover, to the extent the First-Out Obligations are included in Class 1, such classification violates the Bankruptcy Code because Class 1 Claims are discharged, as of the Effective Date, under the Plan in contravention of the Final DIP Order.  Plan at Art. VIII(A).

32.     Third, as described in greater detail below, the Plan substantially impairs RBC's legal, equitable, and contractual rights, defenses, and claims; thus, the Debtors may not properly designate RBC's First-Out Obligations as unimpaired.  *See* 11 U.S.C. § 1124(1) (establishing a claim is impaired unless a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest"); *In re GSC, Inc.*, 453 B.R. 132, 177 (Bankr. S.D.N.Y. 2011) ("Any alteration to the claimant's legal, equitable, or contractual rights under a plan would make that claim impaired."); *In re Union Meeting Partners*, 160 B.R. 757, 771 (Bankr. E.D. Pa. 1993) ("'[I]mpairment' is a term of art and includes virtually any alteration of a claimant's rights . . . even where a creditor's rights are improved by a plan."); *In re American Solar King Corp.*, 561, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) ("[E]ven the smallest impairment . . . entitles a creditor to participate in voting."); *Downtown Athletic Club of*

*N.Y.C. v. Caspi Dev. Corp. (In re Downtown Athletic Club of N.Y.C.*), Case No. 98-B-41419, 1998 Bankr. LEXIS 1642 (Bankr. S.D.N.Y. Dec. 21, 1998) ("[A]ny alteration, even one that enhances [a creditor's] rights, constitutes impairment.").

## II.    The Plan Improperly Impairs RBC's Rights In Violation of the Final DIP Order.

33.    Here, the Plan would eliminate the Court-ordered and bargained-for rights of RBC, in contravention to section 1129(a)(3) of the Bankruptcy Code.  Because the Plan violates the Final DIP Order, which is *res judicata*, and improperly alters the rights of RBC, it cannot be confirmed as written.  *See, e.g., In re Multiut Corp.*, 449 B.R. 323, 339 (Bankr. N.D. Ill.2011) ("Additionally, [section] 1129(a)(2) mandates compliance with court orders issued in furtherance of the reorganization process."); *In re Draiman*, 450 B.R. 777, 799 (Bankr. N.D. Ill. 2011) (same); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 303 (Bankr. N.D. Ill. 2008) (same); *In re A & B Assocs., L.P.*, Case No. 17-40185-EJC, 2019 WL 1470892, at *50 (Bankr. S.D. Ga. Mar. 29, 2019) (same); *see also In re W.J. Servs., Inc.*, 139 B.R. 824, 827 (Bankr. S.D. Tex. 1992) (citing *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371 (1940)) ("Final orders of the bankruptcy court are res judicata of all matters that were or could have been litigated before the Court."); *see also Hendrick v. Avent*, 891 F.2d 583, 587 (5th Cir. 1990) (holding that a prior sale order was *res judicata* that barred the plaintiff's collateral attack on the judgment).

34.    Specifically, the protections provided to RBC in the Final DIP Order are being impaired and prejudiced under the Plan.  Notably, despite an existing breach of the Collateral Trust Agreement by the DIP Lenders, the Final DIP Order provides:

> Upon the occurrence of the Discharge of First-Out Obligations pursuant to this Final Order, (w) the Discharge of First-Out Obligations shall be deemed effective as of the entry of this Final Order, (x) the Controlling Priority Lien Representative (as defined in the Collateral Trust Agreement) shall be deemed to remove Royal Bank of Canada as Collateral Trustee and thereupon deemed to appoint Wilmington Trust N.A. as the Collateral Trustee under the Collateral Trust Agreement, (y) the Controlling Priority Lien Representative shall be deemed to have instructed the

16

Collateral Trustee to consent to the entry of this Final Order, and (z) Royal Bank of Canada shall be the "predecessor Collateral Trustee" under the Collateral Trust Agreement and remain entitled to enforce all rights and privileges relating thereto including the immunities granted to it in Article 5 and the provisions of Section 7.8 and 7.9 of the Collateral Trust Agreement, as well as the provisions of the Interim Order and this Final Order.

Final DIP Order ¶ 7. As such, the Controlling Priority Lien Representative became subject to the control of the DIP Lenders. And, in relinquishing the role of Controlling Priority Lien Representative, RBC would have less ability to protect itself and its interests if the DIP Lenders, Debtors, or others later tried to attack RBC's rights, claims, and priorities. Thus, RBC would not have supported entry of the Final DIP Order without the protections set forth therein, or without paragraph 22(e) of the Final DIP Order, which provides such protections "shall survive, and shall not be modified, impaired or discharged by . . . the entry of an order confirming a chapter 11 plan. . . ." Final DIP Order at ¶ 22(e).

35. The clear disregard of RBC's rights is especially problematic given that RBC has been named a defendant in the Lien-Related Litigation, where the Debtors have alleged that RBC made "mistakes" in connection with the Amended Mortgages.[20] The Plan, as written, purports to improperly discharge RBC's rights, defenses, and claims under the Final DIP Order and Collateral Trust Agreement, including the immunity and indemnification provisions that are critical to RBC's defense of the claims and potential claims asserted or threatened to be asserted in the Lien-Related Litigation.[21]

---

[20]   As the Lien-Related Litigation is currently abated, it is unclear whether the DIP Lenders or their agents intend to assert cross claims against RBC. Until RBC has certainty regarding this issue, the provisions of the Final DIP Order and the protections contained within the Collateral Trust Agreement (including the immunity and indemnification provisions) are of critical importance.

[21]   The Collateral Trust Agreement is a subordination agreement that governs RBC's rights vis-à-vis the Debtors and Secured Noteholders. *See, e.g.*, Collateral Trust Agreement, Exhibit D, § 4.02(a). Courts routinely enforced intercreditor agreements under section 510(a) of the Bankruptcy Code, and the agreed subordination under the Collateral Trust Agreement is the principal reason the First-Out Obligations were ordered senior to the DIP Obligations under the Interim and Final DIP Orders *See, e.g.*, 11 U.S.C. § 510(a) ("A subordination agreement is

17

36.     For example, the Final DIP Order included a specific right to "remain entitled to enforce" all rights and privileges under the Collateral Trust Agreement vis-à-vis the Debtors, DIP Lenders, and Secured Noteholders, and others, as well as, the provisions of the Interim DIP Order and Final DIP Order.  *See, e.g.*, Final DIP Order ¶ 7.  Yet, Article IV(P) of the Plan provides for the termination, cancellation, satisfaction, and discharge of all documents evidencing claims (which would presumably include the Collateral Trust Agreement):

> [The] DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect ___**solely**___ to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors.

Plan at Art. IV(P) (emphasis added).

37.     Similarly, Article IV(P) further provides "[t]he provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date."  Plan at Art. IV(P).

38.     Tellingly, these provisions purport protect the rights of the DIP Lenders, Secured Noteholders, successor notes and collateral trustees (WSFS and WTNA, respectively), and other

---

enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); *In re Boston Generating, LLC*, 440 B.R. 302, 318-19 (Bankr. S.D.N.Y. 2010); *In re Erickson Retirement Cmtys., LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009).

parties that support the Plan, but such provisions **do not include protection for RBC**.[22]  Thus,

RBC's claims under the Collateral Trust Agreement and Final DIP Order would be terminated,

cancelled, satisfied, and discharged under the Plan in violation of paragraph 22(e) of the Final DIP

Order.

39.    Other provisions of the Plan similarly protect the DIP Lenders, Secured

Noteholders, successor notes and collateral trustees, and other parties that support the Plan, but

notably exclude any protection for RBC.  *See, e.g.*, Plan at Art. IV(R) (providing that the DIP

Agent shall be entitled to the continued payment of fees and expenses without similarly providing

for the continuation of the payment of RBC's fees and expenses, even though the payment of the

DIP Agent's fees and expenses is subordinate to the payment of First-Out Obligations—including

RBC's fees, expenses, and entitlement to indemnification—under the Final DIP Order); Plan at

Art. IV(D) (providing that "all rights, claims, and defenses of the Holders of the DIP Claims,

including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed

preserved," without similarly providing for the preservation of RBC's rights); Plan at Art. IV(D)

(providing that notwithstanding provisions in the Plan that determine who should bear the costs of

the Lien-Related Litigation, "nothing in this paragraph shall alter the rights of the DIP Lenders or

DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or

DIP Credit Agreement," without similarly protecting the rights of RBC).

40.    Further, the Plan provides, *inter alia*, "[a]ll costs of prosecuting the Lien-Related

Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by

---

[22]    *See also* Plan at Art. IV(G) (Upon the Effective Date, "all property in each Estate, all Causes of Action, and any
property . . . shall vest . . . free and clear of all Liens, Claims, charges, or other encumbrances").  To the extent
that RBC's rights under the Final DIP Order and Collateral Trust Agreement are not expressly preserved, the
discharge, injunction, and release provisions also conflict with the Final DIP Order.  *See* Plan at Art. VIII.

the Reorganized Debtors or payable by one group of parties to the other." Plan at Art. IV(D). This is directly contrary to RBC's right to indemnification under the Final DIP Order and Collateral Trust Agreement, and constitutes yet another modification, impairment, and discharge of RBC's rights, defenses, and claims. And, to the extent that the Plan attempts to alter RBC's rights under the Final DIP Order in any respect, it is not confirmable.

**III.    The Plan Violates the Best Interests Test Because RBC Would Receive the Benefit of the Final DIP Order in a Chapter 7 Liquidation.**

41.    Under the so-called "best interests test," each holder of a claim in an impaired class that does not accept a plan must "receive or retain under the plan on account of such claim or interest property of a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title. . . ." 11 U.S.C. § 1129(a)(7)(A). Here, RBC does not accept the Plan and would unquestionably receive more if the Debtors were liquidated under Chapter 7. Specifically, if these cases were converted, RBC would be entitled to the continued benefit of the protections in the Final DIP Order and under the Collateral Trust Agreement in the Lien-Related Litigation.[23] Further, RBC's rights, defenses, and claims would be preserved if these cases were converted; instead, the Plan purports to deem RBC's acceptance to (i) the requirement that RBC cover the costs of the litigation despite its indemnification and (ii) the procedural and scheduling limitations that the Plan imposes on such litigation, which infringe RBC's due process rights. In Chapter 7, RBC would also still be entitled to first-priority and first-payment priority, even above the DIP Liens, pursuant to the Final DIP Order. Accordingly, the Plan violates the best interests test, and should not be confirmed.

---

[23]    *See* Final DIP Order at ¶ 22(e) (providing that such protections "shall survive, and shall not be modified, impaired or discharged by . . . the entry of an order converting any of the Cases to a case under chapter 7. . . .").

217569.000174 23418525.12

IV.    **In the Alternative, or in Addition, the Plan Does Not Satisfy 11 U.S.C. § 1129(a)(8) and Violates the Cram Down Provisions of 11 U.S.C. § 1129(b).**

42.    Pursuant to section 1129(a)(8) of the Bankruptcy Code, for a plan to be confirmed, each class of claims or interests must either be unimpaired or accept the plan.  Here, RBC's rights are being substantially impaired under the Plan, and the Debtors must seek confirmation pursuant to section 1129(b) of the Bankruptcy Code.

43.    Under section 1129(b) of the Bankruptcy Code, a plan is not confirmable unless the Plan is "fair and equitable" and does not "discriminate unfairly."  11 U.S.C. § 1129(b)(1).  Here, the Plan discriminates unfairly by, *inter alia*, providing for continuing protections in favor of the DIP Lenders, the successor notes and collateral trustee under the Plan (in the spirit of the Final DIP Order), but eliminating the rights of RBC as a holder of First-Out Obligations and the predecessor Collateral Trustee.

44.    Generally, a plan must at a minimum, either (i) provide that a secured creditor retain its liens and receive deferred cash payments equal to the present value of its allowed secured claim or (ii) provide the secured creditor with the "indubitable equivalent" of its claims.  11 U.S.C. § 1129(b)(2)(A); *In re Couture Hotel Corp.*, 536 B.R. 712, 741-42 (Bankr. N.D. Tex. 2015) ("The minimal requirements of § 1129(b)(2) are that the secured claimant (1) must retain its lien(s) and be paid the full amount of its claim in deferred cash payments the present value of which must equal the value of its collateral, (2) must be paid from the sale of its collateral, or (3) must realize the indubitable equivalent of its claim.").  However, the Plan does not provide that RBC will retain the rights it was granted under the Final DIP Order securing the First-Out Obligations.

45.    The requirement to treat a secured lender fairly and equitably in a cram-down plan also reflects the dictate of the Fifth Amendment of the United States Constitution that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private

property be taken for public use, without just compensation."  U.S. CONST. amend. V; *see, e.g.*, *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 278 (1940) ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property."); *In re SCOPAC*, 624 F.3d 274, 278 n.1 (5th Cir. 2010), *opinion modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011) (explaining that "adequate protection must be sufficient to protect the creditor against diminution in the value of his collateral during the bankruptcy"); *see also In re George Ruggiere Chrysler-Plymouth*, 727 F.2d 1017, 1019-1020 (11th Cir. 1984) (stating that because security interests are "property rights" protected by Fifth Amendment from public taking without just compensation, bankruptcy court cannot allow secured interest to be threatened by improper use of collateral); *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (stating that adequate protection is necessary to ensure a prepetition secured creditor receives value for which it bargained prior to bankruptcy and to safeguard the creditor from diminution in value of its interest during chapter 11 reorganization; *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("The concept of adequate protection was designed to 'insure that the secured creditor receives the value for which he bargained.'"  (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 5839)).  Here, the Debtor is essentially taking RBC's collateral without paying full value in violation of the Fifth Amendment.

46.     Accordingly, the Plan cannot be crammed down against RBC.

## V.     The Plan Provisions Relating to the Lien-Related Litigation Violate RBC's Procedural Due Process Rights and are Not Feasible

47.     As the Debtors have asserted meritless claims against RBC in the Lien-Related Litigation, RBC favors an expeditious ruling on such claims.  Further, to the extent such claim are moot as a result of the impairment of the DIP Loans, RBC also favors an expeditious resolution of those issues.  However, Article IV(D) of the Plan appears to provide not only for an expedited (and

likely unworkable) schedule for all "Lien-Related Litigation," but also includes numerous other additional procedural and substantive limitations on RBC's ability to defend itself.  *See* Plan at Art. IV(D).  RBC was not consulted regarding the claims to be litigated, the proposed litigation schedule, or other limitations under the Plan.  RBC does not agree to such procedures, many of which violate RBC's procedural due process rights.  *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) ("Due process . . . calls for such procedural protections as the particular situation demands.") (internal quotations omitted).

48.    While RBC would certainly like to resolve the Lien-Related Litigation expeditiously, the timeline proposed in the Plan is not clear or feasible under the best of circumstances.  Absent clear parameters regarding the claims to be litigated, and the preservation of RBC's rights under the Final DIP Order, RBC cannot consent to the proposed schedule as it is violative of RBC's due process rights.

## **Reservation of Rights**

49.    RBC reserves all rights to supplement or amend this objection, or to join any objections or other pleading filed in connection with the Plan.

## **Conclusion**

WHEREFORE, RBC requests that the Court deny confirmation of the Plan and grant RBC such other and further relief to which it may be entitled under law or equity.

*[concluded on the following page]*

Houston, Texas
Dated: April 27, 2019

THOMPSON & KNIGHT LLP

By: _/s/ Tye C. Hancock_
Tye C. Hancock
Texas State Bar No. 24032271
Anthony F. Pirraglia
Texas State Bar No. 24103017
811 Main Street, Suite 2500,
Houston, Texas 77002
Telephone: 713.654.8111
Fax: 713.654.1871
Tye.Hancock@tklaw.com
Anthony.Pirraglia@tklaw.com

-and-

Steven J. Levitt
Texas State Bar No. 24092690
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
Telephone: 214.969.1700
Facsimile: 214.969.1751
steven.levitt@tklaw.com

_Counsel for Royal Bank of Canada_

**<u>Certificate of Service</u>**

I certify that on April 27, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Tye C. Hancock*
Tye C. Hancock

# Exhibit A

*Execution Version*

COLLATERAL TRUST AGREEMENT

dated as of February 14, 2018

among

**SANCHEZ ENERGY CORPORATION,**
as the Company,

the Grantors and Guarantors from time to time party hereto,

**ROYAL BANK OF CANADA,**
as the First-Out Representative,

**DELAWARE TRUST COMPANY,**
as the First Lien Representative,

the other Priority Lien Representatives from time to time party hereto

and

**ROYAL BANK OF CANADA,**
as Collateral Trustee

# TABLE OF CONTENTS

## ARTICLE 1
### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Defined Terms ..................................................................................................2
Section 1.2    Rules of Interpretation ....................................................................................18

## ARTICLE 2
### THE TRUST ESTATE

Section 2.1    Declaration of Trust ........................................................................................20
Section 2.2    Collateral Shared Equally and Ratably ...........................................................21
Section 2.3    Similar Collateral and Agreements .................................................................21
Section 2.4    Insolvency Matters ..........................................................................................21

## ARTICLE 3
### OBLIGATIONS AND POWERS OF COLLATERAL TRUSTEE

Section 3.1    Appointment and Undertaking of the Collateral Trustee ...............................23
Section 3.2    Release or Subordination of Liens ..................................................................24
Section 3.3    Enforcement of Liens ......................................................................................24
Section 3.4    Application of Proceeds ...................................................................................27
Section 3.5    Powers of the Collateral Trustee .....................................................................30
Section 3.6    Documents and Communications ....................................................................30
Section 3.7    For Sole and Exclusive Benefit of Holders of Priority Lien Obligations ..............30
Section 3.8    Additional Priority Lien Debt ..........................................................................30
Section 3.9    Priority Lien Agents ........................................................................................33

## ARTICLE 4
### OBLIGATIONS ENFORCEABLE BY THE COMPANY AND THE OTHER GRANTORS

Section 4.1    Release of Liens on Collateral ........................................................................34
Section 4.2    Delivery of Copies to Priority Lien Representatives .......................................35
Section 4.3    Collateral Trustee not Required to Serve, File or Record ...............................36
Section 4.4    Release of Liens in Respect of First-Out or First Lien Obligations ................36

## ARTICLE 5
### IMMUNITIES OF THE COLLATERAL TRUSTEE

Section 5.1    No Implied Duty ..............................................................................................36
Section 5.2    Appointment of Agents and Advisors ..............................................................36
Section 5.3    Other Agreements ............................................................................................37
Section 5.4    Solicitation of Instructions ..............................................................................37
Section 5.5    Limitation of Liability .....................................................................................37
Section 5.6    Documents in Satisfactory Form .....................................................................37
Section 5.7    Entitled to Rely ................................................................................................37
Section 5.8    Priority Lien Debt Default ...............................................................................38
Section 5.9    Actions by Collateral Trustee ..........................................................................38

i

Section 5.10  Security or Indemnity in favor of the Collateral Trustee .......................................38
Section 5.11  Rights of the Collateral Trustee ..................................................................................38
Section 5.12  Limitations on Duty of Collateral Trustee in Respect of Collateral ......................39
Section 5.13  Assumption of Rights, Not Assumption of Duties .................................................39
Section 5.14  No Liability for Clean Up of Hazardous Materials ................................................40
Section 5.15  Other Relationships with the Company, Grantors or Guarantors .........................40

ARTICLE 6
RESIGNATION AND REMOVAL OF THE COLLATERAL TRUSTEE

Section 6.1  Resignation or Removal of Collateral Trustee ..........................................................41
Section 6.2  Appointment of Successor Collateral Trustee ...........................................................41
Section 6.3  Succession .......................................................................................................................41
Section 6.4  Merger, Conversion or Consolidation of Collateral Trustee ..................................42
Section 6.5  Concerning the Collateral Trustee and the Priority Lien Representatives ............42

ARTICLE 7
MISCELLANEOUS PROVISIONS

Section 7.1  Amendment .....................................................................................................................43
Section 7.2  Voting ..............................................................................................................................46
Section 7.3  Further Assurances .........................................................................................................46
Section 7.4  Successors and Assigns .................................................................................................47
Section 7.5  Delay and Waiver ...........................................................................................................48
Section 7.6  Notices .............................................................................................................................48
Section 7.7  Entire Agreement ...........................................................................................................49
Section 7.8  Compensation; Expenses ..............................................................................................49
Section 7.9  Indemnity ........................................................................................................................50
Section 7.10  Severability ....................................................................................................................50
Section 7.11  Headings .........................................................................................................................50
Section 7.12  Obligations Secured ......................................................................................................51
Section 7.13  Governing Law ..............................................................................................................51
Section 7.14  Consent to Jurisdiction .................................................................................................51
Section 7.15  Waiver of Jury Trial ......................................................................................................51
Section 7.16  Counterparts, Electronic Signatures ...........................................................................52
Section 7.17  Effectiveness ..................................................................................................................52
Section 7.18  Grantors and Additional Grantors ..............................................................................52
Section 7.19  Continuing Nature of this Agreement ........................................................................52
Section 7.20  Insolvency ......................................................................................................................53
Section 7.21  Rights and Immunities of Priority Lien Representatives .........................................53
Section 7.22  Intercreditor Agreement ...............................................................................................53
Section 7.23  Force Majeure ................................................................................................................54
Section 7.24  U.S.A. Patriot Act .........................................................................................................54
Section 7.25  Limitation on Liability .................................................................................................55

Exhibit A  [Form of] Additional Secured Debt Designation
Exhibit B  [Form of] Collateral Trust Joinder – Additional Debt

ii

Exhibit C        [Form of] Collateral Trust Joinder – Additional Grantor
Exhibit D        [Form of] Intercreditor Agreement

US-DOCS\98243399.18

This Collateral Trust Agreement (as amended, supplemented, amended and restated or otherwise modified form time to time in accordance with **Section 7.1** hereof, this "**Agreement**") is dated as of February 14, 2018 and is by and among Sanchez Energy Corporation, a Delaware corporation (the "**Company**"), the Grantors and Guarantors from time to time party hereto, Royal Bank of Canada, as First-Out Representative (as defined below), Delaware Trust Company, as First Lien Representative (as defined below), Royal Bank of Canada, as Collateral Trustee (in such capacity and together with its successors in such capacity, the "**Collateral Trustee**") and any Priority Lien Representative of a Series of Priority Lien Debt that executes and delivers a Collateral Trust Joinder.

RECITALS

The Company issued 7.25% Senior Secured First Lien Notes due 2023 (the "**Initial First Lien Notes**") in an aggregate principal amount of $500,000,000 pursuant to an Indenture dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "**First Lien Indenture**") among the Company, the guarantors party thereto and Delaware Trust Company, as trustee (in such capacity and together with its successors in such capacity, the "**Trustee**"), which Initial First Lien Notes will be Priority Lien Debt for purposes of this Agreement.

The Company, Royal Bank of Canada, as administrative agent and the lenders and other agents party thereto, have entered into the Senior Credit Facility (as defined below) which will be First-Out Debt for purposes of this Agreement.

The Company, the Grantors and the Guarantors have secured (or intend to secure) their Obligations under the First Lien Indenture, the Senior Credit Facility, any future Priority Lien Debt and any other Priority Lien Obligations, with Liens on all present and future Collateral to the extent that such Liens have been provided for in the applicable Security Documents.

This Agreement sets forth the terms on which each Secured Party (other than the Collateral Trustee) has appointed the Collateral Trustee to act as the collateral trustee for the present and future holders of the Priority Lien Obligations to receive, hold, maintain, administer and distribute the Collateral at any time delivered to the Collateral Trustee or the subject of the Security Documents, and to enforce the Security Documents and all interests, rights, powers and remedies of the Collateral Trustee with respect thereto or thereunder and the proceeds thereof.

Capitalized terms used in this Agreement have the meanings assigned to them above or in Article 1 below.

1

## AGREEMENT

In consideration of the premises and the mutual agreements herein set forth, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

## ARTICLE 1
## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1   Defined Terms. The following terms will have the following meanings:

"**2013 Credit Agreement**" means the Amended and Restated Credit Agreement dated as of May 31, 2013 among the Company, the Company's Subsidiaries party thereto, as co-borrowers, Capital One, National Association, as resigning administrative agent and issuing bank, Royal Bank of Canada, as successor administrative agent and issuing bank, Capital One, National Association, as syndication agent, and Compass Bank and SunTrust Bank, as co-documentation agents, and the lenders party thereto.

"**2014 Credit Agreement**" means the Second Amended and Restated Credit Agreement dated as of June 30, 2014 among the Company, as borrower, the Company's Subsidiaries party thereto, as guarantors, Royal Bank of Canada, as administrative agent and issuing bank, Capital One, National Association, as syndication agent, and Compass Bank and SunTrust Bank, as co-documentation agents, and the lenders party thereto.

"**Act of First-Out Debtholders**" means, as to any matter at any time a Priority Lien Debt Default has occurred and is continuing, a direction in writing delivered to the Collateral Trustee by or with the written consent of the holders of First-Out Debt representing the Required First-Out Debtholders.

"**Additional Notes**" has the meaning given to the term "Additional Notes" in the First Lien Indenture as in effect on the date hereof.

"**Additional Priority Lien Debt**" has the meaning set forth in **Section 3.8(b)**.

"**Additional Secured Debt Designation**" means an Officers' Certificate in substantially the form of **Exhibit A**.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"**Agreement**" has the meaning set forth in the preamble.

2

"**Availability**" means, with respect to the Senior Credit Facility, the amount (which shall not be less than zero) equal to (a) the Borrowing Base then available to the Company for borrowings (or, if there is no Borrowing Base, the aggregate commitments for advances of credit of the lenders available to the Company thereunder) less (b) the aggregate principal amount of Indebtedness (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Company and its Restricted Subsidiaries thereunder) then outstanding under the Senior Credit Facility.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Laws**" means the Bankruptcy Code or any other supranational, national, federal, provincial or state law for the relief of debtors.

"**Board of Directors**" means:

(1)   with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)   with respect to a limited partnership, the Board of Directors of the general partner of the partnership;

(3)   with respect to a limited liability company, the manager or managers, the managing member or members or any controlling committee of managers or managing members thereof; and

(4)   with respect to any other Person, the board or committee of such Person serving a similar function.

"**Borrowing Base**" means the maximum amount in United States dollars determined or redetermined by the lenders under the Senior Credit Facility as the aggregate lending value to be ascribed to the Oil and Gas Properties of the Company and the Guarantors against which such lenders are prepared to provide loans or other Indebtedness to the Company under the Senior Credit Facility, as determined on such occasions as may be required by the Senior Credit Facility, and which is based upon, inter alia, the review by such lenders of the Hydrocarbon reserves, royalty interests and other assets and liabilities of the Company and the Restricted Subsidiaries, and without taking into account any lower commitment amount elected by the Company.

"**Capital Stock**" means:

(1)   in the case of a corporation, corporate stock;

(2)   · in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)   in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

3

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities exercisable for, exchangeable for or convertible into Capital Stock, regardless of whether such debt securities include any right of participation with Capital Stock.

"**Cash Management Arrangement**" means any agreement giving rise to Cash Management Obligations.

"**Cash Management Obligations**" means, with respect to any Person, any obligations of such Person in respect of treasury management arrangements (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, and any other demand deposit or operating account relationships or other cash management services, including any treasury management line of credit.

"**Collateral**" means all assets and property of the Company or a Grantor, whether real, personal or mixed, wherever located and whether now owned or at any time acquired after the date of the First Lien Indenture by the Company or a Grantor as to which a Lien has been granted or assigned to the Collateral Trustee to secure (or to purportedly secure) any or all of the Priority Lien Obligations.

"**Collateral Trust Joinder**" means (i) with respect to the provisions of this Agreement relating to any Additional Priority Lien Debt, an agreement substantially in the form of **Exhibit B**, and (ii) with respect to the provisions of this Agreement relating to the addition of additional Grantors, an agreement substantially in the form of **Exhibit C**.

"**Collateral Trustee**" has the meaning set forth in the preamble.

"**Commercial Lenders**" means commercial banks, institutional investors and institutionally managed funds engaged in oil and gas lending in the ordinary course of their respective businesses (including, for the avoidance of doubt, Royal Bank of Canada and GSO Capital Partners LP).

"**Company**" has the meaning set forth in the preamble.

"**Controlling Priority Lien Representative**" means (a) at any time prior to the earlier of (i) the Shifting Control Date and (ii) the date of the Discharge of First-Out Obligations, the Senior Credit Facility Agent (subject to **Section 3.1(c)**) or (b) on or any time after the earlier of (i) the Shifting Control Date and (ii) the date of the Discharge of First-Out Obligations, the Priority Lien Representative for the Required First Lien Debtholders.

"**Discharge of Excess First-Out Obligations**" means the occurrence of all of the following:

(a)    termination or expiration of all commitments to extend credit that would constitute Excess First-Out Obligations;

(b)     payment in full in cash of the principal of and interest and premium (if any) on all Excess First-Out Obligations (other than any undrawn letters of credit);

(c)     discharge or cash collateralization (at the lower of (i) 105% of the aggregate undrawn amount and (ii) the percentage of the aggregate undrawn amount required for release of liens under the terms of the Senior Credit Facility or Refinancing Credit Facility in respect thereof, as applicable) of all outstanding letters of credit constituting Excess First-Out Obligations; and

(d)     payment in full in cash of all other Excess First-Out Obligations that are outstanding and unpaid at the time that each of the events described in clauses (a), (b) and (c) above shall have occurred.

"**Discharge of First Lien Obligations**" means the occurrence of all of the following:

(a)     termination or expiration of all commitments to extend credit that would constitute First Lien Obligations;

(b)     payment in full in cash of the principal of and interest and premium (if any) on all First Lien Obligations; and

(c)     payment in full in cash of all other First Lien Obligations (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at or prior to such time) that are outstanding and unpaid at the time that each of the events described in clauses (a) and (b) above shall have occurred;

*provided* that, if, at any time after the Discharge of First Lien Obligations has occurred, the Company or any Guarantor enters into any First Lien Document evidencing a First Lien Obligation which incurrence is not prohibited by the applicable Priority Lien Documents, then such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes hereof with respect to such new First Lien Obligation (other than with respect to any actions previously taken as a result of the occurrence of such first Discharge of First Lien Obligations), and, from and after the date on which the Company designates such Indebtedness as First Lien Obligations in accordance herewith, the obligations under such First Lien Document shall automatically and without any further action be treated as First Lien Obligations for all purposes hereof, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein.

"**Discharge of First-Out Obligations**" means the occurrence of all of the following:

(a)     termination or expiration of all commitments to extend loans and letters of credit that would constitute First-Out Obligations (other than Excess First-Out Obligations);

(b)     payment in full in cash of the principal of and interest and premium (if any) on all loans and letter of credit obligations that constitute First-Out Obligations (other than any undrawn letters of credit and other than Excess First-Out Obligations);

5

(c)    discharge or cash collateralization at the lower of (i) 105% of the aggregate undrawn amount and (ii) the percentage of the aggregate undrawn amount required for release of liens under the terms of the Senior Credit Facility or any Refinancing Credit Facility of all outstanding letters of credit constituting First-Out Obligations (other than Excess First-Out Obligations);

(d)    (i) payment in full in cash of all First-Out Hedging Obligations that are secured by a Priority Lien and the termination of all First-Out Hedging Agreements relating thereto, (ii) the novation of all transactions entered into thereunder or pursuant thereto on terms and to counterparties acceptable to the First-Out Hedging Counterparties, (iii) the Company has provided or is concurrently providing collateral to secure the First-Out Hedging Obligations substantially similar, or of substantially equal value, to the Collateral then subject to a Priority Lien, or (iv) the establishment of other arrangements with respect to such First-Out Hedging Obligations as may be acceptable to the First-Out Hedging Counterparties (and communicated to the Collateral Trustee); and

(e)    payment in full in cash of all other First-Out Obligations (other than Excess First-Out Obligations and any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at or prior to such time) that are outstanding and unpaid at the time that each of the events described in clauses (a), (b), (c) and (d) above shall have occurred;

*provided* that, if, at any time after the Discharge of First-Out Obligations has occurred, the Company or any Guarantor enters into any First-Out Document evidencing a First-Out Obligation which incurrence is not prohibited by the applicable Priority Lien Documents, then such Discharge of First-Out Obligations shall automatically be deemed not to have occurred for all purposes hereof with respect to such new First-Out Obligation (other than with respect to any actions previously taken as a result of the occurrence of such first Discharge of First-Out Obligations), and, from and after the date on which the Company designates such Indebtedness as First-Out Obligations, the obligations under such First-Out Document shall automatically and without any further action be treated as First-Out Obligations for all purposes hereof, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein and any First Lien Obligations shall be deemed to have been at all times First Lien Obligations and at no time First-Out Obligations.

"**Discharge of Priority Lien Obligations**" means the occurrence of the Discharge of First-Out Obligations, the Discharge of First Lien Obligations and the Discharge of Excess First-Out Obligations.

"**Enforcement Action**" means, with respect to any Series of Priority Lien Debt, (a) the taking of any action to enforce any Lien in respect of the Collateral, including the institution of any foreclosure proceedings, the noticing of any public or private sale or other disposition under the Bankruptcy Code or any attempt to vacate or obtain relief from a stay or other injunction restricting any other action described in this definition, (b) the exercise of any right or remedy provided to a secured creditor on account of a Lien under the Priority Lien Documents (including, in either case, any delivery of any notice to seek to obtain payment directly from any account debtor of the Company or any Guarantor or the taking of any action or the exercise of

US-DOCS\98243399.18

any right or remedy in respect of the setoff or recoupment against, collection or foreclosure on or marshalling of the Collateral or proceeds of Collateral), under applicable law, at equity, in an Insolvency or Liquidation Proceeding or otherwise, including the acceptance of Collateral in full or partial satisfaction of a Lien, (c) the sale, assignment, transfer, lease, license, or other disposition as a secured creditor on account of a Lien of all or any portion of the Collateral, by private or public sale (judicial or non-judicial) or any other means, (d) the solicitation of bids from third parties to conduct the liquidation of all or a portion of Collateral as a secured creditor on account of a Lien, (e) the exercise of any other enforcement right relating to the Collateral (including the exercise of any voting rights relating to any capital stock composing a portion of the Collateral) whether under the Priority Lien Documents, under applicable law of any jurisdiction, in equity, in an Insolvency or Liquidation Proceeding, or otherwise, or (f) the appointment of a receiver, manager or interim receiver of all or any portion of the Collateral or the commencement of, or the joinder with any creditor in commencing, any Insolvency or Liquidation Proceeding against the Company or any Guarantor or any assets of the Company or any Guarantor.

"**Excess First-Out Obligations**" means First-Out Obligations (including for purposes of this definition any Indebtedness that, but for having been incurred in an amount exceeding the principal amount permitted under clause (1) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in effect on the date hereof), would otherwise constitute First-Out Obligations) for the principal amount of loans or letters of credit and related reimbursement obligations under the Senior Credit Facility or any Refinancing Credit Facility (other than such Obligations constituting First-Out Hedging Obligations or First-Out Cash Management Obligations) in excess of the principal amount permitted under clause (1) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in effect on the date hereof).

"**Financial Officer**" of any Person means the Chief Financial Officer, Chief Accounting Officer, principal accounting officer, Controller, Treasurer or Assistant Treasurer of such Person.

"**First Lien Debt**" means (a) the Initial First Lien Notes and the related Note Guarantees thereof and (b) additional Indebtedness that was incurred pursuant to clause (3)(a), (3)(b) or (5) (insofar as such Indebtedness permitted to be incurred under clause (5) refunds, refinances, extends, replaces, renews or defeases Indebtedness incurred under clause (3)(a) or (3)(b) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in effect on the date hereof)) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in effect on the date hereof) and any guarantees thereof, in each case under this clause (b), that are secured equally and ratably with the First Lien Obligations by a Priority Lien that is permitted to be incurred and so secured under the terms of each applicable Priority Lien Document; provided, in the case of any additional Indebtedness referred to in this clause (b), that:

(i)      on or prior to the date of incurrence of such Indebtedness by the Company or any Guarantor, such Indebtedness is designated by the Company, in an Additional Secured Debt Designation delivered to each Priority Lien Representative and the Collateral Trustee, as both "Priority Lien Debt" and "First Lien Debt" for the purposes of the Priority Lien Documents,

(ii)     a Priority Lien Representative is designated with respect to such Indebtedness and executes and delivers to the Collateral Trustee a Collateral Trust Joinder on behalf of itself and all holders of such Indebtedness,

(iii)     all requirements set forth in this Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Lien to secure such additional Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements and the other provisions of this clause (b) will be conclusively established, absent manifest error, if the Company delivers to the Collateral Trustee an Additional Secured Debt Designation stating that such requirements and other provisions have been satisfied and that such Indebtedness is "First Lien Debt"), and

(iv)     such Indebtedness is pari passu in right of payment (it being understood that there may be different tranches of First Lien Debt with different maturities and amortization profiles, but the principal amount of Indebtedness under all such tranches must in all other respects be pari passu in right of payment) and does not have any senior or junior rights with respect to the application of proceeds from Collateral other than as provided herein.

"**First Lien Documents**" means the Note Documents and any additional indenture, credit agreement or other agreement pursuant to which any other First Lien Debt is incurred and secured in accordance with the terms of each applicable Priority Lien Document and the Security Documents related thereto (other than any Security Documents that do not secure First Lien Obligations).

"**First Lien Indenture**" has the meaning set forth in the recitals.

"**First Lien Obligations**" means, the First Lien Debt and all other obligations (as defined under the applicable First Lien Document) in respect thereof.

"**First Lien Representative**" means (a) in the case of the Notes, the Trustee and (b) in the case of any other Series of First Lien Debt, the agent, trustee or counterparty who maintains the transfer register for such Series of First Lien Debt, as applicable, and is appointed as a representative of such Series of First Lien Debt (for purposes related to the administration of the applicable Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of First Lien Debt and that executes and delivers an Additional Secured Debt Designation and a Collateral Trust Joinder in accordance herewith.

"**First Lien Secured Parties**" means each holder of a First Lien Obligation, including each First Lien Representative and the Collateral Trustee.

"**First-Out Cash Management Arrangements**" means a Cash Management Arrangement with a First-Out Cash Management Counterparty which creates First-Out Cash Management Obligations.

"**First-Out Cash Management Counterparty**" has the meaning set forth in the definition of "First-Out Cash Management Obligations".

"**First-Out Cash Management Obligations**" means all Cash Management Obligations owing to the Senior Credit Facility Agent, any other First-Out Representative or any of their

8

respective Affiliates or a Person that is or was a lender under the Senior Credit Facility or any Refinancing Credit Facility or any Affiliate of any such lender, in each case at the time the Cash Management Arrangements which created such Cash Management Obligations were entered into (each such Person, a "**First-Out Cash Management Counterparty**"); provided that, in each case, such Cash Management Obligations are permitted (or not prohibited) to be incurred and secured by a Priority Lien under the terms of each applicable Priority Lien Document (and the satisfaction of such requirements will be conclusively established, absent manifest error, if the Company represents and warrants to the applicable First-Out Cash Management Counterparty in either the applicable Cash Management Arrangements or in an Officers' Certificate delivered to such First-Out Cash Management Counterparty that such Cash Management Obligations are "First-Out Cash Management Obligations").

"**First-Out Debt**" means (a) Indebtedness under the Senior Credit Facility (including the undrawn amount of letters of credit whether or not then available to be drawn) incurred under clause (1) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in effect on the date hereof) and any guarantees thereof, (b) First-Out Cash Management Obligations, (c) First-Out Hedging Obligations and (d) Indebtedness under any Refinancing Credit Facility (including the undrawn amount of letters of credit whether or not then available to be drawn) incurred under clause (1) of the definition of "Permitted Debt" and any guarantees thereof that is permitted to be incurred and so secured under the terms of each applicable Priority Lien Document; provided, in the case of this clause (d), that

   (i)      on or prior to the incurrence of such Indebtedness, such Indebtedness is designated by the Company, in an Additional Secured Debt Designation delivered to each Priority Lien Representative and the Collateral Trustee, as both "Priority Lien Debt" and "First-Out Debt" for the purposes of the Priority Lien Documents;

   (ii)      the Senior Credit Facility Agent under such Refinancing Credit Facility shall have duly executed and delivered to the Collateral Trustee on behalf of itself and all holders of Indebtedness thereunder a Collateral Trust Joinder; and

   (iii)      all requirements set forth in this Agreement as to the confirmation, grant or perfection of the Collateral Trustee's Lien to secure such Indebtedness are satisfied (and the satisfaction of such requirements and the other provisions of this clause (d) will be conclusively established, absent manifest error, if the Company delivers to the Collateral Trustee an Additional Secured Debt Designation stating that such requirements and other provisions have been satisfied and that such debt constitutes First-Out Debt).

"**First-Out Documents**" means, collectively, the documentation in respect of the Senior Credit Facility (including any Refinancing Credit Facility in respect thereof), each First-Out Hedging Agreement and each First-Out Cash Management Arrangement pursuant to which any First-Out Debt is incurred and secured in accordance with the terms of each applicable Priority Lien Document and the Security Documents related thereto (other than any Security Documents that do not secure First-Out Obligations).

"**First-Out Hedging Agreements**" means a Hedging Agreement with a First-Out Hedging Counterparty giving rise to any First-Out Hedging Obligations.

9

"**First-Out Hedging Counterparty**" has the meaning set forth in the definition of "First-Out Hedging Obligations".

"**First-Out Hedging Obligations**" means (i) all Hedging Obligations arising or existing under any Hedging Agreement in effect on the date hereof with a Qualified Hedging Counterparty or a Secured Priority Swap Provider (as defined in the Senior Credit Facility (as in effect on the date hereof)), and (ii) all Hedging Obligations entered into after the date hereof owing to any Person that is both (x) a Qualified Hedging Counterparty and (y) an Approved Counterparty (as defined in the Senior Credit Facility) at the time such Hedging Obligations are entered into (each such Person, a "**First-Out Hedging Counterparty**"); provided that, in each case, such Hedging Obligations are permitted (or not prohibited) to be incurred and secured by a Priority Lien under the terms of each applicable Priority Lien Document (and the satisfaction of such requirements will be conclusively established, absent manifest error, if the Company represents and warrants, as of the time of incurrence of any such Hedging Obligations, to the applicable First-Out Hedging Counterparty in either the applicable Hedging Agreement or in an Officers' Certificate delivered to such First-Out Hedging Counterparty that such Hedging Obligations are "First-Out Hedging Obligations").

"**First-Out Obligations**" means the First-Out Debt and all other Obligations (as defined in the applicable First-Out Document) in respect thereof.

"**First-Out Prior Payment Rights**" has the meaning set forth in **Section 3.8(b)(1)**.

"**First-Out Representative**" means (a) in the case of the Senior Credit Facility (and First-Out Hedging Obligations and First-Out Cash Management Obligations constituting "Obligations" thereunder), the Senior Credit Facility Agent or (b) in the case of any Refinancing Credit Facility (and First-Out Hedging Obligations and First-Out Cash Management Obligations constituting "Obligations" thereunder), the agent or trustee who maintains the transfer register for such Refinancing Credit Facility and is appointed as a representative of such First-Out Debt (for purposes related to the administration of the applicable Security Documents) pursuant to such Refinancing Credit Facility and that executes and delivers an Additional Secured Debt Designation and a Collateral Trust Joinder in accordance therewith.

"**First-Out Secured Parties**" means each holder of a First-Out Obligation, including each First-Out Representative and the Collateral Trustee.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity, exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Grantor**" means each of and "**Grantors**" means, collectively, the Company and the Guarantors and any other Person (if any) that at any time provides collateral security for any Priority Lien Obligations.

"**Guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any

Indebtedness or other obligations (and "*Guaranteed*" and "*Guaranteeing*" shall have meanings that correspond to the foregoing).

"**Guarantor**" means any Person who has Guaranteed payment of any Priority Lien Obligations, and their respective successors and assigns.

"**Hedging Agreements**" means any transaction or agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, whether or not any such transaction is governed by or subject to any master agreement. For the avoidance of doubt, (a) a Hedging Agreement governed by a master agreement, including any master agreement published by the International Swaps and Derivatives Association, Inc., shall be deemed entered into when such individual Hedging Agreement is entered into without regard to the date on which such master agreement is entered into, (b) any hedge position or hedging arrangement of the type described in the immediately preceding sentence shall be considered a Hedging Agreement regardless of whether a written agreement or written confirmation is entered into, and (c) options, warrants, rights and other similar interests in respect of equity interests in the Company shall not constitute Hedging Agreements.

"**Hedging Obligations**" means, with respect to any Person, the obligations (whether contingent or otherwise) of such Person incurred under Hedging Agreements in the ordinary course of business and not for speculative purposes.

"**Hydrocarbon Interests**" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous Hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"**Hydrocarbons**" means crude oil, natural gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all constituents, elements or compounds thereof and products refined or processed therefrom.

"**Indebtedness**" has the meaning assigned to such term in the First Lien Indenture or to such term or other similar term in any applicable Priority Lien Document.

"**Indemnified Liabilities**" means any and all liabilities (including all environmental liabilities), obligations, losses, damages, penalties, actions, judgments, suits, costs, taxes, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, performance, administration or enforcement of this Agreement or any of the other Security Documents, including any of the foregoing relating to the use of proceeds of any Priority Lien Debt or the violation of, noncompliance with or liability under, any law (including environmental laws) applicable to or enforceable against the Company, any Subsidiary of the Company or any Grantor or Guarantor or any of the Collateral and all reasonable costs and

expenses (including reasonable fees and expenses of legal counsel selected by the Indemnitee) incurred by any Indemnitee in connection with any claim, action, investigation or proceeding in any respect relating to any of the foregoing, whether or not suit is brought.

"**Indemnitee**" has the meaning set forth in **Section 7.9(a)**.

"**Initial First Lien Notes**" has the meaning set forth in the recitals.

"**Insolvency or Liquidation Proceeding**" means:

(a)     any case or proceeding commenced by or against the Company, any Grantor or any Guarantor under the Bankruptcy Code or any other Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Company, any Grantor or any Guarantor, any receivership or assignment for the benefit of creditors relating to the Company, any Grantor or any Guarantor or any similar case or proceeding relative to the Company, any Grantor or any Guarantor or its creditors, as such, in each case whether or not voluntary;

(b)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Company, any Grantor or any Guarantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(c)     any other proceeding of any type or nature in which substantially all claims of creditors of the Company, any Grantor or any Guarantor are determined and any payment or distribution is or may be made on account of such claims.

"**Intercreditor Agreement**" means an intercreditor agreement, among the Collateral Trustee, each Junior Lien Representative and the Company and the other parties from time to time party thereto, substantially in the form of **Exhibit D** hereto, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the First Lien Indenture.

"**Junior Lien Debt**" has the meaning assigned to such term in the First Lien Indenture.

"**Junior Lien Representative**" has the meaning assigned to such term in the First Lien Indenture.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the UCC (or equivalent statutes) of any jurisdiction or Production Payments and Reserve Sales and the like payable out of Oil and Gas Properties other than a precautionary financing statement respecting a lease not intended as a security agreement.

"**Mortgage**" has the meaning set forth in **Section 3.8(d)**.

"**Mortgaged Property**" has the meaning set forth in **Section 3.8(d)**.

"**Note Documents**" means the First Lien Indenture, the Notes, the Intercreditor Agreement, if any, this Agreement and the Security Documents.

"**Note Guarantees**" means the guarantees of the obligations of the Company under the First Lien Indenture and the Notes by any Restricted Subsidiary provided for by the provisions of Article Ten of the First Lien Indenture.

"**Notes**" means, collectively, the Initial First Lien Notes and the Additional Notes for which the requirements set forth in **Section 3.8** of this Agreement have been satisfied.

"**Obligations**" means any principal (including reimbursement obligations and obligations to provide cash collateral with respect to letters of credit whether or not drawn), interest (including, to the extent legally permitted, all interest, fees and expenses accrued thereon on or after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate even if such interest, fee or expense is not enforceable, allowable or allowed as a claim in such proceeding), premium (if any), penalties, fees, charges, expenses, indemnifications, reimbursements, damages, guarantees and other liabilities or amounts payable under the documentation governing any Indebtedness or in respect thereto.

"**Officers' Certificate**" means a certificate signed by two officers of the Company, one of whom must be either the principal executive officer or a Financial Officer, as applicable, including:

(a)    a statement that the Person making such certificate has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate are based;

(c)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

"**Oil and Gas Properties**" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products,

13

revenues and other incomes from or attributable to the Hydrocarbon Interests,(f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"**Permitted Prior Liens**" has the meaning assigned to the term "Permitted Collateral Liens" in the First Lien Indenture.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, limited liability company or government or other entity.

"**Priority Lien**" means a first priority Lien (subject to the Intercreditor Agreement, if any, and in priority only to Permitted Prior Liens) granted by any Grantor in favor of the Collateral Trustee pursuant to a Security Document, at any time, upon any property of the Company or such Grantor to secure Priority Lien Obligations.

"**Priority Lien Agent**" has the meaning assigned to such term in the Intercreditor Agreement.

"**Priority Lien Debt**" means, collectively, First-Out Debt and First Lien Debt.

"**Priority Lien Debt Default**" means any "Event of Default" under any Priority Lien Document governing any Series of Priority Lien Debt (other than First-Out Cash Management Obligations) or any similar event or condition (with or without the giving of notice and whether or not notice has been given) which, under the terms of any Priority Lien Document governing any Series of Priority Lien Debt, in each case after giving effect to any applicable grace periods, (x) except in the case of any Priority Lien Debt constituting any Hedging Obligation secured by a Priority Lien, causes the Priority Lien Debt outstanding thereunder to become immediately due and payable or (y) in the case of any Priority Lien Debt constituting any Hedging Obligation secured by a Priority Lien, causes the counterparty thereto to close out or terminate such Hedging Obligation at a time when such counterparty is owed in excess of $40,000,000 under such Hedging Obligation.

"**Priority Lien Documents**" means, collectively, the First Lien Documents and the First-Out Documents.

14

"**Priority Lien Obligations**" means Priority Lien Debt and all other obligations (as defined under the applicable Priority Lien Document) in respect thereof.

"**Priority Lien Representative**" means (a) in the case of the Notes, the Trustee, (b) in the case of the Senior Credit Facility or any Refinancing Credit Facility in respect thereof (and First-Out Hedging Obligations and First-Out Cash Management Obligations constituting "Obligations" thereunder), the First-Out Representative or (c) in the case of any other Series of Priority Lien Debt, the trustee, agent or representative of the holders of such Series of Priority Lien Debt or counterparty who maintains the transfer register for such Series of Priority Lien Debt, if applicable, and (A) is appointed as a Priority Lien Representative of such Series of Priority Lien Debt (for purposes related to the administration of the applicable Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Priority Lien Debt, together with its successors in such capacity and (B) that has executed and delivered an Additional Secured Debt Designation and a Collateral Trust Joinder in accordance herewith.

"**Priority Lien Representative for the Required First Lien Debtholders**" means the Trustee or such other Person expressly designated as such by action of the Required First Lien Debtholders.

"**Priority Lien Secured Party**" means each holder of Priority Lien Obligations, the Collateral Trustee and each Priority Lien Representative.

"**Qualified Hedging Counterparty**" means (i) any Person who at the time a Hedging Agreement was entered into was (a) a lender or any Affiliate of a lender under the Senior Credit Facility, (b) a Person who had been a lender under the 2013 Credit Agreement or any Affiliate of such a Person, (c) a Person who had been a lender under the 2014 Credit Agreement or any Affiliate of such a Person, or (d) Shell Energy North America (US), L.P., Koch Supply & Trading, LP, BP Energy Company, Citibank, N.A., JPMorgan Chase Bank, N.A., or any of their respective Affiliates, or (ii) any Person whose issuer rating or long term senior unsecured debt rating, at the time of entry into the applicable Hedging Agreement, is, or, at the time such Person or any Affiliate thereof first entered into a Hedging Agreement with a Grantor after the date of this Agreement, was, BBB / Baa2 by S&P or Moody's (or their equivalent) or higher (or whose obligations under the applicable Hedging Agreement are guaranteed by an Affiliate of such Person who, at the time of entry into the applicable Hedging Agreement, meets, or, at the time such Person or any Affiliate thereof entered into such first such Hedging Agreement, met, such rating standards), in each case under clause (i)(d) or clause (ii) if either (1) the Company has provided to such Person an Officers' Certificate as described in the proviso in the definition of "First-Out Hedging Obligations" or (2) any such Hedging Agreement entered into after the date of this Agreement provides by its terms that it is intended to be secured as a First-Out Hedging Obligation.

"**Reaffirmation Agreement**" means an agreement reaffirming the security interests granted to the Collateral Trustee in substantially the form attached as Exhibit 1 to **Exhibit A** of this Agreement.

15

"**Refinancing Credit Facility**" means any oil and gas reserves-based revolving or term credit facility, the majority of the commitments under which are held by Commercial Lenders, that refunds, refinances or replaces the Senior Credit Facility or any other Refinancing Credit Facility, in each case, in whole and with all commitments under the refunded, refinanced or replaced facility having been terminated.

"**Required First Lien Debtholders**" means, at any time, the holders of a majority in aggregate principal amount of all First Lien Debt then outstanding, calculated in accordance with the provisions of **Section 7.2**. For purposes of this definition, First Lien Debt registered in the name of, or beneficially owned by, the Company or any Affiliate of the Company will be deemed not to be outstanding.

"**Required First-Out Debtholders**" means (a) for so long as no loans are outstanding and there is no Availability for borrowings under the Senior Credit Facility, the holders of a majority of the net termination amount (which shall not be less than zero) that would be payable by the Company or any Subsidiary as of the date of determination to the First-Out Hedging Counterparties upon termination of all First-Out Hedging Agreements, and (b) at such time as there are then loans outstanding or Availability under the Senior Credit Facility, the holders of a majority of the sum of (i) the aggregate principal amount of loans and of commitments contributing to Availability under the Senior Credit Facility and (ii) the net termination amount (which shall not be less than zero) that would be payable by the Company or any Subsidiary as of the date of determination to the First-Out Hedging Counterparties upon termination of all First-Out Hedging Agreements.

"**Required Priority Lien Debtholders**" means, collectively, the Required First Lien Debtholders and the Required First-Out Debtholders.

"**Security Documents**" means this Agreement, each Collateral Trust Joinder and all security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, control agreements or other grants or transfers for security executed and delivered by the Company, any Grantor or any Guarantor creating (or purporting to create) a Priority Lien upon Collateral in favor of the Collateral Trustee, for the benefit of any of the Priority Lien Secured Parties, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms and **Section 7.1**.

"**Senior Credit Facility**" means that certain Third Amended and Restated Credit Agreement, dated as of February 14, 2018, as amended, amended and restated, supplemented or otherwise modified, among the Company, the Commercial Lenders party thereto, Royal Bank of Canada, as administrative agent, together with all related notes, letters of credit, bankers acceptances, collateral documents, guarantees, and any other related agreements and instruments executed and delivered in connection therewith, in each case as from time to time amended, modified, supplemented or restated or replaced, refunded or refinanced in whole by any Refinancing Credit Facility, including by or pursuant to any agreement or instrument that extends the maturity of any Indebtedness thereunder, or increases the amount of available borrowings thereunder, or, after a gap in time during which there is no Senior Credit Facility, establishes a single, new replacement credit facility pursuant to which Indebtedness is incurred under clause (1) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in

16

effect on the date hereof) (*provided* that any increase in borrowings is permitted under clause (1) of the definition of "Permitted Debt" set forth in the First Lien Indenture (as in effect on the date hereof)), or adds Subsidiaries of the Company as additional borrowers or guarantors thereunder, in each case with respect to such agreement or any successor or replacement agreement and whether by the same or any other agent, Commercial Lender or any group of any of the foregoing. For the avoidance of doubt, "Senior Credit Facility" shall include any Refinancing Credit Facility in respect of the Senior Credit Facility or any other such Refinancing Credit Facility.

"**Senior Credit Facility Agent**" means, initially, Royal Bank of Canada in its capacity as the collateral agent under the Senior Credit Facility, and any other agent or representative of the First-Out Secured Parties then most recently designated in accordance with the applicable provisions of the Senior Credit Facility, together with its successors in such capacity, for purposes of administration of collateral matters with respect to the Senior Credit Facility (and First-Out Hedging Obligations and First-Out Cash Management Obligations constituting "Obligations" thereunder).

"**Series of First Lien Debt**" means, severally, the Notes and each other issue or series of First Lien Debt.

"**Series of Priority Lien Debt**" means, severally, the Senior Credit Facility, the Notes and each other issue or series of Priority Lien Debt.

"**Shifting Control Date**" means the date upon which (a) a Priority Lien Debt Default under any First Lien Document has occurred and is continuing, and (b) the Priority Lien Representative for the Required First Lien Debtholders delivers written notice to the Senior Credit Facility Agent and the Collateral Trustee (in accordance with **Section 7.6** and specifying both the first day and the last day of the corresponding Standstill Period) that (1) the condition under clause (a) has been met, (2) the Standstill Period has expired and (3) the Required First Lien Debtholders wish to commence or continue an Enforcement Action pursuant to the terms hereof.

"**Standstill Period**" means the period of 60 consecutive days commencing on the date on which the Priority Lien Representative for the Required First Lien Debtholders has delivered a notice to the Senior Credit Facility Agent and the Collateral Trustee (in accordance with **Section 7.6**) that a Priority Lien Debt Default exists; *provided* that such period shall be extended so long as the Senior Credit Facility Agent has instructed (or shall be seeking relief from any stay or other prohibition in any Insolvency or Liquidation Proceeding otherwise precluding the Senior Credit Facility Agent from instructing) the Collateral Trustee to commence an Enforcement Action under the terms of the Collateral Trust Agreement and the Collateral Trustee (acting at the direction of the Senior Credit Facility Agent as the then Controlling Priority Lien Representative) is diligently pursuing (or shall be seeking relief from any stay or other prohibition in any Insolvency or Liquidation Proceeding otherwise precluding the Collateral Trustee from so diligently pursuing) an Enforcement Action against a material portion of the Collateral.

"**Subsidiary**" means, with respect to any specified Person:

US-DOCS\98243399.18

(1)    any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of Voting Stock is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)    any partnership (whether general or limited) or limited liability company (a) the sole general partner or member of which is such Person or a Subsidiary of such Person, or (b) if there is more than a single general partner or member, either (x) the only managing general partners or managing members of which are such Person or one or more Subsidiaries of such Person (or any combination thereof) or (y) a majority of the outstanding general partner interests, member interests or other Voting Stock of such partnership or limited liability company is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof).

If not otherwise specified, reference to a Subsidiary shall mean a Subsidiary of the Company.

"**Title Datedown Product**" has the meaning set forth in **Section 3.8(d)**.

"**Trust Estate**" has the meaning set forth in **Section 2.1**.

"**Trustee**" has the meaning set forth in the recitals.

"**UCC**" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any collateral.

"**Voting Stock**" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of members of the Board of Directors of such Person; provided that with respect to a limited partnership or other entity which does not have a Board of Directors, Voting Stock means the Capital Stock of the general partner of such limited partnership or other business entity with the ultimate authority to manage the business and operations of such Person.

Section 1.2    Rules of Interpretation.

(a)    All capitalized terms used in this Agreement and not otherwise defined herein have the meanings assigned to them in the First Lien Indenture as in effect on the date hereof.

(b)    Unless otherwise indicated, (i) any reference to any agreement or instrument will be deemed to include a reference to that agreement or instrument as assigned, amended, supplemented, amended and restated, or otherwise modified and in effect from time to time or replaced in accordance with the terms of this Agreement and (ii) any reference to any enactment will be deemed to include a reference to that enactment as re-enacted, amended or extended from time to time and to any successor enactment.

18

(c)     The use in this Agreement or any of the other Security Documents of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The word "will" shall be construed to have the same meaning and effect as the word "shall." The definitions set forth herein shall apply equally to both the singular and plural forms of the terms defined.

(d)     References to "Sections," "clauses," "recitals" and the "preamble" will be to Sections, clauses, recitals and the preamble, respectively, of this Agreement unless otherwise specifically provided. References to "Articles" will be to Articles of this Agreement unless otherwise specifically provided. References to "Exhibits" and "Schedules" will be to Exhibits and Schedules, respectively, to this Agreement unless otherwise specifically provided.

(e)     Any references contained herein to any section, clause, paragraph, definition or other provision of the Senior Credit Facility, the First Lien Indenture or other Priority Lien Documents (including any definition contained therein) shall be deemed to be a reference to such section, clause, paragraph, definition or other provision as in effect on the date of this Agreement; *provided* that any reference to any such section, clause, paragraph or other provision shall refer to such section, clause, paragraph or other provision of the Senior Credit Facility, the First Lien Indenture or other Priority Lien Documents (including any definition contained therein) as amended or modified from time to time if such amendment or modification has been made in accordance with the Senior Credit Facility, the First Lien Indenture or other Priority Lien Documents, as applicable. Unless otherwise set forth herein, references to principal amount shall include, without duplication, any reimbursement obligations with respect to a letter of credit and the face amount of any outstanding letter of credit (whether or not such amount is, at the time of determination, drawn or available to be drawn).

(f)     This Agreement and the other Security Documents will be construed without regard to the identity of the party who drafted it and as though the parties participated equally in drafting it. Consequently, each of the parties acknowledges and agrees that any rule of construction that a document is to be construed against the drafting party will not be applicable either to this Agreement or the other Security Documents.

(g)     If the First Lien Indenture (as in effect on the date hereof) is no longer in effect at the time any Indebtedness is incurred, any reference herein to Indebtedness incurred under a clause of the definition of "Permitted Debt" set forth in such First Lien Indenture (as in effect on the date hereof) shall include Indebtedness that would have been permitted to be incurred under such clause had such First Lien Indenture (as in effect on the date hereof) been so in effect at such time.

## ARTICLE 2
## THE TRUST ESTATE

Section 2.1    Declaration of Trust.

To secure the payment of the Priority Lien Obligations and in consideration of the premises and the mutual agreements set forth herein, each of the Grantors, each Priority Lien Representative and each other Priority Lien Secured Party hereby confirms the grant of Liens in favor of the Collateral Trustee, and the Collateral Trustee hereby accepts and agrees to hold, in trust under this Agreement for the benefit of all current and future Priority Lien Secured Parties, on all of such Grantor's right, title and interest in, to and under all Collateral and on all Liens now or hereafter granted to the Collateral Trustee by each Grantor under any Security Document for the benefit of the Priority Lien Secured Parties, together with all of the Collateral Trustee's right, title and interest in, to and under the Security Documents, and all interests, rights, powers and remedies of the Collateral Trustee thereunder or in respect thereof and all cash and non-cash proceeds thereof (collectively, the "**Trust Estate**").

The Collateral Trustee and its successors and assigns under this Agreement will hold the Trust Estate in trust for the benefit solely and exclusively of all current and future Priority Lien Secured Parties as security for the payment of all present and future Priority Lien Obligations.

Notwithstanding the foregoing, if at any time:

(a)    all Liens securing the Priority Lien Obligations have been released as provided in **Section 4.1**;

(b)    the Collateral Trustee holds no other property in trust as part of the Trust Estate;

(c)    the Discharge of Priority Lien Obligations has occurred;

(d)    no monetary obligation (other than indemnification and other contingent obligations not then due and payable and letters of credit that have been cash collateralized at the lower of (i) 105% of the aggregate undrawn amount and (ii) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Priority Lien Documents) is outstanding and payable under this Agreement to the Collateral Trustee or any of its co-trustees or agents (whether in an individual or representative capacity); and

(e)    the Company delivers to the Collateral Trustee an Officers' Certificate stating that all Priority Liens of the Collateral Trustee have been released in compliance with all applicable provisions of the Priority Lien Documents and that the Grantors are not required by any Priority Lien Document to grant any Priority Lien upon any property,

then this Agreement and any other Security Documents then in effect and the Trust Estate arising hereunder will terminate (subject to any reinstatement pursuant to **Section 7.19** and other than with respect to indemnification and other contingent obligations not then due and payable), except that all provisions under any Priority Lien Documents that are expressly stated to survive termination of any Priority Lien Documents that are enforceable by the Collateral Trustee or any

US-DOCS\98243399.18

of its co-trustees or agents (whether in an individual or representative capacity) will remain enforceable in accordance with their terms.

The parties further declare and covenant that the Trust Estate will be held and distributed by the Collateral Trustee subject to the further agreements herein.

Section 2.2    Collateral Shared Equally and Ratably.    The parties to this Agreement agree that the payment and satisfaction of all of the Priority Lien Obligations will be secured equally and ratably (subject to the First-Out Prior Payment Rights) by the Priority Lien established in favor of the Collateral Trustee for the benefit of the Priority Lien Secured Parties, notwithstanding the time of incurrence of any Priority Lien Obligations or time or method of creation or perfection of any Priority Liens securing such Priority Lien Obligations and notwithstanding any provision of the UCC or any other applicable law or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing the Priority Lien Obligations or any other circumstance whatsoever, whether or not any Insolvency or Liquidation Proceeding has been commenced against the Company or any other Grantor. It is the intent of the parties that (i) all Priority Lien Obligations will be and are secured equally and ratably (subject to the First-Out Prior Payment Rights) by all Priority Liens at any time granted by the Company or any other Grantor to secure any Priority Lien Obligations, whether or not upon property otherwise constituting collateral for the Priority Lien Obligations, and that all such Priority Liens will be enforceable by the Collateral Trustee for the benefit of all Priority Lien Secured Parties equally and ratably (subject to the First-Out Prior Payment Rights) and (ii) notwithstanding **Section 2.3**, all Priority Lien Obligations will be and are secured equally and ratably (subject to the First-Out Prior Payment Rights) by any Lien (other than any liens granted in connection with the cash collateralization of any letter of credit or Hedging Obligations in accordance with the definition of "Discharge of First-Out Obligations" or **Section 3.4(a)**) at any time granted by the Company or any other Guarantor, or created by statute, for the benefit of any Priority Lien Secured Party to secure any Priority Lien Obligations, whether or not upon property otherwise constituting collateral for the Priority Lien Obligations, and such Priority Lien Secured Party will be deemed to hold and have held such Lien, and, upon the request of the Collateral Trustee, shall cause such Lien to be enforced, for the benefit of the Collateral Trustee for security for all the Priority Lien Obligations (subject to the First-Out Prior Payment Rights), and shall promptly notify the Collateral Trustee in writing of the existence of such Lien.

Section 2.3    Similar Collateral and Agreements.    Except as otherwise set forth herein, the parties to this Agreement agree that it is their intention that the Collateral securing the Priority Lien Obligations is identical. In furtherance of the foregoing, unless the Company otherwise elects, the parties hereto agree that the Priority Lien Obligations shall be secured by the same set of Security Documents granting liens and security interests in favor of the Collateral Trustee, for the benefit of all of the Priority Lien Secured Parties.

Section 2.4    Insolvency Matters.

(a)    The Collateral Trustee (on behalf of the First-Out Secured Parties) and the First-Out Representative, for itself and on behalf of the First-Out Secured Parties, and the Collateral Trustee (on behalf of the First Lien Secured Parties) and the First Lien Representative

21

for itself and on behalf of the First Lien Secured Parties, acknowledges and agrees that because of, among other things, their differing rights to payment of the proceeds of the Collateral, the First-Out Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed, confirmed or adopted in an Insolvency or Liquidation Proceeding.

(b)     To further effectuate the intent of the parties as provided in **Section 2.4(a)**, if it is held that the claims of the First-Out Secured Parties and the First Lien Secured Parties in respect of the Collateral constitute only one secured claim (rather than separate classes of secured claims), then each of the parties hereto hereby acknowledges and agrees that all distributions shall be made as if there were separate classes of secured claims against the Grantors in respect of the Collateral (for this purpose ignoring all claims held by the First Lien Secured Parties who are not First-Out Secured Parties) and (except with respect to any Excess First-Out Obligations) the First-Out Secured Parties shall be entitled to receive, in addition to amounts distributed to them from, or in respect of, the Collateral in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees, costs, expenses, premiums, and other charges, irrespective of whether a claim for such amounts is allowed or allowable in such Insolvency or Liquidation Proceeding, before any distribution from, or in respect of, any Collateral is made in respect of the claims held by the First Lien Secured Parties who are not First-Out Secured Parties, with the Collateral Trustee (on behalf of the First Lien Secured Parties who are not First-Out Secured Parties) and the First Lien Secured Parties who are not First-Out Secured Parties acknowledging and agreeing to turn over to the First-Out Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the First Lien Secured Parties who are not First-Out Secured Parties.

(c)     To further effectuate the intent of the parties as provided in **Section 2.4(a)**, if it is held that the claims of the First-Out Secured Parties and the First Lien Secured Parties in respect of the Collateral constitute only one secured claim (rather than separate classes of secured claims) and a plan of reorganization is submitted to the holders of Priority Lien Debt providing for the issuance of Capital Stock in exchange for all or a portion of such Priority Lien Debt, then the holders of First Lien Debt agree that they shall vote in favor of such plan of reorganization only if the holders of First-Out Debt vote in favor of such plan of reorganization.

(d)     None of any First Lien Representative or any other First Lien Secured Party (whether in the capacity of a secured creditor or an unsecured creditor) shall propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization that is inconsistent with the priorities or other provisions of this Agreement, other than with the prior written consent of the Priority Lien Representative for the Required First-Out Debtholders or to the extent any such plan is proposed or supported by the number of First-Out Secured Parties required under Section 1126(d) of the Bankruptcy Code.

US-DOCS\98243399.18

**ARTICLE 3**
**OBLIGATIONS AND POWERS OF COLLATERAL TRUSTEE**

Section 3.1    <u>Appointment and Undertaking of the Collateral Trustee</u>.

(a)    Each Priority Lien Secured Party (other than the Collateral Trustee) acting through its respective Priority Lien Representative and/or by its acceptance of the Security Documents hereby appoints the Collateral Trustee to serve as collateral trustee hereunder on the terms and conditions set forth herein. Subject to, and in accordance with, this Agreement, the Collateral Trustee will, as collateral trustee, for the benefit solely and exclusively of the present and future Priority Lien Secured Parties:

(1)    accept, enter into, hold, maintain, administer and enforce all Security Documents, including all Collateral subject thereto, and all Liens created thereunder, perform its obligations hereunder and under the Security Documents and protect, exercise and enforce the interests, rights, powers and remedies granted or available to it under, pursuant to or in connection with the Security Documents (including in connection with any Enforcement Action or Insolvency or Liquidation Proceeding);

(2)    take all lawful and commercially reasonable actions permitted under the Security Documents that it may deem necessary or advisable to protect or preserve its interest in the Collateral subject thereto and such interests, rights, powers and remedies;

(3)    deliver and receive notices pursuant to this Agreement and the Security Documents;

(4)    sell, assign, collect, assemble, foreclose on, institute legal proceedings with respect to, take any Enforcement Action, or otherwise exercise or enforce the rights and remedies of a secured party (including a mortgagee, trust deed beneficiary and insurance beneficiary or loss payee) with respect to the Collateral under the Security Documents and its other interests, rights, powers and remedies;

(5)    remit as provided in **Section 3.4** all cash proceeds received by the Collateral Trustee from an Enforcement Action under the Security Documents or any of its other interests, rights, powers or remedies or otherwise received by it in accordance with this Agreement;

(6)    execute and deliver (i) amendments and supplements to the Security Documents as from time to time authorized pursuant to **Section 7.1** accompanied by an Officers' Certificate and Opinion of Counsel to the effect that the amendment or supplement was permitted under **Section 7.1** and (ii) acknowledgements of Collateral Trust Joinders delivered pursuant to **Section 3.8** or **7.18** hereof;

(7)    release or subordinate any Lien granted to it by any Security Document upon any Collateral if and as required by **Section 3.2**, **Section 4.1** or **Section 4.2**; and

23

(8)     enter into and perform its obligations and protect, exercise and enforce its interest, rights, powers and remedies under the Intercreditor Agreement, if any.

(b)     Each party to this Agreement acknowledges and consents to the undertaking of the Collateral Trustee set forth in **Section 3.1(a)** and agrees to each of the other provisions of this Agreement applicable to the Collateral Trustee.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Collateral Trustee will not commence any Enforcement Action or otherwise take any action or proceeding against any of the Collateral unless and until it shall have been directed by written notice from the Controlling Priority Lien Representative and then only in accordance with the provisions of this Agreement and the Intercreditor Agreement, if any.  Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of any Priority Lien Debt Default under the applicable Priority Lien Documents, the Senior Credit Facility Agent, at any time that it is acting as Controlling Priority Lien Representative hereunder, will not direct the Collateral Trustee or otherwise take any action hereunder as Controlling Priority Lien Representative unless and until it shall have been directed by written notice of an Act of First-Out Debtholders and then only in accordance with the provisions of this Agreement and the Intercreditor Agreement, if any.

(d)     Notwithstanding anything to the contrary contained in this Agreement, neither the Company nor any of its Affiliates may serve as Collateral Trustee.

Section 3.2    Release or Subordination of Liens.  The Collateral Trustee will not release or subordinate any Priority Lien of the Collateral Trustee or consent to the release or subordination of any Priority Lien of the Collateral Trustee, except:

(a)     as directed by the Controlling Priority Lien Representative accompanied by an Officers' Certificate to the effect that the release or subordination was permitted by each applicable Priority Lien Document and otherwise setting forth the requirements of **Section 4.1(b)(1)** and **4.1(b)(2)**;

(b)     as required by **Article 4**;

(c)     to release or subordinate Liens on Collateral to the extent permitted by each applicable Priority Lien Document; provided that the Collateral Trustee receives an Officers' Certificate confirming the foregoing; or

(d)     as ordered pursuant to applicable law under a final and nonappealable order or judgment of a court of competent jurisdiction.

Section 3.3    Enforcement of Liens.

(a)     (i) The Collateral Trustee shall act or refrain from acting with respect to the Collateral, only on the written instructions of the Controlling Priority Lien Representative, (ii) the Collateral Trustee shall not follow any instructions with respect to the Collateral from any Priority Lien Secured Party other than the Controlling Priority Lien Representative and (iii) no

24

Priority Lien Secured Party (other than the Priority Lien Representative acting as the Controlling Priority Lien Representative) shall or shall instruct the Collateral Trustee to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to (including any Enforcement Action) or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Collateral, whether under any Security Document, applicable law or otherwise, it being agreed that only the Collateral Trustee, acting on the written instructions of the Controlling Priority Lien Representative and in accordance with the applicable Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Collateral, including any Enforcement Action; provided that, if and to the extent that such Enforcement Action is to be conducted through receivership, a court-appointed receiver will be utilized. If the Collateral Trustee at any time receives written notice from the Controlling Priority Lien Representative stating that a Priority Lien Debt Default has occurred, the Collateral Trustee at the written direction of the Controlling Priority Lien Representative will promptly deliver written notice thereof to each other Priority Lien Representative. Notwithstanding the equal priority of the Liens, the Collateral Trustee (acting on the written instructions of the Controlling Priority Lien Representative) may deal with the Collateral as if the Controlling Priority Lien Representative had a senior Lien on the Collateral. No Priority Lien Secured Party will contest, protest or object to any Enforcement Action brought by the Collateral Trustee or any other exercise by the Collateral Trustee of any rights and remedies relating to the Collateral, in each case, in accordance with the terms of this Agreement.

(b)     Each Priority Lien Representative, on behalf of itself and the Priority Lien Secured Parties for which it is acting hereunder, agrees that it will not accept any Lien on any Collateral for the benefit of any Priority Lien Obligations (other than (i) funds deposited for the satisfaction, discharge, redemption or defeasance of any Series of Priority Lien Debt, (ii) cash collateral deposited with any Priority Lien Representative or Priority Lien Secured Party in accordance with the terms of the applicable Priority Lien Documents and (iii) cash collateral deposited with any Priority Lien Representative or Priority Lien Secured Party in respect of any Hedging Obligations or Cash Management Obligations which are secured under the applicable Priority Lien Documents) other than pursuant to the Security Documents, and by executing this Agreement (or a Collateral Trust Joinder), each Priority Lien Representative and each Priority Lien Secured Party for which it is acting hereunder agree to be bound by the provisions of this Agreement and the other Security Documents applicable to it.

(c)     Each Priority Lien Representative, on behalf of itself and each Priority Lien Secured Party for which it is acting hereunder, agrees that (i) it will not challenge or question in any proceeding the validity, allowability or enforceability of any Priority Lien Obligations or any Priority Lien Document or the validity, attachment, perfection or priority of any Lien under any Priority Lien Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not seek, and hereby waives any right, to have any Collateral or any part thereof marshalled upon any foreclosure or other disposition of such Collateral; (iii) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; (iv) it will not object to or oppose, and shall be deemed to consent to, a sale or other disposition of any Collateral (or any portion thereof) under section 363 of the Bankruptcy

US-DOCS\98243399.18

Code or any other Bankruptcy Law or any other provision of the Bankruptcy Code or any other Bankruptcy Law if the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative) shall have consented to such sale or disposition of such Collateral, the Priority Liens attach to the proceeds of such sale or disposition, and the proceeds of such sale or disposition received by the Collateral Trustee are applied in accordance with the provisions of **Section 3.4**; (v) it will not object to or otherwise contest (or support any other Person contesting), any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the Collateral made by the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative); (vi) it will not seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of any Collateral, without the prior written consent of the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative); (vii) it will not object to, or otherwise contest (or support any Person contesting), (A) any request by the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative) for adequate protection on account of the Collateral or (B) any objection by the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative) to any motion, relief, action or proceeding based on the Collateral Trustee's claimed lack of adequate protection with respect to the Collateral; (viii) it will not assert or enforce (or support any Person asserting or enforcing) any claim under section 506(c) of the Bankruptcy Code pari passu with or on a first priority basis to the Priority Liens for costs or expenses of preserving or disposing any Collateral; and (ix) other than as otherwise provided herein, oppose or otherwise contest (or support any other Person contesting) any lawful exercise by the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative) of the right to credit bid at any sale of Collateral; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Collateral Trustee or any other Priority Lien Secured Party to enforce this Agreement. No Priority Lien Secured Party may consent to any credit bid or acceptance of Collateral in respect of all or part of the Priority Lien Obligations unless the Discharge of First-Out Obligations would occur immediately upon the initial consummation of the transaction subject to subject credit bid or acceptance of Collateral.

(d)      Prior to the commencement of any Enforcement Action with respect to any Collateral, the Controlling Priority Lien Representative shall provide written notice (which notice shall include an instruction to the Collateral Trustee to provide a copy of such notice to each Priority Lien Representative) of its intention to direct the Collateral Trustee to commence an Enforcement Action to the Collateral Trustee (who shall promptly provide a copy of such notice to each Priority Lien Representative). Failure by the Collateral Trustee to deliver a copy of the Enforcement Action notice to any Priority Lien Representative shall not affect the enforceability and effectiveness of the Enforcement Action.

(e)      Except as specifically set forth in this Agreement, each of the Priority Lien Representatives and the other Priority Lien Secured Parties may exercise any rights of termination or acceleration of any Indebtedness or other Obligations owing under their respective Priority Lien Documents or to demand payment under the guarantee in respect thereof or take any actions and exercise all rights that would be available to a holder of unsecured claims or exercise any rights arising out of, relating to, or in respect of, the enforcement of any Lien (other than a Priority Lien) or any Insolvency or Liquidation Proceeding in respect thereof against the Company or any other Grantor, in each case in accordance with the terms of their respective

26

Priority Lien Documents and applicable law and otherwise consistent with the order of application in **Section 3.4** and the other terms of this Agreement; provided that, during the continuance of any Priority Lien Debt Default under the applicable Priority Lien Documents, the proceeds of exercise of any set-off rights in respect thereof shall be distributed in accordance with **Section 3.4**.

Section 3.4    Application of Proceeds.

(a)    The Collateral Trustee will apply the proceeds of any collection, sale, foreclosure or other realization upon, or any other Enforcement Action with respect to, any Collateral and the proceeds thereof, the proceeds of any insurance policy required under any Priority Lien Document or otherwise covering the Collateral, any condemnation proceeds with respect to the Collateral, and any other amounts required to be delivered to the Collateral Trustee by any Priority Lien Secured Party or Priority Lien Representative pursuant to any other provision of this Agreement and for application in accordance with this **Section 3.4(a)**, in the following order of application (and the Controlling Priority Lien Representative shall provide an officer's certificate which identifies which amounts are payable to which Priority Lien Secured Parties pursuant to this **Section 3.4(a)** and the Collateral Trustee shall be entitled to rely exclusively on such officer's certificate without independent inquiry):

FIRST, to the payment of all amounts payable under this Agreement on account of the Collateral Trustee's fees and expenses and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security Document, including but not limited to amounts necessary to provide for the expenses of the Collateral Trustee in maintaining and disposing of the Collateral (including, but not limited to, indemnification payments and reimbursements);

SECOND, to the repayment of Indebtedness (as defined under the applicable documents) and other obligations in respect thereof (in each case, other than Priority Lien Obligations) secured by a Permitted Prior Lien on the Collateral that was sold or realized upon to the extent that such other Indebtedness or obligation is to be discharged (in whole or in part) in connection with such sale and such Permitted Prior Lien has priority over the Liens securing the Priority Lien Obligations; *provided*, that this clause Second shall only apply to proceeds of such Collateral;

THIRD, to the First-Out Representative for application (i) to the equal and ratable payment of all outstanding First-Out Obligations, other than the Excess First-Out Obligations, that are then due and payable in such order as may be provided in the First-Out Documents in an amount sufficient to pay in full in cash all outstanding First-Out Obligations (other than Excess First-Out Obligations) that are then due and payable (including all interest, fees and expenses accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the First-Out Documents, even if such interest, fee or expense is not enforceable, allowable or allowed as a

27

claim in such proceeding), and (ii) whether or not then due and payable, to (A) the discharge or cash collateralization of all asserted indemnity claims, (B) the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the First-Out Documents) of all outstanding letters of credit and bankers' acceptances or the backstop thereof pursuant to arrangements reasonably satisfactory to the relevant issuing bank, if any, constituting First-Out Obligations (other than any Excess First-Out Obligations), and (C) the termination, expiration or other collateral arrangements in respect of First-Out Hedging Obligations that are satisfactory to the applicable First-Out Hedging Counterparty;

FOURTH, subject to **Section 2.4(b)**, after the Discharge of First-Out Obligations (other than Excess First-Out Obligations), equally and ratably to the First Lien Representatives for application to the payment of all outstanding First Lien Debt and any other First Lien Obligations that are then due and payable in such order as may be provided in the applicable First Lien Documents in an amount sufficient to pay in full in cash all such outstanding First Lien Debt and all other First Lien Obligations that are then due and payable (including all interest, fees and expenses accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the applicable First Lien Documents, even if such interest, fee or expense is not enforceable, allowable or allowed as a claim in such proceeding);

FIFTH, to the First-Out Representative for application to the equal and ratable payment of any Excess First-Out Obligations that are then due and payable in such order as may be provided in the First-Out Documents in an amount sufficient to pay in full in cash all outstanding Excess First-Out Obligations that are then due and payable (including all interest, fees and expenses accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the First-Out Documents, even if such interest, fee or expense is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the First-Out Documents) of all outstanding letters of credit and bankers' acceptances or the backstop thereof pursuant to arrangements reasonably satisfactory to the relevant issuing bank, if any, constituting Excess First-Out Obligations; and

SIXTH, subject to the Intercreditor Agreement, if any, any surplus remaining after the Discharge of Priority Lien Obligations will be paid to the Company or the applicable Guarantor, as the case may be, its successors or assigns, or to such other Persons as may be entitled to such amounts under applicable law or as a court of competent jurisdiction may direct.

Notwithstanding the foregoing, if any Series of Priority Lien Debt has released its Lien on any Collateral as described below in **Section 4.4**, then such

Series of Priority Lien Debt and any related Priority Lien Obligations of that Series of Priority Lien Debt thereafter shall not be entitled to share in the proceeds of any Collateral so released by that Series of Priority Lien Debt.

For the avoidance of doubt, the Collateral Trustee shall only apply proceeds in accordance with this **Section 3.4** to the extent that such proceeds are actually so received by the Collateral Trustee.

(b)     If any portion of the proceeds of the Collateral is in the form of cash, then such cash shall be applied pursuant to the priorities set forth in this **Section 3.4** before any non-cash proceeds are applied pursuant to the priorities set forth in this **Section 3.4**; provided that, irrespective of the terms of any plan of reorganization (including the confirmation of such plan of reorganization pursuant to section 1129(b) of the Bankruptcy Code or the equivalent provision of any other Bankruptcy Laws), each of the Priority Lien Representatives hereby acknowledges and agrees to turn over to the Collateral Trustee amounts otherwise received or receivable by them under such plan of reorganization to the extent necessary to effectuate the intent of this **Section 3.4**. If any Priority Lien Secured Party collects or receives any proceeds of an Enforcement Action, proceeds of any title or other insurance, and any proceeds subject to Liens that have been avoided or otherwise invalidated that should have been applied to the payment of the First-Out Obligations in accordance with **Section 3.4(a)** above, whether prior to or after the commencement of an Insolvency or Liquidation Proceeding or otherwise, such Priority Lien Secured Party will forthwith deliver the same to the Collateral Trustee, for the account of the applicable Priority Lien Secured Parties, to be applied in accordance with **Section 3.4(a)**. Until so delivered, such proceeds shall be segregated and will be held in trust by that Secured Party for the benefit of the applicable Secured Parties.

(c)     To the extent any Priority Lien Secured Party or Priority Lien Representative receives cash, property or other assets from any Insolvency or Liquidation Proceeding, such cash, property or other assets will be delivered to the Collateral Trustee for application in accordance with **Section 3.4(a)** (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the applicable Priority Lien Documents or other documentation in respect of Priority Lien Obligations, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding) until the Discharge of Priority Lien Obligations.

(d)     If, after the occurrence and during the continuance of a Priority Lien Debt Default, any Discharge of First Lien Obligations occurs by way of the exercise of any rights of set-off, banker's liens or consolidation of accounts prior to the Discharge of First-Out Obligations, the relevant Priority Lien Secured Party shall immediately segregate and hold an amount equal to the amount so discharged in trust for application to the First-Out Obligations and forthwith deliver such amount to the Collateral Trustee as provided in **Section 3.4(b)**.

(e)     This **Section 3.4** is intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Priority Lien Obligations, each present and future Priority Lien Representative and the Collateral Trustee as holder of Priority Liens. The Priority Lien Representative of each future issuance of Additional Notes and each

29

future Series of Priority Lien Debt will be required to deliver a Collateral Trust Joinder including an Additional Secured Debt Designation as provided in **Section 3.8** at the time of incurrence of such Series of Priority Lien Debt.

(f)     In connection with the application of proceeds pursuant to **Section 3.4(a)**, except as otherwise directed by the Controlling Priority Lien Representative, the Collateral Trustee may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

(g)     In making the determinations and allocations in accordance with **Section 3.4(a)**, the Collateral Trustee may conclusively rely upon information supplied in writing by the relevant Priority Lien Representative as to the amounts of unpaid principal and interest and other amounts outstanding with respect to its respective Priority Lien Debt and any other Priority Lien Obligations.

Section 3.5   Powers of the Collateral Trustee.

(a)     The Collateral Trustee is irrevocably authorized and empowered to enter into and perform its obligations and protect, perfect, exercise and enforce its interest, rights, powers and remedies under the Security Documents (including in connection with any Enforcement Action and in any Insolvency or Liquidation Proceeding) and applicable law and in equity and to act as set forth in this Article 3 or, subject to the other provisions of this Agreement, as requested in any lawful written directions given to it from time to time in respect of any matter by the Controlling Priority Lien Representative.

(b)     No Priority Lien Representative or holder of Priority Lien Obligations (other than the Collateral Trustee) will have any liability whatsoever for any act or omission of the Collateral Trustee, and the Collateral Trustee will have no liability whatsoever for any act or omission of any Priority Lien Representative or any holder of Priority Lien Obligations.

Section 3.6   Documents and Communications.  The Collateral Trustee will permit each Priority Lien Representative upon reasonable written notice and at reasonable times from time to time to inspect and copy, at the cost and expense of the party requesting such copies, any and all Security Documents and other documents, notices, certificates, instructions or communications received by the Collateral Trustee in its capacity as such.

Section 3.7   For Sole and Exclusive Benefit of Holders of Priority Lien Obligations. The Collateral Trustee will accept, hold, administer and enforce all Liens on the Collateral at any time transferred or delivered to it and all other interests, rights, powers and remedies at any time granted to or enforceable by the Collateral Trustee and all other property of the Trust Estate solely and exclusively for the benefit of the present and future holders of present and future Priority Lien Obligations, and will distribute all proceeds received by it from an Enforcement Action solely and exclusively pursuant to the provisions of **Section 3.4**.

Section 3.8   Additional Priority Lien Debt.

(a)     The Collateral Trustee will, as collateral trustee hereunder, perform its undertakings set forth in **Section 3.1(a)** with respect to any Priority Lien Obligations constituting

30

Additional Notes or a Series of Priority Lien Debt that is issued or incurred after the date hereof provided that:

(1)    such Priority Lien Obligations are identified as Priority Lien Debt in accordance with the procedures set forth in **Section 3.8(b)**; and

(2)    unless such debt is issued under an existing Priority Lien Document for any Series of Priority Lien Debt whose Priority Lien Representative is already party to this Agreement, the designated Priority Lien Representative identified pursuant to **Section 3.8(b)** signs a Collateral Trust Joinder and promptly delivers the same to the Collateral Trustee.

(b)    The Company will be permitted to designate as an additional holder of Priority Lien Debt hereunder each Person who is, or who becomes, the registered holder of Priority Lien Debt incurred by the Company, any Grantor or any Guarantor after the date of this Agreement in accordance with the terms of all applicable Priority Lien Documents. The Company may only effect such designation by delivering to the Collateral Trustee an Additional Secured Debt Designation that:

(1)    states that the Company or applicable Grantor or Guarantor intends to incur additional Priority Lien Debt ("**Additional Priority Lien Debt**") that is permitted by each applicable Priority Lien Document to be incurred and to be secured with a Priority Lien equally and ratably with all previously existing and future Priority Lien Debt (but subject to the prior payment rights ("**First-Out Prior Payment Rights**") of the holders of First-Out Obligations as set forth in clause THIRD of **Section 3.4(a)**, unless such Additional Priority Lien Debt is First-Out Debt);

(2)    specifies the name, address and contact information of the Priority Lien Representative for such series of Additional Priority Lien Debt for purposes of **Section 7.6**;

(3)    attaches as Exhibit 1 to such Additional Secured Debt Designation a Reaffirmation Agreement in substantially the form attached as Exhibit 1 to **Exhibit A** of this Agreement, which Reaffirmation Agreement has been duly executed by the Company and each Grantor and Guarantor; and

(4)    states that the Company has caused a copy of the Additional Secured Debt Designation and the related Collateral Trust Joinder to be delivered to each then existing Priority Lien Representative.

Although the Company shall be required to deliver a copy of each Additional Secured Debt Designation and each Collateral Trust Joinder to each then existing Priority Lien Representative, the failure to so deliver a copy of the Additional Secured Debt Designation and/or Collateral Trust Joinder to any then-existing Priority Lien Representative shall not affect the status of such debt as Additional Priority Lien Debt if the other requirements of this **Section 3.8** are complied with. Each of the Collateral Trustee and the other then existing Priority Lien Representatives shall receive a legal opinion or opinions of counsel (subject to customary assumptions and qualifications) from the Company as to the Additional Priority Lien Debt being permitted by the

31

terms of the Priority Lien Documents and secured by a valid and perfected security interest in the Collateral; provided that (i) such legal opinion or opinions need not address any collateral of a type not previously covered by any legal opinion delivered by or on behalf of the Company and (ii) nothing shall preclude such legal opinion or opinions from being delivered on a post-closing basis after the incurrence of such Additional Priority Lien Debt if permitted by the Priority Lien Representative for such Additional Priority Lien Debt. Notwithstanding the foregoing, nothing in this Agreement will be construed to allow the Company, any Grantor or any Guarantor to incur additional Indebtedness (including Additional Notes) unless otherwise permitted by the terms of all applicable Priority Lien Documents. Liens upon the Collateral to secure Additional Priority Lien Debt shall be created pursuant to the Security Documents that create Liens upon the Collateral to secure the other Priority Lien Obligations as then in effect; *provided* that, to the extent required by applicable law or as otherwise may be elected by the Company, such Liens upon the Collateral to secure Additional Priority Lien Debt and other Priority Lien Obligations may be created pursuant to a separate set of Security Documents, in favor of the Collateral Trustee, which shall be in all material respects the same form as the Security Documents creating the Liens upon the Collateral to secure the other Priority Lien Obligations as then in effect. Additional Priority Lien Debt shall not be secured by Liens upon any Collateral unless the other Priority Lien Obligations are also secured by Liens on such Collateral. Additional Priority Lien Debt shall be guaranteed by all of the applicable Guarantors and shall not be guaranteed by any Person that is not a Guarantor.

(c)     With respect to any Priority Lien Obligations constituting Additional Notes or other Additional Priority Lien Debt that is issued or incurred after the date hereof, the Company and each of the Grantors and Guarantors agrees to take such actions (if any) as necessary and as may from time to time reasonably be requested by the Collateral Trustee, any Priority Lien Representative or any Controlling Priority Lien Representative, and enter into such technical amendments, modifications and/or supplements to the then existing Guarantees and Security Documents (or execute and deliver such additional Security Documents) as necessary and as may from time to time be reasonably requested by such Persons (including as contemplated by **clause (d)** below), to ensure that the Additional Notes or the Additional Priority Lien Debt, as applicable, is secured by, and entitled to the benefits of, the Security Documents, and each Priority Lien Secured Party (by its acceptance of the benefits hereof) hereby agrees to, and authorizes the Collateral Trustee to enter into, any such technical amendments, modifications and/or supplements (and additional Security Documents). The Company and each Grantor and Guarantor hereby further agrees that, if there are any recording, filing or other similar fees payable in connection with any of the actions to be taken pursuant to this **Section 3.8(c)** or **Section 3.8(d)**, all such amounts shall be paid by, and shall be for the account of, the Company and the respective Grantors and Guarantors, on a joint and several basis.

(d)     Without limitation of the foregoing, each Grantor agrees to take the following actions with respect to any real property Collateral (including Oil and Gas Properties) with respect to all Additional Priority Lien Debt (it being understood that any such actions may be taken following the incurrence of any such Additional Priority Lien Debt on a post-closing basis if permitted by the Priority Lien Representative for such Additional Priority Lien Debt):

(1)     each applicable Grantor shall enter into, and deliver to the Collateral Trustee and the Priority Lien Representative for such Additional Priority Lien

US-DOCS\98243399.18

Debt a mortgage modification or new mortgage or deed of trust with regard to each real property subject to a mortgage or deed of trust (each such mortgage modification or new mortgage or deed of trust, as the case may be, a "**Mortgage**" and each such property a "**Mortgaged Property**"), in proper form for recording in all applicable jurisdictions, and otherwise in form and substance reasonably acceptable to the Collateral Trustee and such Priority Lien Representative;

(2)     each applicable Grantor will cause to be delivered a local counsel opinion (subject to customary assumptions and qualifications) to the effect that the Mortgage is effective to create a valid Lien in favor of the Collateral Trustee with respect to the relevant Mortgaged Property described therein; and

(3)     each applicable Grantor will cause a title company to have delivered to the Collateral Trustee and the Priority Lien Representative for such Additional Priority Lien Debt an endorsement to each title insurance policy for any real property Collateral (excluding Oil and Gas Properties), if any, then in effect for the benefit of the Priority Lien Secured Parties, date down(s) or other evidence (which may include a new title insurance policy) (each such delivery, a "**Title Datedown Product**"), in each case insuring that (i) the priority of the Liens of the applicable Mortgage(s) as security for the Priority Lien Obligations has not changed, or, if a new Mortgage is entered into, that the Lien of such new Mortgage securing the Priority Lien Debt then being incurred is a Priority Lien, subject only to those Liens permitted by the Priority Lien Documents, (ii) since the later of the original date of such title insurance product and the date of the Title Datedown Product delivered most recently prior to (and not in connection with) such additional Indebtedness, there has been no change in the condition of title (subject to **Section 3.8(d)(iii)(C)** below) and (iii) there are no intervening liens or encumbrances which may then or thereafter take priority over the Lien of the applicable Mortgage(s), in each case other than with respect to Liens permitted by each Priority Lien Document.

The Company will deliver an Officers' Certificate to the Collateral Trustee and the Priority Lien Representative for such Additional Priority Lien Debt confirming that the foregoing conditions have been satisfied.

(e)     The Company shall have the right, at any time, to enter into any First-Out Document evidencing First-Out Debt so long as the incurrence thereof is not prohibited by any Priority Lien Documents, and to designate such debt as First-Out Debt in accordance with **Section 3.8(b)**. At any time from and after the date of such designation pursuant to **Section 3.8(b)**, subject to compliance with **Section 3.8(c)** and **(d)**, the obligations under such First-Out Document shall automatically and without further action be treated as First-Out Debt for all purposes of this Agreement.

Section 3.9   Priority Lien Agents.

(a)     Notwithstanding anything to the contrary in this Agreement, the Intercreditor Agreement, if any, the Priority Lien Documents or in any Security Documents, the parties hereto agree as follows:

US-DOCS\98243399.18

(1)     any reference to Priority Lien Agent in the Intercreditor Agreement shall refer to the Collateral Trustee;

(2)     the Collateral Trustee, as Priority Lien Agent, will not be required to take any action under the Intercreditor Agreement unless and until the Controlling Priority Lien Representative directs the Collateral Trustee in writing, as Priority Lien Agent, to take such action; and

(3)     in no event shall the Collateral Trustee, as Priority Lien Agent, be required to take any action in connection with the purchase or sale of Priority Lien Obligations under the Intercreditor Agreement (rather, the purchases and sales of the Priority Lien Obligations shall be coordinated among the holders of the Junior Lien Debt and the holders of the Priority Lien Obligations (or their appointed representative)).

(b)     In the event the Intercreditor Agreement requires the delivery, or receipt, of any notice by the Priority Lien Agent, such delivery or receipt will be deemed satisfied in all respects when the Collateral Trustee makes such delivery or receives such notice.

(c)     The parties hereto agree that this Section shall not be deemed to be in conflict or inconsistent with the Intercreditor Agreement.

## ARTICLE 4
## OBLIGATIONS ENFORCEABLE BY THE COMPANY AND THE OTHER GRANTORS

Section 4.1     Release of Liens on Collateral.

(a)     The Priority Liens upon the Collateral will be automatically released in each of the following circumstances:

(1)     as to all Collateral, upon the Discharge of Priority Lien Obligations;

(2)     as to any Collateral of the Company, any Grantor or any Guarantor that is sold, transferred or otherwise disposed of by the Company, any Grantor or any Guarantor to a Person that is not (either before or after such sale, transfer or disposition) the Company, a Grantor or a Guarantor in a transaction or other circumstance that is not prohibited by the Senior Credit Facility, the First Lien Indenture or any of the other Priority Lien Documents;

(3)     as to any Collateral of a Grantor or Guarantor that is (A) released as a Grantor or Guarantor, as applicable, under each Priority Lien Document and (B) not obligated (as primary obligor or guarantor) with respect to any other Priority Lien Obligations and so long as the respective release does not violate the terms of any Priority Lien Document which then remains in effect;

(4)     as to any other release of any of the Collateral, if (A) consent to the release of that Collateral has been given by the requisite percentage or number of holders

34

of each Series of Priority Lien Debt at the time outstanding as provided for in the applicable Priority Lien Documents and (B) the Company has delivered an Officers' Certificate to the Collateral Trustee certifying that all such necessary consents have been obtained; or

(5)    as to any Collateral of the Company, any Grantor or any Guarantor that is foreclosed upon by the Collateral Trustee or against which the Collateral Trustee otherwise exercises its rights or remedies (including in connection with an Enforcement Action) (whether or not any Insolvency or Liquidation Proceeding is pending at the time) in each case, which results in a disposition of such Collateral.

(b)    The Collateral Trustee agrees for the benefit of the Company and the other Grantors that, if the Collateral Trustee at any time receives:

(1)    an Officers' Certificate and an Opinion of Counsel each stating that (A) the signing Officer or opinion giver, as the case may be, has read **Article 4** of this Agreement and understands the provisions and the definitions relating hereto, (B) such Officer or opinion giver, as the case may be, has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not the conditions precedent in this Agreement, the Intercreditor Agreement, if any, and all other Priority Lien Documents, if any, relating to the release of the Collateral have been complied with and (C) in the opinion of such Officer or opinion giver, as the case may be, such conditions precedent, if any, have been complied with; and

(2)    the proposed instrument or instruments releasing such Lien as to such property in recordable form, if applicable;

then, promptly following receipt by the Collateral Trustee of the items required by this **Section 4.1(b)**, upon written request of the Company, the Collateral Trustee will execute (with such acknowledgements and/or notarizations as are required) and deliver evidence of such release to the Company or other applicable Grantor.

(c)    The Collateral Trustee hereby agrees that in the case of any release pursuant to **Section 4.1(a)(2)**, if the terms of any such sale, transfer or other disposition require the payment of the purchase price to be contemporaneous with the delivery of the applicable release, then, subject to the Intercreditor Agreement, if any, and at the written request of and at the expense of the Company or other applicable Grantor, the Collateral Trustee will either (A) be present at and deliver the release at the closing of such transaction or (B) deliver the release under customary escrow arrangements that permit such contemporaneous payment and delivery of the release.

Section 4.2    Delivery of Copies to Priority Lien Representatives.  The Company will deliver to each Priority Lien Representative a copy of each Officers' Certificate delivered to the Collateral Trustee pursuant to **Section 4.1(b)**, together with copies of all documents delivered to the Collateral Trustee with such Officers' Certificate. The Priority Lien Representatives will not be obligated to take notice thereof or to act thereon.

35

Section 4.3    Collateral Trustee not Required to Serve, File or Record.    Subject to **Section 3.2**, the Collateral Trustee is not required to serve, file, register or record any instrument releasing or subordinating its Liens on any Collateral; provided that if the Company or any other Grantor shall make a written demand in the form of an Officers' Certificate for a termination statement under Section 9-513(c) of the UCC, the Collateral Trustee shall, at the Company's or such other Grantor's expense, comply with the  written request of the Company or Grantor to comply with the requirements of such UCC provision as determined by the Company or Grantor.

Section 4.4    Release of Liens in Respect of First-Out or First Lien Obligations.    In addition to any release pursuant to **Section 4.1** hereof, the Collateral Trustee's Priority Liens will no longer secure:

(a)    the First-Out Obligations, and the right of the holders of such First-Out Obligations to the benefits and proceeds of the Priority Liens on the Collateral will terminate and be discharged, upon the occurrence of each of Discharge of First-Out Obligations and the Discharge of Excess First-Out Obligations; and

(b)    the First Lien Obligations, and the right of the holders of such First Lien Obligations to the benefits and proceeds of the Priority Liens on the Collateral will terminate and be discharged, upon (i) the Discharge of First Lien Obligations or (ii) defeasance of the First Lien Obligations in accordance with the applicable First Lien Document if such document provides for a release of Liens on the Collateral upon such defeasance.

## ARTICLE 5
## IMMUNITIES OF THE COLLATERAL TRUSTEE

Section 5.1    No Implied Duty.  The Collateral Trustee will not have any duties nor will it have responsibilities or obligations other than those expressly assumed by it in this Agreement, the other Security Documents and the Intercreditor Agreement, if any. No implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement, the other Priority Lien Documents or the Intercreditor Agreement, if any, or otherwise exist against the Collateral Trustee. Without limiting the generality of the foregoing sentences, the use of the term "trustee" in this Agreement with reference to the Collateral Trustee is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The Collateral Trustee will not be required to take any action that is contrary to applicable law or any provision of this Agreement, the other Security Documents or the Intercreditor Agreement, if any.

Section 5.2    Appointment of Agents and Advisors.    The Collateral Trustee may execute any of the trusts or powers hereunder or under any other Security Document or perform any duties hereunder either directly or by or through agents, attorneys, accountants, appraisers or other experts or advisors selected by it in good faith as it may reasonably require and will not be responsible for any misconduct or negligence on the part of any of them selected in the absence of gross negligence, bad faith or willful misconduct (as determined in the final non-appealable judgment of a court of competent jurisdiction).

36

Section 5.3    Other Agreements.  The Collateral Trustee has accepted its appointment as collateral trustee hereunder and is bound by the Security Documents executed by the Collateral Trustee as of the date of this Agreement, and, as directed in writing by the Controlling Priority Lien Representative, the Collateral Trustee shall execute additional Security Documents delivered to it after the date of this Agreement (including to secure Obligations arising under Additional Priority Lien Debt to the extent such Obligations are permitted to be incurred and secured under the Priority Lien Documents); provided that such additional Security Documents do not adversely affect the rights, privileges, benefits and immunities of the Collateral Trustee or conflict with the terms of the Intercreditor Agreement, if any. The Collateral Trustee will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing Priority Lien Debt (other than this Agreement, the Senior Credit Facility and the other Security Documents to which it is a party).

Section 5.4    Solicitation of Instructions.

(a)    The Collateral Trustee may at any time solicit written confirmatory instructions, in the form of a direction by the Controlling Priority Lien Representative, an Officers' Certificate or an order of a court of competent jurisdiction, as to any action that it may be requested or required to take, or that it may propose to take, in the performance of any of its obligations under this Agreement or the other Security Documents.

(b)    No written direction given to the Collateral Trustee by the Controlling Priority Lien Representative that in the sole judgment of the Collateral Trustee imposes, purports to impose or might reasonably be expected to impose upon the Collateral Trustee any obligation or liability not set forth in or arising under this Agreement and the other Security Documents will be binding upon the Collateral Trustee unless the Collateral Trustee elects, at its sole option, to accept such direction.

(c)    The Collateral Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of the Controlling Priority Lien Representative pursuant to the provisions of this Agreement, unless such representative shall have furnished to the Collateral Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities including attorneys' fees and expenses which may be incurred therein or thereby.

Section 5.5    Limitation of Liability.  The Collateral Trustee will not be responsible or liable for any action taken or omitted to be taken by it hereunder or under any other Security Document, except for its own gross negligence, bad faith or willful misconduct as determined in the final non-appealable judgment of a court of competent jurisdiction.

Section 5.6    Documents in Satisfactory Form.  The Collateral Trustee will be entitled, but not obligated, to require that all agreements, certificates, opinions, instruments and other documents at any time submitted to it, including those expressly provided for in this Agreement or any other Security Document, be delivered to it in a form reasonably satisfactory to it.

Section 5.7    Entitled to Rely.  The Collateral Trustee may seek and conclusively rely upon, and shall be fully protected in conclusively relying upon, any judicial order or judgment, upon any advice, opinion or statement of legal counsel, independent consultants and other

37

experts selected by it in good faith and upon any certification, instruction, notice or other writing delivered to it by the Company, any Grantor or any Guarantor in compliance with the provisions of this Agreement or delivered to it by any Priority Lien Representative as to the holders of Priority Lien Obligations for whom it acts, without being required to determine the authenticity thereof or the correctness of any fact stated therein or the propriety or validity of service thereof. The Collateral Trustee may act in reliance upon any instrument comporting with the provisions of this Agreement or any other Security Document or any signature believed by it in good faith to be genuine and may assume that any Person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof or the other Security Documents has been duly authorized to do so. To the extent an Officers' Certificate or opinion of counsel is required or permitted under this Agreement or any other Security Document to be delivered to the Collateral Trustee in respect of any matter, the Collateral Trustee may rely conclusively on an Officers' Certificate or opinion of counsel as to such matter and such Officers' Certificate or opinion of counsel shall be full warranty and protection to the Collateral Trustee for any action taken, suffered or omitted by it under the provisions of this Agreement and the other Security Documents.

Section 5.8   Priority Lien Debt Default.  The Collateral Trustee will not be required to inquire as to the occurrence or absence of any Priority Lien Debt Default and will not be affected by or required to act upon any notice or knowledge as to the occurrence of any Priority Lien Debt Default unless and until it is directed in writing by the Controlling Priority Lien Representative.

Section 5.9   Actions by Collateral Trustee.  As to any matter not expressly provided for by this Agreement or the other Security Documents, the Collateral Trustee will act or refrain from acting as directed in writing by the Controlling Priority Lien Representative and will be fully protected if it does so, and any action taken, suffered or omitted pursuant hereto or thereto shall be binding on the holders of Priority Lien Obligations.

Section 5.10  Security or Indemnity in favor of the Collateral Trustee.  The Collateral Trustee will not be required to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its powers or rights hereunder or under any other Security Document unless it has been provided with security or indemnity reasonably satisfactory to it against any and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.

Section 5.11  Rights of the Collateral Trustee.  In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in any other Security Document, the terms and provisions of this Agreement shall supersede and control the terms and provisions of such other Security Document. In the event there is any bona fide, good faith disagreement between the other parties to this Agreement or any of the other Security Documents resulting in adverse claims being made in connection with Collateral held by the Collateral Trustee and the terms of this Agreement or any of the other Security Documents do not unambiguously mandate the action the Collateral Trustee is to take or not to take in connection therewith under the circumstances then existing, or the Collateral Trustee is in doubt as to what action it is required to take or not to take hereunder or under the other Security Documents, it will be entitled to refrain from taking any action (and will incur no liability for

38

doing so) until directed otherwise in writing by a request signed jointly by the parties hereto entitled to give such direction or by order of a court of competent jurisdiction.

Section 5.12  Limitations on Duty of Collateral Trustee in Respect of Collateral.

(a)     Beyond the exercise of reasonable care in the custody of Collateral in its possession, the Collateral Trustee will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Trustee will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Liens on the Collateral; provided that, notwithstanding the foregoing, the Collateral Trustee will execute, file or record UCC-3 continuation statements and other documents and instruments to preserve, protect or perfect the security interests granted to the Collateral Trustee (subject to the priorities set forth herein) if it shall receive a specific written request to execute, file or record the particular continuation statement or other specific document or instrument by the Controlling Priority Lien Representative (which request shall include an instruction to the Collateral Trustee to provide a copy of such request to each other Priority Lien Representative), it being understood that the Company and/or the applicable Grantor shall be responsible for all filings required in connection with any Security Document and the continuation, maintenance and/or perfection of any such filing or the lien and security interest granted in connection therewith.  The Collateral Trustee shall deliver to each other Priority Lien Representative a copy of any such written request. The Collateral Trustee will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Collateral Trustee will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Trustee in good faith.

(b)     Except as provided in **Section 5.12(a)**, the Collateral Trustee will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Collateral Trustee hereby disclaims any representation or warranty to the current and future holders of the Priority Lien Obligations concerning the perfection of the security interests granted to it or in the value of any Collateral. The Collateral Trustee shall not be under any obligation to any Priority Lien Representative or any holder of Priority Lien Debt to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement, any other Security Document or the Intercreditor Agreement, if any, or to inspect the properties, books or records of the Company, any Grantor or any Guarantor.

Section 5.13  Assumption of Rights, Not Assumption of Duties.     Notwithstanding anything to the contrary contained herein:

US-DOCS\98243399.18

(1)      each of the parties thereto will remain liable under each of the Security Documents (other than this Agreement) to the extent set forth therein to perform all of their respective duties and obligations thereunder to the same extent as if this Agreement had not be executed;

(2)      the exercise by the Collateral Trustee of any of its rights, remedies or powers hereunder will not release such parties from any of their respective duties or obligations under the other Security Documents; and

(3)      the Collateral Trustee will not be obligated to perform any of the obligations or duties of the Company or any Grantor.

Section 5.14  <u>No Liability for Clean Up of Hazardous Materials</u>.  In the event that the Collateral Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any trust obligation for the benefit of another, which in the Collateral Trustee's sole discretion may cause the Collateral Trustee to be considered an "owner or operator" under any environmental laws or otherwise cause the Collateral Trustee to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Trustee reserves the right, instead of taking such action, either to immediately resign as Collateral Trustee or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Collateral Trustee will not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Trustee's actions or inactions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

Section 5.15  <u>Other Relationships with the Company, Grantors or Guarantors</u>.  Royal Bank of Canada and its Affiliates (and any successor Collateral Trustee and its Affiliates) may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Company, any Grantor or any Guarantor and its Affiliates as though it was not the Collateral Trustee hereunder and without notice to or consent of the Priority Lien Secured Parties. The Priority Lien Representatives and the holders of the Priority Lien Obligations acknowledge that, pursuant to such activities, Royal Bank of Canada or its Affiliates (and any successor Collateral Trustee and its Affiliates) may receive information regarding the Company, any Grantor or its Guarantor or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Company, such Grantor or Guarantor or such Affiliate) and acknowledge that the Collateral Trustee shall not be under any obligation to provide such information to the Priority Lien Representatives or the holders of the Priority Lien Obligations. Nothing herein shall impose or imply any obligation on the part of Royal Bank of Canada (or any successor Collateral Trustee) to advance funds.

## ARTICLE 6
## RESIGNATION AND REMOVAL OF THE COLLATERAL TRUSTEE

Section 6.1    Resignation or Removal of Collateral Trustee.  Subject to the appointment of a successor Collateral Trustee as provided in **Section 6.2** and the acceptance of such appointment by the successor Collateral Trustee:

(a)    the Collateral Trustee may resign at any time by giving not less than 30 days' prior written notice of resignation to each Priority Lien Representative and the Company; and

(b)    the Collateral Trustee may be removed at any time, with or without cause, by the Controlling Priority Lien Representative.

Section 6.2    Appointment of Successor Collateral Trustee.  Upon any such resignation or removal, a successor Collateral Trustee may be appointed by the Controlling Priority Lien Representative. If no successor Collateral Trustee has been so appointed and accepted such appointment within 30 days after the predecessor Collateral Trustee gave notice of resignation or was removed, the retiring Collateral Trustee may (at the expense of the Company), at its option, appoint a successor Collateral Trustee, or petition a court of competent jurisdiction for appointment of a successor Collateral Trustee, which must be a bank or trust company:

(1)    authorized to exercise corporate trust powers;

(2)    having a combined capital and surplus of at least $250,000,000;

(3)    maintaining an office in New York, New York; and

(4)    that is not the Company or any of its Affiliates or any Priority Lien Representative.

The Collateral Trustee will fulfill its obligations hereunder until a successor Collateral Trustee meeting the requirements of this **Section 6.2** has accepted its appointment as Collateral Trustee and the provisions of **Section 6.3** have been satisfied.

Section 6.3    Succession.  When the Person so appointed as successor Collateral Trustee accepts such appointment:

(1)    such Person will succeed to and become vested with all the rights, powers, privileges and duties of the predecessor Collateral Trustee, and the predecessor Collateral Trustee will be discharged from its duties and obligations hereunder; and

(2)    the predecessor Collateral Trustee will (at the expense of the Company) promptly transfer all Liens and collateral security and other property of the Trust Estate within its possession or control to the possession or control of the successor Collateral Trustee and will execute instruments and assignments as may be necessary or desirable or reasonably requested by the successor Collateral Trustee to transfer to the

successor Collateral Trustee all Liens, interests, rights, powers and remedies of the predecessor Collateral Trustee in respect of the Security Documents or the Trust Estate.

Thereafter the predecessor Collateral Trustee will remain entitled to enforce the immunities granted to it in **Article 5** and the provisions of **Sections 7.8** and **7.9**, and said provisions will survive termination of this Agreement for the benefit of the predecessor of the Collateral Trustee. The predecessor Collateral Trustee shall have no liability whatsoever for the actions or inactions of the successor Collateral Trustee.

Section 6.4   Merger, Conversion or Consolidation of Collateral Trustee.   Any Person into which the Collateral Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Trustee shall be a party, or any Person succeeding to the business of the Collateral Trustee shall be the successor of the Collateral Trustee pursuant to **Section 6.3**, provided that (i) without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding, such Person satisfies the eligibility requirements specified in clauses (1) through (4) of **Section 6.2** and (ii) prior to any such merger, conversion or consolidation, the Collateral Trustee shall have notified the Company and each Priority Lien Representative thereof in writing.

Section 6.5   Concerning the Collateral Trustee and the Priority Lien Representatives.

(a)   Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that this Agreement has been signed by each Priority Lien Representative, not in its individual capacity or personally but solely in its capacity as trustee, representative or agent for the benefit of the related holders of the applicable Series of Priority Lien Debt in the exercise of the powers and authority conferred and vested in it under the related Priority Lien Documents, and in no event shall such Priority Lien Representative, in its individual capacity, have any liability for the representations, warranties, covenants, agreements or other obligations of any other party under this Agreement, any Priority Lien Document or in any of the certificates, reports, documents, data notices or agreements delivered by such other party pursuant hereto or thereto.

(b)   Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that this Agreement has been signed by Royal Bank of Canada, not in its individual capacity or personally but in its capacity as Collateral Trustee, and in no event shall Royal Bank of Canada, in its individual capacity, have any liability for the representations, warranties, covenants, agreements or other obligations of any other party under this Agreement, any Priority Lien Document or in any of the certificates, reports, documents, data notices or agreements delivered by such other party pursuant hereto or thereto.

(c)   Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that this Agreement has been signed by Royal Bank of Canada, not in its individual capacity or personally but in its capacity as First-Out Representative, and in no event shall Royal Bank of Canada, in its individual capacity, have any liability for the representations, warranties, covenants, agreements or other obligations of any

42

other party under this Agreement, any Priority Lien Document or in any of the certificates, reports, documents, data notices or agreements delivered by such other party pursuant hereto or thereto.

(d)     Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that this Agreement has been signed by Delaware Trust Company, not in its individual capacity or personally but in its capacity as Trustee signing as First Lien Representative, pursuant to directions set forth in the First Lien Indenture, and in no event shall Delaware Trust Company or any other Priority Lien Representative, in its individual capacity, have any liability for the representations, warranties, covenants, agreements or other obligations of any other party under this Agreement, any Priority Lien Document or in any of the certificates, reports, documents, data notices or agreements delivered by such other party pursuant hereto or thereto.

(e)     In entering into this Agreement, the Collateral Trustee shall be entitled to the benefit of every provision of the Priority Lien Documents relating to the rights, exculpations or conduct of, affecting the liability of or otherwise affording protection to the "collateral trustee," "collateral agent," "trustee," "mortgagee," "agent," and "administrative agent" thereunder. In no event will the Collateral Trustee be liable for any act or omission on the part of the Grantors or any Priority Lien Representative.

(f)     Except as otherwise set forth herein, neither the Collateral Trustee nor any Priority Lien Representative shall be required to exercise any discretion or take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) solely upon the written instructions of the Controlling Priority Lien Representative as provided herein; provided that neither the Collateral Trustee nor any Priority Lien Representative shall be required to take any action that (i) it in good faith believes exposes it to personal liability unless it receives an indemnification satisfactory to it from the applicable holders of the Priority Lien Obligations with respect to such action or (ii) is contrary to this Agreement, the Intercreditor Agreement, if any, or applicable law.

## ARTICLE 7
## MISCELLANEOUS PROVISIONS

Section 7.1    Amendment.

(a)     No amendment or supplement to the provisions of any Security Document will be effective without the approval of the Collateral Trustee and the Required Priority Lien Debtholders, except that:

(1)     any amendment or supplement that has the effect solely of:

(A)     adding or maintaining Collateral, securing additional Priority Lien Debt that was otherwise permitted by the terms of the Priority Lien Documents to be secured by the Collateral or preserving, perfecting or establishing the Liens thereon or the rights of the Collateral Trustee or any Priority Lien Representative therein;

43

(B)  curing any ambiguity, omission, mistake, defect or inconsistency;

(C)  providing for the assumption of the Company's, any Grantor's or any Guarantor's obligations under any Priority Lien Document in the case of a merger or consolidation or sale of all or substantially all of the properties or assets of the Company, any Grantor or such Guarantor to the extent permitted by the terms of the Senior Credit Facility, the First Lien Indenture and the other Priority Lien Documents, as applicable;

(D)  making any change that would provide any additional rights or benefits to the holders of Priority Lien Debt or the Collateral Trustee or that does not adversely affect the legal rights under the First Lien Indenture, the Senior Credit Facility or any other Priority Lien Document of any holder of First-Out Obligations or First Lien Obligations, any other holder of Priority Lien Debt or the Collateral Trustee; or

(E)  effecting any release of Collateral otherwise permitted under the Priority Lien Documents,

will become effective when executed and delivered by the Company or any other applicable Grantor party thereto and the Collateral Trustee;

(2)  no amendment or supplement that:

(A)  amends the provisions of this **clause (2)**, or the definition of "*Discharge of Priority Lien Obligations,*" "*Priority Lien Debt,*" "*Priority Lien Debt Default,*" "*Priority Lien Obligations,*" or "*Required Priority Lien Debtholders*";

(B)  reduces, impairs or adversely affects the right of any holder of First-Out Obligations to vote its outstanding First-Out Debt as to any matter described as subject to a direction by, or the agreement of, the Controlling Priority Lien Representative;

(C)  reduces, impairs or adversely affects the right of any holder of First Lien Obligations to vote its outstanding First Lien Debt as to any matter described as subject to a direction by, or the agreement of, the Controlling Priority Lien Representative;

(D)  amends the definition of "*Controlling Priority Lien Representative,*" "*Discharge of First-Out Obligations,*" "*First-Out Debt,*" "*First-Out Documents,*" "*First-Out Obligations,*" "*First-Out Secured Parties,*" "*Required First-Out Debtholders,*" any other definition containing the words "*First-Out*" or "*Hedging*" therein or any other defined terms to the extent referenced or implicated therein;

44

(E)     amends the definition of "*Controlling Priority Lien Representative*," "*Discharge of First Lien Obligations*," "*First Lien Debt*," "*First Lien Documents*," "*First Lien Obligations*," "*First Lien Secured Parties*," "*Required First Lien Debtholders*," any other definition containing the words "*First Lien*" therein or any other defined terms to the extent referenced or implicated therein; or

(F)     reduces, impairs or adversely affects the right of any holder of Priority Lien Obligations to (i) share in the order of application described in **Section 3.4** in the proceeds of an Enforcement Action that has not been released in accordance with the provisions described in **Section 4.1** or **4.4**, or (ii) require that Liens securing Priority Lien Obligations be released only as set forth in the provisions described in **Sections 4.1** or **4.4**,

will become effective without the consent of (i) with respect to clause (A) the Required First-Out Debtholders and the Required First Lien Debtholders, (ii) with respect to clause (B), the Required First-Out Debtholders, (iii) with respect to clause (C), the Required First Lien Debtholders, (iv) with respect to clause (D), the Required First-Out Debtholders and, to the extent such amendment reduces, impairs or adversely affects the right of any holder of First Lien Obligations, the Required First Lien Debtholders, (v) with respect to clause (E), the Required First Lien Debtholders and, to the extent such amendment reduces, impairs or adversely affects the right of any holder of First-Out Obligations, the Required First-Out Debtholders, and (vi) with respect to clause (F), the Required Priority Lien Debtholders and each First-Out Hedging Counterparty adversely affected thereby; and

(3)     no amendment or supplement that imposes any obligation upon the Collateral Trustee or any Priority Lien Representative or adversely affects the rights of the Collateral Trustee or any Priority Lien Representative, respectively, in its individual capacity as such will become effective without the consent of the Collateral Trustee or such Priority Lien Representative, respectively.

(b)     [Reserved].

(c)     Notwithstanding **Section 7.1(a)** but subject to **Sections 7.1(a)(2)** and **Section 7.1(a)(3)**:

(1)     any mortgage or other Security Document or the Intercreditor Agreement may be amended or supplemented with the approval of the Collateral Trustee (acting at the written direction of the Controlling Priority Lien Representative), unless such amendment or supplement would not be permitted under the terms of this Agreement, the Intercreditor Agreement, if any, or any Priority Lien Document;

(2)     any amendment or waiver of, or any consent under, any provision of any security document that secures Priority Lien Obligations will apply automatically to any comparable provision of any comparable Security Document without the consent

45

of or notice to any holder of Priority Lien Obligations and without any action by the Company, any Grantor or any Guarantor or any holder of Priority Lien Obligations; and

(3)     any mortgage or other Security Document may be amended or supplemented with the approval of the Collateral Trustee (but without the consent of or notice to any holder of Priority Lien Obligations and without any action by any holder of Priority Lien Obligations) (i) to cure any ambiguity, defect or inconsistency, or (ii) to make other changes that do not have an adverse effect on the validity of the Lien created thereby.

(d)     The Collateral Trustee will not enter into any amendment or supplement unless it has received an Officers' Certificate to the effect that such amendment or supplement will not result in a breach of any provision or covenant contained in the Intercreditor Agreement, if any, or any of the Priority Lien Documents. Prior to executing any amendment or supplement pursuant to this **Section 7.1**, the Collateral Trustee shall receive an Opinion of Counsel of the Company to the effect that the execution of such document is authorized or permitted hereunder and is the legal, valid and binding obligation of the Company, and with respect to amendments adding Collateral, an Opinion of Counsel of the Company addressing customary creation and perfection and other customary matters (for example, if such additional Collateral consists of equity interests of any Person which equity interests constitute certificated securities, status as protected purchaser) with respect to such additional Collateral (which opinion may be subject to customary assumptions and qualifications).

Section 7.2     Voting. In connection with any matter under this Agreement requiring a vote of holders of Priority Lien Debt, each Series of Priority Lien Debt will cast its votes in accordance with the Priority Lien Documents governing such Series of Priority Lien Debt. Following and in accordance with the outcome of the applicable vote under its Priority Lien Documents, the Priority Lien Representative of each Series of Priority Lien Debt will vote the total amount of Priority Lien Debt under that Series of Priority Lien Debt as a block in respect of any vote under this Agreement.

Section 7.3     Further Assurances.

(a)     The Company and each of the Grantors and Guarantors will do or cause to be done all acts and things that may be required, or that the Collateral Trustee (acting at the written direction of the Controlling Priority Lien Representative) from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the holders of Priority Lien Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become, or are required by any Priority Lien Document to become, Collateral after the date hereof), in each case, as contemplated by, and with the Lien priority required under, the Priority Lien Documents and in connection with any merger, consolidation or sale of assets of the Company, any Grantor or any Guarantor, the property and assets of the Person which is consolidated or merged with or into the Company, any Grantor or any Guarantor, to the extent that they are property or assets of the types which would constitute Collateral under the security documents, shall be treated as after-acquired property and the Company, any Grantor or such Guarantor shall take such action

46

as may be reasonably necessary to cause such property and assets to be made subject to the Priority Liens, in the manner and to the extent required under the Priority Lien Documents.

(b)    Upon the reasonable request of the Collateral Trustee (acting at the written direction of the Controlling Priority Lien Representative) or any Priority Lien Representative at any time and from time to time, the Company and each of the Grantors and Guarantors will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that the Collateral Trustee (acting at the direction of the Controlling Priority Lien Representative) may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by the Priority Lien Documents for the benefit of holders of Priority Lien Obligations; provided that no such security document, instrument or other document shall be materially more burdensome upon the Company, any Grantor and the Guarantors than the Priority Lien Document executed and delivered (or required to be executed and delivered promptly after the date hereof) by the Company, the Grantors and the Guarantors in connection with the issuance of the Initial First Lien Notes on or about the date hereof.

(c)    Upon the request of the Collateral Trustee, the Company, the Grantors and the Guarantors will permit the Collateral Trustee or any of its agents or representatives, at reasonable times and intervals upon reasonable prior notice, to visit their offices and sites and inspect any of the Collateral and to discuss matters relating to the Collateral with their respective officers and independent public accountants. The Company, the Grantors and the Guarantors shall, at any reasonable time and from time to time upon reasonable prior notice, permit the Collateral Trustee or any of its agents or representatives to examine and make copies of and abstracts from the records and books of account of the Company, the Grantors and the Guarantors and their Subsidiaries, all at the Company's expense.

Section 7.4    Successors and Assigns.

(a)    Except as provided in **Section 5.2**, the Collateral Trustee may not, in its capacity as such, delegate any of its duties or assign any of its rights hereunder, and any attempted delegation or assignment of any such duties or rights will be null and void. All obligations of the Collateral Trustee hereunder will inure to the sole and exclusive benefit of, and be enforceable by, each Priority Lien Representative and each Priority Lien Secured Party, each of whom will be entitled to enforce this Agreement as a third-party beneficiary hereof, and all of their respective successors and assigns.

(b)    Except as otherwise permitted by the Priority Lien Documents, neither the Company nor any Grantor or Guarantor may delegate any of its duties or assign any of its rights hereunder, and any attempted delegation or assignment of any such duties or rights will be null and void. All obligations of the Company, the Grantors and the Guarantors hereunder will inure to the sole and exclusive benefit of, and be enforceable by, the Collateral Trustee, each Priority Lien Representative and each Priority Lien Secured Party, each of whom will be entitled to enforce this Agreement as a third-party beneficiary hereof, and all of their respective successors and assigns.

47

Section 7.5   <u>Delay and Waiver</u>.   No failure to exercise, no course of dealing with respect to the exercise of, and no delay in exercising, any right, power or remedy arising under this Agreement or any of the other Security Documents will impair any such right, power or remedy or operate as a waiver thereof. No single or partial exercise of any such right, power or remedy will preclude any other or future exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.

Section 7.6   <u>Notices</u>.   Any communications, including notices and instructions, between the parties hereto or notices provided herein to be given may be given to the following addresses:

|  |  |
|---|---|
| If to the Collateral Trustee: | Royal Bank of Canada<br>Agency Services Group<br>222 Bay Street, 26th Floor<br>Toronto, Ontario M5K 1H6<br>Attention:  Manager Agency Services<br>Fax: (416) 842-4023 |
| If to the Company or any other Grantor: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Alfredo Gutierrez<br>Fax: (713) 756-2784 |
| If to the Trustee: | Delaware Trust Company<br>251 Little Falls Drive<br>Wilmington, Delaware 19808<br>Attention:  Corporate Trust Administration<br>Fax: (302) 636-8666 |
| If to the Senior Credit Facility Agent: | Royal Bank of Canada<br>2800 Post Oak Blvd., Suite 3900<br>Houston, Texas 77056<br>Attention:  Don J. McKinnerney<br>Fax:  (713) 403-5624 |

and if to any other Priority Lien Representative, to such address as it may specify by written notice to the parties named above.

All notices and communications will be mailed by first class mail, certified or registered, return receipt requested, by overnight air courier guaranteeing next day delivery, or delivered by facsimile to the relevant address or number set forth above or, as to holders of Priority Lien Debt, its address shown on the register kept by the office or agency where the relevant Priority Lien Debt may be presented for registration of transfer or for exchange. Failure to mail or delivery by facsimile a notice or communication to a holder of Priority Lien Debt or any defect in it will not affect its sufficiency with respect to other holders of Priority Lien Debt.

48

If a notice or communication is mailed or delivered by facsimile in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

Section 7.7    Entire Agreement.  This Agreement states the complete agreement of the parties relating to the undertaking of the Collateral Trustee set forth herein and supersedes all oral negotiations and prior writings in respect of such undertaking.

Section 7.8    Compensation; Expenses.  The Grantors jointly and severally agree to pay, promptly upon demand:

(1)    such compensation to the Collateral Trustee and its agents including attorneys as the Company and the Collateral Trustee may agree in writing from time to time;

(2)    all reasonable costs and expenses incurred by the Collateral Trustee and its agents including attorneys in the preparation, execution, delivery, filing, recordation, administration or enforcement of this Agreement or any other Security Document or any consent, amendment, waiver or other modification relating hereto or thereto;

(3)    all reasonable fees, expenses and disbursements of legal counsel and any auditors, accountants, consultants or appraisers or other professional advisors and agents engaged by the Collateral Trustee or any Priority Lien Representative incurred in connection with the negotiation, preparation, closing, administration, performance or enforcement of this Agreement and the other Security Documents or any consent, amendment, waiver or other modification relating hereto or thereto and any other document or matter requested by the Company, any Grantor or any Guarantor;

(4)    all reasonable costs and expenses incurred by the Collateral Trustee and its agents in creating, perfecting, preserving, releasing or enforcing the Collateral Trustee's Liens on the Collateral, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, and title insurance premiums;

(5)    all other reasonable costs and expenses incurred by the Collateral Trustee and its agents in connection with the negotiation, preparation and execution of the Security Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby or the exercise of rights or performance of obligations by the Collateral Trustee thereunder; and

(6)    after the occurrence of any Priority Lien Debt Default, all costs and expenses incurred by the Collateral Trustee, its agents and any Priority Lien Representative in connection with any Enforcement Action subject to the Security Documents or any interest, right, power or remedy of the Collateral Trustee or in connection with any Enforcement Action or the proof, protection, administration or resolution of any claim based upon the Priority Lien Obligations in any Insolvency or Liquidation Proceeding, including all fees and disbursements of attorneys, accountants, auditors, consultants, appraisers and other professionals engaged by the Collateral Trustee, its agents or the Priority Lien Representatives.

49

The agreements in this **Section 7.8** will survive repayment of all other Priority Lien Obligations and the removal or resignation of the Collateral Trustee and termination of this Agreement.

Section 7.9    Indemnity.

(a)    The Grantors jointly and severally agree to defend, indemnify, pay and hold harmless the Collateral Trustee, each Priority Lien Representative, each Priority Lien Secured Party and each of their respective Affiliates and each and all of the directors, officers, partners, trustees, employees, attorneys and agents, and (in each case) their respective heirs, representatives, successors and assigns (each of the foregoing, an "**Indemnitee**") from and against any and all Indemnified Liabilities, whether brought by a third party or by any Grantor; provided that no Indemnitee will be entitled to indemnification hereunder with respect to any Indemnified Liability to the extent such Indemnified Liability is found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. THIS INDEMNITY COVERS ORDINARY NEGLIGENCE OF ANY OF THE FOREGOING PARTIES.

(b)    All amounts due under this **Section 7.9** will be payable within 10 days upon written demand.

(c)    To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in **Section 7.9(a)** may be unenforceable in whole or in part because they violate any law or public policy, each of the Grantors will contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(d)    No Grantor will ever assert any claim against any Indemnitee, on any theory of liability, for any lost profits or special, indirect or consequential damages or (to the fullest extent a claim for punitive damages may lawfully be waived) any punitive damages arising out of, in connection with, or as a result of, this Agreement or any other Priority Lien Document or any agreement or instrument or transaction contemplated hereby or relating in any respect to any Indemnified Liability, and each of the Grantors hereby forever waives, releases and agrees not to sue upon any claim for any such lost profits or special, indirect, consequential or (to the fullest extent lawful) punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(e)    The agreements in this **Section 7.9** will survive repayment of all other Priority Lien Obligations and the removal or resignation of the Collateral Trustee and termination of this Agreement.

Section 7.10   Severability.  If any provision of this Agreement is invalid, illegal or unenforceable in any respect or in any jurisdiction, the validity, legality and enforceability of such provision in all other respects and of all remaining provisions, and of such provision in all other jurisdictions, will not in any way be affected or impaired thereby.

Section 7.11   Headings.  Section headings herein have been inserted for convenience of reference only, are not to be considered a part of this Agreement and will in no way modify or restrict any of the terms or provisions hereof.

50

Section 7.12  <u>Obligations Secured</u>.  All obligations of the Grantors set forth in or arising under this Agreement will be Priority Lien Obligations and are secured by all Liens granted by the Security Documents.

Section 7.13  <u>Governing Law</u>.   THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS AGREEMENT.

Section 7.14  <u>Consent to Jurisdiction</u>.   All judicial proceedings brought against any party hereto arising out of or relating to this Agreement or any of the other Security Documents may be brought in any state or federal court of competent jurisdiction in the State, County and City of New York. By executing and delivering this Agreement, each party hereto irrevocably:

(1)     accepts generally and unconditionally the exclusive jurisdiction and venue of such courts;

(2)     waives any defense of forum non conveniens;

(3)     agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to such party at its address provided in accordance with **Section 7.6**;

(4)     agrees that service as provided in **clause (3)** above is sufficient to confer personal jurisdiction over such party in any such proceeding in any such court and otherwise constitutes effective and binding service in every respect; and

(5)     agrees that each party hereto retains the right to serve process in any other manner permitted by law or to bring proceedings against any party in the courts of any other jurisdiction.

Section 7.15  <u>Waiver of Jury Trial</u>.  EACH PARTY TO THIS AGREEMENT WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER SECURITY DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE INTENTS AND PURPOSES OF THE OTHER SECURITY DOCUMENTS. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE OTHER SECURITY DOCUMENTS, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HERETO HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH PARTY HERETO WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE,

MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS **SECTION 7.15** AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF OR TO THIS AGREEMENT OR ANY OF THE OTHER SECURITY DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING THERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 7.16   <u>Counterparts, Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts (including by facsimile), each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument. The parties hereto may sign this Agreement and any Collateral Trust Joinder and transmit the executed copy by electronic means, including facsimile or noneditable *.pdf files. The electronic copy of the executed Agreement and any Collateral Trust Joinder is and shall be deemed an original signature.

Section 7.17   <u>Effectiveness</u>.  This Agreement will become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by each party of written notification of such execution and written or telephonic authorization of delivery thereof.

Section 7.18   <u>Grantors and Additional Grantors</u>.  Each Grantor represents and warrants that it has duly executed and delivered this Agreement. The Company will cause each Person that hereafter becomes a Grantor or is required by any Priority Lien Document to become a party to this Agreement to become a party to this Agreement, for all purposes of this Agreement, by causing such Person to execute and deliver to the Collateral Trustee a Collateral Trust Joinder, whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof. The Company shall promptly provide each Priority Lien Representative with a copy of each Collateral Trust Joinder executed and delivered pursuant to this **Section 7.18**; provided that the failure to so deliver a copy of the Collateral Trust Joinder to any then-existing Priority Lien Representative shall not affect the inclusion of such Person as a Grantor if the other requirements of this **Section 7.18** are complied with.

Section 7.19   <u>Continuing Nature of this Agreement</u>.   This Agreement, including the priority payment rights of the First-Out Secured Parties, will be reinstated following termination hereof if at any time any payment or distribution in respect of any of the Priority Lien Obligations is rescinded or must otherwise be returned in an Insolvency or Liquidation Proceeding or otherwise by any Priority Lien Secured Party, Priority Lien Representative or any representative of any such party (whether by demand, settlement, litigation or otherwise). If all or any part of a payment or distribution made with respect to the First-Out Obligations is recovered from any holder of Priority Lien Obligations, any Priority Lien Representative in an Insolvency or Liquidation Proceeding or otherwise, such payment or distribution received by any holder of Priority Lien Obligations or Priority Lien Representative with respect to the Priority Lien Obligations from the proceeds of any Collateral at any time after the date of the payment or distribution that is so recovered, whether pursuant to a right of subrogation or otherwise, such Priority Lien Representative or holder of a Priority Lien Obligation, as the case may be, will forthwith deliver the same to the Collateral Trustee, for the ratable account of the holders of the

First-Out Obligations to be applied in accordance with **Section 3.4**. Until so delivered, such proceeds will be held by such Priority Lien Representative or holder of Priority Lien Obligations, as the case may be, for the ratable benefit of the holders of the First-Out Obligations.

Section 7.20   <u>Insolvency</u>.  This Agreement will be applicable both before and after the commencement of any Insolvency or Liquidation Proceeding by or against any Grantor. The relative rights, as provided for in this Agreement, will continue after the commencement of any such Insolvency or Liquidation Proceeding on the same basis as prior to the date of the commencement of any such case, as provided in this Agreement.

Section 7.21   <u>Rights and Immunities of Priority Lien Representatives</u>.  The Trustee and the Collateral Trustee will be entitled, to the extent applicable to such entity, to all of the rights, protections, immunities and indemnities set forth in the First Lien Indenture, the Senior Credit Facility Agent will be entitled, to the extent applicable to such entity, to all of the rights, protections, immunities and indemnities set forth in the Senior Credit Facility and any future Priority Lien Representative will be entitled to all of the rights, protections, immunities and indemnities set forth in the credit agreement, indenture or other agreement governing the applicable Priority Lien Debt with respect to which such Person will act as representative, in each case as if such rights, protections, immunities and indemnities were specifically set forth herein. In no event will any Priority Lien Representative be liable for any act or omission on the part of the Grantors or the Collateral Trustee hereunder.

Section 7.22   <u>Intercreditor Agreement</u>.

(a)      Each Person that is secured hereunder, by accepting the benefits of the security provided hereby, (i) agrees (or is deemed to agree) that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreement, if any, and (ii) authorizes (or is deemed to authorize) and instructs (or is deemed to instruct) the Collateral Trustee on behalf of such Person to enter into, and perform under, the Intercreditor Agreement, if any, as "Priority Lien Agent". The Collateral Trustee agrees to enter into any agreements, amendments, joinders, releases or other instruments constituting or related to the Security Documents, without any further consent of any Priority Lien Secured Party, to add additional Indebtedness as Priority Lien Debt (to the extent permitted to be incurred and secured by the applicable Priority Lien Documents) and add other parties (or any authorized agent or trustee therefor) holding such Indebtedness thereto and to establish that the Lien on any Collateral securing such Indebtedness ranks equally and ratably with the Liens on such Collateral securing the other Priority Lien Debt then outstanding (subject to the First-Out Prior Payment Rights). The foregoing provisions are intended as an inducement to the lenders under the Senior Credit Facility to extend credit to the Company, as the borrower under the Senior Credit Facility, to the First-Out Cash Management Counterparties to provide First-Out Cash Management Arrangements and to the First-Out Hedging Counterparties to enter into the First-Out Hedging Agreements, and such lenders, First-Out Cash Management Counterparties and First-Out Hedging Counterparties are intended third party beneficiaries of this provision and the provisions of the Intercreditor Agreement, if any. Notwithstanding anything to the contrary contained herein, to the extent that any Lien on any Collateral is perfected by the possession or control of such Collateral or of any account in which such Collateral is held, and if such Collateral or any such account is in fact in the possession or under the control of the Collateral Trustee, or of agents or bailees of the Collateral

US-DOCS\98243399.18

Trustee, the perfection actions and related deliverables described in this Agreement or the other Security Documents shall be deemed satisfied as to such Collateral.

(b)     Notwithstanding anything in the Intercreditor Agreement, if any, to the contrary, for such time as the Collateral Trustee remains the holder of the Priority Liens for the benefit of all Priority Lien Secured Parties, the First-Out Representative, in its capacity as a "Priority Lien Agent" under the Intercreditor Agreement hereby agrees that (i) it shall not exercise any rights or powers granted to a "Priority Lien Agent" under the Intercreditor Agreement except at the direction of the Collateral Trustee, and (ii) to the extent requested by the Collateral Trustee, it shall execute any and all documents, agreements and instruments, and take all actions, in each case, in its capacity as a "Priority Lien Agent" under the Intercreditor Agreement, that the Collateral Trustee may request in connection with the exercise of any rights or power granted to a "Priority Lien Agent" under the Intercreditor Agreement.  The First-Out Representative, in its capacity as a "Priority Lien Agent" under the Intercreditor Agreement, hereby appoints the Collateral Trustee its attorney-in-fact, with full power and authority in the place and stead of the First-Out Representative, in its capacity as a "Priority Lien Agent" under the Intercreditor Agreement, and in the name of the First-Out Representative, in its capacity as a "Priority Lien Agent" under the Intercreditor Agreement, in the Collateral Trustee's discretion to take any action and to execute any instrument consistent with the terms of this Agreement and the Intercreditor Agreement which the Collateral Trustee may deem necessary or advisable to accomplish the purposes hereof (but the Collateral Trustee shall not be obligated to and shall have no liability to the Senior Credit Facility Agent or any third party for failure to so do or take action, unless so instructed by the Controlling Priority Lien Representative); provided that, the Collateral Trustee shall not exercise its rights hereunder unless the First-Out Representative shall have failed to perform its obligations pursuant to this **Section 7.22(b)**.  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof.  The First-Out Representative, in its capacity as a "Priority Lien Agent" under the Intercreditor Agreement, hereby ratifies all that such attorney shall lawfully do or cause to be done consistent with the foregoing grant of authority and by virtue hereof.

Section 7.23  Force Majeure.  In no event shall the Collateral Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.24  U.S.A. Patriot Act.  The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the Collateral Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Collateral Trustee.  The parties to this Agreement agree that they will provide the Collateral Trustee with such information as it may request in order for the Collateral Trustee to satisfy the requirements of the U.S.A. Patriot Act.

US-DOCS\98243399.18

Section 7.25 <u>Limitation on Liability</u>. Notwithstanding anything to the contrary in this Agreement, no past, present or future director, officer, partner, employee, incorporator, manager or shareholder or other owner of Capital Stock of the Company or any Guarantor, as such, shall have any liability for any obligations of the Company or any Guarantor under this Agreement or any Security Document, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Priority Lien Secured Party waives and releases all such liability. The waiver and release are part of the consideration for issuance of any Priority Lien Debt.  The limitations on recourse set forth in this **<u>Section 7.25</u>** shall survive the Discharge of Priority Lien Obligations.

US-DOCS\98243399.18

IN WITNESS WHEREOF, the parties hereto have caused this Collateral Trust Agreement to be executed by their respective officers or representatives as of the day and year first above written.

**COMPANY:**

SANCHEZ ENERGY CORPORATION

By: _____

    Name:  Antonio R. Sanchez, III
    Title:   Chief Executive Officer

[Signature Page to Collateral Trust Agreement (Sanchez Energy)]

**GUARANTORS AND GRANTORS:**

SN PALMETTO, LLC

SN MARQUIS LLC

SN COTULLA ASSETS, LLC

SN OPERATING, LLC

SN TMS, LLC

SN CATARINA, LLC

SN EF MAVERICK, LLC

ROCKIN L RANCH COMPANY, LLC

By: _____
Name:   Antonio R. Sanchez, III
Title:   Chief Executive Officer

[Signature Page to Collateral Trust Agreement (Sanchez Energy)]

**ROYAL BANK OF CANADA**, as First-Out
Representative

By:
Name:
Title:

**DELAWARE TRUST COMPANY,** as First Lien
Representative and as Trustee

By: _____
Name: Thomas Musarra
Title:   Vice President

ROYAL BANK OF CANADA, as Collateral
Trustee

By:
Name:
Title:

[Signature Page to Collateral Trust Agreement (Sanchez Energy)]

**EXHIBIT A**

**[FORM OF]**
**ADDITIONAL SECURED DEBT DESIGNATION**

Reference is made to the Collateral Trust Agreement, dated as of February 14, 2018 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "**Collateral Trust Agreement**"), among Sanchez Energy Corporation (the "**Company**"), the Grantors and Guarantors from time to time party thereto, Royal Bank of Canada, as First-Out Representative (as defined therein), Delaware Trust Company, as First Lien Representative (as defined therein), and Royal Bank of Canada, as Collateral Trustee. Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Collateral Trust Agreement. This Additional Secured Debt Designation is being executed and delivered in order to designate additional secured debt as Priority Lien Debt entitled to the benefit of the Collateral Trust Agreement.

Each of the undersigned, constituting the duly appointed [*specify title*][1] and [*specify title*], respectively, of the Company, hereby certifies on behalf of [*the Company or applicable Grantor*] that:

(A)　[*the Company or applicable Grantor*] intends to incur Additional Priority Lien Debt which will be permitted by each applicable Priority Lien Document to be secured by a Priority Lien equally and ratably with all previously existing and future Priority Lien Debt (subject to the First-Out Prior Payment Rights);

(B)　the name and address of the Priority Lien Representative for the Additional Priority Lien Debt for purposes of **Section 7.6** of the Collateral Trust Agreement is:

_____

_____

Telephone: _____

Fax:_____

(C)　attached as Exhibit 1 hereto is a Reaffirmation Agreement duly executed by the Company, each Grantor and each Guarantor,

(D)　the Company has caused a copy of this Additional Secured Debt Designation and the related Collateral Trust Joinder to be delivered to each existing Priority Lien Representative,

---

[1] The two signatories must satisfy the requirements set forth in the definition of "Officers' Certificate" in the Collateral Trust Agreement.

(E)     such Additional Priority Lien Debt shall constitute [First-Out Debt] [First Lien Debt] and Priority Lien Debt for purposes of the Collateral Trust Agreement, and

(F)     [*insert additional statements satisfying the requirements set forth in clauses (a), (b), (c) and (d) of the definition of "Officers' Certificate" in the Collateral Trust Agreement*].

IN WITNESS WHEREOF, the Company has caused this Additional Secured Debt Designation to be duly executed by the undersigned officers[2] as of _____, 20____.

**[COMPANY][GRANTOR]**

By:      _____
Name:  _____
Title:   _____


By:      _____
Name:  _____
Title:   _____

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the duly appointed Collateral Trustee under the Collateral Trust Agreement, hereby acknowledges receipt of an executed copy of this Additional Secured Debt Designation.

**ROYAL BANK OF CANADA**, as Collateral Trustee

By:      _____
Name:  _____
Title:   _____

---

[2] The two signatories must satisfy the requirements set forth in the definition of "Officers' Certificate" in the Collateral Trust Agreement.

US-DOCS\98243399.18

**EXHIBIT 1 TO ADDITIONAL SECURED DEBT DESIGNATION**

**[FORM OF]**
**REAFFIRMATION AGREEMENT**

Reference is made to the Collateral Trust Agreement, dated as of February 14, 2018 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "**Collateral Trust Agreement**"), among Sanchez Energy Corporation (the "**Company**"), the Grantors and Guarantors from time to time party thereto, Royal Bank of Canada, as First-Out Representative (as defined therein), Delaware Trust Company, as First Lien Representative (as defined therein), and Royal Bank of Canada, as Collateral Trustee. Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Collateral Trust Agreement. This Reaffirmation Agreement is being executed and delivered as of _____, 20__ in connection with an Additional Secured Debt Designation of even date herewith which Additional Secured Debt Designation has designated additional Priority Lien Debt entitled to the benefit of the Collateral Trust Agreement.

Each of the undersigned hereby consents to the designation of additional secured debt as [First-Out Debt] [First Lien Debt] and Priority Lien Debt as set forth in the Additional Secured Debt Designation of even date herewith and hereby confirms its respective guarantees, pledges, grants of security interests and other obligations, as applicable, under and subject to the terms of each of the Priority Lien Documents to which it is party, and agrees that, notwithstanding the designation of such additional indebtedness or any of the transactions contemplated thereby, such guarantees, pledges, grants of security interests and other obligations, and the terms of each Priority Lien Document to which it is a party, are not impaired or adversely affected in any manner whatsoever and shall continue to guarantee and secure as applicable and otherwise be in full force and effect and such additional secured debt shall be entitled to all of the benefits of such Priority Lien Documents.

Governing Law and Miscellaneous Provisions. The provisions of Article 7 of the Collateral Trust Agreement will apply with like effect to this Reaffirmation Agreement.

IN WITNESS WHEREOF, each of the undersigned has caused this Reaffirmation Agreement to be duly executed as of the date written above.

*[names of the Company, Grantors and Guarantors]*

Name: _____
Title: _____

**EXHIBIT B**

**[FORM OF]**
**COLLATERAL TRUST JOINDER – ADDITIONAL DEBT**

Reference is made to the Collateral Trust Agreement, dated as of February 14, 2018 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "**Collateral Trust Agreement**"), among Sanchez Energy Corporation (the "**Company**"), the Grantors and Guarantors from time to time party thereto, Royal Bank of Canada, as First-Out Representative (as defined therein), Delaware Trust Company, as First Lien Representative (as defined therein), and Royal Bank of Canada, as Collateral Trustee. Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Collateral Trust Agreement. This Collateral Trust Joinder is being executed and delivered pursuant to **Section 3.8** of the Collateral Trust Agreement as a condition precedent to the debt for which the undersigned is acting as agent being entitled to the benefits of being additional Priority Lien Debt under the Collateral Trust Agreement.

1.   [2.   Joinder.   The   undersigned,   _____,   a _____, (the "**New Representative**") as [*trustee, administrative agent, collateral agent*] under that certain [*described applicable indenture, credit agreement or other document governing the additional secured debt*] hereby agrees to become party as a [First-Out Representative] [First Lien Representative] and Priority Lien Representative under the Collateral Trust Agreement for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Collateral Trust Agreement as fully as if the undersigned had executed and delivered the Collateral Trust Agreement as of the date thereof.]³

3.   [1][4.]  Additional Secured Debt Designation

The undersigned, on behalf of itself and each holder of Obligations in respect of the [*Additional Notes*][*Series of Priority Lien Debt*] for which the undersigned is acting as Priority Lien Representative hereby agrees, for the enforceable benefit of all Priority Lien Secured Parties and each existing and future holder of Priority Liens and as a condition to being treated as Priority Lien Debt under the Collateral Trust Agreement that:

(a)   subject to **Section 3.4** of the Collateral Trust Agreement, all Priority Lien Obligations will be and are secured equally and ratably by all Priority Liens at any time granted by the Company or any other Grantor to secure any Obligations in respect of any [*Additional Notes*][*Series of Priority Lien Debt*] (subject to the First-Out Prior Payment Rights), whether or not upon property otherwise constituting collateral for such Series of Priority Lien Debt, and that all such Priority Liens will be enforceable by the Collateral Trustee for the benefit of all holders of Priority Lien Obligations equally and ratably (subject to the First-Out Prior Payment Rights);

(b)   the undersigned, on behalf of itself and each holder of Obligations in respect of the [*Additional Notes*][*Series of Priority Lien Debt*] for which the undersigned is acting as [First-Out Representative] [First Lien Representative] and Priority Lien Representative,

---

³ Delete if Additional Priority Lien Debt constitutes Additional Notes.

hereby consents to and agrees to be bound by the provisions of the Intercreditor Agreement, if any, the Collateral Trust Agreement and the other Security Documents, including the provisions relating to the ranking of Priority Liens and the order of application of proceeds from the enforcement of Priority Liens; and

(c)    the undersigned, on behalf of itself and each holder of Obligations in respect of the [*Additional Notes*][*Series of Priority Lien Debt*] for which the undersigned is acting as [First-Out Representative] [First Lien Representative] and Priority Lien Representative, hereby appoints the Collateral Trustee to serve as collateral trustee under the Security Documents on the terms and conditions set forth therein and hereby consents to the performance by the Collateral Trustee of, and directs the Collateral Trustee to perform its obligations under the Collateral Trust Agreement, the Security Documents and the Intercreditor Agreement, if any.

5.    <u>Governing Law and Miscellaneous Provisions</u>.  The provisions of Article 7 of the Collateral Trust Agreement will apply with like effect to this Collateral Trust Joinder.

IN WITNESS WHEREOF, the parties hereto have caused this Collateral Trust Joinder to be executed by their respective officers or representatives as of _____, 20____.

[*insert name of the new representative*]

Name: _____
Title: _____

The Collateral Trustee hereby acknowledges receipt of this Collateral Trust Joinder and agrees to act as Collateral Trustee for the [*New Representative*][*Trustee*] and the holders of the Obligations represented thereby:

[_____]

By:    _____
Name: _____
Title: _____

**EXHIBIT C**

**[FORM OF]**
**COLLATERAL TRUST JOINDER – ADDITIONAL GRANTOR**

Reference is made to the Collateral Trust Agreement, dated as of February 14, 2018 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "**Collateral Trust Agreement**"), among Sanchez Energy Corporation (the "**Company**"), the Grantors and Guarantors from time to time party thereto, Royal Bank of Canada, as First-Out Representative (as defined therein), Delaware Trust Company, as First Lien Representative (as defined therein), and Royal Bank of Canada, as Collateral Trustee. Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Collateral Trust Agreement. This Collateral Trust Joinder is being executed and delivered pursuant to **Section 7.18** of the Collateral Trust Agreement.

1.  <u>Joinder</u>.  The undersigned, _____, a _____, hereby agrees to become party as a Grantor under the Collateral Trust Agreement for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Collateral Trust Agreement as fully as if the undersigned had executed and delivered the Collateral Trust Agreement as of the date thereof.

2.  <u>Governing Law and Miscellaneous Provisions</u>.  The provisions of Article 7 of the Collateral Trust Agreement will apply with like effect to this Collateral Trust Joinder.

IN WITNESS WHEREOF, the parties hereto have caused this Collateral Trust Joinder to be executed by their respective officers or representatives as of _____, 20____.

[_____]

By: _____
Name:
Title:

The Collateral Trustee hereby acknowledges receipt of this Collateral Trust Joinder and agrees to act as Collateral Trustee with respect to the Collateral pledged by the new Grantor:

[_____]

By: _____
Name: _____
Title: _____

US-DOCS\98243399.18

**EXHIBIT D**

**[FORM OF]**
**INTERCREDITOR AGREEMENT**

[Attached.]

US-DOCS\98243399.18

**FORM OF**

**INTERCREDITOR AGREEMENT**

dated as of                          , 20__  between

,

as Priority Lien Collateral Trustee,

and

,

as Junior Lien Representative

And acknowledged and agreed to by
the Company and Grantors on the signature pages hereto

THIS IS THE INTERCREDITOR AGREEMENT REFERRED TO IN (A) THE INDENTURE DATED AS OF FEBRUARY [●], 2018, AMONG SANCHEZ ENERGY CORPORATION, CERTAIN OF ITS SUBSIDIARIES FROM TIME TO TIME PARTY THERETO AND [●], AS TRUSTEE AND (B) THE [CREDIT AGREEMENT], DATED AS OF [●], 20__, AMONG THE COMPANY, AS BORROWER, [●], AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT, AND THE LENDERS FROM TIME TO TIME PARTY THERETO.

# TABLE OF CONTENTS[1]

**Page**

## ARTICLE I.
## DEFINITIONS

Section 1.01    Construction; Certain Defined Terms ........................................................... 1

## ARTICLE II.
## LIEN PRIORITIES

Section 2.01    Relative Priorities.......................................................................... 13
Section 2.02    Prohibition on Marshalling, Etc. ........................................................ 14
Section 2.03    No New Liens................................................................................ 14
Section 2.04    Similar Collateral and Agreements ................................................... 14
Section 2.05    No Duties of Priority Lien Collateral Trustee .................................... 15
Section 2.06    No Duties of Junior Lien Representative ........................................... 15

## ARTICLE III.
## ENFORCEMENT RIGHTS; PURCHASE OPTION

Section 3.01    Limitation on Enforcement Action...................................................... 16
Section 3.02    Standstill Periods; Permitted Enforcement Action............................... 16
Section 3.03    Insurance ...................................................................................... 18
Section 3.04    Notification of Release of Collateral ................................................. 19
Section 3.05    No Interference; Payment Over......................................................... 19
Section 3.06    Purchase Option ............................................................................ 20

## ARTICLE IV.
## OTHER AGREEMENTS

Section 4.01    Release of Liens; Automatic Release of Junior Liens.............................. 22
Section 4.02    Certain Agreements With Respect to Insolvency or Liquidation Proceedings .......... 22
Section 4.03    Reinstatement ................................................................................ 26
Section 4.04    Refinancings; Additional Priority Lien Debt and Additional Junior Lien Debt......... 26
Section 4.05    Amendments to Junior Lien Documents ............................................. 28
Section 4.06    Legends ......................................................................................... 28
Section 4.07    Junior Lien Secured Parties Rights as Unsecured Creditors; Judgment Lien
                Creditor ........................................................................................ 28
Section 4.08    Postponement of Subrogation .......................................................... 28
Section 4.09    Acknowledgment by the Secured Debt Representatives ........................... 29

## ARTICLE V.
## GRATUITOUS BAILMENT FOR PERFECTION OF CERTAIN SECURITY INTERESTS

Section 5.01    General ......................................................................................... 29
Section 5.02    Deposit Accounts ........................................................................... 29

---

[1] LW, please fix the formatting so that the Section headings display correctly.

i

**DRAFT**  048826-0073

ARTICLE VI.
APPLICATION OF PROCEEDS; DETERMINATION OF AMOUNTS

Section 6.01    Application of Proceeds ........................................................................ 30
Section 6.02    Determination of Amounts .................................................................... 30

ARTICLE VII.
NO RELIANCE; NO LIABILITY; OBLIGATIONS ABSOLUTE;
CONSENT OF GRANTORS; ETC.

Section 7.01    No Reliance; Information......................................................................... 30
Section 7.02    No Warranties or Liability ...................................................................... 31
Section 7.03    Obligations Absolute............................................................................... 31
Section 7.04    Grantors Consent..................................................................................... 32

ARTICLE VIII.
REPRESENTATIONS AND WARRANTIES

Section 8.01    Representations and Warranties of Each Party ....................................... 32
Section 8.02    Representations and Warranties of Each Representative ......................... 32

ARTICLE IX.
MISCELLANEOUS

Section 9.01    Notices...................................................................................................... 33
Section 9.02    Waivers; Amendment................................................................................ 33
Section 9.03    Actions Upon Breach; Specific Performance........................................... 34
Section 9.04    Parties in Interest...................................................................................... 34
Section 9.05    Survival of Agreement .............................................................................. 34
Section 9.06    Counterparts ............................................................................................. 34
Section 9.07    Severability............................................................................................... 35
Section 9.08    Governing Law; Jurisdiction; Consent to Service of Process .................. 35
Section 9.09    WAIVER OF JURY TRIAL ..................................................................... 35
Section 9.10    Headings.................................................................................................... 36
Section 9.11    Conflicts.................................................................................................... 36
Section 9.12    Provisions Solely to Define Relative Rights ........................................... 36
Section 9.13    Certain Terms Concerning the Junior Lien Representative...................... 36
Section 9.14    Certain Terms Concerning the Priority Lien Collateral Trustee and the Junior
                Lien Representative .................................................................................. 36
Section 9.15    Authorization of Secured Agents .............................................................. 37
Section 9.16    Further Assurances.................................................................................... 37
Section 9.17    Relationship of Secured Parties................................................................ 37


Annex and Exhibits

Annex I         Legends

Exhibit A       Form of Priority Confirmation Joinder
Exhibit B       Security Documents

ii

**DRAFT**  048826-0073

**INTERCREDITOR AGREEMENT**, dated as of [●] (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), is between and among [●], as the collateral trustee for the Priority Lien Secured Parties referred to herein (in such capacity, and together with its successors and assigns in such capacity, the "Priority Lien Collateral Trustee") and [●], as the collateral [agent][trustee] for the Junior Lien Secured Parties referred to herein (in such capacity, and together with its successors in such capacity, the "Junior Lien Representative"), and acknowledged and agreed to by SANCHEZ ENERGY CORPORATION (the "Company") and the Grantors (defined below) on the signature pages hereto.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Priority Lien Collateral Trustee (for itself and on behalf of the Priority Lien Secured Parties) and the Junior Lien Representative (for itself and on behalf of the Junior Lien Secured Parties) agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.01   <u>Construction; Certain Defined Terms</u>.   (a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any reference herein to any agreement, instrument, other document, statute or regulation shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms of each applicable Secured Debt Document (including, for the avoidance of doubt, this Agreement), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein," "hereof and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vi) the term "or" is not exclusive and (vii) if the Priority Lien Indenture (as in effect on the date hereof) is no longer in effect at the time any indebtedness is incurred, any reference herein to indebtedness incurred under a clause of the definition of "Permitted Debt" set forth in such Priority Lien Indenture (as in effect on the date hereof) shall include indebtedness that would have been permitted to be incurred under such clause had such Priority Lien Indenture (as in effect on the date hereof) been so in effect at such time.

(b)       All terms used in this Agreement that are defined in Article 1, 8 or 9 of the New York UCC (whether capitalized herein or not) and not otherwise defined herein have the meanings assigned to them in Article 1, 8 or 9 of the New York UCC.  If a term is defined in Article 9 of the New York UCC and another Article of the New York UCC, such term shall have the meaning assigned to it in Article 9 of the New York UCC. Other capitalized terms used but not defined herein shall have the meanings assigned to them in the Priority Lien Credit Facility, or if none is then outstanding, in the Priority Lien Indenture.

1

(c)     Unless otherwise set forth herein, all references herein to the Junior Lien Representative shall be deemed to refer to the Junior Lien Representative in its capacity as collateral [agent][trustee] under each Junior Lien Facility.

(d)     As used in this Agreement, the following terms have the meanings specified below:

"Accounts" has the meaning assigned to such term in Section 3.01(a).

"Additional Junior Lien Debt" means any indebtedness incurred under any Additional Junior Lien Facility.

"Additional Junior Lien Documents" means the Additional Junior Lien Facility and the Additional Junior Lien Security Documents.

"Additional Junior Lien Facility" means any indenture, credit agreement or other agreement entered into by the Company or any Grantor for purposes of incurring secured indebtedness on a Junior Lien basis, which agreement and such debt is permitted under each applicable Secured Debt Document.

"Additional Junior Lien Obligations" means, with respect to any Grantor, any obligations of such Grantor owed to any Additional Junior Lien Secured Party (or any of its Affiliates) in respect Additional Junior Lien Debt or otherwise under any Additional Junior Lien Documents.

"Additional Junior Lien Secured Parties" means, at any time, each Junior Lien Agent, the beneficiaries of each indemnification obligation undertaken by any Grantor under any Additional Junior Lien Document and each other holder of, obligee in respect of, or holder or lender pursuant to, any Series of Junior Lien Debt outstanding at such time.

"Additional Junior Lien Security Documents" means the Additional Junior Lien Facility (insofar as the same grants a Lien on the Collateral) and any other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements, or grants or transfers for security, now existing or entered into after the date hereof, executed and delivered by the Company or any other Grantor creating (or purporting to create) a Lien upon the Junior Lien Collateral in favor of the Additional Junior Lien Secured Parties.

"Additional Priority Lien Debt" means any indebtedness incurred under any Additional Priority Lien Facility.

"Additional Priority Lien Documents" means the Additional Priority Lien Facility and the Additional Priority Lien Security Documents.

"Additional Priority Lien Facility" means any indenture, credit agreement or other agreement entered into by the Company or any Grantor for purposes of incurring secured indebtedness on a Priority Lien basis, which agreement and such debt is permitted under each applicable Secured Debt Document.

"Additional Priority Lien Obligations" means, with respect to any Grantor, any obligations of such Grantor owed to any Additional Priority Lien Secured Party (or any of its Affiliates) in respect Additional Priority Lien Debt or otherwise under any Additional Priority Lien Documents.

"Additional Priority Lien Secured Parties" means, at any time, the Priority Lien Agent, the beneficiaries of each indemnification obligation undertaken by any Grantor under any Additional Priority

**DRAFT**  048826-0073

Lien Document and each other holder of, obligee in respect of, or holder or lender pursuant to, any Series of Priority Lien Debt outstanding at such time.

"Additional Priority Lien Security Documents" means each Additional Priority Lien Facility (insofar as the same grants a Lien on the Collateral) and any other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements, or grants or transfers for security, now existing or entered into after the date hereof, executed and delivered by the Company or any other Grantor creating (or purporting to create) a Lien upon the Priority Lien Collateral in favor of the Additional Priority Lien Secured Parties.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereinafter in effect, or any successor statute.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Board of Directors" means:

(1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a limited partnership, the Board of Directors of the general partner of the partnership;

(3)     with respect to a limited liability company, the manager or managers, the managing member or members or any controlling committee of managers or managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in Houston, Texas or in New York, New York or another place of payment are authorized or required by law to close.

"Capital Stock" means:

(a)     in the case of a corporation, corporate stock;

(b)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

**DRAFT**  048826-0073

(d)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities exercisable for, exchangeable for or convertible into Capital Stock, regardless of whether such debt securities include any right of participation with Capital Stock.

"Cash Management Obligations" means, with respect to any Person, any obligations of such Person in respect of treasury management arrangements (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, and any other demand deposit or operating account relationships or other cash management services, including any treasury management line of credit.

"Class" means (a) in the case of Priority Lien Debt, the Priority Lien Debt, taken together, and (b) in the case of Junior Lien Debt, every Series of Junior Lien Debt, taken together.

"Collateral" means the Priority Lien Collateral and the Junior Lien Collateral.

"Company" has the meaning assigned to such term in the preamble.

"DIP Financing" has the meaning assigned to such term in Section 4.02(b).

"DIP Financing Liens" has the meaning assigned to such term in Section 4.02(b).

"Discharge of Priority Lien Obligations" means the occurrence of all of the following:

(a)     termination or expiration of all commitments to extend loans, letters of credit or other forms of credit that would constitute Priority Lien Obligations;

(b)     payment in full in cash of the principal of (to the extent such principal does not constitute Excess Priority Lien Obligations) and interest and premium (if any) on all Priority Lien Debt (other than any undrawn letters of credit);

(c)     discharge or cash collateralization (at the lower of (i) 105% of the aggregate undrawn amount and (ii) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Priority Lien Document) of all outstanding letters of credit constituting Priority Lien Obligations that are not Excess Priority Lien Obligations;

(d)     (i) payment in full in cash of all Hedging Obligations constituting Priority Lien Obligations and the termination of all Hedging Contracts relating thereto, (ii) the novation of all transactions entered into under all Hedging Contracts in respect of any Hedging Obligations constituting Priority Lien Obligations or pursuant thereto on terms and to counterparties acceptable to the counterparties holding such Hedging Obligations, (iii) the Company has provided or is concurrently providing collateral to secure the Hedging Obligations constituting Priority Lien Obligations substantially similar, or of substantially equal value, to the Collateral then subject to a Priority Lien, or (iv) the establishment of other arrangements with respect to such Hedging Obligations constituting Priority Lien Obligations as may be acceptable to the counterparties holding such Hedging Obligations (and communicated to the Priority Lien Collateral Trustee); and

(e)     payment in full in cash of all other Priority Lien Obligations, including without limitation, Cash Management Obligations, that are outstanding and unpaid at the time that each of the events described in clauses (a), (b), (c) and (d) above shall have occurred (other than any obligations for

4

taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at or prior to such time);

provided that, if, at any time after the Discharge of Priority Lien Obligations has occurred, the Company or any other Grantor enters into any Priority Lien Document evidencing a Priority Lien Obligation which incurrence is not prohibited by the applicable Secured Debt Documents, then such Discharge of Priority Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement with respect to such new Priority Lien Obligations (other than with respect to any actions previously taken as a result of the occurrence of such first Discharge of Priority Lien Obligations), and, from and after the date on which the Company designates such indebtedness as Priority Lien Debt in accordance with this Agreement, the obligations under such Priority Lien Document shall automatically and without any further action be treated as Priority Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth in this Agreement, and any Junior Lien Obligations shall be deemed to have been at all times Junior Lien Obligations and at no time Priority Lien Obligations.  For the avoidance of doubt, a Replacement as contemplated by Section 4.04(a) shall not be deemed to cause a Discharge of Priority Lien Obligations.

"Discharge of Junior Lien Obligations" means the occurrence of all of the following:

(a)     termination or expiration of all commitments to extend credit that would constitute Junior Lien Obligations;

(b)     payment in full in cash of the principal of and interest and premium (if any) on all Junior Lien Debt;

(c)     payment in full in cash of all other Junior Lien Obligations that are outstanding and unpaid at the time that each of the events described in clauses (a) and (b) above shall have occurred (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at or prior to such time);

provided that, if at any time after the Discharge of Junior Lien Obligations has occurred, the Company or any other Grantor enters into any Junior Lien Document evidencing a Junior Lien Obligation which incurrence is not prohibited by the applicable Priority Lien Documents, then such Discharge of Junior Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement with respect to such new Junior Lien Obligations (other than with respect to any actions previously taken as a result of the occurrence of such first Discharge of Junior Lien Obligations), and, from and after the date on which the Company designates such indebtedness as Junior Lien Debt in accordance with this Agreement, the obligations under such Junior Lien Document shall automatically and without any further action be treated as Junior Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth in this Agreement, and any Junior Lien Obligations shall be deemed to have been at all times Junior Lien Obligations and at no time Priority Lien Obligations.  For the avoidance of doubt, a Replacement as contemplated by Section 4.04(a) shall not be deemed to cause a Discharge of Junior Lien Obligations.

"Disposition" means any sale, lease, exchange, assignment, license, contribution, transfer or other disposition.  "Dispose" shall have a correlative meaning.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is exercisable for, convertible into, or exchangeable for, Capital Stock).

**DRAFT**  048826-0073

"<u>Excess Priority Lien Obligations</u>" means Priority Lien Obligations for the principal amount of notes, loans, letters of credit and reimbursement obligations in excess of the amount in <u>clause (a)</u> of the definition of "Priority Lien Cap."

"<u>Financial Officer</u>" of any Person means the Chief Financial Officer, Chief Accounting Officer, principal accounting officer, controller, treasurer or assistant treasurer of such Person.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Grantors</u>" means the Company, and each other subsidiary of the Company that shall have granted any Lien in favor of any of the Priority Lien Collateral Trustee or the Junior Lien Representative on any of its assets or properties to secure any of the Secured Obligations.

"<u>Hedging Contracts</u>" means any transaction or agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, whether or not any such transaction is governed by or subject to any master agreement. For the avoidance of doubt, (a) a Hedging Contract governed by a master agreement, including any master agreement published by the International Swaps and Derivatives Association, Inc., shall be deemed entered into when such individual Hedging Contract is entered into without regard to the date on which such master agreement is entered into, (b) any hedge position or hedging arrangement of the type described in the immediately preceding sentence shall be considered a Hedging Contract regardless of whether a written agreement or written confirmation is entered into, and (c) options, warrants, rights and other similar interests in respect of equity interests in the Company shall not constitute Hedging Contracts.

"<u>Hedging Obligations</u>" means, with respect to any Person, the obligations (whether contingent or otherwise) of such Person incurred under Hedging Contracts in the ordinary course of business and not for speculative purposes.

"<u>Hydrocarbon Interests</u>" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous Hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"<u>Hydrocarbons</u>" means crude oil, natural gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all constituents, elements or compounds thereof and products refined or processed therefrom.

"<u>Insolvency or Liquidation Proceeding</u>" means:

(a)      any case or proceeding commenced by or against the Company or any other Grantor under the Bankruptcy Code or any other Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Company or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Company or any other

6

Grantor or any similar case or proceeding relative to the Company or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(b)      any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Company or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(c)      any other proceeding of any type or nature in which substantially all claims of creditors of the Company or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"Junior Lien" means a Lien, junior to the Priority Liens as provided in this Agreement, granted by the Company or any other Grantor in favor of holders of Junior Lien Debt (or any collateral trustee or representative in connection therewith), at any time, upon any property of the Company or any Grantor to secure Junior Lien Obligations (including Liens under the security documents associated with any Additional Junior Lien Facility).

"Junior Lien Agent" means, (1) in the case of the Junior Lien [Credit Agreement][Indenture], [●] and (2) with respect to any other Series of Junior Lien Debt, the trustee, agent and other representative of the holders of Junior Lien Debt of such Series of Junior Lien Debt under any Junior Lien Facility that (a) maintains the transfer register for such Series of Junior Lien Debt and (b) is appointed as a Junior Lien Agent (for purposes related to the administration of the Junior Lien Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Junior Lien Debt, together with its successors in such capacity.

"Junior Lien Collateral" means (i) all "Collateral," as defined in any Junior Lien Document and (ii) all other assets and property, whether real, personal or mixed, wherever located and whether now owned or at any time acquired after the date hereof by the Company or any Grantor now or at any time hereafter subject to Liens which secure, but only to the extent securing, any Junior Lien Obligations, other than, in the case of clause (ii), Excluded Assets (as defined in the Junior Lien Documents).

"Junior Lien [Credit Agreement][Indenture]" means [insert description].

"Junior Lien Debt" means the aggregate indebtedness outstanding under all Junior Lien Facilities (with outstanding letters of credit being deemed to have a principal amount equal to the stated amount thereof) that was permitted to be, and is, incurred under each Junior Lien Document.

"Junior Lien Documents" means, collectively, all indentures, credit agreements, loan documents, notes, guarantees, instruments, documents and agreements governing or evidencing, or executed or delivered in connection with, each Junior Lien Facility, or pursuant to which Junior Lien Debt is incurred and the documents pursuant to which Junior Lien Obligations are granted.

"Junior Lien Facility" means the indebtedness under the Junior Lien [Credit Agreement][Indenture] and any Additional Junior Lien Facility.

"Junior Lien Obligations" means Junior Lien Debt and all other Obligations in respect thereof. Notwithstanding any other provision hereof, the term "Junior Lien Obligations" will include accrued interest, fees, costs, and other charges incurred under any Junior Lien Facility and the other Junior Lien Documents, whether incurred before or after commencement of an Insolvency or Liquidation Proceeding and whether or not allowable in an Insolvency or Liquidation Proceeding. To the extent that any payment with respect to the Junior Lien Obligations (whether by or on behalf of any Grantor, as proceeds of

**DRAFT**  048826-0073

security, enforcement of any right of set off, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"Junior Lien Purchasers" has the meaning assigned to such term in Section 3.06.

"Junior Lien Representative" means the trustee, agent or representative of the holders of all Series of Junior Lien Debt that is appointed as the  "Junior Lien Representative" hereunder (for purposes related to the administration of the Junior Lien Security Documents) pursuant to the Junior Lien Facility governing each Series of Junior Lien Debt, together with its successors in such capacity. The Junior Lien Representative shall initially be [*insert*].

"Junior Lien Secured Parties" means, at any time, the Junior Lien Representative, each Junior Lien Agent, the beneficiaries of each indemnification obligation undertaken by any Grantor under any Junior Lien Document and each other holder of, or obligee in respect of, any Junior Lien Debt outstanding at such time.

"Junior Lien Security Documents" means each Junior Lien Facility (insofar as the same grants a Lien on the Collateral), each agreement listed in Part B of Exhibit B hereto and any other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements, or other document effecting any grant or transfer for security, now existing or entered into after the date hereof, executed and delivered by the Company or any other Grantor creating (or purporting to create) a Lien upon Collateral in favor of the Junior Lien Representative, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms and the terms of the Junior Lien Documents.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction or production payments and reserve sales and the like payable out of Oil and Gas Properties other than a precautionary financing statement respecting a lease not intended as a security agreement.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Obligations" means any principal (including reimbursement obligations and obligations to provide cash collateral with respect to letters of credit whether or not drawn), premium, if any, interest (including, to the extent legally permitted, all interest, fees and expenses accrued thereon on or after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate even if such interest, fee or expense is not enforceable, allowable or allowed as a claim in such proceeding), penalties, fees, charges, expenses, indemnifications, reimbursement obligations, damages, guarantees, and other liabilities or amounts payable under the documentation governing any indebtedness or in respect thereto.

"Officers' Certificate" means a certificate signed by two officers of the Company, one of whom must be either the principal executive officer or a Financial Officer, as applicable.

**DRAFT** 048826-0073

"Oil and Gas Business" means:

(a)     the acquisition, exploration, development, production, operation and disposition of interests in oil, gas and other Hydrocarbon properties;

(b)     the gathering, marketing, treating, processing, storage, distribution, selling and transporting of any production from such interests or properties;

(c)     any business relating to exploration for or development, production, treatment, processing, storage, transportation or marketing of, oil, gas and other minerals and products produced in association therewith; and

(d)     any activity that, as determined in good faith by the Company, arises from, relates to or is ancillary, complementary or incidental to or necessary or appropriate for the activities described in clauses (1) through (3) of this definition.

"Oil and Gas Properties" means: (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) that may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, that relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and that may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property that may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Priority Confirmation Joinder" means an agreement substantially in the form of Exhibit A.

"Priority Lien" means a Lien granted by a Priority Lien Security Document in favor of the Priority Lien Collateral Trustee, at any time, upon any Property of the Company or any other Grantor to secure Priority Lien Obligations.

"Priority Lien Agent" means (1) in respect of indebtedness under the Priority Lien Indenture, Delaware Trust Company, as trustee, (2) in respect of indebtedness under the Priority Lien Credit Facility,

**DRAFT** 048826-0073

the Hedging Obligations, to the extent such Hedging Obligations are secured by the Priority Liens, and the Cash Management Obligations, to the extent such Cash Management Obligations are secured by the Priority Liens, [●], as administrative agent and collateral agent, or (3) in the case of any other Series of Priority Lien Debt, the trustee, agent or representative of the holders of such Series of Priority Lien Debt who (a) maintains the transfer register for such Series of Priority Lien Debt, if applicable, (b) is appointed as a Priority Lien Agent of such Series of Priority Lien Debt (for purposes related to the administration of the applicable Priority Lien Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Priority Lien Debt, together with its successors in such capacity and (c) has become party to the Priority Lien Collateral Trust Agreement by executing a joinder in the form required under the Priority Lien Collateral Trust Agreement and has executed and delivered any other documents required to be delivered under the terms of the Priority Lien Collateral Trust Agreement and any other Priority Lien Documents.  Each Priority Lien Agent shall be the corresponding "Priority Lien Representative" under the Priority Lien Collateral Trust Agreement.

"Priority Lien Cap" means, as of any date, (a) the aggregate principal amount of all indebtedness (including any interest paid-in-kind) secured by Priority Liens that is permitted to be incurred under clauses (1), (3)(a) and (3)(b) of the definition of "Permitted Debt" in the Priority Lien Indenture (as in effect on the date of this Agreement), plus (b) the amount of all Hedging Obligations, to the extent such Hedging Obligations are secured by the Priority Liens, plus (c) all obligations with respect to Cash Management Obligations, to the extent such Cash Management Obligations are secured by Priority Liens, plus (d) the amount of accrued and unpaid interest (excluding any interest paid-in-kind) on, and the amount of outstanding fees with respect to, any of the foregoing. For purposes of this definition, all letters of credit will be valued at the face amount thereof, whether or not drawn.

"Priority Lien Collateral" means (i) all "Collateral," as defined in the Priority Lien Documents, and (ii) all other assets and property, whether real, personal or mixed, wherever located and whether now owned or at any time acquired after the date hereof by the Company or any Grantor now or at any time hereafter subject to Liens which secure, but only to the extent securing, any Priority Lien Obligation, other than, in the case of clause (ii), Excluded Assets (as defined in the Priority Lien Documents).

"Priority Lien Collateral Trust Agreement" means that certain Collateral Trust Agreement, dated as of February [●], 2018, among the Company, the Grantors and Guarantors from time to time party thereto, [●], as First Out Representative and as Collateral Trustee, Delaware Trust Company, as the First Lien Representative, and the other Priority Lien Agents from time to time party thereto, as Priority Lien Representatives.

"Priority Lien Collateral Trustee" means [●], as collateral trustee under the Priority Lien Collateral Trust Agreement, together with its successors in such capacity.

"Priority Lien Credit Facility" means that certain [Credit Agreement][2], dated as of [●], among the Company, as borrower, [●], as administrative agent and collateral agent, and the lenders from time to time party thereto, as the same may be amended or modified from time to time, and as the same may be restated, refinanced or replaced by any First Out Credit Facility (as such term is defined in the Priority Lien Indenture).

"Priority Lien Debt" means the aggregate indebtedness outstanding under all Priority Lien Facilities (with outstanding letters of credit being deemed to have a principal amount equal to the stated amount thereof) that was permitted to be, and is, incurred under each Priority Lien Document.

---

[2] To be updated as appropriate

**DRAFT**  048826-0073

"<u>Priority Lien Documents</u>" means, collectively, all indentures, credit agreements, loan documents, notes, guarantees, instruments, documents and agreements governing or evidencing, or executed or delivered in connection with, each Priority Lien Facility, or pursuant to which Priority Lien Debt is incurred and the documents pursuant to which Priority Lien Obligations are granted.

"<u>Priority Lien Facility</u>" means the indebtedness under the Priority Lien Indenture, the Priority Lien Credit Facility and any Additional Priority Lien Facility.

"<u>Priority Lien Indenture</u>" means that certain indenture, dated as of February [●], 2018, among the Company, the Grantors party thereto from time to time, Delaware Trust Company, as indenture trustee and collateral trustee, as amended, restated, adjusted, waived, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof (including any supplements executed in connection with the issuance of any Additional Priority Lien Debt) unless restricted by the terms of this Agreement or credit agreement, loan agreement, note agreement, promissory note, indenture or any other agreement or instrument evidencing or governing the terms of any Priority Lien Debt.

"<u>Priority Lien Obligations</u>" means all Priority Lien Debt and all other Obligations in respect of or in connection with Priority Lien Debt together with Hedging Obligations and Cash Management Obligations, in each case to the extent that such Hedging Obligations and Cash Management Obligations are secured by Priority Liens. For the avoidance of doubt, Hedging Obligations and Cash Management Obligations shall constitute Priority Lien Obligations only to the extent that such Hedging Obligations and Cash Management Obligations constitute "Obligations" under the Priority Lien Credit Facility. Notwithstanding any other provision hereof, the term "Priority Lien Obligations" will include accrued interest, fees, costs, and other charges incurred under each Priority Lien Facility and the other Priority Lien Documents, whether incurred before or after commencement of an Insolvency or Liquidation Proceeding, and whether or not allowable in an Insolvency or Liquidation Proceeding. To the extent that any payment with respect to the Priority Lien Obligations (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of set-off, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"<u>Priority Lien Secured Parties</u>" means, at any time, the Priority Lien Collateral Trustee, each Priority Lien Agent, each agent, trustee, lender, note holder or issuing bank under each Priority Lien Facility, each holder, provider or obligee of any Hedging Obligations and Cash Management Obligations, in each case to the extent that such Obligations are Priority Lien Obligations, the beneficiaries of each indemnification obligation undertaken by any Grantor under any Priority Lien Document, each other Person that provides letters of credit, guarantees or other credit support related thereto under any Priority Lien Document and each other holder of, or obligee in respect of, any Priority Lien Obligations, in each case to the extent designated as a secured party (or a party entitled to the benefits of the security) under any Priority Lien Document outstanding at such time.

"<u>Priority Lien Security Documents</u>" means each Priority Lien Facility (insofar as the same grants a Lien on the Collateral), each agreement listed in Part A of <u>Exhibit B</u> hereto, and any other security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, control agreements, or other documents effecting any grant or transfer for security, now existing or entered into after the date hereof, executed and delivered by the Company or any other Grantor creating (or purporting to create) a Lien upon Collateral in favor of the Priority Lien Collateral Trustee, for the benefit of any of the Priority Lien Secured Parties, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms and the terms of the Priority Lien Collateral Trust Agreement.

**DRAFT** 048826-0073

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Replaces" means, (a) in respect of any Priority Lien Facility or the Priority Lien Obligations (an "Original Priority Facility"), that an agreement refunds, refinances or replaces such Original Priority Facility in whole (in a transaction that is in compliance with Section 4.04(a) or Section 4.04(b), as applicable) and that all commitments thereunder are terminated, or, to the extent permitted by the terms of the applicable Original Priority Facility, in part and (b) in respect of any Junior Lien Facility or the Junior Lien Obligations (an "Original Junior Facility"), that an agreement refunds, refinances or replaces such Original Junior Facility in whole (in a transaction that is in compliance with Section 4.04(a) or Section 4.04(b), as applicable) and that all commitments thereunder are terminated, or, to the extent permitted by the terms of the applicable Original Junior Facility, in part. "Replace," "Replaced" and "Replacement" shall have correlative meanings.

"Restricted Subsidiaries" has the meaning assigned to such term in the Priority Lien Credit Facility, or if none is then outstanding, in the Priority Lien Indenture.

"Section 363 Event" has the meaning assigned to such term in Section 4.02(d).

"Section 363 Notice" has the meaning assigned to such term in Section 4.02(d).

"Section 363 Objections" has the meaning assigned to such term in Section 4.02(d).

"Secured Debt Documents" means the Priority Lien Documents and the Junior Lien Documents.

"Secured Debt Representative" means the Priority Lien Collateral Trustee and the Junior Lien Representative.

"Secured Obligations" means the Priority Lien Obligations and the Junior Lien Obligations.

"Secured Parties" means the Priority Lien Secured Parties and the Junior Lien Secured Parties.

"Security Documents" means the Priority Lien Security Documents and the Junior Lien Security Documents.

"Series of Junior Lien Debt" means, severally, the [notes][extensions of credit] under the Junior Lien [Indenture][Credit Agreement] and each other issue or series of Junior Lien Debt (including any Additional Junior Lien Facility) for which a single transfer register is maintained.

"Series of Priority Lien Debt" means, severally, the Priority Lien Credit Facility, the notes issued under the Priority Lien Indenture and each other issue or series of Priority Lien Debt.

"Series of Secured Debt" means the Priority Lien Debt and each Series of Junior Lien Debt.

"subsidiary" means, with respect to any Person,

(a)     any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of Voting Stock is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

**DRAFT**  048826-0073

(b)      any partnership (whether general or limited) or limited liability company (a) the sole general partner or member of which is such Person or a Subsidiary of such Person, or (b) if there is more than a single general partner or member, either (x) the only managing general partners or managing members of which are such Person or one or more Subsidiaries of such Person (or any combination thereof) or (y) a majority of the outstanding general partner interests, member interests or other Voting Stock of such partnership or limited liability company is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof).

If not otherwise specified, reference to a Subsidiary shall mean a Subsidiary of the Company.

"Standstill Period" has the meaning assigned to such term in Section 3.02.

"Voting Stock" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of members of the Board of Directors of such Person; provided that with respect to a limited partnership or other entity which does not have a Board of Directors, Voting Stock means the Capital Stock of the general partner of such limited partnership or other business entity with the ultimate authority to manage the business and operations of such Person.

## ARTICLE II.
## LIEN PRIORITIES

Section 2.01   Relative Priorities.   (a) The grant of the Priority Liens pursuant to the Priority Lien Documents and the grant of the Junior Liens pursuant to the Junior Lien Documents create two separate and distinct Liens on the Collateral.

(b)      Notwithstanding anything to the contrary contained in this Agreement, the Priority Lien Documents, the Junior Lien Documents or any other agreement or instrument or operation of law to the contrary, or any other circumstance whatsoever and irrespective of (i) how a Lien was acquired (whether by grant, possession, statute, operation of law, subrogation, or otherwise), (ii) the time, manner, or order of the grant, attachment or perfection of a Lien, (iii) any conflicting provision of the New York UCC or other applicable law, (iv) any defect in, or non-perfection, setting aside, or avoidance of, a Lien or a Priority Lien Document or a Junior Lien Document, (v) the modification of a Priority Lien Obligation or a Junior Lien Obligation, (vi) the subordination of a Lien on Collateral securing a Priority Lien Obligation to a Lien securing another obligation of the Company or any other Person that is permitted under the Priority Lien Documents as in effect on the date hereof or securing a DIP Financing, or (vii) the subordination of a Lien on Collateral securing a Junior Lien Obligation to a Lien securing another obligation of the Company or any other Person (other than a Priority Lien Obligation) that is permitted under the Junior Lien Documents as in effect on the date hereof, the Junior Lien Representative, on behalf of itself and the other Junior Lien Secured Parties, hereby agrees that (A) any Priority Lien on any Collateral now or hereafter held by or for the benefit of any Priority Lien Secured Party shall be senior in right, priority, operation, effect and all other respects to any and all Junior Liens on any Collateral, in any case, subject to the Priority Lien Cap as provided herein and (B) any Junior Lien on any Collateral now or hereafter held by or for the benefit of any Junior Lien Secured Party shall be junior and subordinate in right, priority, operation, effect and all other respects to any and all Priority Liens on any Collateral, in any case, subject to the Priority Lien Cap as provided herein.

(c)      It is acknowledged that, subject to the Priority Lien Cap (as provided herein), (i) the aggregate amount of the Priority Lien Obligations may be increased from time to time pursuant to

13

the terms of the Priority Lien Documents, (ii) a portion of the Priority Lien Obligations consists or may consist of indebtedness that is revolving in nature, and the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and (iii) (A) the Priority Lien Documents may be replaced, restated, supplemented, restructured or otherwise amended or modified from time to time and (B) the Priority Lien Obligations may be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, refinanced or otherwise amended or modified from time to time, in the case of the foregoing (A) and (B) all without affecting the subordination of the Junior Liens hereunder or the provisions of this Agreement defining the relative rights of the Priority Lien Secured Parties and the Junior Lien Secured Parties.  The lien priorities provided for herein shall not be altered or otherwise affected by any amendment, modification, supplement, extension, increase, renewal, restatement or Replacement of either the Priority Lien Obligations (or any part thereof) or the Junior Lien Obligations (or any part thereof), by the release of any Collateral or of any guarantees for any Priority Lien Obligations or by any action that any Secured Debt Representative or Secured Party may take or fail to take in respect of any Collateral.

Section 2.02    Prohibition on Marshalling, Etc.    Until the Discharge of Priority Lien Obligations, neither the Junior Lien Representative nor any other Junior Lien Secured Party will assert, and each hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation, or other similar right that may be available to a junior secured creditor with respect to the Collateral or any similar rights a junior secured creditor may have under applicable law.

Section 2.03    No New Liens.  The parties hereto agree that, so long as the Discharge of Priority Lien Obligations has not occurred, none of the Grantors shall, nor shall any Grantor permit any of its Restricted Subsidiaries to, (a) grant or permit any additional Liens on any asset of a Grantor to secure any Junior Lien Obligation, or take any action to perfect any additional Liens, unless it has also granted, or substantially concurrently therewith grants (or offers to grant), a Lien on such asset of such Grantor to secure the Priority Lien Obligations and has taken all actions required to perfect such Liens; provided, however, the refusal or inability of the Priority Lien Collateral Trustee to accept such Lien will not prevent the Junior Lien Representative from taking the Lien or (b) grant or permit any additional Liens on any asset of a Grantor to secure any Priority Lien Obligation, or take any action to perfect any additional Liens, unless it has also granted, or substantially concurrently therewith grants (or offers to grant), a Lien on such asset of such Grantor to secure the Junior Lien Obligations and has taken all actions required to perfect such Liens; provided, however, the refusal or inability of the Junior Lien Representative to accept such Lien will not prevent the Priority Lien Collateral Trustee from taking the Lien, with each such Lien as described in this Section 2.03 to be subject to the provisions of this Agreement.  To the extent that the provisions of the immediately preceding sentence are not complied with for any reason, without limiting any other right or remedy available to the Priority Lien Collateral Trustee, the other Priority Lien Secured Parties, the Junior Lien Representative or the other Junior Lien Secured Parties, the Junior Lien Representative, for itself and on behalf of the other Junior Lien Secured Parties, agrees that any amounts received by or distributed to any Junior Lien Secured Party, pursuant to or as a result of any Lien granted in contravention of this Section 2.03 shall be subject to Section 3.05(b).

Section 2.04    Similar Collateral and Agreements.  The parties hereto acknowledge and agree that it is their intention that the Priority Lien Collateral and the Junior Lien Collateral be identical.  In furtherance of the foregoing, the parties hereto agree (a) to cooperate in good faith in order to determine, upon any reasonable request by the Priority Lien Collateral Trustee or the Junior Lien Representative, the specific assets included in the Priority Lien Collateral and the Junior Lien Collateral, the steps taken to perfect the Priority Liens and the Junior Liens thereon and the identity of the respective parties obligated under the Priority Lien Documents and the Junior Lien Documents in respect of the Priority Lien Obligations and the Junior Lien Obligations, respectively, (b) that the Junior Lien Security Documents

14

creating Liens on the Collateral shall be in all material respects the same forms of documents as the respective Priority Lien Security Documents creating Liens on the Collateral other than (i) with respect to the priority nature of the Liens created thereunder in such Collateral, (ii) such other modifications to such Junior Lien Security Documents which are less restrictive than the corresponding Priority Lien Security Documents, (iii) provisions in the Junior Lien Security Documents which are solely applicable to the rights and duties of the Junior Lien Representative and/or the Junior Lien Agents, and (iv) with such deletions or modifications of representations, warranties and covenants as are customary with respect to security documents establishing Liens securing publicly traded debt securities, and (c) that at no time shall there be any Grantor that is an obligor in respect of the Junior Lien Obligations that is not also an obligor in respect of the Priority Lien Obligations.

Section 2.05   No Duties of Priority Lien Collateral Trustee.  The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, acknowledges and agrees that neither the Priority Lien Collateral Trustee nor any other Priority Lien Secured Party shall have any duties or other obligations to any such Junior Lien Secured Party with respect to any Collateral, other than to transfer to the Junior Lien Representative any remaining Collateral and any proceeds of the sale or other Disposition of any such Collateral remaining in its possession following the Discharge of Priority Lien Obligations, in each case without representation or warranty on the part of the Priority Lien Collateral Trustee or any Priority Lien Secured Party.  In furtherance of the foregoing, each Junior Lien Secured Party acknowledges and agrees that until the Discharge of Priority Lien Obligations (subject to the terms of Section 3.02, including the rights of the Junior Lien Secured Parties following the expiration of any applicable Standstill Period), the Priority Lien Collateral Trustee shall be entitled, for the benefit of the Priority Lien Secured Parties, to sell, transfer or otherwise Dispose of or deal with such Collateral, as provided herein and in the Priority Lien Documents, without regard to any Junior Lien or any rights to which the Junior Lien Representative or any Junior Lien Secured Party would otherwise be entitled as a result of such Junior Lien.  Without limiting the foregoing, the Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, agrees that neither the Priority Lien Collateral Trustee nor any other Priority Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Collateral, or to sell, Dispose of or otherwise liquidate all or any portion of such Collateral, in any manner that would maximize the return to the Junior Lien Secured Parties, notwithstanding that the order and timing of any such realization, sale, Disposition or liquidation may affect the amount of proceeds actually received by the Junior Lien Secured Parties from such realization, sale, Disposition or liquidation.  The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, hereby waives any claim any Junior Lien Secured Party may now or hereafter have against the Priority Lien Collateral Trustee or any other Priority Lien Secured Party arising out of any actions which the Priority Lien Collateral Trustee or any other Priority Lien Secured Parties take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral, and actions with respect to the collection of any claim for all or any part of the Priority Lien Obligations from any account debtor, guarantor or any other party) in accordance with this Agreement and the Priority Lien Documents or the valuation, use, protection or release of any security for the Priority Lien Obligations.

Section 2.06   No Duties of Junior Lien Representative.  The Priority Lien Collateral Trustee, for itself and on behalf of each Priority Lien Secured Party, acknowledges and agrees that neither the Junior Lien Representative nor any other Junior Lien Secured Party shall have any duties or other obligations to such Priority Lien Secured Party with respect to any Collateral, except as expressly set forth in this Agreement.

US-DOCS\98299524.2                                   **DRAFT**  048826-0073

## ARTICLE III.
## ENFORCEMENT RIGHTS; PURCHASE OPTION

Section 3.01    Limitation on Enforcement Action.   Prior to the Discharge of Priority Lien Obligations, the Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, hereby agrees that, subject to Section 3.05(b) and Section 4.07, neither the Junior Lien Representative nor any other Junior Lien Secured Party shall commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its interest in or realize upon, or take any other action available to it in respect of, any Collateral under any Junior Lien Document, applicable law or otherwise (including but not limited to any right of setoff), it being agreed that only the Priority Lien Collateral Trustee, acting in accordance with the applicable Priority Lien Documents, shall have the exclusive right (and whether or not any Insolvency or Liquidation Proceeding has been commenced), to take any such actions or exercise any such remedies, in each case, without any consultation with or the consent of the Junior Lien Representative or any other Junior Lien Secured Party.  In exercising rights and remedies with respect to the Collateral, the Priority Lien Collateral Trustee and the other Priority Lien Secured Parties may enforce the provisions of the Priority Lien Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in their sole discretion and regardless of whether such exercise and enforcement is adverse to the interest of any Junior Lien Secured Party.  Such exercise and enforcement shall include the rights of an agent appointed by them to Dispose of Collateral upon foreclosure, to incur expenses in connection with any such Disposition and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code, the Bankruptcy Code or any other Bankruptcy Law.  Without limiting the generality of the foregoing, the Priority Lien Collateral Trustee will have the exclusive right to deal with that portion of the Collateral consisting of deposit accounts and securities accounts (collectively "Accounts"), including exercising rights under control agreements with respect to such Accounts.  The Junior Lien Representative, for itself and on behalf of the other Junior Lien Secured Parties, hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Junior Lien Security Document or any other Junior Lien Document shall be deemed to restrict in any way the rights and remedies of the Priority Lien Collateral Trustee or the other Priority Lien Secured Parties with respect to the Collateral as set forth in this Agreement.  Notwithstanding the foregoing, subject to Section 3.05, the Junior Lien Representative, on behalf of the Junior Lien Secured Parties, may, but will have no obligation to, take all such actions (not adverse to the Priority Liens or the rights of the Priority Lien Collateral Trustee and the Priority Lien Secured Parties) it deems necessary to perfect or continue the perfection of the Junior Liens in the Collateral or to create, preserve or protect (but not enforce) the Junior Liens in the Collateral.  Nothing herein shall limit the right or ability of the Junior Lien Secured Parties to (i) purchase (by credit bid or otherwise) all or any portion of the Collateral in connection with any enforcement of remedies by the Priority Lien Collateral Trustee to the extent that, and so long as, the Priority Lien Secured Parties receive payment in full in cash of all Priority Lien Obligations (other than the Excess Priority Lien Obligations) after giving effect thereto or (ii) file a proof of claim with respect to the Junior Lien Obligations.

Section 3.02    Standstill Periods; Permitted Enforcement Action.

(a)    Prior to the Discharge of Priority Lien Obligations and notwithstanding the foregoing Section 3.01, both before and during an Insolvency or Liquidation Proceeding:  after a period of 180 days has elapsed (which period will be tolled during any period in which the Priority Lien Collateral Trustee is not entitled, on behalf of the Priority Lien Secured Parties, to enforce or exercise any rights or remedies with respect to any Collateral as a result of (i) any injunction issued by a court of competent jurisdiction or (ii) the automatic stay or any other stay or other prohibition in any Insolvency or Liquidation Proceeding) since the date on which the Junior Lien Representative has delivered to the

16

Priority Lien Collateral Trustee written notice of the acceleration of any Junior Lien Debt (the "Standstill Period"), the Junior Lien Representative and the other Junior Lien Secured Parties may enforce or exercise any rights or remedies with respect to any Collateral; provided, that notwithstanding the expiration of the Standstill Period or anything in the Junior Lien Facility to the contrary, in no event may the Junior Lien Representative or any other Junior Lien Secured Party enforce or exercise any rights or remedies with respect to any Collateral, or commence, join with any Person at any time in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding, if the Priority Lien Collateral Trustee on behalf of any or all of the Priority Lien Secured Parties or any other Priority Lien Secured Party shall have commenced, and shall be diligently pursuing (or shall have sought or requested relief from, or modification of, the automatic stay or any other stay or other prohibition in any Insolvency or Liquidation Proceeding to enable the commencement and pursuit thereof), the enforcement or exercise of any rights or remedies with respect to any material portion of the Collateral or any such action or proceeding (prompt written notice thereof to be given to each of the Junior Lien Agents by the Priority Lien Collateral Trustee); provided, further, that, at any time after the expiration of the Standstill Period, if neither the Priority Lien Collateral Trustee nor any other Priority Lien Secured Party shall have commenced and be diligently pursuing (or shall have sought or requested relief from, or modification of, the automatic stay or any other stay or other prohibition in any Insolvency or Liquidation Proceeding to enable the commencement and pursuit thereof) the enforcement or exercise of any rights or remedies with respect to any material portion of the Collateral or any such action or proceeding, and the Junior Lien Representative shall have commenced the enforcement or exercise of any rights or remedies with respect to any material portion of the Collateral or any such action or proceeding, then for so long as the Junior Lien Representative is diligently pursuing such rights or remedies, neither any Priority Lien Secured Party nor the Priority Lien Collateral Trustee shall take any action of a similar nature (other than a joinder in connection with such action or proceeding as may reasonably be considered necessary to preserve the rights of the Priority Lien Secured Parties therein) with respect to such Collateral, or commence, join with any Person at any time in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding.

(b)     Anything to the contrary in this Article III or in any other provision of this Agreement notwithstanding, Junior Lien Representative may:

(i)     if an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, file a claim or statement of interest with respect to the Junior Lien Debt;

(ii)     take any action (not adverse to the priority status of the Liens on the Collateral securing the Priority Lien Debt, or the rights of Priority Lien Collateral Trustee or any other Priority Lien Secured Party to undertake enforcement actions with respect to the Collateral or otherwise) in order to create or perfect its Lien in and to the Collateral;

(iii)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Junior Lien Secured Parties, including any claims secured by the Collateral, if any;

(iv)     file any pleadings, objections, motions or agreements which assert rights or interests available to, or exercise rights as (to the extent not prohibited by Section 4.07), unsecured creditors of the Grantors arising under any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

17

(v)     vote on any plan of reorganization and make any filings (including proofs of claim) and arguments and motions that are, in each case, not in contravention of the provisions of this Agreement, with respect to the Junior Lien Debt and the Collateral;

(vi)    seek to enforce any of the terms of the Junior Lien Loan Documents to the extent not expressly prohibited by the other provisions of this Agreement;

(vii)   join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial Lien enforcement proceeding with respect to the Collateral initiated by the Priority Lien Collateral Trustee (or any Priority Lien Secured Parties) to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with an enforcement action by the Priority Lien Collateral Trustee (it being understood that neither the Junior Lien Collateral Agent nor any Junior Lien Secured Party shall be entitled to receive any proceeds of any Collateral unless otherwise expressly permitted herein);

(viii)  bid for or purchase Collateral at any public, private or judicial foreclosure upon such Collateral initiated by Priority Lien Collateral Trustee or any Priority Lien Secured Party, or any sale of Collateral during an Insolvency Proceeding; provided that such bid may only include a "credit bid" in respect of any Junior Lien Debt to the extent that, and so long as, the Priority Lien Secured Parties receive payment in full in cash of all Priority Lien Obligations (other than the Excess Priority Lien Obligations) after giving effect thereto; and

(ix)    take or otherwise exercise any enforcement actions after the expiration of the Standstill Period to the extent specifically permitted in the second proviso to Section 3.02(a) or with the consent of the Priority Lien Collateral Trustee or as required by a court of competent jurisdiction.

Section 3.03     Insurance.   Unless and until the Discharge of Priority Lien Obligations has occurred (subject to the terms of Section 3.02, including the rights of the Junior Lien Secured Parties following expiration of any applicable Standstill Period), the Priority Lien Collateral Trustee shall have the sole and exclusive right, subject to the rights of the Grantors under the Priority Lien Documents, to adjust and settle claims in respect of Collateral under any insurance policy in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.   Unless and until the Discharge of Priority Lien Obligations has occurred, and subject to the rights of the Grantors under the Priority Lien Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) in respect of the Collateral shall be paid to the Priority Lien Collateral Trustee pursuant to the terms of the Priority Lien Documents (including for purposes of cash collateralization of commitments, letters of credit and Hedging Obligations).   If the Junior Lien Representative or any Junior Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of the foregoing, it shall pay such proceeds over to the Priority Lien Collateral Trustee.   In addition, if by virtue of being named as an additional insured or loss payee of any insurance policy of any Grantor covering any of the Collateral, the Junior Lien Representative or any other Junior Lien Secured Party, shall have the right to adjust or settle any claim under any such insurance policy, then unless and until the Discharge of Priority Lien Obligations has occurred, the Junior Lien Representative and any such Junior Lien Secured Party shall follow the instructions of the Priority Lien Collateral Trustee, or of the Grantors under the Priority Lien Documents to the extent the Priority Lien Documents grant such Grantors the right to adjust or settle such claims, with respect to such adjustment or settlement (subject to the terms of Section 3.02, including the rights of the Junior Lien Secured Parties following expiration of any applicable Standstill Period).

18

**DRAFT**  048826-0073

Section 3.04    Notification of Release of Collateral. Each of the Priority Lien Collateral Trustee and the Junior Lien Representative shall give the other Secured Debt Representatives prompt written notice of the Disposition by it of, and release by it of the Lien on, any Collateral.  Such notice shall describe in reasonable detail the subject Collateral, the parties involved in such Disposition or release, the place, time manner and method thereof, and the consideration, if any, received therefor; provided, however, that the failure to give any such notice shall not in and of itself in any way impair the effectiveness of any such Disposition or release.

Section 3.05    No Interference; Payment Over.

(a)    No Interference.  The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, agrees that each Junior Lien Secured Party (i) will not take or cause to be taken any action the purpose or effect of which is, or could be, to make any Junior Lien *pari passu* with, or to give such Junior Lien Secured Party any preference or priority relative to, any Priority Lien with respect to the Collateral or any part thereof, (ii) will not challenge or question in any proceeding the validity or enforceability of any Priority Lien Obligations or Priority Lien Document, or the validity, attachment, perfection or priority of any Priority Lien, or the validity or enforceability of the priorities, rights or duties established by the provisions of this Agreement, (iii) will not take or cause to be taken any action the purpose or effect of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other Disposition of the Collateral by any Priority Lien Secured Party or the Priority Lien Collateral Trustee acting on their behalf, (iv) shall have no right to (A) direct the Priority Lien Collateral Trustee or any other Priority Lien Secured Party to exercise any right, remedy or power with respect to any Collateral or (B) consent to the exercise by the Priority Lien Collateral Trustee or any other Priority Lien Secured Party of any right, remedy or power with respect to any Collateral, (v) will not institute any suit or assert in any suit or Insolvency or Liquidation Proceeding any claim against the Priority Lien Collateral Trustee or other Priority Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to, and neither the Priority Lien Collateral Trustee nor any other Priority Lien Secured Party shall be liable for, any action taken or omitted to be taken by the Priority Lien Collateral Trustee or other Priority Lien Secured Party with respect to any Priority Lien Collateral, (vi) will not seek, and hereby waives any right, to have any Collateral or any part thereof marshaled upon any foreclosure or other Disposition of such Collateral, (vii) will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement, (viii) will not object to, and hereby waives any right to object to, forbearance by the Priority Lien Collateral Trustee or any Priority Lien Secured Party, and (ix) will not assert, and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or other similar right that may be available under applicable law with respect to the Collateral or any similar rights a junior secured creditor may have under applicable law; and

(b)    Payment Over.  The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, hereby agrees that if any Junior Lien Secured Party shall obtain possession of any Collateral or shall realize any proceeds or payment in respect of any Collateral, pursuant to the exercise of any rights or remedies with respect to the Collateral under any Junior Lien Security Document, or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding, to the extent permitted hereunder, at any time prior to the Discharge of Priority Lien Obligations, then it shall hold such Collateral, proceeds or payment in trust for the Priority Lien Collateral Trustee and the other Priority Lien Secured Parties and transfer such Collateral, proceeds or payment, as the case may be, to the Priority Lien Collateral Trustee as promptly as practicable.  Furthermore, the Junior Lien Representative shall, at the Grantors' expense, promptly send written notice to the Priority Lien Collateral Trustee upon receipt of such Collateral by any Junior Lien

19

Secured Party, proceeds or payment and if directed by the Priority Lien Collateral Trustee within ten (10) Business Days after receipt by the Priority Lien Collateral Trustee of such written notice, shall deliver such Collateral, proceeds or payment to the Priority Lien Collateral Trustee in the same form as received, with any necessary endorsements, or as court of competent jurisdiction may otherwise direct. The Priority Lien Collateral Trustee is hereby authorized to make any such endorsements as agent for the Junior Lien Representative or any other Junior Lien Secured Party. All Junior Liens will remain attached to and enforceable against all proceeds so held or remitted, subject to the priorities set forth in this Agreement. Anything contained herein to the contrary notwithstanding, this Section 3.05(b) shall not apply to any proceeds of Collateral realized in a transaction not prohibited by the Priority Lien Documents and as to which the possession or receipt thereof by the Junior Lien Representative or any other Junior Lien Secured Party is otherwise permitted by the Priority Lien Documents.

Section 3.06    Purchase Option.

(a)    Notwithstanding anything in this Agreement to the contrary, on or at any time after (i) the commencement of an Insolvency or Liquidation Proceeding, (ii) the acceleration of the Priority Lien Obligations, (iii) the exercise or undertaking of any rights of set-off in respect of any Collateral by any Priority Lien Secured Party under any Priority Lien Document, (iv) the occurrence of any event of default based on non-payment of principal under any Priority Lien Document, or (v) the delivery of any Section 363 Notice or the occurrence of any Section 363 Event, each of the holders of the Junior Lien Debt and each of their respective designated Affiliates (the "Junior Lien Purchasers") will have the several right, at their respective sole option and election (but will not be obligated), at any time upon prior written notice to the Priority Lien Collateral Trustee, to purchase from the Priority Lien Secured Parties (A) all (but not less than all) Priority Lien Obligations (including unfunded commitments and Hedging Obligations) other than any Priority Lien Obligations constituting Excess Priority Lien Obligations and (B) if applicable, all loans provided by any of the Priority Lien Secured Parties in connection with a DIP Financing that are outstanding on the date of such purchase (including, in each case, principal, interest, fees, reasonable attorneys' fees and legal expenses, but excluding contingent indemnification obligations for which no claim or demand for payment has been made at or prior to such time) (collectively, the "Purchase Option Obligations"). Promptly following the receipt of such notice, the Priority Lien Collateral Trustee will deliver to the Junior Lien Representative a statement of the amount of Purchase Option Obligations then outstanding and the amounts due pursuant to Section 3.06(b)(i) and (ii) below. The right to purchase provided for in this Section 3.06 will expire unless, within 10 Business Days after the receipt by the Junior Lien Representative of such a statement of the amounts due pursuant to Section 3.06(b)(i) and (ii) below, the Junior Lien Representative delivers to the Priority Lien Collateral Trustee an irrevocable commitment of the Junior Lien Purchasers to purchase all (but not less than all) of the Purchase Option Obligations and to otherwise complete such purchase on the terms set forth under this Section 3.06.

(b)    On the date specified by the Junior Lien Representative (on behalf of the Junior Lien Purchasers) in such irrevocable commitment (which shall not be less than five Business Days nor more than 20 Business Days, after the receipt by the Priority Lien Collateral Trustee of such irrevocable commitment), the Priority Lien Secured Parties shall sell to the Junior Lien Purchasers all (but not less than all) the Purchase Option Obligations that are outstanding on the date of such sale, subject to any required approval of any Governmental Authority then in effect, if any, and only if on the date of such sale, the Priority Lien Collateral Trustee receives the following:

(i)    payment, as the purchase price for all Purchase Option Obligations sold in such sale, of an amount equal to the full amount of (A) all Priority Lien Obligations (other than outstanding letters of credit as referred to in clause (ii) below and any Priority Lien Obligations constituting Excess Priority Lien Obligations) and (B) if applicable, all loans provided by any of the

**DRAFT**  048826-0073

Priority Lien Secured Parties in connection with a DIP Financing then outstanding (including, in each case, principal, interest, fees, reasonable attorneys' fees and legal expenses, but excluding contingent indemnification obligations for which no claim or demand for payment has been made at or prior to such time); <u>provided</u> that in the case of obligations in respect of Hedging Obligations that are secured by Priority Liens, in lieu of payment pursuant to clause (A) above, the Junior Lien Purchasers shall cause the applicable agreements governing such Hedging Obligations to be assigned and novated or, if such agreements have been terminated, such purchase price shall include an amount equal to the sum of any unpaid amounts then due in respect of such Hedging Obligations, calculated using the market quotation method and after giving effect to any netting arrangements;

(ii)     a cash collateral deposit in such amount as the Priority Lien Collateral Trustee determines is reasonably necessary to secure the payment of any outstanding letters of credit constituting Priority Lien Obligations that may become due and payable after such sale (but not in any event in an amount greater than one hundred five percent (105%) of the amount then reasonably estimated by the Priority Lien Collateral Trustee to be the aggregate outstanding amount of such letters of credit at such time), which cash collateral shall be (A) held by the Priority Lien Collateral Trustee as security solely to reimburse the issuers of such letters of credit that become due and payable after such sale and any fees and expenses incurred in connection with such letters of credit and (B) returned to the Junior Lien Representative (except as may otherwise be required by applicable law or any order of any court or other Governmental Authority) promptly after the expiration or termination from time to time of all payment contingencies affecting such letters of credit; and

(iii)     any agreements, documents or instruments which the Priority Lien Collateral Trustee may reasonably request pursuant to which the Junior Lien Representative and the Junior Lien Purchasers in such sale expressly assume and adopt all of the obligations of the Priority Lien Collateral Trustee and the Priority Lien Secured Parties under the Priority Lien Documents and in connection with loans (and related obligations, including interest, fees and expenses) provided by any of the Priority Lien Secured Parties in connection with a DIP Financing on and after the date of the purchase and sale and the Junior Lien Representative (or any other representative appointed by the holders of a majority in aggregate principal amount of the Junior Lien Obligations owned by the Junior Lien Purchasers and then outstanding) becomes a successor agent thereunder.

(c)     Such purchase of the Purchase Option Obligations shall be made on a *pro rata* basis among the Junior Lien Purchasers giving notice to the Priority Lien Collateral Trustee of their interest to exercise the purchase option hereunder according to each such Junior Lien Purchaser's portion of the Junior Lien Obligations owned by the Junior Lien Purchasers and outstanding on the date of purchase or such portion as such Junior Lien Purchasers may otherwise agree among themselves. Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account of the Priority Lien Collateral Trustee as the Priority Lien Collateral Trustee may designate in writing to the Junior Lien Representative for such purpose. Interest shall be calculated to but excluding the Business Day on which such sale occurs if the amounts so paid by the Junior Lien Purchasers to the bank account designated by the Priority Lien Collateral Trustee are received in such bank account at or prior to 12:00 noon, New York City time, and interest shall be calculated to and including such Business Day if the amounts so paid by the Junior Lien Purchasers to the bank account designated by the Priority Lien Collateral Trustee are received in such bank account later than 12:00 noon, New York City time.

(d)     Such sale shall be expressly made without representation or warranty of any kind by the Priority Lien Secured Parties as to the Purchase Option Obligations, the Collateral or otherwise and without recourse to any Priority Lien Secured Party, except that the Priority Lien Secured Parties shall represent and warrant severally as to the Purchase Option Obligations then owing to them: (i) that such applicable Priority Lien Secured Party owns such Purchase Option Obligations; and (ii) that such

21

applicable Priority Lien Secured Party has the necessary corporate or other governing authority to assign such interests.

(e)     After such sale becomes effective, the outstanding Priority Lien Obligations will remain secured by the Priority Liens upon the Collateral in accordance with the applicable provisions of the Priority Lien Documents as in effect at the time of such sale, and the Persons thereupon becoming the holders of Priority Lien Obligations will remain entitled to the benefit of the Priority Liens upon the Collateral and sharing rights in the proceeds thereof in accordance with the provisions of the Priority Lien Documents as in effect at the time of such sale, as fully as if the sale of the Priority Lien Obligations had not been made, but only the Person or successor agent to whom the Priority Liens are transferred in such sale will have the right to foreclose upon or otherwise enforce the Priority Liens and only the Junior Lien Purchasers in the sale will have the right to direct such Person or successor as to matters relating to the foreclosure or other enforcement of the Priority Liens.

(f)     Each Grantor irrevocably consents to any assignment effected to one or more Junior Lien Purchasers pursuant to this Section 3.06 (so long as such Junior Lien Purchasers meet all eligibility standards contained in all relevant Priority Lien Documents, other than obtaining the consent of any Grantor to an assignment, to the extent required by such Priority Lien Documents) for purposes of all Priority Lien Documents and hereby agrees that no further consent from such Grantor shall be required.

## ARTICLE IV.
## OTHER AGREEMENTS

Section 4.01    Release of Liens; Automatic Release of Junior Liens.  (a) Prior to the Discharge of Priority Lien Obligations, the Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees that, in the event the Priority Lien Collateral Trustee or the requisite Priority Lien Secured Parties under the Priority Lien Documents release the Priority Lien on any Collateral, the Junior Lien on such Collateral shall terminate and be released automatically and without further action if (i) such release is permitted under the Junior Lien Documents, (ii) such release is effected in connection with the Priority Lien Collateral Trustee's foreclosure upon, or other exercise of rights or remedies with respect to, such Collateral, or (iii) such release is effected in connection with a sale or other Disposition of any Collateral (or any portion thereof) under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code if the requisite Priority Lien Secured Parties under the Priority Lien Documents shall have consented to such sale or Disposition of such Collateral; provided that, in the case of each of clauses (i), (ii) and (iii), the Junior Liens on such Collateral shall attach to (and shall remain subject and subordinate to all Priority Liens securing Priority Lien Obligations, subject to the Priority Lien Cap) any proceeds of a sale, transfer or other Disposition of Collateral not paid to the Priority Lien Secured Parties or that remain after the Discharge of Priority Lien Obligations.

(b)     The Junior Lien Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such releases and other instruments as shall reasonably be requested by the Priority Lien Collateral Trustee to evidence and confirm any release of Collateral provided for in this Section 4.01.

Section 4.02    Certain Agreements With Respect to Insolvency or Liquidation Proceedings.

(a)     The parties hereto acknowledge that this Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code and shall continue in full force and effect, notwithstanding the commencement of any Insolvency or Liquidation Proceeding by or against the Company or any of its subsidiaries or any action taken in such Insolvency or Liquidation Proceeding, including any attempted rejection under Section 365 of the Bankruptcy Code.  All references in this

Agreement to the Company or any of its subsidiaries or any other Grantor will include such Person or Persons as a debtor-in-possession and any receiver or trustee for such Person or Persons in an Insolvency or Liquidation Proceeding.  For the purposes of this <u>Section 4.02</u>, unless otherwise provided herein, <u>clauses (b)</u> through and including <u>(o)</u> shall be in full force and effect prior to the Discharge of Priority Lien Obligations.

(b)    If the Company or any of its subsidiaries shall become subject to any Insolvency or Liquidation Proceeding and shall, as debtor(s)-in-possession, or if any receiver or trustee for such Person or Persons shall, move for approval of financing ("<u>DIP Financing</u>") to be provided by one or more lenders under Section 364 of the Bankruptcy Code and/or the use of cash collateral under Section 363 of the Bankruptcy Code, the Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, agrees that neither it nor any other Junior Lien Secured Party will raise any objection to, contest or oppose, and each Junior Lien Secured Party will waive any claim such Person may now or hereafter have related to or in connection with, any such financing or to the Liens on the Collateral securing the same ("<u>DIP Financing Liens</u>"), or any use, sale or lease of cash collateral that constitutes Collateral or to any grant of administrative expense priority under Section 364 of the Bankruptcy Code, unless (A) the Priority Lien Collateral Trustee or the Priority Lien Secured Parties oppose or object to such DIP Financing or such DIP Financing Liens or such use of cash collateral, (B) the maximum principal amount of indebtedness permitted under such DIP Financing exceeds the sum of (I) the amount of Priority Lien Obligations refinanced with the proceeds thereof (not including the amount of any Excess Priority Lien Obligations) and (II) the amount equal to 20% of the aggregate principal amount of pre-petition Priority Lien Obligations (other than Hedging Obligations), or (C) the terms of such DIP Financing provide for the sale of a substantial part of the Collateral (other than a Disposition pursuant to Section 363 of the Bankruptcy Code and with respect to which the Junior Lien Secured Parties are deemed to have consented pursuant to <u>Section 4.02(d)</u>) or require the confirmation of a plan of reorganization containing specific terms or provisions (other than repayment in cash of such DIP Financing on the effective date thereof). To the extent such DIP Financing Liens are senior to, or rank *pari passu* with, the Priority Liens, the Junior Lien Representative will, for itself and on behalf of the other Junior Lien Secured Parties, subordinate the Junior Liens on the Collateral to the Priority Liens and to such DIP Financing Liens, so long as the Junior Lien Representative, on behalf of the Junior Lien Secured Parties, retains Liens on all the Collateral, including proceeds thereof arising after the commencement of any Insolvency or Liquidation Proceeding, with the same priority relative to the Priority Liens as existed prior to the commencement of the case under the Bankruptcy Code.

(c)    Prior to the Discharge of Priority Lien Obligations, without the prior written consent of the Priority Lien Collateral Trustee which consent is in its sole discretion, the Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, agrees not to propose, support or enter into any DIP Financing.

(d)    The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, agrees that it shall be deemed to have consented to, and shall not object to, oppose or contest (or join with or support any other party objecting to, opposing or contesting) a sale or other Disposition, a motion to sell or Dispose or the bidding procedure for such sale or Disposition of any Collateral (or any portion thereof) under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code (any such sale or motion, a "<u>Section 363 Event</u>" and any notice or ruling issued by a court of competent jurisdiction in respect of such Section 363 Event, a "<u>Section 363 Notice</u>") if the requisite Priority Lien Secured Parties under the Priority Lien Documents shall have consented to such sale or Disposition, such motion to sell or Dispose or such bidding procedure for such sale or Disposition of such Collateral and all Priority Liens and Junior Liens will attach to the proceeds of the sale in the same respective priorities as set forth in this Agreement.  Notwithstanding the foregoing in this <u>Section 4.02(d)</u>, if the Junior Lien Purchasers have exercised their purchase option (or have committed to exercise

23

their purchase option) pursuant to <u>Section 3.06(a)</u>, Section 363 Objections shall be permitted to be made by the Junior Lien Representative or any Junior Lien Secured Party, but only so long as the Junior Lien Purchasers shall not have defaulted on their obligations to consummate the purchase of the Priority Lien Debt and other obligations contemplated by <u>Section 3.06</u>.

(e)     The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, waives any claim that it may now or hereafter have against the Priority Lien Collateral Trustee or any other Priority Lien Secured Party arising out of any DIP Financing Liens (that are granted in a manner that is consistent with this Agreement) or administrative expense priority under Section 364 of the Bankruptcy Code.

(f)     The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees that neither the Junior Lien Representative nor any other Junior Lien Secured Party will file or prosecute in any Insolvency or Liquidation Proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral, nor object to, oppose or contest (or join with or support any third party objecting to, opposing or contesting) (i) any request by the Priority Lien Collateral Trustee or any other Priority Lien Secured Party for adequate protection or (ii) any objection by the Priority Lien Collateral Trustee or any other Priority Lien Secured Party to any motion, relief, action or proceeding based on the Priority Lien Collateral Trustee or Priority Lien Secured Parties claiming a lack of adequate protection, except that the Junior Lien Secured Parties may:

(i)     freely seek and obtain relief granting adequate protection in the form of a replacement Lien co-extensive in all respects with, but subordinated (as set forth in <u>Section 2.01</u>) to, and with the same relative priority to the Priority Liens as existed prior to the commencement of the Insolvency or Liquidation Proceeding, all Liens granted in the Insolvency or Liquidation Proceeding to, or for the benefit of, the Priority Lien Secured Parties; and

(ii)     freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Priority Lien Obligations;

(g)     The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, waives any claim it or any such other Junior Lien Secured Party may now or hereafter have against the Priority Lien Collateral Trustee or any other Priority Lien Secured Party (or their representatives) arising out of any election by the Priority Lien Collateral Trustee or any Priority Lien Secured Parties, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code.

(h)     The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees that in any Insolvency or Liquidation Proceeding, neither the Junior Lien Representative nor any other Junior Lien Secured Party shall support or vote to accept any plan of reorganization or disclosure statement of the Company or any other Grantor unless (i) such plan is accepted by the Class of Priority Lien Secured Parties in accordance with Section 1126(c) of the Bankruptcy Code or otherwise provides for the payment in full in cash of all Priority Lien Obligations (including all post-petition interest approved by the bankruptcy court, fees and expenses and cash collateralization of all letters of credit) on the effective date of such plan of reorganization, or (ii) such plan provides on account of the Priority Lien Secured Parties for the retention by the Priority Lien Collateral Trustee, for the benefit of the Priority Lien Secured Parties, of the Liens on the Collateral securing the Priority Lien Obligations, and on all proceeds thereof whenever received, and such plan also provides that any Liens retained by, or granted to, the Junior Lien Representative are only on property securing the Priority Lien Obligations and shall have the same relative priority with respect to the

24

Collateral or other property, respectively, as provided in this Agreement with respect to the Collateral. Except as provided herein, the Junior Lien Secured Parties shall remain entitled to vote their claims in any such Insolvency or Liquidation Proceeding.

(i)     The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees that, subject to the provisions of Section 3.02, neither the Junior Lien Representative nor any other Junior Lien Secured Party, shall seek relief, pursuant to Section 362(d) of the Bankruptcy Code or otherwise, from the automatic stay of Section 362(a) of the Bankruptcy Code or from any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral if the Priority Lien Collateral Trustee has not received relief from the automatic stay (or it has not been lifted for the Priority Lien Collateral Trustee's benefit) without the prior written consent of the Priority Lien Collateral Trustee, which consent is in its sole discretion.

(j)     The Junior Lien Representative for and on behalf of itself and each other Junior Lien Secured Party agrees that neither the Junior Lien Representative nor any other Junior Lien Secured Party shall oppose or challenge any claim by the Priority Lien Collateral Trustee or any other Priority Lien Secured Party for the allowance or payment in any Insolvency or Liquidation Proceeding of Priority Lien Obligations consisting of post-petition interest, fees or expenses pursuant to Section 506(b) of the Bankruptcy Code, to the extent of the value of the Priority Liens (such value determined without regard to the existence of the Junior Liens) on the Collateral, subject to the Priority Lien Cap.

(k)     Without the prior written consent of the Priority Lien Collateral Trustee, which consent is in its sole discretion, neither the Junior Lien Representative nor any other Junior Lien Secured Party shall (or shall join with or support any other party in opposing, objecting to or contesting, as the case may be), in any Insolvency or Liquidation Proceeding involving any Grantor, (i) oppose, object to or contest the determination of the extent of or validity of any Liens held by any of Priority Lien Secured Party or the value of any claims of any such holder under Section 506(a) of the Bankruptcy Code or otherwise or (ii) oppose, object to or contest the payment to the Priority Lien Secured Party of interest, fees or expenses, or to the cash collateralization of letters of credit under Section 506(b) of the Bankruptcy Code.

(l)     Notwithstanding anything to the contrary contained herein, if in any Insolvency or Liquidation Proceeding a determination is made that any Lien encumbering any Collateral is not enforceable for any reason, then the Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees that, any distribution or recovery they may receive in respect of any Collateral shall be segregated and held in trust and forthwith paid over, subject to the requirements of Section 6.01(a), to the Priority Lien Collateral Trustee for the benefit of the Priority Lien Secured Parties in the same form as received without recourse, representation or warranty (other than a representation of the Junior Lien Representative that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, hereby appoints the Priority Lien Collateral Trustee, and any officer or agent of the Priority Lien Collateral Trustee, with full power of substitution, the attorney-in-fact of each Junior Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.02(l) and taking any action and executing any instrument that the Priority Lien Collateral Trustee may deem necessary or advisable to accomplish the purposes of this Section 4.02(l), which appointment is irrevocable and coupled with an interest.

(m)     Without the prior written consent of the Priority Lien Collateral Trustee which is in its sole discretion, unless the Standstill Period has expired, the Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees it will not file or join an involuntary

25

DRAFT  048826-0073

bankruptcy petition or seek the appointment of an examiner or a trustee for the Company or any of its subsidiaries.

(n)     Neither Priority Lien Collateral Trustee nor any other Priority Lien Secured Party shall oppose or challenge any claim by the Junior Lien Representative or any other Junior Lien Secured Party for the allowance or payment in any Insolvency or Liquidation Proceeding of Junior Lien Obligations consisting of post-petition interest, fees or expenses pursuant to Section 506(b) of the Bankruptcy Code, to the extent of the value of the Junior Liens on the Collateral, provided that if the Priority Lien Collateral Trustee or any other Priority Lien Secured Party shall have made any such claim, such claim (i) shall have been approved or (ii) will be approved contemporaneously with the approval of any such claim by the Junior Lien Representative or any Junior Lien Secured Party, as applicable.

(o)     The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, waives any right to assert or enforce any claim under Section 506(c) or 552 of the Bankruptcy Code as against any Priority Lien Secured Party or any of the Collateral.

Section 4.03   Reinstatement.   If (a) any Priority Lien Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of any Grantor any amount or (b) all or part of any payment with respect to any Priority Lien Obligations previously made shall be rescinded (any of (a) and (b), a "Recovery") for any reason whatsoever, then the Priority Lien Obligations shall be reinstated to the extent of such Recovery and the Priority Lien Secured Parties shall be entitled to a reinstatement of Priority Lien Obligations with respect to all such recovered amounts.   The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, agrees that if, at any time, it or any other a Junior Lien Secured Party receives written notice of any Recovery, (i) if the Junior Lien Representative receives such a notice, the Junior Lien Representative shall promptly deliver a copy of such notice to the Priority Lien Collateral Trustee and each other Junior Lien Secured Party and (ii) the Junior Lien Representative or such other Junior Lien Secured Party, as applicable, shall promptly pay over to the Priority Lien Collateral Trustee any payment received by the Junior Lien Representative or such Junior Lien Secured Party, as applicable, and then in its possession or under its control in respect of any Collateral subject to any Priority Lien securing such Priority Lien Obligations and shall promptly turn any Collateral subject to any such Priority Lien then held by the Junior Lien Representative or such Junior Lien Secured Party, as applicable, over to the Priority Lien Collateral Trustee, and the provisions set forth in this Agreement shall be reinstated as if such payment had not been made, until the Discharge of Priority Lien Obligations.   If this Agreement shall have been terminated prior to any such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.   Any amounts received by the Junior Lien Representative or any other Junior Lien Secured Party and then in its possession or under its control on account of the Junior Lien Obligations, after the termination of this Agreement shall, in the event of a reinstatement of this Agreement pursuant to this Section 4.03 and to the extent consistent with Section 6.01(a), be held in trust for and paid over to the Priority Lien Collateral Trustee for the benefit of the Priority Lien Secured Parties for application to the reinstated Priority Lien Obligations until the discharge thereof.   This Section 4.03 shall survive termination of this Agreement.

Section 4.04   Refinancings; Additional Priority Lien Debt and Additional Junior Lien Debt.

(a)     The Priority Lien Obligations and the Junior Lien Obligations may be Replaced, in whole or in part, by, and the Company may otherwise incur, any Additional Priority Lien Debt or Additional Junior Lien Debt, as the case may be, in each case, without notice to, or the consent of any Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof; provided, that:

26

(i)     in the case of any Additional Priority Lien Debt, (x) the aggregate outstanding principal amount of the Priority Lien Obligations, after giving effect to the incurrence of such Additional Priority Lien Debt, shall not exceed the Priority Lien Cap and (y) such Additional Priority Lien Debt satisfies any applicable requirements of the Priority Lien Collateral Trust Agreement; and

(ii)     on or prior to the incurrence of Additional Priority Lien Debt or Additional Junior Lien Debt, the Priority Lien Collateral Trustee and Junior Lien Representative shall have received (A) an Officers' Certificate from the Company stating that (x) the incurrence thereof is permitted by each applicable Secured Debt Document to be incurred, (y) such Additional Priority Lien Debt or Additional Junior Lien Debt is designated by the Company as "Priority Lien Debt" or "Junior Lien Debt", as applicable, for the purposes of the Secured Debt Documents and this Agreement; provided that no Series of Secured Debt may be designated as more than one of Priority Lien Debt or Junior Lien Debt and (z) the requirements of Section 4.06 have been satisfied, and (B) a Priority Confirmation Joinder from the holders or lenders of (as applicable) such Additional Priority Lien Debt or such Additional Junior Lien Debt (or an authorized agent, trustee or other representative on their behalf).

(b)     The Company will be permitted to designate as an additional holder of Junior Lien Obligations hereunder each Person who is, or who becomes, the registered holder of Junior Lien Debt incurred by the Company after the date of this Agreement in accordance with the terms of all applicable Secured Debt Documents. The Company may effect such designation by delivering to the Priority Lien Collateral Trustee and the Junior Lien Representative, each of the following:

(i)     an Officers' Certificate stating that the Company intends to incur Additional Junior Lien Obligations which will be Junior Lien Debt, which will be permitted by each applicable Secured Debt Document to be incurred and secured by a Junior Lien equally and ratably with all previously existing and future Junior Lien Debt;

(ii)     a Junior Lien Agent on behalf of the holders or lenders of such Additional Junior Lien Obligations, as applicable, must be designated as an additional holder of Secured Obligations hereunder and must, prior to such designation, sign and deliver on behalf of the holders or lenders of such Additional Junior Lien Obligations a Priority Confirmation Joinder, and, to the extent necessary or appropriate to facilitate such transaction, a new intercreditor agreement substantially similar to this Agreement, as in effect on the date hereof; and

(iii)     evidence that the Company has duly authorized, executed (if applicable) and recorded (or caused to be recorded) in each appropriate governmental office all relevant filings and recordations deemed necessary by the Company and the holder of such Additional Junior Lien Obligations or its Junior Lien Agent, to ensure that the Additional Junior Lien Obligations are secured by the Collateral in accordance with the Junior Lien Security Documents (provided that such filings and recordings may be authorized, executed and recorded following any incurrence on a post-closing basis if permitted by the Junior Lien Agent for such Additional Junior Lien Obligations).

Notwithstanding the foregoing, nothing in this Agreement will be construed to allow the Company or any other Grantor to incur additional indebtedness unless otherwise permitted by the terms of each applicable Secured Debt Document.

Each of the then-existing Priority Lien Collateral Trustee and the Junior Lien Representative shall be authorized to execute and deliver such documents and agreements (including amendments or supplements to this Agreement) as such holders, lenders, agent, trustee or other representative may reasonably request to give effect to any such Replacement or any incurrence of Additional Priority Lien Obligations or Additional Junior Lien Obligations, it being understood that the Priority Lien Collateral Trustee and the

27

Junior Lien Representative or (if permitted by the terms of the applicable Secured Debt Documents) the Grantors, without the consent of any other Secured Party or (in the case of the Grantors) one or more Secured Debt Representatives, may amend, supplement, modify or restate this Agreement to the extent necessary or appropriate to facilitate such amendments or supplements to effect such Replacement or incurrence all at the expense of the Grantors.  Upon the consummation of such Replacement or incurrence and the execution and delivery of the documents and agreements contemplated in the preceding sentence, the holders or lenders of such indebtedness and any authorized agent, trustee or other representative thereof shall be entitled to the benefits of this Agreement.

Section 4.05    Amendments to Junior Lien Documents.  Prior to the Discharge of Priority Lien Obligations, without the prior written consent of the Priority Lien Collateral Trustee, no Junior Lien Document may be amended, supplemented, restated or otherwise modified and/or refinanced or entered into to the extent such amendment, supplement, restatement or modification and/or refinancing, or the terms of any new Junior Lien Document, would (i) adversely affect the lien priority rights of the Priority Lien Secured Parties or the rights of the Priority Lien Secured Parties to receive payments owing pursuant to the Priority Lien Documents, (ii) except as otherwise provided for in this Agreement, add any Liens securing the Collateral granted under the Junior Lien Security Documents, (iii) confer any additional rights on the Junior Lien Representative or any other Junior Lien Secured Party in a manner adverse to the Priority Lien Secured Parties, or (iv) contravene the provisions of this Agreement or the Priority Lien Documents.

Section 4.06    Legends.  Each of (a) the Priority Lien Collateral Trustee acknowledges with respect to each Priority Lien Facility and the Priority Lien Security Documents, and (b) the Junior Lien Representative acknowledges that each Junior Lien Facility and the Junior Lien Documents (other than control agreements to which both the Priority Lien Collateral Trustee and the Junior Lien Representative are parties) and each associated Security Document (other than control agreements to which both the Priority Lien Collateral Trustee and the Junior Lien Representative are parties) granting any security interest in the Collateral will contain the appropriate legend set forth on Annex I.

Section 4.07    Junior Lien Secured Parties Rights as Unsecured Creditors; Judgment Lien Creditor.  Both before and after the Discharge of Priority Lien Obligations, and before and during any Insolvency or Liquidation Proceeding, any of the Junior Lien Secured Parties may take any actions and exercise any and all rights that would be available to a holder of unsecured claims; provided, however, that the Junior Lien Secured Parties may not take any of the actions prohibited by Section 3.05(a) or Section 4.02 or any other provisions in this Agreement; provided, further, that in the event that any of the Junior Lien Secured Parties becomes a judgment lien creditor in respect of any Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Junior Lien Obligations, such judgment lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Priority Lien Obligations) as the Junior Liens are subject to this Agreement.

Section 4.08    Postponement of Subrogation.  The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, hereby agrees that no payment or distribution to any Priority Lien Secured Party pursuant to the provisions of this Agreement shall entitle any Junior Lien Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of Priority Lien Obligations shall have occurred.  Following the Discharge of Priority Lien Obligations, but subject to reinstatement as provided in Section 4.03, each Priority Lien Secured Party will execute such documents, agreements, and instruments as any Junior Lien Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Priority Lien Obligations resulting from payments or distributions to such Priority Lien Secured Party by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by such Priority Lien Secured Party are paid by such Person upon request for payment thereof.

28

**DRAFT**  048826-0073

Section 4.09    Acknowledgment by the Secured Debt Representatives.    Each of the Priority Lien Collateral Trustee, for itself and on behalf of the other Priority Lien Secured Parties and the Junior Lien Representative, for itself and on behalf of the other Junior Lien Secured Parties, hereby acknowledges that this Agreement is a material inducement to enter into a business relationship, that each has relied on this Agreement to enter into each Priority Lien Facility and each Junior Lien Facility, as applicable, and all documentation related thereto, and that each will continue to rely on this Agreement in their related future dealings.

## ARTICLE V.
## GRATUITOUS BAILMENT FOR PERFECTION OF CERTAIN SECURITY INTERESTS

Section 5.01    General.    Prior to the Discharge of Priority Lien Obligations, the Priority Lien Collateral Trustee agrees that if it shall at any time hold a Priority Lien on any Collateral that can be perfected by the possession or control of such Collateral or of any Account in which such Collateral is held, and if such Collateral or any such Account is in fact in the possession or under the control of the Priority Lien Collateral Trustee, the Priority Lien Collateral Trustee will serve as gratuitous bailee, acquire and hold possession or control of the such Collateral or such Accounts for the benefit or and on behalf of, and act as agent and representative of, the Junior Lien Representative for the sole purpose of perfecting the Junior Lien of the Junior Lien Representative on such Collateral.  It is agreed that the obligations of the Priority Lien Collateral Trustee and the rights of the Junior Lien Representative and the other Junior Lien Secured Parties in connection with any such bailment arrangement will be in all respects subject to the provisions of Article II.  Notwithstanding anything to the contrary herein, the Priority Lien Collateral Trustee will be deemed to make no representation as to the adequacy of the steps taken by it to perfect the Junior Lien on any such Collateral and shall have no responsibility, duty, obligation or liability to the Junior Lien Representative, any other Junior Lien Secured Party or any other Person for such perfection or failure to perfect, it being understood that the sole purpose of this Article is to enable the Junior Lien Secured Parties to obtain a perfected Junior Lien in such Collateral to the extent, if any, that such perfection results from the possession or control of such Collateral or any such Account by the Priority Lien Collateral Trustee.  The Priority Lien Collateral Trustee acting pursuant to this Section 5.01 shall not have by reason of the Priority Lien Security Documents, the Junior Lien Security Documents, this Agreement or any other document or theory, a fiduciary relationship in respect of any Priority Lien Secured Party, the Junior Lien Representative or any Junior Lien Secured Party.  Subject to Section 4.03, from and after the Discharge of Priority Lien Obligations, the Priority Lien Collateral Trustee shall take all such actions in its power as shall reasonably be requested by the Junior Lien Representative (at the sole cost and expense of the Grantors) to transfer possession or control of such Collateral or any such Account (in each case to the extent the Junior Lien Representative has a Lien on such Collateral or Account after giving effect to any prior or concurrent releases of Liens) to the Junior Lien Representative for the benefit of all Junior Lien Secured Parties.

Section 5.02    Deposit Accounts.    Prior to the Discharge of Priority Lien Obligations, to the extent that any Account is under the control of the Priority Lien Collateral Trustee at any time (within the meaning of the term "control" as it relates to Accounts under Articles 8 and 9 of the New York UCC), the Priority Lien Collateral Trustee will act as gratuitous bailee for the Junior Lien Representative for the purpose of perfecting the Liens of the Junior Lien Secured Parties in such Accounts and the cash and other assets therein as provided in Section 3.01 (but will have no duty, responsibility or obligation to the Junior Lien Secured Parties (including, without limitation, any duty, responsibility or obligation as to the maintenance of such control, the effect of such arrangement or the establishment of such perfection) except as set forth in the last sentence of this Section 5.02(a)).  Unless the Junior Liens on such Collateral shall have been or concurrently are released, after the occurrence of Discharge of Priority Lien Obligations, the Priority Lien Collateral Trustee shall, at the request of the Junior Lien Representative, cooperate with the Grantors and the Junior Lien Representative (at the expense of the Grantors) in

29

    DRAFT  048826-0073

permitting control of any other Accounts to be transferred to the Junior Lien Representative (or for other arrangements with respect to each such Accounts satisfactory to the Junior Lien Representative to be made).

## ARTICLE VI.
## APPLICATION OF PROCEEDS; DETERMINATION OF AMOUNTS

Section 6.01    Application of Proceeds.  Prior to the Discharge of Priority Lien Obligations, and regardless of whether an Insolvency or Liquidation Proceeding has been commenced, Collateral or proceeds received in connection with the enforcement or exercise of any rights or remedies with respect to any portion of the Collateral will be applied:

(a)    first, to the payment in full in cash of all Priority Lien Obligations that are not Excess Priority Lien Obligations,

(b)    second, to the payment in full in cash of all Junior Lien Obligations,

(c)    third, to the payment in full in cash of all Excess Priority Lien Obligations, and

(d)    fourth, to the Company or as otherwise required by applicable law.

Section 6.02    Determination of Amounts.   Whenever a Secured Debt Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any Priority Lien Obligations (or the existence of any commitment to extend credit that would constitute Priority Lien Obligations), Junior Lien Obligations, or the existence of any Lien securing any such obligations, or the Collateral subject to any such Lien, it may request that such information be furnished to it in writing by the other Secured Debt Representatives and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that if a Secured Debt Representative shall fail or refuse reasonably promptly to provide the requested information, the requesting Secured Debt Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  Each Secured Debt Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to the Company or any of their subsidiaries, any Secured Party or any other Person as a result of such determination.

## ARTICLE VII.
## NO RELIANCE; NO LIABILITY; OBLIGATIONS ABSOLUTE;
## CONSENT OF GRANTORS; ETC.

Section 7.01    No Reliance; Information.  The Priority Lien Secured Parties and the Junior Lien Secured Parties shall have no duty to disclose to any Junior Lien Secured Party or to any Priority Lien Secured Party, as the case may be, any information relating to the Company or any of the other Grantors, or any other circumstance bearing upon the risk of non-payment of any of the Priority Lien Obligations or the Junior Lien Obligations, as the case may be, that is known or becomes known to any of them or any of their Affiliates.  In the event any Priority Lien Secured Party or any Junior Lien Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Junior Lien Secured Party or any Priority Lien Secured Party, as the case may be, it shall be under no obligation (a) to make, and shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of the information so

30

provided, (b) to provide any additional information or to provide any such information on any subsequent occasion or (c) to undertake any investigation.

Section 7.02    No Warranties or Liability.

(a)    The Priority Lien Collateral Trustee, for itself and on behalf of the other Priority Lien Secured Parties, acknowledges and agrees that, except for the representations and warranties set forth in Article VIII, neither the Junior Lien Representative nor any other Junior Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Junior Lien Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.

(b)    The Junior Lien Representative, for itself and on behalf of the other Junior Lien Secured Parties, acknowledges and agrees that, except for the representations and warranties set forth in Article VIII, neither the Priority Lien Collateral Trustee nor any other Priority Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Priority Lien Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.

(c)    The Priority Lien Collateral Trustee and the other Priority Lien Secured Parties shall have no express or implied duty to the Junior Lien Representative or any other Junior Lien Secured Party, and the Junior Lien Representative and the other Junior Lien Secured Parties shall have no express or implied duty to the Priority Lien Collateral Trustee or any other Priority Lien Secured Party, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of a default or an event of default under any Priority Lien Document and any Junior Lien Document (other than, in each case, this Agreement), regardless of any knowledge thereof which they may have or be charged with.

(d)    The Junior Lien Representative, for itself and on behalf of each other Junior Lien Secured Party, hereby waives any claim that may be had against the Priority Lien Collateral Trustee or any other Priority Lien Secured Party arising out of any actions which the Priority Lien Collateral Trustee or such Priority Lien Secured Party takes or omits to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any Collateral, and actions with respect to the collection of any claim for all or only part of the Priority Lien Obligations from any account debtor, guarantor or any other party) in accordance with this Agreement and the Priority Lien Documents or the valuation, use, protection or release of any security for such Priority Lien Obligations.

Section 7.03    Obligations Absolute. The Lien priorities provided for herein and the respective rights, interests, agreements and obligations hereunder of the Priority Lien Collateral Trustee and the other Priority Lien Secured Parties, the Junior Lien Representative and the other Junior Lien Secured Parties shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Secured Debt Document;

(b)    any change in the time, place or manner of payment of, or in any other term of (including the Replacing of), all or any portion of the Priority Lien Obligations, it being specifically acknowledged that a portion of the Priority Lien Obligations consists or may consist of indebtedness that is revolving in nature, and the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed;

31

(c)     any amendment, waiver or other modification, whether by course of conduct or otherwise, of any Secured Debt Document;

(d)     the securing of any Priority Lien Obligations or Junior Lien Obligations with any additional collateral or guarantees, or any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral or any release of any guarantee securing any Priority Lien Obligations or Junior Lien Obligations;

(e)     the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(f)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the Priority Lien Obligations or the Junior Lien Obligations.

Section 7.04   <u>Grantors Consent</u>.  Each Grantor hereby consents to the provisions of this Agreement and the subordination and other intercreditor arrangements provided for herein and agrees that the obligations of the Grantors under the Secured Debt Documents will in no way be diminished or otherwise affected by such provisions or arrangements (except as expressly provided herein).

# ARTICLE VIII.
## REPRESENTATIONS AND WARRANTIES

Section 8.01   <u>Representations and Warranties of Each Party</u>.  Each party hereto represents and warrants to the other parties hereto as follows:

(a)     Such party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to enter into and perform its obligations under this Agreement.

(b)     This Agreement has been duly executed and delivered by such party.

(c)     The execution, delivery and performance by such party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any Governmental Authority of which the failure to obtain could reasonably be expected to have a Material Adverse Effect (as defined in the Priority Lien Credit Facility, or if none is then outstanding, in the Priority Lien Indenture), (ii) will not violate any applicable law or regulation or any order of any Governmental Authority or any indenture, agreement or other instrument binding upon such party which could reasonably be expected to have a Material Adverse Effect and (iii) will not violate the charter, by-laws or other organizational documents of such party.

Section 8.02   <u>Representations and Warranties of Each Representative</u>.  Each of the Priority Lien Collateral Trustee and the Junior Lien Representative represents and warrants to the other parties hereto that it is authorized under each Priority Lien Facility and the Junior Lien Facility, as the case may be, to enter into this Agreement.

32

## ARTICLE IX.
### MISCELLANEOUS

Section 9.01    Notices.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(a)    if to the Priority Lien Collateral Trustee, to it at:


With a copy to (which shall not constitute notice):



(b)    if to the Junior Lien Representative, to it at:




With a copy to (which shall not constitute notice):



(c)    if to any other Secured Debt Representative, to such address as specified in the Priority Confirmation Joinder.

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by facsimile or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As agreed to in writing among the Company, the Priority Lien Collateral Trustee and the Junior Lien Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

Section 9.02    Waivers; Amendment.  (a) No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a

33

right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each Secured Debt Representative; provided, however, that this Agreement may be amended from time to time as provided in Section 4.04.  Any amendment of this Agreement that is proposed to be effected without the consent of a Secured Debt Representative as permitted by the proviso to the preceding sentence shall be submitted to such Secured Debt Representative for its review at least 5 Business Days prior to the proposed effectiveness of such amendment.

Section 9.03    Actions Upon Breach; Specific Performance.  (a) Prior to the Discharge of Priority Lien Obligations, if any Junior Lien Secured Party, contrary to this Agreement, commences or participates in any action or proceeding against any Grantor or the Collateral, such Grantor, with the prior written consent of the Priority Lien Collateral Trustee, may interpose as a defense or dilatory plea the making of this Agreement, and any Priority Lien Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such Grantor.

(b)    Prior to the Discharge of Priority Lien Obligations, should any Junior Lien Secured Party, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement), or take any other action in violation of this Agreement or fail to take any action required by this Agreement, the Priority Lien Collateral Trustee or any other Priority Lien Secured Party (in its own name or in the name of the relevant Grantor) or the relevant Grantor, with the prior written consent of the Priority Lien Collateral Trustee, (A) may obtain relief against such Junior Lien Secured Party by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Junior Lien Representative on behalf of each Junior Lien Secured Party that (I) the Priority Lien Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (II) each Junior Lien Secured Party waives any defense that the Grantors and/or the Priority Lien Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages, and (B) shall be entitled to damages, as well as reimbursement for all reasonable and documented costs and expenses incurred in connection with any action to enforce the provisions of this Agreement.

Section 9.04    Parties in Interest.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.  No other Person will be entitled to rely on, have the benefit of or enforce this Agreement.

Section 9.05    Survival of Agreement.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

Section 9.06    Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.

Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.07   Severability.   Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.08   Governing Law; Jurisdiction; Consent to Service of Process.   (a) THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES (BUT GIVING EFFECT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATION LAW).

(b)   Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such federal court.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)   Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section 9.08.   Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.   Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.09   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT.   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**DRAFT**  048826-0073

Section 9.10     Headings.  Article, Section, Exhibit and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.11     Conflicts.  As between the Priority Lien Secured Parties, on the one hand, and the Junior Lien Secured Parties, on the other hand, in the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any Secured Debt Documents, the provisions of this Agreement shall control.

Section 9.12     Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the distinct and separate relative rights of the Priority Lien Secured Parties and the Junior Lien Secured Parties.  None of the Company, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than Sections 4.01, 4.02, 4.04, or 4.05) is intended to or will amend, waive or otherwise modify the provisions of any Priority Lien Facility or any Junior Lien Facility, as applicable), and except as expressly provided in this Agreement neither the Company nor any other Grantor may rely on the terms hereof (other than Sections 4.01, 4.02, 4.04, or 4.05, Article VII and Article IX).  Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are absolute and unconditional, to pay the Obligations under the Secured Debt Documents as and when the same shall become due and payable in accordance with their terms.  Notwithstanding anything to the contrary herein or in any Secured Debt Document, the Grantors shall not be required to act or refrain from acting pursuant to this Agreement, any Priority Lien Document or any Junior Lien Document with respect to any Collateral in any manner that would cause a default under any Priority Lien Document.

Section 9.13     Certain Terms Concerning the Junior Lien Representative.  The Junior Lien Representative is executing and delivering this Agreement solely in its capacity as such and pursuant to direction set forth in the Junior Lien Facility; and in so doing, the Junior Lien Representative shall not be responsible for the terms or sufficiency of this Agreement for any purpose.  The Junior Lien Representative shall have no duties or obligations under or pursuant to this Agreement other than such duties and obligations as may be expressly set forth in this Agreement as duties and obligations on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to the Agreement, the Junior Lien Representative shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under each Junior Lien Facility and the other Junior Lien Documents.

Section 9.14     Certain Terms Concerning the Priority Lien Collateral Trustee and the Junior Lien Representative.  None of the Priority Lien Collateral Trustee or the Junior Lien Representative shall have any liability or responsibility for the actions or omissions of any other Secured Party, or for any other Secured Party's compliance with (or failure to comply with) the terms of this Agreement.  None of the Priority Lien Collateral Trustee or the Junior Lien Representative shall have individual liability to any Person if it shall mistakenly pay over or distribute to any Secured Party (or the Company or any other Grantor) any amounts in violation of the terms of this Agreement, so long as the Priority Lien Collateral Trustee or the Junior Lien Representative, as the case may be, is acting in good faith.  Each party hereto hereby acknowledges and agrees that each of the Priority Lien Collateral Trustee and the Junior Lien Representative is entering into this Agreement solely in its capacity under the Priority Lien Documents and the Junior Lien Documents, respectively, and not in its individual capacity.  The Priority Lien Collateral Trustee shall not be deemed to owe any fiduciary duty to the Junior Lien Representative or any Junior Lien Agent or any other Junior Lien Secured Party; and the Junior Lien Representative shall not be deemed to owe any fiduciary duty to the Priority Lien Collateral Trustee or any other Priority Lien Secured Party.

36

Section 9.15    <u>Authorization of Secured Agents</u>.  By accepting the benefits of this Agreement and the other Priority Lien Security Documents, each Priority Lien Secured Party authorizes the Priority Lien Collateral Trustee to enter into this Agreement and to act on its behalf as collateral agent hereunder and in connection herewith.  By accepting the benefits of this Agreement and the other Junior Lien Security Documents, each Junior Lien Secured Party authorizes the Junior Lien Representative to enter into this Agreement and to act on its behalf as collateral agent hereunder and in connection herewith.

Section 9.16    <u>Further Assurances</u>.  Each of the Priority Lien Collateral Trustee, for itself and on behalf of the other Priority Lien Secured Party, the Junior Lien Representative, for itself and on behalf of the other Junior Lien Secured Parties, and each Grantor party hereto, for itself and on behalf of its subsidiaries, agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable law, or which the Priority Lien Collateral Trustee or the Junior Lien Representative may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

Section 9.17    <u>Relationship of Secured Parties</u>.  Nothing set forth herein shall create or evidence a joint venture, partnership or an agency or fiduciary relationship among the Secured Parties.  None of the Secured Parties nor any of their respective directors, officers, agents or employees shall be responsible to any other Secured Party or to any other Person for any Grantor's solvency, financial condition or ability to repay the Priority Lien Obligations or the Junior Lien Obligations, or for statements of any Grantor, oral or written, or for the validity, sufficiency or enforceability of the Priority Lien Documents or the Junior Lien Documents, or any security interests granted by any Grantor to any Secured Party in connection therewith.  Each Secured Party has entered into its respective financing agreements with the Grantors based upon its own independent investigation, and none of the Priority Lien Collateral Trustee or the Junior Lien Representative makes any warranty or representation to the other Secured Debt Representatives or the Secured Parties for which it acts as agent nor does it rely upon any representation of the other agents or the Secured Parties for which it acts as agent with respect to matters identified or referred to in this Agreement.

[SIGNATURES BEGIN NEXT PAGE]

37

**DRAFT**  048826-0073

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[●], as Priority Lien Collateral Trustee

By: _____
Name:
Title:

Signature Page
Intercreditor Agreement

**DRAFT**  048826-0073

[____],

as Junior Lien Representative

By: _____
Name:
Title:

Signature Page
Intercreditor Agreement

**DRAFT**  048826-0073

**ACKNOWLEDGED AND AGREED AS OF
THE DATE FIRST ABOVE WRITTEN:**

**SANCHEZ ENERGY CORPORATION**

By:_____
     Name:
     Title:


**[●]**

By:_____
     Name:
     Title:

Signature Page
Intercreditor Agreement

**DRAFT**  048826-0073

## ANNEX I

## LEGENDS

<ins>Provision for each Junior Lien Facility and all Junior Lien Documents</ins>

Reference is made to the Intercreditor Agreement, dated as of                    , 20__, between [●], as Priority Lien Collateral Trustee (as defined therein), and                                    ,   as Junior Lien Representative (as defined therein) (the "Intercreditor Agreement").  Each holder of any Junior Lien Obligations, by its acceptance of such Junior Lien Obligations (i) consents to the subordination of Liens provided for in the Intercreditor Agreement, (ii) agrees that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreement and (iii) authorizes and instructs the Junior Lien Representative on behalf of each Junior Lien Secured Party (as defined therein) to enter into the Intercreditor Agreement as Junior Lien Representative on behalf of such Junior Lien Secured Parties.  The foregoing provisions are intended as an inducement to the lenders under each Priority Lien Facility to extend credit to the Company and such lenders are intended third party beneficiaries of such provisions and the provisions of the Intercreditor Agreement.

<ins>Provision for all Priority Lien Security Documents and all Junior Lien Security Documents that Grant a Security Interest in Collateral</ins>

Reference is made to the Intercreditor Agreement, dated as of                    , 20__, between [●], as Priority Lien Collateral Trustee (as defined therein), and                                    ,   as   Junior Lien Representative (as defined therein) (the "Intercreditor Agreement").  Each Person that is secured hereunder, by accepting the benefits of the security provided hereby, [(i) consents (or is deemed to consent), to the subordination of Liens provided for in the Intercreditor Agreement,]3 [(i)][(ii)] agrees (or is deemed to agree) that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreement, [(ii)][(iii)] authorizes (or is deemed to authorize) the [Priority Lien Collateral Trustee] [Junior Lien Representative] on behalf of such Person to enter into, and perform under, the Intercreditor Agreement and [(iii)][(iv)] acknowledges (or is deemed to acknowledge) that a copy of the Intercreditor Agreement was delivered, or made available, to such Person.

Notwithstanding any other provision contained herein, this Agreement, the Liens created hereby and the rights, remedies, duties and obligations provided for herein are subject in all respects to the provisions of the Intercreditor Agreement and, to the extent provided therein, the applicable Security Documents (as defined in the Intercreditor Agreement).  In the event of any conflict or inconsistency between the provisions of this Agreement and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall control.

---

[3] Bracketed language to be included in the Junior Lien Security Documents only.

[SANCHEZ INTERCREDITOR AGREEMENT]

**DRAFT**  048826-0073

**EXHIBIT A**
**TO INTERCREDITOR AGREEMENT**

**[FORM OF]**
**PRIORITY CONFIRMATION JOINDER**

Reference is made to the Intercreditor Agreement, dated as of [●] (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "Intercreditor Agreement") between [●], as Priority Lien Collateral Trustee for the Priority Lien Secured Parties, and [_____], as Junior Lien Representative for the Junior Lien Secured Parties.

Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Intercreditor Agreement. This Priority Confirmation Joinder is being executed and delivered pursuant to Section 4.04 [(a)][(b)] of the Intercreditor Agreement as a condition precedent to the debt for which the undersigned is acting as representative being entitled to the rights and obligations of being Additional Priority Lien Obligations or Additional Junior Lien Obligations, as applicable, under the Intercreditor Agreement.

1.     Joinder.   The undersigned, [_____], a [_____], (the "New Representative") as [trustee] [collateral agent] [administrative agent] [collateral trustee] under that certain *[describe applicable indenture, credit agreement or other document governing the Additional Priority Lien Obligations or Additional Junior Lien Obligations]* hereby:

(a)     represents that the New Representative has been authorized to become bound by the provisions of the Intercreditor Agreement as if it were a party thereto on behalf of the Additional [Priority Lien Secured Parties under an Additional Priority Lien Facility as a Priority Lien Agent in respect of such Additional Priority Lien Facility] [Junior Lien Secured Parties under an Additional Junior Lien Facility as a Junior Lien Agent in respect of such Additional Junior Lien Facility] under the Intercreditor Agreement for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement and become a party thereto as of the date thereof; and

(b)     agrees that its address for receiving notices pursuant to the Intercreditor Agreement shall be as follows:

[Address];

2.     Priority Confirmation.

[*Option A:  to be used if additional debt constitutes Priority Lien Debt*] The undersigned New Representative, on behalf of itself and each Priority Lien Secured Party for which the undersigned is acting as [administrative][collateral] agent hereby agrees, for the benefit of all Secured Parties and each future Secured Debt Representative, and as a condition to being treated as Priority Lien Obligations under the Intercreditor Agreement, that the New Representative is bound by the provisions of the Intercreditor Agreement as if it were a party thereto, including the provisions relating to the ranking of Priority Liens. [or]

[*Option B:  to be used if additional debt constitutes a Series of Junior Lien Debt*] The undersigned New Representative, on behalf of itself and each holder of Obligations in respect of the Series of Junior Lien Debt that constitutes an Additional Junior Lien Facility for which the undersigned is acting as Junior Lien Agent hereby agrees, for the benefit of all Secured Parties and each future Secured

[SANCHEZ INTERCREDITOR AGREEMENT]

**DRAFT**  048826-0073

Debt Representative, and as a condition to being treated as Secured Obligations under the Intercreditor Agreement, that:

      (a)     all Junior Lien Obligations will be and are secured equally and ratably by all Junior Liens at any time granted by the Company or any other Grantor to secure any Obligations in respect of such Series of Junior Lien Debt, whether or not upon Property otherwise constituting Collateral for such Series of Junior Lien Debt, and that all such Junior Liens will be enforceable by the Junior Lien Representative for the benefit of all Junior Lien Secured Parties equally and ratably;

      (b)     the New Representative and each holder of Obligations in respect of the Series of Junior Lien Debt for which the undersigned is acting as Junior Lien Agent are bound by the provisions of the Intercreditor Agreement as if they had become parties thereto, including the provisions relating to the ranking of Priority Liens and Junior Liens and the order of application of proceeds from enforcement of Priority Liens and Junior Liens; and

      **(c)**     the New Representative and each holder of Obligations in respect of the Series of Junior Lien Debt for which the undersigned is acting as Junior Lien Agent appoints the Junior Lien Representative and consents to the terms of the Intercreditor Agreement and the performance by the Junior Lien Representative of, and directs the Junior Lien Representative to perform, its obligations under the Intercreditor Agreement, together with all such powers as are reasonably incidental thereto.

      3.     <u>Full Force and Effect of Intercreditor Agreement</u>.  Except as expressly supplemented hereby, the Intercreditor Agreement shall remain in full force and effect.

      4.     <u>Governing Law and Miscellaneous Provisions</u>.  The provisions of <u>Article IX</u> of the Intercreditor Agreement will apply with like effect to this Priority Confirmation Joinder.

      5.     <u>Expenses</u>.  The Company agrees to reimburse each Secured Debt Representative for its reasonable out of pocket expenses in connection with this Priority Confirmation Joinder, including the reasonable fees, other charges and disbursements of counsel.

Exhibit A - 2

[SANCHEZ INTERCREDITOR AGREEMENT]

**DRAFT** 048826-0073

IN WITNESS WHEREOF, the parties hereto have caused this Priority Confirmation Joinder to be executed by their respective officers or representatives as of [_____, 20____].

[insert name of New Representative]

By: _____
Name: _____
Title: _____

The Priority Lien Collateral Trustee hereby acknowledges receipt of this Priority Confirmation Joinder [and agrees to act as Priority Lien Collateral Trustee for the New Representative and the holders of the Obligations represented thereby]:

_____
as Priority Lien Collateral Trustee

By: _____
Name: _____
Title: _____

The Junior Lien Representative hereby acknowledges receipt of this Priority Confirmation Joinder [and agrees to act as Junior Lien Representative for the New Representative and the holders of the Obligations represented thereby]:

_____
as Junior Lien Representative

By: _____
Name: _____
Title: _____

Exhibit A - 3

[SANCHEZ INTERCREDITOR AGREEMENT]

**DRAFT**  048826-0073

Acknowledged and Agreed to by:

**SANCHEZ ENERGY CORPORATION**, as Borrower

By: _____
Name: _____
Title: _____


**[_____]**

By: _____
Name:
Title:

Exhibit A - 4

**DRAFT**  048826-0073

**EXHIBIT B**
**TO INTERCREDITOR AGREEMENT**

**SECURITY DOCUMENTS**

**PART A.**

**List of Priority Lien Security Documents**

1.

**PART B.**

**List of Junior Lien Security Documents**

2.

Exhibit B - 1

[SANCHEZ INTERCREDITOR AGREEMENT]

**DRAFT**  048826-0073