**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/10/2021

| | | |
|---|---|---|
| **IN RE:** | § | |
| **SANCHEZ ENERGY CORPORATION,** *et al* | § | **CASE NO: 19-34508** |
| | § | |
| **SN PALMETTO, LLC** | § | **CASE NO: 19-34509** |
| | § | |
| **SN MARQUIS LLC** | § | **CASE NO: 19-34510** |
| | § | |
| **SN COTULLA ASSETS, LLC** | § | **CASE NO: 19-34511** |
| | § | |
| **SN OPERATING, LLC** | § | **CASE NO: 19-34512** |
| | § | |
| **SN TMS, LLC** | § | **CASE NO: 19-34513** |
| | § | |
| **SN CATARINA, LLC** | § | **CASE NO: 19-34514** |
| | § | |
| **ROCKIN L RANCH COMPANY, LLC** | § | **CASE NO: 19-34515** |
| | § | |
| **SN EF MAVERICK, LLC** | § | **CASE NO: 19-34516** |
| | § | |
| **SN PAYABLES, LLC** | § | **CASE NO: 19-34517** |
| | § | |
| **SN UR HOLDINGS, LLC,** | § | **CASE NO: 19-34518** |
| | § | **Jointly Administered** |
| Debtors. | § | |
| | § | **CHAPTER 11** |

<u>**MEMORANDUM OPINION**</u>

In Phase 2 of this Lien-Related Litigation, the Court must determine whether certain Senior Noteholders hold valid liens on six challenged oil and gas leases. The Senior Noteholders' purported liens were created by Deeds of Trust. The Unsecured Creditor Representative asserts that liens on the Challenged Leases can be avoided in bankruptcy because those Deeds of Trust do not reference the Challenged Leases with reasonable certainty. Under the confirmed chapter 11 plan, unsecured creditors are entitled to share in the proceeds of any avoided liens. The Senior Noteholders contend that their liens are valid and perfected because the Deeds of Trust contained

mere clerical errors, which do not create uncertainty regarding which leases are subject to liens. For the reasons that follow, three Challenged Leases are not referenced with reasonable certainty. The liens on those three Leases may be avoided; the balance may not.

BACKGROUND

a.   *Setting the Stage for the Lien-Related Litigation*

Sanchez Energy Corporation, along with ten of its affiliates (collectively, "Sanchez"), filed petitions under chapter 11 of the Bankruptcy Code on August 11, 2019.[1]  (ECF No. 1).  Sanchez is an upstream oil and gas producer.  Prior to the petition date, Sanchez issued $500 million of Senior Secured First Lien Notes ("Senior Notes").  (ECF No. 1658 at 10).  As collateral for the Senior Notes, Sanchez agreed to grant the Senior Noteholders a first-priority lien on substantially all of its assets.  (ECF No. 1658 at 10).  Royal Bank of Canada ("RBC") served as the Collateral Trustee under the Senior Note Indenture Agreement.  (ECF No. 1658 at 10).  Among the assets Sanchez pledged as collateral were numerous oil and gas leases located in south Texas.

On or about April 13, 2018, Sanchez and the Collateral Trustee executed eighteen Deeds of Trust granting liens on Sanchez assets situated in ten Texas counties.  (ECF No. 1658 at 11). The Deeds of Trust were recorded in the official property records of each county where property described in a Deed of Trust was located.  (ECF No. 1658 at 12).  In other words, if a particular Deed of Trust purported to grant a lien on land located in three counties, that Deed of Trust was recorded in the property records of all three counties.

The language of all eighteen Deeds of Trust was substantially similar.  Each specific Deed of Trust included an Exhibit A, referencing all leases and other interests encumbered by that

---

[1] The Debtors are Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis, LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Co., LLC, SN EF Maverick, LLC, SN Payables, LLC, and SN UR Holdings, LLC.

particular Deed of Trust.  However, on the eve of the Sanchez bankruptcy, a group of Senior Noteholders discovered inaccuracies in the Exhibit A references to certain Challenged Leases.  To cure the errors, the Senior Noteholders, through an agent, filed Correction Affidavits to the Deeds of Trust in the applicable county property records.  The Senior Noteholders filed the Correction Affidavits in June and July 2019, less than two months before the petition date.

The Deeds of Trust, the errors in the Deeds of Trust, and the Correction Affidavits are the focus of the Court's inquiry.  The Court will expand on those documents shortly.  Uncertainty surrounding the adequacy or validity of the Senior Noteholders' liens loomed over the Sanchez bankruptcy from its inception.  (*See* ECF No. 74 at 2).  A day after the petition date, Sanchez moved for authority to obtain debtor-in possession ("DIP") financing, provided by certain Senior Noteholders.  (ECF No. 26).  An ad hoc group of unsecured noteholders objected and argued that the Correction Affidavits were avoidable preferences.  (*See generally* ECF No. 74).  If so, the ad hoc group argued, the Challenged Leases could become unencumbered assets, possibly increasing the distribution to unsecured creditors.  The Senior Noteholders disagreed and the disposition of the Challenged Leases became a central aspect of the Sanchez restructuring.

About six months after the petition date, the Court approved an alternative DIP financing agreement.  Senior Noteholders once again agreed to provide the DIP financing.  The Court entered the "Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. § 361, 362, 363, 364, and 507(b)" ("Final DIP Order"), on January 22, 2020.  (ECF No. 865).  The Final DIP Order approved Sanchez's access to "a $200 million superpriority,

priming, senior secured delayed-draw term loan credit facility including $150 million in New Money Loans and $50 million in Roll-Up Loans."  (ECF No. 1486 at 12).

Sanchez pledged "all tangible and intangible pre- and post-petition property," as collateral ("DIP Collateral") for the DIP financing.  (ECF No. 865 at 22).  Thus, the DIP Collateral included both property encumbered by the Senior Noteholders' liens, as well as any unencumbered property.  However, the DIP Collateral also contained a carve out.  (ECF No. 865 at 24-25).  The carve out excluded avoidance actions, and the proceeds thereof, from the DIP Collateral.  (ECF No. 865 at 22).  If the Court ultimately avoided the Senior Noteholders' liens on any Challenged Leases, those Challenged Leases would not be included in the DIP Collateral package.

The Court confirmed the Sanchez chapter 11 plan of reorganization on April 30, 2020. (ECF No. 1212).  The plan establishes the Lien-Related Litigation in order to resolve disputes between the DIP Lenders, Senior Noteholders, and unsecured creditors regarding the Challenged Leases.   The plan allows unsecured creditors to select a "Lien-Related Litigation Creditor Representative" ("Creditor Representative").  (ECF No. 1205 at 10).  The plan grants the Creditor Representative "standing to pursue, prosecute, and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint . . . ."[2]  (ECF No. 1205 at 27).  The Lien Challenge Complaint alleges avoidance actions relating to the Challenged Leases.  (Case No. 20-03057; ECF No. 1 at 4-6).  "Lien-Related Litigation" is defined in the plan as:

> [A]ll litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the [Senior Noteholders] or the priority or scope of the liens and/or claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims . . . (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code

---

[2] The plan defines the term "Lien Challenge Complaint" as "the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057)."  (ECF No. 1205 at 10).

> (including issues regarding diminution of value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 522 of the Bankruptcy Code,  (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets.

(ECF No. 1205 at 10).  The definition goes on to preserve any "rights, claims, or defenses" of the DIP Lenders or Senior Noteholders pertaining to the Lien-Related Litigation.  (ECF No. 1205 at 10).

The Lien-Related Litigation involves three Phases.  (ECF No. 1205 at 24).  The Lien-Related Litigation agenda is set out in Article IV.D of the plan.  (ECF No. 1205 at 24).  Phase 1 required the Court to interpret the meaning of certain provisions of the Final DIP Order.  Phase 2 litigates the existence, validity, perfection, and avoidance of liens on the Challenged Leases.  Phase 3 will require any valuations necessary in light of the Court's resolution of the first two Phases.

In Phase 1, the parties submitted questions of law, which the Court answered at a hearing held on August 14, 2020.  (*See* ECF No. 1592).  The Court concluded that avoidance actions, and the traceable proceeds thereof, "remain in the Creditor Representative's bundle of rights."  (ECF No. 1599 at 5).  Relevant to today's decision, the carve-out found in the Final DIP Order means that "the DIP Lenders and [Senior Noteholders'] claims and liens have no recourse to the avoidance actions or the proceeds thereof, other than 50% of the first $100 million of proceeds from the avoidance actions against parties other than the pre-petition parties."  (ECF No. 1599 at 4).

The Phase 1 ruling means that if the errors in the Deeds of Trust were immaterial, the Senior Noteholders' liens on the Challenged Leases are valid and perfected.  If the errors were sufficient to render the Senior Noteholders' liens on the Challenged Leases void, then the Challenged Leases were unencumbered assets on the petition date.  Those unencumbered assets

became DIP Collateral under the Final DIP Order.  On the other hand, if the Deeds of Trust covering the Challenged Leases were merely voidable, and subsequently perfected by Correction Affidavits, the proceeds are carved out of the DIP Collateral and may benefit unsecured creditors. That is true, of course, only if the Correction Affidavits are themselves avoidable.

     *b.  Errors and Corrections in the Conveyances*

Sanchez owned the Challenged Leases when it executed the Deeds of Trust.  Those leases (or lease memoranda) were recorded in the property records of each applicable county.  The central issues in this case are whether the Deeds of Trust reference some Challenged Leases with reasonable certainty and whether other Challenged Leases describe the subject property with reasonable certainty.  No party disputes that Sanchez and the Senior Noteholders executed the Deeds of Trust intending to create liens on the Challenged Leases.  However, errors in the Deeds of Trust and Challenged Leases raise the possibility that the purported liens were void, voidable, or unperfected.

The Senior Noteholders sought to resolve the uncertainty by filing Correction Affidavits in the months immediately prior to Sanchez's bankruptcy.  The parties agree that the Correction Affidavits fixed the inaccuracies in the original Deeds of Trust.  The Senior Noteholders characterize the Correction Affidavits as merely clerical.  However, the Creditor Representative argues that the liens on the Challenged Leases were not perfected until the Correction Affidavits were filed.  Because the Senior Noteholders filed the Correction Affidavits within the preference window, the Creditor Representative believes the liens may be avoided in bankruptcy.

1.  <u>The Deeds of Trust</u>

Sanchez executed eighteen Deeds of Trust granting the Senior Noteholders liens on the Sanchez assets.  The Deeds of Trust relating to the Challenged Leases are largely identical.  Each Deed of Trust includes a handful of provisions relevant to today's discussion.

First, the header of each Deed of Trust lists a particular Sanchez entity as the grantor and RBC as the grantee.  (*E.g.*, ECF No. 1702-11 at 1).  Each header also lists the Texas counties where the collateral is situated.  For instance, the header on one Deed of Trust, granted by SN Cotulla Assets, LLC, states "STATE OF TEXAS, COUNTIES OF DIMMIT, FRIO, LASALLE, AND ZAVALA." (ECF No. 1702-14 at 1).  The headers appear on the first page, but not on subsequent pages.  However, some Deeds of Trust also include footers identifying the relevant counties.  (*E.g.*, ECF No. 1702-12).  Those footers appear on every page.

Second, the Deeds of Trust contain Release Clauses.  Each Release Clause states that "solely to the extent not included on Exhibit A attached hereto, any property described in the Existing Mortgages is *hereby released*, and the Collateral Trustee hereby releases any such property, from the security interest created under the Existing Mortgage and *shall not be subject to the security interest created hereby*."  (ECF No. 1703-4 at 3 (emphasis added)).  The Release Clauses release any Sanchez property that is not listed on Exhibit A from the liens formed by the Deeds of Trust.

Third, Clause A of each Deed of Trust states, in relevant part, that each Deed of Trust grants a lien on:

> All those certain oil, gas and mineral leases and the estates created thereby, royalty interests, overriding royalty interests, production payments, net profits interests, fee interests, carried interests, reversionary interests and all other rights, titles, interests or estates *described on Exhibit A attached hereto* and made a part hereof, *whether such rights, titles, interests or estates are completely and accurately described therein or not* . . . .

(ECF No. 1703-4 at 3-4 (emphasis added)).  Clause A explains that each Deed of Trust creates a

lien on property described in Exhibit A.  In tension with the Release Clause, Clause A disclaims

any incomplete or inaccurate description of property found in Exhibit A.  According to Clause A,

incomplete or inaccurate descriptions do not prevent the grant of the lien.

Fourth, Clause B of the Deeds of Trust purports to create liens on present and future

unitization and pooling agreements.  Clause B creates liens on:

> All present and future rights, titles, interests and estates in and to present and future
> drilling, spacing, proration or production units, as created by the terms of any
> unitization, communitization and pooling agreements and all properties, property
> rights and estates created thereby which include, belong or appertain to the Subject
> Interests, including, without limitation, all such units formed voluntarily or under
> or pursuant to any Law . . . relating to any of the Subject Interests . . . .

(ECF No. 1702-12 at 3).

Fifth, Clause C creates liens on all present and future oil and gas produced from the

interests described in Clauses A and B.  Clause C grants liens on:

> All present and future oil, gas, casinghead gas, condensate, drip gasoline, natural
> gasoline, distillate, all other liquid or gaseous hydrocarbons produced or to be
> produced in conjunction therewith, all products, by-products and all other
> substances derived therefrom or the processing thereof; and all other similar
> minerals now or hereafter accruing to, attributable to, or produced from, the Subject
> Interests or to which Grantor now or hereafter may be entitled as a result of, or by
> virtue of, Grantor's ownership of the Subject Interests (collectively,
> "Hydrocarbons").

(ECF No. 1702-12 at 4).

2.  Errors in Exhibit A References

Each Deed of Trust includes an Exhibit A.  The purpose of Exhibit A is to set out the

specific property interests subject to liens formed by the Deeds of Trust.  Each Exhibit A begins

with a boilerplate Introduction, followed by a schedule of leases and wells subject to the specific

Deed of Trust.  (*See* ECF No. 1702-12 at 22-36).

The Introduction to Exhibit A aims to provide an "explanation of the terminology, format and information contained in Exhibit 'A.'" (ECF No. 1702-12 at 22). Each Introduction first explains that "[t]his instrument covers the Grantor's entire interest in each of the land parcels, mineral servitudes, mineral leases, mineral royalties and other mineral rights described in Exhibit 'A.'" (ECF No. 1702-12 at 22). As with the main body of the Deeds of Trust, the Introductions include "Savings Clauses" that disclaim errors found in Exhibit A, stating "[t]he inclusion (or the inaccuracy thereof) of [an interest described] is not in any way a limitation or restriction on the interest of the Grantor being subjected to a lien and encumbrance of this instrument." (ECF No. 1702-12 at 22). The Introduction states that "[t]his instrument is intended to cover the entire interest of the Grantor in any lease described in Exhibit 'A.'" (ECF No. 1702-12 at 22).

The Lien Challenge Complaint sets out eight leases that were incorrectly referenced in Exhibit A of an applicable Deed of Trust. The Creditor Representative only challenges the Deeds of Trust covering six of those leases. The six Challenged Leases are:

- The Harrison Lease: a lease between Harrison Interested, Ltd., Lessor, and P Ranch Working Interest, LLC, Lessee, dated May 12, 2010;

- The Hausser Lease: a lease between Robert Hausser, Jr. et al, Lessors, and SEP Holdings II, LLC, Lessee, dated June 7, 2010;

- The Koenning Lease: a lease between Roy Allen Koenning, Lessor, and EOG Resources, Inc., Lessee, dated February 10, 2009;

- The Briscoe Ranch Lease: a lease between Briscoe Ranch, Inc., Lessor, and Edward G. Vaughan, Lessee, dated December 1, 2005;

- The Pilgrim Lake Lease: a lease between Pilgrim Lake, Ltd., Lessor, and SEP Holdings II, LLC, Lessee, dated August 25, 2008; and

- The Metcalf Lease: a lease between Evelyn I Metcalf, Lessor, and Anadarko E&P Company, LP, Lessee, dated September 23, 2010.

The Harrison Lease is referenced in Exhibit A of the Deed of Trust executed by SN Catarina on June 30, 2014.  (ECF No. 1659 at 11).  The Hausser, Koenning, and Pilgrim Lake Leases are referenced in Exhibit A of the Deed of Trust executed by SN Palmetto's predecessor, SEP Holdings II, LLC on November 15, 2012.  (ECF No. 1659 at 11).  The Briscoe Ranch, and Metcalf Leases are referenced in Exhibit A of the Deed of Trust executed by SN Maverick on April 6, 2017.  (ECF No. 1659 at 11).

The errors related to the Challenged Leases fall into two main categories.  First, some Challenged Leases are identified by reference to a single county with incorrect recording information.  Second, other Challenged Leases or lease memoranda contain misleading property descriptions.  The lease-by-lease challenges are detailed in the next sections of this opinion.

<u>The Harrison Lease</u>

The Harrison Lease is referenced by a Deed of Trust from SN Catarina, LLC to RBC ("SN Catarina Deed").  (ECF No. 1703-5 at 1).  The header and footers of the SN Catarina Deed state that it concerns property in Dimmit, LaSalle, and Webb County.  (ECF No. 1703-5 at 1).  The Deed of Trust was recorded in Dimmit, LaSalle, and Webb County.

Exhibit A of the SN Catarina Deed contains a seven-page lease schedule listing over one hundred leases.  Each lease is referenced by Lease Number, Lessor, Lessee, Lease Date, Expiration Date, Book, Page, Instrument Number, County, and State.  (ECF No. 1703-5 at 25).  The three counties listed on the header of the SN Catarina Deed are somewhat misleading.  While the overwhelming majority of the leases in Exhibit A list Dimmit County, only two list Webb County, and no lease lists LaSalle County.  Additionally, three leases list Zavala County, ten list Gonzales County, four list Frio County, and one lists DeWitt County.  None of those counties are named in the header or footer of the SN Catarina Deed.

The Harrison Lease is found on page six of Exhibit A. (ECF No. 1703-5 at 30). Exhibit A describes the Harrison Lease as Lease No. T0615001, between Harrison Interests, Ltd., and P Ranch Working Interest, LLC, dated May 12, 2010 and expiring May 12, 2015. That information is substantially accurate.[3] However, Exhibit A goes on to state that the Harrison Lease is recorded at Book 2943, Page 294, Instrument 1072987 in Dimmit County. That reference is not accurate. The Book, Page, and Instrument Numbers listed refer to the property records of Webb County, not Dimmit County.

The Harrison Lease itself concerns land located in all three of Dimmit, Webb, and LaSalle Counties. (ECF No. 1705-21 at 1). In Dimmit County, the Harrison Lease is recorded at Book 386, Page 510, Instrument 15055. (ECF No. 1702-11 at 24). In LaSalle County, the Harrison Lease is recorded at Book 505, Page 161, Instrument 86051. (ECF No. 1702-11 at 24). As mentioned, the Harrison Lease is located at Book 2943, Page 294, Instrument 1072987 in Webb County. Exhibit A does not indicate that the Harrison Lease covers land in Webb or LaSalle County. In fact, every lease listed in Exhibit A indicates only a single county. No lease is listed more than once.[4]

### The Hausser Lease

The Hausser Lease is referenced by a Deed of Trust from SN Palmetto, LLC to RBC ("SN Palmetto Deed"). (ECF No. 1703-19 at 1). The header of the SN Palmetto Deed states that it concerns property in DeWitt, Frio, Gonzales, and Zavala County. (ECF No. 1703-19 at 1). Each page of the SN Palmetto Deed, along with the Introduction pages of Exhibit A (but not the Exhibit

---

[3] Exhibit A states that the Harrison Lease expired on May 12, 2015, however, the Harrison Lease actually expired on May 12, 2013. (ECF No. 1703-5 at 30).

[4] The Exhibit A lease schedule appears to be sorted first by alphabetical County, and then numerically by Book Number within each County. Thus, Exhibit A might conceivably include a row for the Harrison Lease under Dimmit County, and then a second and third row for the Harrison Lease in LaSalle and Webb County.

A lease schedule), lists those four counties in the footer.  The SN Palmetto Deed was recorded in all four counties.

The Creditor Representative argues that Exhibit A of the SN Palmetto Deed contains an incorrect reference to the Hausser Lease.  The lease schedule in Exhibit A of the SN Palmetto Deed appears to be identical to the lease schedule previously described in the SN Catarina Deed.  (*Compare* ECF No. 1703-19 at 30 *with* ECF No. 1703-5 at 30).

Exhibit A of the SN Palmetto Deed describes the Hausser Lease as Lease No. T0474005, between Robert Hausser, Jr., et al, and SEP Holdings II LLC, executed on June 7, 2010, and expiring on June 6, 2013.  (ECF No. 1703-19 at 30).  That information is correct.  However, like the Harrison Lease, the Hausser Lease includes recording information for the wrong county.  Exhibit A states that the Hausser Lease is recorded at Book 314, Page 128, Instrument 0126770, in Frio County.  (ECF No. 1703-19 at 30).  While that Instrument Number does refer to the Hausser Lease recording in Frio County, the Book and Page Numbers refer to a recording in Zavala County.  (*See* ECF Nos. 1705-23 at 8; 1705-24).

The Hausser Lease concerns land located in both Frio and Zavala County.  (ECF No. 1705-23 at 1).  In Zavala County, the Hausser Lease is recorded at Book 314, Page 128, Instrument 084407.  (ECF No. 1705-24 at 1).  In Frio County, the Hausser Lease is recorded at Book 76, Page 625, Instrument 0126770.  (ECF No. 1705-23 at 7).  Exhibit A does not indicate that the Hausser Lease also covers land in Zavala County.

The Koenning Lease

Like the Hausser Lease, the Koenning Lease is referenced by the SN Palmetto Deed.  (ECF No. 1703-17 at 1).  Again, the header of the SN Palmetto Deed states that it concerns property in DeWitt, Frio, Gonzales, and Zavala County.  (ECF No. 1703-17 at 1).  Each page of the SN

Palmetto Deed, along with the Introduction pages of Exhibit A (but not the Exhibit A lease schedule), lists those four counties in the footer.  The SN Palmetto Deed was recorded in all four counties.

Also like the Hausser Lease, the recording information provided for the Koenning Lease corresponds to a different county than the one listed on Exhibit A.  Exhibit A of the SN Palmetto Deed describes the Koenning Lease as Lease No. T0463045, between Roy Allen Koenning and EOG Resources, Inc., executed on February 10, 2009, and expiring on February 10, 2014.  (ECF No. 1703-17 at 25).  That information is correct.  (ECF No. 1705-25 at 1).

However, just like the Harrison and Hausser Leases, the Koenning Lease includes mismatched county recording information.  Exhibit A states that the Koenning Lease is recorded at Book 999, Page 837, Instrument 239874, in DeWitt County.  (ECF No. 1703-17 at 25).  That recording information refers to the Koenning Lease filed in Gonzales County.  (*See* ECF Nos. 1705-25 at 1).

The Koenning Lease concerns land located in Gonzales and DeWitt County.  (ECF No. 1705-25 at 1).  In DeWitt County, the Koenning Lease is recorded at Book 434, Page 1, Instrument 89879.  (ECF No. 1705-25 at 3).  In Gonzales County, the Koenning Lease is recorded at Book 999, Page 837, Instrument 239874.  (ECF No. 1705-25 at 1).  Exhibit A does not indicate that the Koenning Lease also covers land in Gonzales County.

The Briscoe Ranch Lease

The Briscoe Ranch Lease is referenced by a Deed of Trust from SN EF Maverick, LLC to RBC ("SN Maverick Deed").  (ECF No. 1703-10).  The header and footers of the SN Maverick Deed state that it concerns property in Dimmit, LaSalle, Maverick, Webb, and Zavala County.

(ECF No. 1703-5 at 1).  The SN Maverick Deed was recorded in all five counties.  The Briscoe Ranch Lease covers land in both Dimmit and LaSalle Counties.  (ECF No. 1705-17 at 1).

Exhibit A of the SN Maverick Deed includes two references to the Briscoe Ranch Lease. (ECF No. 1703-10 at 25, 31).  The first reference in Exhibit A describes the Briscoe Ranch Lease as Lease No. T0616002-001, between Briscoe Ranch, Inc., and Edward G. Vaughan, executed on December 1, 2005, and expiring on November 30, 2010.  (ECF No. 1703-10 at 25).  Exhibit A provides that the Briscoe Ranch Lease is recorded at Book 329, Page 138, Instrument 7002, in Dimmit County.  (ECF No. 1703-10 at 25).

A memorandum of the Briscoe Ranch Lease is recorded at Book 329, Page 138 in Dimmit County.  (ECF No. 1705-17).  However, that memorandum describes the land by referring to a July 11, 1971 deed, purportedly recorded at Book 167, Page 87 in LaSalle County and Book 148, Page 92 in Dimmit County.  (ECF No. 1705-17 at 3).  No such deed is recorded at those locations.

The second reference to the Briscoe Ranch Lease in Exhibit A includes the same Lease Number, Lessor, Lessee, Lease Date, and Expiration Date as the first reference.  (ECF No. 1703-10 at 31).  The second reference lists a recording at Book 460, Page 230, Instrument 79159 in LaSalle County.  (ECF No. 1703-10 at 31).  That reference corresponds with a second memorandum of the Briscoe Ranch lease, filed in LaSalle County.  (ECF No. 1705-18).  The second memorandum appears to correct the errors in the first memorandum.  However, the second memorandum is not executed.  (ECF No. 1705-19 at 3).  The second memorandum includes a copy of the first memorandum signature page, but no other execution.  (*See* ECF No. 1705-19).

<u>The Pilgrim Lake Lease</u>

The Pilgrim Lake Lease is referenced by the same SN Palmetto Deed as the Hausser and Koenning Leases.  (ECF No. 1703-18 at 1).  The header of the SN Palmetto Deed states that it

concerns property in DeWitt, Frio, Gonzales, and Zavala County. (ECF No. 1703-18 at 1). Each page of the SN Palmetto Deed, along with the Introduction pages of Exhibit A (but not the Exhibit A lease schedule), lists those four counties in the footer. The Deed of Trust was recorded in all four counties.

Unlike the previous Challenged Leases, the issue concerning the Pilgrim Lake Lease relates to the property description in the Lease itself. The recording information provided for the Pilgrim Lake Lease in Exhibit A is correct. Exhibit A describes the Pilgrim Lake Lease as Lease No. T0463003, between Pilgrim Lake, Ltd. and SEP Holdings II LLC, executed on August 25, 2008, and expiring on August 25, 2013. (ECF No. 1703-18 at 30). That information is correct. (ECF No. 1705-29 at 1). Exhibit A also correctly states that the Pilgrim Lake Lease is recorded at Book 989, Page 143, Instrument 237576, in Gonzales County. (ECF No. 1703-18 at 30). That recording information accurately references the Pilgrim Lake Lease filed in Gonzales County. (*See* ECF No. 1705-29 at 1).

The Creditor Representative takes issue with the Pilgrim Lake Lease because of a discrepancy in the original lease, not the SN Palmetto Deed. The Pilgrim Lake Lease states that it only concerns land in Gonzales County. (ECF No. 1705-29 at 1). However, the original Pilgrim Lake Lease includes its own Exhibit A, which also purports to affect land in DeWitt County. (ECF No. 1705-29 at 5). The Pilgrim Lake Lease was recorded in DeWitt County. However, Exhibit A to the Pilgrim Lake Lease does not appear to be signed by the parties to the lease. (ECF No. 1705-29 at 5-7).

### The Metcalf Lease

The Metcalf Lease is referenced by the same SN Maverick Deed as the Briscoe Ranch Lease. (ECF No. 1703-10). The header and footers of the SN Maverick Deed state that it concerns

property in Dimmit, LaSalle, Maverick, Webb, and Zavala County. (ECF No. 1703-5 at 1). The SN Maverick Deed was recorded in all five counties.

The Metcalf Lease concerns land located entirely within Dimmit County. (ECF No. 1705-32 at 1). The original Metcalf Lease is recorded at Book 402, Page 201, Instrument 17630 in Dimmit County. (ECF No. 1705-31). However, the Metcalf Lease was later amended. (*Compare* ECF No. 1705-31 *with* ECF No. 1705-32). The amended Metcalf Lease is recorded in Dimmit County at Book 415, Page 461, Instrument 19563. (ECF No. 1705-32 at 1).

Exhibit A of the SN Maverick Deed includes a reference to the original Metcalf Lease, but not the amended Metcalf Lease. Exhibit A describes the Metcalf Lease as Lease No. T0619007-001, between Evelyn I. Metcalf and Anadarko E&P Company LP, executed on September 23, 2010, and expiring on September 23, 2015. (ECF No. 1703-10 at 25). That execution date corresponds with the amended Metcalf Lease, and the correct expiration date was September 23, 2013. (ECF No. 1705-32 at 1). Exhibit A goes on to state that the Metcalf Lease is recorded at Book 402, Page 201, Instrument 17630, in Dimmit County. (ECF No. 1703-10 at 25). That recording reference refers to the original Metcalf Lease, not the amended Metcalf Lease.

3. Correction Affidavits

Prior to the Sanchez bankruptcy case, a group of Senior Noteholders learned about many of the inaccuracies in the Deeds of Trust. The Senior Noteholders expressed their concerns to the Sanchez Board of Directors about how the errors might impact the status of some liens. (ECF No. 1709-4). The Senior Noteholders suggested that Sanchez file affidavits correcting the errors. (ECF No. 1709-4). Sanchez declined.

The Senior Noteholders instead engaged Cinco Energy Management Group ("Cinco") to file correction affidavits on the Noteholders' behalf. (*E.g.*, ECF No. 1703-21). Cinco recorded a

total of seventeen Correction Affidavits, which claimed to make "non-material changes that result from clerical and/or inadvertent errors and/or ambiguities in the Original Instrument[s]."  (*E.g.*, ECF No. 1703-21 at 1).  Cinco filed the Correction Affidavits in June and July 2019.  (E.g., 1704-9 at 1 (affidavit dated July 24, 2019, correcting Deed of Trust from SN Cotulla Assets to RBC)).

The Correction Affidavits amended numerous leases listed on the lease schedules, including the Challenged Leases.  The Correction Affidavits primarily fixed two issues related to the Challenged Leases.  First, the Correction Affidavits corrected the recording reference errors to the Challenged Leases. Second, the Correction Affidavits amended the lease schedules to include the recording information for each county where a Challenged Lease is located.

For instance, Exhibit A of the SN Palmetto Deed incorrectly referenced the Koenning Lease at Book 999, Page 837, Instrument 239874 in DeWitt County.  (ECF No. 1704-9 at 2).  As previously explained, that reference is to the Koenning Lease recording in Gonzales County.  The Correction Affidavit corrected the error by changing DeWitt County to Gonzales County.  (ECF No. 1704-9 at 2).  Additionally, the Correction Affidavit added the correct recording information for the Koenning Lease in DeWitt County.  (ECF No. 1704-9 at 2 (Koenning Lease recording at Book 434, Page 1, Instrument 89879 in DeWitt County)).  The amendments to the other Challenged Lease references were of the same nature.

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.  This proceeding is a core matter pursuant to 28 U.S.C. § 157(b)(2)(B), (F), and (K).

DISCUSSION

In Phase 2, the Creditor Representative aims to avoid the Senior Noteholders' liens on the Challenged Leases, rendering those leases unencumbered.  Before determining whether the Bankruptcy Code permits avoidance of those liens, the Court must look to Texas law to establish when the liens were formed and perfected.  First, the Court decides whether the errors in Exhibit A cause the Deeds of Trust to fail the Statute of Frauds.  If the references and referenced documents describe the Challenged Leases with reasonable certainty, despite the errors, the Deeds of Trust comply with the Statute of Frauds.  In that case, the liens are valid, perfected, and unavoidable.

If any Challenged Lease is not referenced with reasonable certainty, the Court must determine whether the Deed of Trust is either void or voidable by a bona fide purchaser.  If void, the Challenged Leases were unencumbered property before Cinco filed the Correction Affidavits. Unencumbered property on the petition date became DIP Collateral.  Conversely, if any liens were voidable, but cured and perfected by the Correction Affidavits, the Court must decide whether the Correction Affidavits were preferential transfers of Sanchez's property.

For the reasons that follow, three Challenged Leases were voidable because they were not referenced with reasonable certainty.  While the Correction Affidavits corrected the errors pertaining to those Leases, the Correction Affidavits may be avoidable preferences.

a. *Some Challenged Leases are Not Referenced with Reasonable Certainty*

In Texas, both the Statute of Frauds and Statute of Conveyances require that transfers of real property be evidenced by a writing signed by the transferor and delivered to the transferee. *See* Tex. Prop. Code § 5.021 ("A conveyance of an estate of inheritance, a freehold, or an estate for more than one year, in land and tenements, must be in writing and must be subscribed and delivered by the conveyor or by the conveyor's agent authorized in writing."); Tex. Bus. Com.

Code § 26.01.  Because the tests for the sufficiency of a writing "is essentially the same for both" the Statute of Frauds and of Conveyances, for convenience courts simply "refer generally to the Statute of Frauds." *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 264 n.10 (Tex. App. 2003).

The Statute of Frauds commands that an agreement "must contain the essential terms of a contract, expressed with certainty and clarity that it may be understood without recourse to parol evidence to show the intention of the parties." *U.S. Enters., Inc. v. Dauley*, 535 S.W.2d 623, 627 (Tex. 1976).  One essential requirement that a real property conveyance must express to satisfy the Statute of Frauds is that the agreement "must furnish within itself, or by reference to some other existing writing, the means or data by which the property to be conveyed may be identified with reasonable certainty." *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (internal quotations omitted).  In short, the conveyance must either describe the land with reasonable certainty or reference another writing that does.

The Statute of Frauds requires that land descriptions be made with reasonable certainty in order to avoid confusion regarding the subject matter of a land conveyance.  *See id.* at 417 ("Contrary to the purpose of extrinsic evidence, the Tejas Gas contract only provides confusion, not reasonable certainty, as to the identity of each lease in the 1982 agreements.").  Reasonable certainty means that a person can "identify the particular property to the exclusion of all others." *MPH Prod. Co. v. McQueen*, 2002 WL 2025373, at *4 (Tex. App.—Tyler Aug. 30, 2002).

When the conveyance involves oil and gas leases, a writing must include "specific information revealing the location of the leases," or reference a record containing such information. *See Preston Exploration Co. v. Chesapeake Energy Corp.*, 716 F. Supp. 2d 656, 660 (S.D. Tex. 2010).  "Generally, where a deed describes land in one survey, but does not specifically

describe or mention land in another survey, the instrument does not convey the land mentioned in the other survey." *MPH Prod. Co.*, 2002 WL 2025373, at *3.

A court may only look to extrinsic evidence in limited circumstances when determining the adequacy of a property description. "Extrinsic evidence may be used 'only for the purpose of identifying the [property] with reasonable certainty from the data' contained in the contract, 'not for the purpose of supplying the location or description of the [property].'" *Long Trusts*, 222 S.W.3d at 416 (citing *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983)). "In essence, the extrinsic evidence referred to must operate to *clarify* the conveyance." *Reiland v. Patrick Thomas Properties, Inc.*, 213 S.W.3d 431, 437 (Tex. App.—Houston 2006) (emphasis added). "The Texas Supreme Court has repeatedly stated that an unlimited review of public records cannot be used to cure an otherwise deficient property description." *Coe v. Chesapeake Exploration, LLC*, 695 F.3d 311, 320 (5th Cir. 2012).

A number of Texas and federal court decisions explore the adequacy of conveyances containing problematic land descriptions or references. In *Maupin v. Chaney*, 163 S.W.2d 380 (Tex. 1942), the Texas Supreme Court upheld the validity of a deed of trust that mis-referenced an original deed. The Maupins sold real property to R. P. Chaney and L. Bowen on April 9, 1929 in exchange for a $3,500.00 promissory note. *Id.* at 381. Five years later, as further security, Chaney and Bowen executed a deed of trust covering the property. *Id.* However, the deed of trust misdescribed the property as Lot 8, instead of Lot 28, and stated that the original deed was executed on April 18, 1929, instead of April 9, 1929. *Id.* The deed of trust correctly referenced the original deed's recording information and stated that the deed of trust was given in consideration for a renewal of "that certain vendor's lien note dated *April 18th*, 1929 in the original principal sum of

$3,500.00." *Id.* (emphasis in original). After the Maupins brought suit, the defendants argued that the errors rendered the deed of trust unenforceable.

The Texas Supreme Court noted that "it is a general rule of law that where a description specifies a property intended to be conveyed, and the instrument furnishes other sufficient means of determining the particular property covered thereby, the description is legally sufficient." *Id.* at 383. The court then laid out the rule that when a reference to another instrument is "in some respects erroneous," the referenced instrument may still "be looked to in ascertaining what property was intended to be conveyed if it corresponds with the reference in other respects, and extrinsic proof shows that there is no other instrument which would accord with the language used in referring to the prior instrument." *Id.* The court clarified that if the extrinsic evidence shows that "the only property ever conveyed by the Maupins to Chaney and Bowen in which a vendor's lien was retained to secure the payment of a note in the sum of $3,500 was the deed of April 9, 1929, instead of a deed dated April 18, 1929, it would support the plaintiffs' contention that the parties actually referred to the deed of date April 9th for a better description of the land conveyed by the deed of trust." *Id.* at 383-84.

*Long Trusts v. Griffin*, 222 S.W.3d 412 (Tex. 2006), shows that descriptions containing the lessor, the lease term, net acreage, and survey name do not describe property with reasonable certainty. *See also Smith v. Sorelle*, 87 S.W.2d 703, 705 (Tex. 1935). *Long Trusts* concerned an agreement to exchange interests in leased wells for payment of operating costs. 222 S.W.3d at 414. The leases were described in two sets of agreements, one executed in 1978, the other in 1982. Both agreements failed under the Statute of Frauds. *Id.*

The 1978 agreements stated that the subject leases were "located 'in the Northeast portion of Rusk County, Texas, and consist[ed] of 50+ leases covering approximately 2100+ net mineral

acres in the Dirgin and Oak Hill Fields Area' as 'described in the attached Exhibit A.'" *Id.* at 416. Exhibit A "provided the lessor name, the survey name, the term, and the net acreage for each lease at issue." *Id.* The Texas Supreme Court found that information insufficient under the Statute of Frauds because merely describing a quantity of land within a larger tract does not provide reasonable certainty. *Id.*

The 1982 agreements also failed under the Statute of Frauds. Those agreements referred to an Exhibit A for a description of the leases, and stated that "[a]] of the acreage as shown on Exhibit 'A' (attached) is dedicated to a Gas Contract with Tejas Gas Corporation." *Id.* Instead of attaching an Exhibit A, the 1982 agreements attached the Tejas Gas contract. *Id.* The Tejas Gas contract included *two* Exhibit A's, as well as an Exhibit B. *Id.* The second Exhibit A sufficiently described the conveyance. *Id.* at 417. However, the second Exhibit A appeared to relate to an entirely different contract. *Id.* (stating Exhibit A was "[a]ttached to and made part of that certain Letter Agreement dated November 22, 1982, and between Riddle Oil Company, Farmoutor and The Long Trusts, Farmoutee"). Thus, although the 1982 agreements did reference a document containing a correct property description, they did not do so with reasonable certainty. *See id.* Importantly, the court noted that "[c]ontrary to the purpose of extrinsic evidence, the Tejas Gas contract only provides confusion, not reasonable certainty . . . ." *Id.*

*Preston Exploration Co. v. GSF, LLC*, 716 F. Supp. 2d 656 (S.D. Tex. 2010), shows that, without including recording information, lease descriptions which include the lessor and lessee, effective lease date, gross acreage, royalty interest, and net revenue interest do not satisfy the Statute of Frauds. In *Preston*, the district court noted that the descriptive information provided "more certainty than those in *Long Trusts*." *Id.* at 659. However, that information still "require[s]

a search of the public records in order to arrive at the location of the property that corresponds to each lease." *Id.* For that reason, the descriptions failed. The district court noted that:

> By contrast, had the volume and page number information for each of the leases been included in the [exhibits], this would have constituted an explicit reference to the public records containing the required location information. This distinction between characteristic data versus volume and page information is crucial, because the latter comports with the general rule that, in order to be statute of frauds compliant, 'a writing must furnish within itself or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty.' *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972). Characteristic data, however, are not thus compliant.

*Id.* at 660.

On appeal, the Fifth Circuit reversed because the district court failed to consider certain exhibits to the conveyances. 669 F.3d 518 (5th Cir. 2012). The exhibits were expressly incorporated into the conveyances and the parties contemplated that the exhibits would not be finalized until after execution of the conveyances. *Id.* at 524. However, the Fifth Circuit did not disturb the district court's holding related to the crucial nature of including recording information. *Id.* In fact, the Fifth Circuit stated that "[t]o the extent that certain leases are listed on Exhibit A of the PSAs but contain no corresponding recording information . . . enforcement is limited to those leases identified by recording information." *Id.*

The *MPH Production* case is also instructive. *MPH Prod. Co. v. McQueen*, 2002 WL 2025373 (Tex. App.—Tyler Aug. 30, 2002). There, a grantor executed a royalty interest that conveyed to MPH "[a]ll of that certain tract or parcel of land out of the A. Lumbera Survey, A-3, et al, Upshur County, Texas, more fully described in an Instrument . . . recorded in Vol. 130, age 756 of the Official Records of Upshur County, Texas." *Id.* at *1. However, no Instrument was recorded at Volume 130, Page 756 of the Official Records of Upshur County. *Id.* at *3. Instead,

the parties intended to reference Volume 130, Page 756 of the Oil, Gas, and Mineral Records of Upshur County. *Id.*

The mistaken reference proved fatal. Even though the intended document did exist at that volume and page in another set of records in Upshur County, the reference to the "Official Records of Upshur County" caused the description to be inadequate. The court clarified that "[w]hile it is clear from the parties' respective arguments that the intended reference in the royalty conveyance was to volume 130, page 756 of the Oil, Gas and Mineral Records of Upshur County, Texas, such a fact is not clear from the face of the conveyance or any other documents referenced therein." *Id.* Thus, the conveyance was insufficient both because it referred to a document that was not in existence at the time and because it did not describe the property with reasonable certainty. *Id.* at *4.

While land subject to a conveyance must be described with reasonable certainty, the Senior Noteholders suggest that a *reference* to a description in another instrument may be less exact. The courts of Texas do not recognize this lesser standard for references. *Pick v. Carroll*, 256 S.W.2d 211, 214 (Tex. Civ. App. 1953) ("While the instrument itself need not contain all the identifying descriptive matter-if other descriptive matter be brought into the instrument, the reference to them must be made with certainty, and nothing can be left to doubtful inference."). In *Pick*, the Court of Civil Appeals explicitly stated that "[i]t is the law in Texas that the reference must be made with certainty; it must be clear, apparent, and unmistakable, it must leave nothing to speculation or doubtful inference." *Id.* Texas law forecloses the Senior Noteholders' argument that a conveyance may reference another instrument with less than reasonable certainty. Both descriptions of land and references to descriptions must be made with reasonable certainty. *See id.* Holding otherwise invites uncertainty, enhances confusion, and undermines the purpose of the Statute of Frauds.

24 / 43

In three instances, Challenged Leases are not referenced with reasonable certainty. Before turning to the specific errors in Exhibit A, the internal inconsistencies of each Deed of Trust invites uncertainty. The inconsistencies come in two forms. First, contradictions between the Release and Savings Clauses create confusion. Second, the counties listed on each Deed of Trust do not correspond with the Exhibit A lease schedules. Those inconsistencies compound the uncertainty caused by the specific reference errors.

All three relevant Deeds of Trust contradict themselves by explicitly releasing interests not described in Exhibit A, while simultaneously claiming that liens attach to incorrectly or incompletely described interests. The Deeds of Trust purport to create liens on all leases described in Exhibit A "whether such . . . interests or estates are completely and accurately described therein or not." (*E.g.*, ECF No. 1703-4 at 3). The Introductions to Exhibit A contain similar Savings Clauses, stating that "the inclusion (or the inaccuracy thereof) of [an interest described] is not in any way a limitation or restriction on the interest of the Grantor being subjected to a lien." (*E.g.*, ECF No. 1702-12 at 22).

Those Savings Clauses state that incomplete or inaccurate descriptions do not limit the grant of liens on the Challenged Leases. These types of clauses, which attempt to disclaim problematic descriptions or references, cannot eradicate the reasonable certainty requirement. *J. Hiram Moore, Ltd. v. Greer*, 172 S.W.3d 609, 614 (Tex. 2005) ("The deed in effect states that [the grantor] conveys nothing, and that she conveys everything.").

Moreover, the Release Clauses directly conflict with the Savings Clauses. Each Release Clause states that "solely to the extent not included on Exhibit A . . . any property described in the Existing Mortgages is hereby released . . . and shall not be subject to the security interest created

hereby." (*E.g.*, ECF No. 1703-4 at 3).  The Release Clauses expressly release liens on property that is not included in Exhibit A.

In essence, the Deeds of Trust say that intentional omissions prevent the grant of a lien, but mistaken omissions do not.  The problem, of course, is that a subsequent purchaser has no knowledge of the original parties' intent.  If a lease is only partially described in Exhibit A, a subsequent purchaser has no way to know whether the partial description was a) intended to grant a lien on the entire lease; b) intended to grant a lien only on the included portion of the lease; or c) a mistake where the parties intended to include the full lease.  The Release and Savings Clauses operate in tension, and create uncertainty when errors are found in Exhibit A.

The second issue relates to the counties described by each Deed of Trust.  While all three Deeds of Trust include headers and footers listing applicable counties, each Exhibit A includes numerous leases located in additional counties.  For instance, the SN Catarina Deed lists Dimmit, LaSalle, and Webb County.  However, Exhibit A to the SN Catarina Deed does not include any leases listing LaSalle County, but does include various leases listing Zavala, Gonzales, Frio, and DeWitt County.  When leases are partially described in Exhibit A, this creates uncertainty regarding whether the SN Catarina Deed is limited to property located in Dimmit, LaSalle, and Webb County, or whether the Deed also grants liens on property located in other counties.

<u>The Hausser Lease</u>

The SN Palmetto Deed does not describe or reference the Hausser Lease with reasonable certainty.  Exhibit A states that the Hausser Lease is located in Frio County, but lists Book and Page numbers associated with another county.  As a result, a search of the Frio County records using the information provided in Exhibit A would not locate the Hausser Lease.  To locate the Lease with reasonable certainty, a subsequent purchaser would need to search the records of Frio

and other counties, utilizing trial and error to determine which fields listed in Exhibit A are accurate.  A reference which requires a subsequent purchaser to carry out an open-ended search of public records does not satisfy the Statute of Frauds.  Even after locating the Hausser Lease, a subsequent purchaser might reasonably believe that the SN Palmetto Deed only formed a lien on the portion of the Hausser Lease located in Frio County, based on the Release Clause.

The Hausser Lease concerns land in Frio and Zavala County.  (ECF No. 1705-23 at 1).  In Zavala County, the Hausser Lease is recorded at Book 314, Page 128, Instrument 084407.  (ECF No. 1705-24 at 1).  In Frio County, the Hausser Lease is recorded at Book 76, Page 625, Instrument 0126770.  (ECF No. 1705-23 at 7).

None of that information is clear from Exhibit A of the SN Palmetto Deed.  Without any reference to Zavala County, that Deed states that the Hausser Lease is located in Frio County and recorded at Book 314, Page 128, Instrument 0126770.  (ECF No. 1703-19 at 30).  While that Instrument number is correct, the Book and Page numbers come from the Zavala County recording.  Exhibit A does correctly describe the Hausser Lease as Lease No. T0474005, between Robert Hausser, Jr., et al, and SEP Holdings II LLC, executed on June 7, 2010, and expiring on June 6, 2013.  (ECF No. 1703-19 at 30).  However, a subsequent purchaser has no way to know what information listed in Exhibit A is correct and what is false.  A search of the Frio County records, utilizing *all* of the information provided in Exhibit A, would not reveal the Hausser Lease. (*See* ECF No. 1733 at 116-18, 127).  Thus, the information provided in Exhibit A does not provide a "reference to some other existing writing[]," consisted with the Statute of Frauds.  *Long Trusts*, 222 S.W.3d at 416.

The Court heard testimony from Paul Yale, an expert landman in Texas, that an individual could locate the Challenged Leases, including the Hausser Lease, using the information found in

Exhibit A.  Mr. Yale began his searches by looking up the applicable Sanchez entity in a particular county's records.  (ECF No. 1733 at 87).  Mr. Yale was "then able to determine that there were a number of . . . deeds of trust that were granted by those affiliates.  *Id.*  Using the lease ID numbers from Exhibit A, Mr. Yale was able to find the correct leases and determine that no other leases met those criteria.

The Court found Mr. Yale to be a highly credible witness, however, his methodology was flawed.  Before embarking on his title searches, Mr. Yale knew what information in Exhibit A was correct, and what information was incorrect.  (ECF No. 1733 at 110).  This allowed him to tailor his searches in a way that omitted the erroneous information.  To be clear, the Court in no way suggests that Mr. Yale conducted his search in bad faith.  However, Mr. Yale's methodology does not reflect the difficulties that an unfamiliar purchaser would face when attempting to locate the Hausser Lease.

Such a purchaser could not easily sift through the inaccuracies found in Exhibit A.  After yielding no results in Frio County using all of the information, a purchaser might look to the records of other counties.  The SN Palmetto Deed states that it concerns land in DeWitt, Gonzales, and Zavala County, as well as Frio.  Searches in those counties, using all of the data, would likewise yield no results.  The same is true for the additional counties that can be found in some entries in Exhibit A.

Instead, the purchaser might weed out the errors by conducting searches with pieces of the Hausser Lease data.  As Mr. Yale showed, this can eventually lead one to the Hausser Lease.  However, if the purchaser does not know that only the Book and Page numbers are incorrect, the purchaser may go through numerous permutations of search terms before landing on a favorable combination.  The problem with the SN Palmetto Deed is more serious than that in *Preston*.  The

SN Palmetto Deed includes much of the same information that was insufficient in *Preston*, and includes recording information that is affirmatively wrong.  *See* 716 F. Supp. 2d at 659.  Like *Long Trusts*, the reference in Exhibit A of the SN Palmetto Deed "only provides confusion, not reasonable certainty," as to the Hausser Lease.  222 S.W.3d at 417.

 *Maupin* does allow a court to look towards extrinsic evidence in limited circumstances to determine the property intended to be conveyed.  However, the search necessary for a subsequent purchaser to determine the identity of the Hausser Lease far exceeds those limits.  Unlike *Maupin*, this case is not a dispute between the original parties regarding what property the original parties intended to convey.  From the evidence before this Court, it is plain that Sanchez and the Senior Noteholders *intended* to grant liens on the Challenged Leases.  The question is whether Sanchez and the Senior Noteholders successfully implemented their intentions by executing Deeds of Trust that reference the Challenged Leases with reasonable certainty.  "The rule permitting latent ambiguities or mistakes in a deed to be explained or corrected *as between the parties* does not affect third parties having no notice of the ambiguity or mistake, and who only have such constructive notice as the record gives."  *Walters v. Pete*, 546 S.W.2d 871, 874 (Tex. App.—Texarkana 1977) (emphasis added).

 The Senior Noteholders also point out that a search using the grantor, grantee, and date information could not lead a purchaser to an incorrect lease.  They suggest this leads to the conclusion that the references are adequate because the references could not lead a purchaser to the wrong lease.  But there is a difference between not being wrong and being confidently correct.  The reference to the Hausser Lease may not lead a purchaser to believe the Senior Noteholders held liens on different leases, but the reference could lead a purchaser to believe the Senior Noteholders did not possess a lien on the Hausser Lease.

Finally, even if a third party identified the Hausser Lease, discovered it pertained to land in both Frio and Zavala County, and realized that the error in the Exhibit A reference involved mismatching the two recordings, the third party would not know whether the SN Palmetto Deed granted a lien on all or part of the Hausser Lease.  As previously explained, the Release and Savings Clauses are in conflict.  A third party might reasonably see the mismatched reference and wonder whether the original parties intended to release the Frio or Zavala County portion of the Hausser Lease.  The Court suspects most third parties would recognize the reference as an error.  The Court ought not to rule on its suspicion; under the Statute of Frauds, neither should a third party. Uncertainty persists.

The Harrison & Koenning Leases

For nearly the same reasons as the Hausser Lease, the Harrison and Koenning Leases are not referenced with reasonable certainty.  The reference to the Hausser Lease included Book and Page numbers associated with a recording in a county other than that listed in Exhibit A.  Similarly, the Harrison and Koenning Leases are referenced with Book, Page, and Instrument numbers from different recordings.  This creates the same issues of uncertainty as with the Hausser Lease.  For those reasons, the Harrison and Koenning Leases are not referenced with reasonable certainty.

The Harrison Lease covers property in Dimmit, Webb, and LaSalle County.  (ECF No. 1705-21 at 1).  In Dimmit County, the Harrison Lease is recorded at Book 386, Page 510, Instrument 15055.  (ECF No. 1702-11 at 24).  In Webb County, the Harrison Lease is recorded at Book 2943, Page 294, Instrument 1072987.  (ECF No. 1705-23 at 7).

The SN Catarina Deed, which references the Harrison Lease, does not provide that information with reasonable certainty.  Without referencing the portion of the Harrison Lease in Webb or LaSalle County, that Deed states that the Harrison Lease is located in Dimmit County

and recorded at Book 2943, Page 294, Instrument 1072987.  (ECF No. 1703-5).  That data corresponds with the Harrison Lease recording in Webb County, not Dimmit County.  Exhibit A correctly describes the Harrison Lease as Lease No. T0615001, between Harrison Interests, Ltd., and P Ranch Working Interest, LLC, executed on May 12, 2010.

The Koenning Lease covers property in DeWitt and Gonzales County.  (ECF No. 1705-25 at 1).  In DeWitt County, the Koenning Lease is recorded at Book 434, Page 1, Instrument 89879. (ECF No. 1705-25 at 3).  In Gonzales County, the Koenning Lease is recorded at Book 999, Page 837, Instrument 239874.  (ECF No. 1705-25 at 1).

Like the Hausser Lease, the Koenning Lease is referenced in Exhibit A of the SN Palmetto Deed.  The SN Palmetto Deed does not reference the Koenning Lease with reasonable certainty. The Deed makes no mention of the portion of the Koenning Lease in Gonzales County.  However, that SN Palmetto Deed states that the Koenning Lease is recorded in DeWitt County at Book 999, Page 837, Instrument 239874.  (ECF No. 1703-17 at 25).  That data corresponds with the Koenning Lease recording in Gonzales County, not DeWitt County.  Exhibit A correctly describes the Harrison Lease as Lease No. T0463045, between Roy Allen Koenning, and EOG Resources, Inc., executed on February 10, 2009, and expiring on February 10, 2014.  (ECF No. 1703-17 at 25).

As with the Hausser Lease, a subsequent purchaser has no way to know what reference data for the Harrison and Koenning Leases are correct and what are false.  Exhibit A states that the Harrison Lease is in Dimmit County and the Koenning Lease is in DeWitt County.  A search of the Dimmit and DeWitt County records, utilizing *all* of the information provided in Exhibit A, would not reveal either Lease.  (*See* ECF No. 1733 at 116-18, 127).  Thus, the references to both the Harrison and Koenning Leases do not provide "reference[s] to some other existing writings," consisted with the Statute of Frauds.  *Long Trusts*, 222 S.W.3d at 416.

The Court's reasonable certainty analysis for the Harrison and Koenning Leases is identical to the Hausser Lease, with one small exception. Because the Book, Page, and Instrument numbers are all correct in Webb and Gonzales County, respectively, a search in those counties would reveal the Harrison and Koenning Leases. However, nothing in Exhibit A discloses that those counties are associated with the Leases. Exhibit A offers no specific indication that the Harrison Lease includes land in Webb County or that the Koenning Lease includes land in Gonzales County. Only the headers and footers might cause a subsequent purchaser to search in Webb or Gonzales County. A subsequent purchaser would be forced to scour the counties listed in the headers of the Deeds, as well as the other counties appearing in Exhibit A, before locating either the Harrison or Koenning Lease. Again, even after locating the Leases, a subsequent purchaser would not be certain whether portions of the Harrison or Koenning Leases were released from the liens. Even though the Book, Page, and Instrument numbers would be correct if a search were undertaken in Webb and Gonzales County, the documents refer to Dimmit and DeWitt Counties. A subsequent purchaser would need to engage in a random multi-county record search before discovering the Harrison or Koenning Lease. The Statute of Frauds demands more certain references. No portions of the Harrison and Koenning Leases are referenced with reasonable certainty.

The Pilgrim Lake Lease

The Pilgrim Lake Lease presents a distinct issue from those in the Hausser, Harrison, and Koenning Leases. Unlike those Leases, Exhibit A of the SN Palmetto Deed accurately references the Pilgrim Lake Lease Memorandum. The Pilgrim Lake Lease Memorandum states that it covers land in Gonzales County, the Memorandum was recorded in Gonzales County, and the SN

Palmetto Deed references that Gonzales County recording.  However, Exhibit A of the Pilgrim Lake Lease Memorandum also describes land in DeWitt County.[5]  (ECF No. 1705-29 at 5).

The Pilgrim Lake Lease Memorandum states that it describes a lease "covering lands located in Gonzales County, Texas, as more particularly described on Exhibit A attached hereto . . . ."  (ECF No. 1705-29 at 1).  The main body of the Memorandum contains no other description of the property besides the referral to Exhibit A.  Exhibit A includes a bold heading which again references only Gonzales County.  (ECF No. 2705-29 at 5 ("Attached to and made part of Memorandum of Oil and Gas Lease dated August 25th, 2008, between Pilgrim Lake, Ltd., as Lessor, and SEP Holdings II, LLC, Lessee, covering lands located in Gonzales County, Texas.")).  However, the first sentence of the property description describes land "situated in Gonzales and DeWitt Counties, being more particularly described in the following ten tracts . . . ."  (ECF No. 2705-29 at 5).

Although the omission of DeWitt County from the body of the Pilgrim Lake Lease Memorandum is initially misleading, the actual property description is not.  Exhibit A of the Memorandum conspicuously mentions DeWitt County at the beginning of the property description, and then goes on to describe a 242.6-acre tract of land in DeWitt County.  (ECF No. 1705-29 at 5-6).  A subsequent purchaser following the reference in Exhibit A of the SN Palmetto Deed would have no difficulty locating the Pilgrim Lake Lease Memorandum.  After locating the Memorandum, Exhibit A of that document leaves no doubt that the Pilgrim Lake Lease covers one tract of land in DeWitt County.  The SN Palmetto Deed references the Pilgrim Lake Lease

---

[5] While Exhibit A of the Pilgrim Lake Lease Memorandum describes land in both Gonzales and DeWitt County, only a small proportion of the lands are located within DeWitt County.  (*See* ECF No. 1705-29 at 5-7).  The Pilgrim Lake Lease covers ten tracts of land, totaling "9,453.97 acres, more or less."  (ECF No. 1705-29 at 5).  Only Tract 8, covering "242.67 acres, more or less," concerns land in DeWitt County.  (ECF No. 1705-29 at 6).

Memorandum with reasonable certainty, and the Memorandum describes the property with reasonable certainty.

The more serious concern is whether a subsequent purchaser would believe that the Release Clause of the SN Palmetto Deed released the portion of the Pilgrim Lake Lease in DeWitt County. The Court is persuaded that a subsequent purchaser would understand that Sanchez and the Senior Noteholders did not intend to release the acreage in DeWitt County. The portion of the Pilgrim Lake Lease within DeWitt County amounts to less than 3% of the total acreage. The omission of DeWitt County occurs in the main body of the Lease Memorandum. It does not stem from the SN Palmetto Deed of Trust. A reasonable person inspecting the Lease Memorandum would recognize that the omission of DeWitt County likely derived from the fact that the overwhelming majority of the Pilgrim Lake acreage is found within Gonzales County. The Release Clause does not release liens on the portion of the Lease in DeWitt County.

The Briscoe Ranch Lease

Located in Dimmit and LaSalle County, the Briscoe Ranch Lease is referenced with reasonable certainty in Exhibit A of the SN Maverick Deed. Exhibit A lists the Briscoe Ranch Lease twice. (ECF No. 1703-10 at 25, 31). The first listing references the original Briscoe Ranch Lease Memorandum ("First Briscoe Ranch Memorandum"), recorded in Dimmit County. The First Briscoe Ranch Memorandum does not contain an adequate description of the property. However, the second listing references a subsequent Briscoe Ranch Lease Memorandum ("Second Briscoe Ranch Memorandum"), recorded in LaSalle County. The Second Briscoe Ranch Memorandum does describe the Briscoe Ranch Lease with reasonable certainty. The Creditor Representative argues that because an attachment to the Second Briscoe Ranch Memorandum is unsigned, it does not describe the property with reasonable certainty. However, the Creditor

Representative's issue relates to the validity of that attachment, not whether the attachment sufficiently describes the property.

Both Briscoe Ranch Lease references in the SN Maverick Deed are accurate. The first listing describes the First Briscoe Ranch Memorandum. That document does not include any description of the property. (ECF No. 1705-17). Instead, it references a July 11, 1971 deed recorded at Book 167, Page 87 in LaSalle County and Book 148, Page 92 in Dimmit County. (ECF No. 1705-17 at 3). No such deed is recorded in either of those locations. While the SN Maverick Deed accurately references the First Briscoe Ranch Memorandum, neither that Memorandum nor the documents it purports to reference contain any property description. Thus, the first reference to the Briscoe Ranch Lease fails the Statute of Frauds.

However, the second listing in Exhibit A makes up for the deficiencies in the first listing. The second listing correctly describes a recording of the Second Briscoe Ranch Memorandum. (ECF No. 1703-10 at 31). An attachment to the Second Briscoe Ranch Memorandum contains an adequate property description, but the attachment is unsigned. (ECF No. 1705-19 at 3). Whether the lack of signatures memorializing the amendment impacts the validity of the Second Briscoe Ranch Memorandum, the Second Memorandum includes an adequate property description.

If anything, the unsigned alterations put a subsequent purchaser on notice of a potential defect in Sanchez's title to the Briscoe Ranch Lease. The validity of Sanchez's title to the Lease is a distinct issue from the sufficiency of the property description. Viewing Exhibit A of the SN Maverick Deed, as well as the Second Briscoe Ranch Memorandum, a subsequent purchaser would have no difficulty determining the property location of the Briscoe Ranch Lease. The Second Briscoe Ranch Memorandum describes the Briscoe Ranch Lease with reasonable certainty, and Exhibit A accurately references the Second Briscoe Ranch Memorandum.

<u>The Metcalf Lease</u>

The Metcalf Lease is referenced with reasonable certainty. The Original Metcalf Lease was subsequently amended, and both the Original and Amended Metcalf Leases were recorded in Dimmit County. The Creditor Representative complains that the reference to the Metcalf Lease in Exhibit A of the SN Maverick Deed refers to the Original Metcalf Lease instead of the Amended Lease. (ECF No. 1659 at 22). The parties do not dispute that the reference to the Original Metcalf Lease is entirely correct. The reference describes the Metcalf Lease with reasonable certainty because after locating the Original Metcalf Lease, a subsequent purchaser would be on inquiry notice of the Amended Metcalf Lease.

b. *Deeds of Trust with Uncertain Reference Descriptions are Voidable*

Because the Hausser, Harrison, and Koenning Leases are not referenced with reasonable certainty, the Deeds of Trust formed voidable liens on those properties. The Senior Noteholders argue that a conveyance which does not describe or reference property with reasonable certainty is void *ab initio*. While courts sometimes refer to such conveyances as "void," case law makes clear that those conveyances are merely voidable by certain parties. As between the original parties, the Deeds of Trust were not void. Extrinsic evidence could be introduced to show the property intended to be conveyed.

The Senior Noteholders cite *Long Trusts* as holding that a deed of trust that fails the Statute of Frauds is void. (*E.g.*, ECF No. 1731 at 29). Specifically, the Senior Noteholders quote *Long Trusts* for the proposition that a conveyance that does not comply with the Statute of Frauds is "void for uncertainty of description." (ECF No. 1731 at 29). That quotation mischaracterizes the *Long Trusts* court's holding. The quotation is a snippet of an explanatory parenthetical found in a citation to *Smith v. Sorelle*, 87 S.W.2d 703, 705 (Tex. 1935). *Long Trusts*, 222 S.W.3d at 416.

The full quotation from *Smith* reads "[a] deed purporting to convey land, which describes it only by quantity and as being part of a larger tract, with nothing whereby to identify what specific portion of the larger tract is intended to be conveyed, is void for uncertainty of description." *Id.* That parenthetical appeared within a discussion of whether certain agreements complied with the Statute of Frauds. *See id.* The *Long Trusts* court was not determining the effect of noncompliance. *See id.* The *Long Trusts* holding was merely that the agreements were "*unenforceable* under the Statute of Frauds," not that those agreements were void. *See id* (emphasis added).

The Fifth Circuit has also explicitly stated that a contract which is "voidable under the statute of frauds . . . is neither void nor illegal." *Southmark Corp. v. Life Inv'rs, Inc.*, 851 F.2d 763, 772 n.14 (5th Cir. 1988). Other Texas courts are in line with that reasoning. *Mason v. Abel*, 215 S.W.2d 377, 381 (Tex. Civ. App.—Dallas 1948) ("A verbal contract to sell or purchase real estate is not void—but merely voidable—in suits to enforce performance."); *Harding Co. v. Sendero Res., Inc.*, 365 S.W.3d 732, 746 n.28 (Tex. App. 2012) ("The statute of frauds merely renders such a contract voidable and unenforceable against an objecting party.").

The Court of Appeals of Texas has held that a deed without proper signatures is "void *ab initio*." *Sanchez v. Telles*, 960 S.W.2d 762, 768 (Tex. App.—El Paso 1997) (emphasis added). However, an unsigned deed is distinguishable from one with an uncertain reference. As the *Sanchez* court noted, that unsigned deed "never should have been recorded." *Id.*

In *Reiland*, the court did state that a conveyance with an insufficient description is "void under the statute of frauds." 213 S.W.3d at 437. However, the court clarified that such a deed cannot "support an action for specific performance or a suit for damages for a breach of contract." *Id.* The court's clarification suggests that a deed failing the Statute of Frauds is unenforceable, not void *ab initio*.

The distinction is supported by the Supreme Court of Texas' decision in *Lowe v. Ragland*, 297 S.W.2d 668 (Tex. 1957). There, the court noted "the general rule . . . that an ineffective instrument may yet have some effect on a later valid instrument which refers to it." *Id.* at 671. If a faulty conveyance was void *ab initio*, it is as if the conveyance never happened. In that case, a void conveyance could not possibly have "some effect on a later valid instrument." *See id.* The general rule stated in *Lowe* could never come to pass. The better view is that a conveyance in violation of the Statute of Frauds is unenforceable. That view comports with *Lowe* because an unenforceable instrument might still have legal significance under certain circumstances, or it might be cured at a later date.

Texas and Fifth Circuit case law shows that the liens on the Hausser, Harrison, and Koenning Leases were voidable. The liens were subject to defenses under the Statute of Frauds. A trustee in bankruptcy may assert such defenses.

A bankruptcy trustee may avoid any transfer which, under applicable non-bankruptcy law, would be avoidable by a bona fide purchaser. *See* 11 U.S.C. § 544(a)(3). Texas defines a bona fide purchaser as "one who acquires (apparent) legal title to property in good faith for a valuable consideration without . . . notice of an infirmity in the title." *Realty Portfolio, Inc. v. Hamilton (In re Hamilton)*, 125 F.3d 292, 298 (5th Cir. 1997). "Although it is a general rule that a stranger to a contract cannot invoke the statute of frauds . . . the courts uniformly hold that the purchaser may assert the defenses which its grantor had." *'Moore' Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.3d 934, 938-39 (Tex. 1972). Thus, subsequent purchasers have successfully invoked the Statute of Frauds. *Reiland*, 213 S.W.3d at 438.

In Texas, transactions that fail the Statute of Frauds are voidable by a bona fide purchaser. *See*, *e.g.*, *'Moore' Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.3d 934, 939 (Tex. 1972). The

Texas Property Code states that "[a] conveyance of . . . an interest in real property or a mortgage or deed of trust is void as to a creditor or a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law."  Tex. Prop. Code § 13.001(a).  "[A]n improperly recorded instrument is not sufficient to trigger a duty of reasonable inquiry."  *In re Santoyo*, 540 B.R. 284, 291 (Bankr. S.D. Tex. 2015).  Further, "[t]o impose a duty to investigate defective instruments would negate entirely the requirements for proper recordation as set forth in the Texas Property Code."  *Id.*

A bona fide purchaser would not be on inquiry notice of the purported liens on the three remaining Challenged Leases because the Leases are not sufficiently referenced by the Deeds of Trust.

### c.   *The Correction Affidavits may be Avoidable Preferences*

The Correction Affidavits cured the reference errors to the three remaining Challenged Leases and added recording references for all of the counties where the Leases are located.  Thus, the Correction Affidavits resolved the errors in the Deeds of Trust, making those Deeds compliant with the Statute of Frauds as to the remaining Challenged Leases.  Because the Correction Affidavits constituted transfers of Sanchez's property within ninety days of the bankruptcy petition, they may be avoidable preferences.

The Bankruptcy Code allows a trustee to avoid preferential transfers.  11 U.S.C. § 547.  A preference is a "transfer of an interest of the debtor in property," made for the benefit of a creditor, on account of an antecedent debt, while the debtor was insolvent, within ninety days of the petition, and which enabled the creditor to receive more than it would receive in a chapter 7 liquidation.  11 U.S.C. § 547(b).

Liens on the three remaining Challenged Leases were perfected when the Correction Affidavits were filed.  The Correction Affidavits are considered transfers of Sanchez's property.  The grant of a lien is a transfer of a debtor's property.  11 U.S.C. § 101(54)(A).  Under the Bankruptcy Code, the transfer is made when the lien is perfected.  11 U.S.C. § 547(e) ("For the purposes of this section . . . a transfer is made (B) at the time such transfer is perfected, if such transfer is perfected after such 30 days.").  A transfer is perfected when "a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee."  *Id.*

Under § 547(e), "a transfer is 'perfected' only when the secured party has done all the acts required to perfect its interest, not at the moment as of which state law may retroactively deem that perfection effective.  *Fid. Fin. Servs., Inc. v. Fink*, 522 U.S. 211, 216 (1998).  The Supreme Court made clear that "Congress did not intend state relation-back provisions or grace periods to control a trustee's power to avoid preferences."  *Id.* at 217.  As to the remaining Challenged Leases, because perfection occurred when Cinco filed the Correction Affidavits, transfers also occurred at that time.

The transfers plainly benefitted the Senior Noteholders.  The Senior Noteholders discovered flaws in the lease schedules and sought to solidify their position ahead of Sanchez's bankruptcy by filing the Correction Affidavits.  The Correction Affidavits state on their face that they benefit RBC as the Collateral Trustee for the Senior Noteholders.  (*E.g.*, ECF No. 1703-21 at 1).

Sanchez did not provide any new consideration for the Correction Affidavits. In fact, Sanchez declined to file the Correction Affidavits on the Senior Noteholder's behalf.  The Correction Affidavits were filed and made on account of an antecedent debt.

The earliest Correction Affidavit was filed forty-six days before Sanchez filed its bankruptcy petitions.  That falls well within the ninety-day preference period.  *See* 11 U.S.C. § 547(b)(4)(A).  A debtor is also presumed insolvent during the ninety-day period before bankruptcy.  11 U.S.C. § 547(f); *see In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 367 (5th Cir. 2002).  The Correction Affidavits were filed within the preference window.

Finally, the Correction Affidavits likely allowed the Senior Noteholders to receive more than they would have in a hypothetical chapter 7 liquidation.  Although valuation issues are reserved for Phase 3, the Correction Affidavits improved the Senior Noteholders' position with respect to the Challenged Leases.  Courts often consider such an improvement in position when determining whether a preferential transfer enabled a creditor to receive more than it would in a liquidation.  *Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1040 (5th Cir. 1987).  Based on the improvement of the Senior Noteholders' position and Sanchez's presumption of insolvency, in Phase 3, the Creditor Representative may show that the Correction Affidavits allowed the Senior Noteholders to receive more than they would have in a liquidation.

For those reasons, the Correction Affidavits may have been avoidable transfers.  Whether Sanchez was insolvent at the time the Correction Affidavits were filed and whether the Correction Affidavits allowed the Senior Noteholders to receive more than they would have in a liquidation are questions reserved for Phase 3.  If a trustee set aside the Correction Affidavits, the three remaining Challenged Leases would have been subject to voidable liens on the petition date.  Because the Hausser, Harrison, and Koenning Leases were encumbered by voidable liens, they were not unencumbered property.  Thus, those Leases did not become DIP Collateral.  The Creditor Representative, asserting a trustee's status as a hypothetical bona fide purchaser, may set aside the liens on the three remaining Challenged Leases.

### d.  Adequate Protection

The Creditor Representative also seeks to claw back adequate protection payments made to the Senior Noteholders during the Sanchez bankruptcy.  The Creditor Representative claims that, based on the stipulated Sanchez enterprise value at the time of confirmation, the Senior Noteholders were massively under-secured.  The Court has not seen any evidence regarding valuation at this Phase of the Lien-Related Litigation.  Valuation issues are reserved for Phase 3.

However, the Senior Noteholders' response challenged the Creditor Representative's standing to pursue claw backs of the adequate protection payments.  That argument has no merit. The Plan grants the Creditor Representative standing to pursue the Lien-Related Litigation.  (ECF No. 1205 at 27).  The plan defines Lien-Related Litigation to include "*adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution of value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order).*"  (ECF No, 1205 at 10 (emphasis added)).  Pursuant to the confirmed plan, the Creditor Representative has standing to pursue claw backs of adequate protection payments.  The substance of the Creditor Representative's adequate protection challenge is reserved for the next Phase of this litigation.

CONCLUSION

A separate order will be entered.

SIGNED 03/09/2021

Marvin Isgur
United States Bankruptcy Judge