

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
03/10/2021

| | | |
|---|---|---|
| IN RE: | § | |
| SANCHEZ ENERGY CORPORATION, *et al* | § § § | CASE NO: 19-34508 |
| SN PALMETTO, LLC | § § | CASE NO: 19-34509 |
| SN MARQUIS LLC | § § | CASE NO: 19-34510 |
| SN COTULLA ASSETS, LLC | § § | CASE NO: 19-34511 |
| SN OPERATING, LLC | § § | CASE NO: 19-34512 |
| SN TMS, LLC | § § | CASE NO: 19-34513 |
| SN CATARINA, LLC | § § | CASE NO: 19-34514 |
| ROCKIN L RANCH COMPANY, LLC | § § | CASE NO: 19-34515 |
| SN EF MAVERICK, LLC | § § | CASE NO: 19-34516 |
| SN PAYABLES, LLC | § § | CASE NO: 19-34517 |
| SN UR HOLDINGS, LLC, | § § | CASE NO: 19-34518 |
| Debtors. | § § § | Jointly Administered |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

After filing for bankruptcy, Nabors contracted with Sanchez to provide drilling services for agreed terms. Headwinds blew, and Sanchez suspended its drilling program prior to the conclusion of the terms. Nabors now moves for an allowed administrative claim equal to the contractual daily standby rates incurred between the suspension of drilling and the end of its contract terms. Sanchez objects. The standby rates are authorized by the contracts and enforceable under Texas law. Because Sanchez entered the contracts post-petition and the estate benefitted from Nabors' services, the administrative expense claim is allowed.

**BACKGROUND**

Sanchez Energy Corporation engaged in oil and gas production and exploration. To operate its business, Sanchez regularly contracted with other parties to provide drilling services. Nabors Drilling Technologies USA, Inc. was one such party. Sanchez and its affiliates filed chapter 11 bankruptcy petitions on August 11, 2019. (ECF No. 1). Post-petition, Sanchez and Nabors entered into or amended certain drilling agreements requiring Nabors to provide drilling equipment and services. Due to unfavorable market conditions, Sanchez suspended its drilling program and stopped using Nabors' services.

The Court confirmed the Sanchez plan of reorganization on April 30, 2020. (ECF No. 1212). The plan became effective on June 30, 2020. (ECF No. 1417). On June 3, 2020, Nabors filed its Motion for Allowance of Administrative Expense Claims Pursuant to 11 U.S.C. § 503(b)(1)(A) & 507(a)(2) ("Motion"). (ECF No. 1296). The Motion seeks administrative priority for three categories of sums due under the post-petition drilling agreements. First, the Motion sought $1,266,268.48 for equipment and services provided under the drilling agreements. (ECF No. 1589 at 3). Sanchez paid that amount in full on July 9, 2020. (ECF No. 1589 at 3). Second, the Motion sought to re-bill amounts for equipment and services totaling $70,852.48. (ECF No. 1589 at 3). Sanchez paid portions of the re-bill amounts on July 9, 2020 and July 23, 2020. (ECF No. 1589 at 3). The re-bill amounts are now paid in full. The third category, at issue in this opinion, is Nabors' claim for $1,224,366.00 concerning standby and early termination fees incurred after Sanchez suspended drilling in March 2020. (ECF No. 1589 at 3).

On December 19, 2017, prior to the petition date, Sanchez and Nabors entered into a Master Drilling Agreement. (ECF No. 1589 at 7). The Master Drilling Agreement provided a framework for Nabors to provide drilling services pursuant to work orders. (ECF No. 1589 at 7). The Master

Drilling Agreement did not obligate either party to perform until such time as a work order was issued. (ECF No. 1589 at 7).

The parties entered into Work Order No. WOA-D19-008, concerning Nabors Rig X-23 ("Rig X-23"), on February 28, 2019. (ECF No. 1589 at 7). On September 4, 2019, after Sanchez filed for bankruptcy, the Rig X-23 Work Order was amended. (ECF No. 1589 at 8). The amendment extended the primary term of the Rig X-23 Work Order until February 29, 2020, and reduced the standby day rate (without crews) to $20,060.00 per day. (ECF No. 1589 at 8). The standby day rate is a daily rate due under the contract on days when regular drilling activity does not occur. A second amendment was signed on October 11, 2019, which further reduced the standby day rate to $18,551.00 per day. (ECF No. 1589 at 9). On February 3, 2020, the parties signed a third amendment, extending the term of the Rig X-23 Work Order until March 30, 2020. (ECF No. 1589 at 9).

On October 12, 2019, the parties entered Work Order No. WOA-D19-065, concerning Nabors Rig X-41 ("Rig X-41"). (ECF No. 1589 at 7). The Rig X-41 Work Order had a primary term through May 15, 2020. The operating day rate and early termination fee was $21,825.00 per day, and the standby day rate (without crews) was $18,551.00 per day. (ECF No. 1589 at 8).

In late February and early March 2020, the COVID-19 pandemic and an oil price dispute between Russia and Saudi Arabia caused significant disruption in hydrocarbon markets. As a result, Sanchez suspended its drilling program. At the time, Rig X-23 was deployed at the Piloncillo E37HD well site and Rig X-41 was located at the Diamond H Ranch 13 HA well site. (ECF No. 1589 at 9).

Sanchez informed Nabors on February 29, 2020 that Rig X-23 would not be extended and would be released. (ECF No. 1589 at 10). On March 13, 2020, Nabors began rigging down Rig

X-23. (ECF No. 1589 at 9). Nabors removed Rig X-23 from the Piloncillo E37HD well site and placed it in Nabors' yard in Pleasanton, Texas on March 17, 2020. (ECF No. 1589 at 9). Pleasanton is located about 113 miles from the Piloncillo E37HD well site. (ECF No. 1589 at 9). Rig X-23 never returned to any of Sanchez's well sites. (ECF No. 1589 at 9).

On March 14, 2020, Rig X-41 began rigging down. (ECF No. 1589 at 9). Sanchez informed Nabors that Rig X-41 would be placed on standby (without crews) on March 16, 2020. (ECF No. 1589 at 10). Rig X-41 was removed from the Diamond H Ranch 13 HA well site on March 22, 2020. (ECF No. 1589 at 9). Like Rig X-23, Rig X-41 returned to Nabors' yard in Pleasanton, approximately 96 miles from the Diamond H site. (ECF No. 1589 at 9). Sanchez never recalled Rig X-41. (ECF No. 1589 at 9).

Sanchez paid Nabors the full amounts owed for demobilizing both Rig X-23 and Rig X-41. (ECF No. 1589 at 10). On April 13, 2020, Nabors invoiced Sanchez for early termination fees in the amounts of $240,075.00 for Rig X-23 and $1,222,200.00 for Rig X-41. (ECF No. 1589 at 10-11). Those invoices were revised on April 28, 2020. (ECF No. 1589 at 11). Nabors calculated the revised invoices by using the standby fee (without crew) rates and sought $185,510.00 for Rig X-23 and $1,038,856.00 for Rig X-41. (ECF No. 1589 at 11).

Nabors filed the Motion on June 3, 2020. (ECF No. 1296). Sanchez filed an objection on July 6, 2020. (ECF No. 1441). The Court held a hearing and took the matter under advisement.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The allowance of administrative claims is a core matter pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

Nabors seeks allowance and payment of its final invoices for Rig X-23 and Rig X-41 as priority administrative expenses. "Under § 507(a), administrative expenses are given priority over all other unsecured claims, other than domestic support obligations and certain trustee expenses not relevant in this case." *In re Am. Coastal Energy, Inc.*, 399 B.R. 805, 808 (Bankr. S.D. Tex. 2009). Section 503(b) of the Bankruptcy Code sets out the requirements of allowed administrative expense claims against the estate. In a chapter 11 case, the debtor is generally required to pay administrative expenses in full on the effective date of the plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A). Accordingly, Article II.A of the Debtor's confirmed plan requires full payment of allowed secured administrative claims.

Administrative expenses include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). To qualify under § 503(b)(1)(A), an expense "must have been of benefit to the estate and its creditors." *Tex v. Lowe (In re H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998). "The benefit requirement is not an additional element to a § 503(b)(1)(A) claim, but rather a means for testing whether an expense is truly 'necessary.'" *In re Am. Coastal Energy*, 399 B.R. at 809 (quoting *In re H.L.S. Energy*, 151 F.3d at 437).

"The policy behind allowing administrative expense priority is to provide an incentive for creditors and vendors to continue doing business with the debtor in possession." *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *3 (Bankr. S.D. Tex. March 18, 2014) (citing *In re Summit Metals, Inc.*, 379 B.R. 40, 56-57 (Bankr. D. Del. 2007)). "Absent this incentive, third parties would be far more inclined to refrain from dealing with a debtor in bankruptcy, thereby harming other creditors." *Id.*

Ordinarily, a written post-petition agreement between a debtor-in-possession and a creditor constitutes inducement by the debtor in-possession. *In re Whistler Energy II, LLC*, 931 F.3d 432, 442 (5th Cir. 2019) (citing *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1509 (11th Cir. 1985)). "This requires paying the full and ordinary cost of such goods and services, including overhead and incidental expenses. Absent full payment, creditors would have little incentive to do business with the debtor-in possession. If a debtor-in-possession decides to rent equipment for its business, for example, it cannot later evade those rental payments by asserting that it did not end up needing the equipment after all." *Id.* at 444.

This Court has previously found that a bankruptcy estate benefits from "downtime charges" owed under a post-petition drilling contract during weather and other delays where drilling was temporarily suspended. *In re ATP Oil & Gas*, 2014 WL 1047818, at *8-9. The benefit requirement did not permit "the [d]ebtor to argue ex post that certain costs incidental to providing beneficial services [did not] relate to a direct benefit to the estate." *Id.* at *9. The Court likened the downtime charges to post-petition payments of insurance premiums because even if the debtor never receives insurance proceeds the insurance coverage benefits the estate. *Id.* Insurance coverage would be unavailable to the debtor without payment of the premiums. *Id.*

Sanchez argues that charging the standby rates is inappropriate because both Rigs were decommissioned and removed from Sanchez's well sites for the remainder of the Work Order terms. Following their removal, Sanchez claims that the Rigs were no longer on standby. Sanchez acknowledges that standby fees are generally compensable as part of an administrative claim. However, Sanchez claims that after suspending its drilling program, Nabors was no longer induced "to continue to provide rig availability." (ECF No. 1441 at 1). Therefore, Rig X-23 and X-41 ceased to benefit the estate.

In *Wagner & Brown v. E.W. Moran Drilling Co., Inc.*, 702 S.W.2d 760 (Tex. App. 1986), the Court of Appeals of Texas applied a standby rate after a drill was removed from its drill site before the end of the contract term. The contract at issue provided that "the contractor go[] to the location with his rig and [be] paid for every day that the rig is there . . . . The term day-work contract provides for a specific amount of time during which the contractor receives payment for services." *Id.* at 769. The term of the contract was 550 days. *Id.* at 765. Due to a downturn in oil and gas markets, Wagner & Brown ordered the contractor to cease drilling operations. *Id.* The suspension came with 120 days remaining in the contract term. *See id.* After drilling stopped, the contractor removed the drill from the well site and it was not utilized again by Wagner & Brown. *Id.* The contractor continued to tender regular monthly invoices, calculated using the daily contractual standby rate, for the remaining 120 days of the contract term. *Id.*

While the issue on appeal dealt with the proper starting date of the 550-day contract term, the *Wagner & Brown* court made clear that Wagner & Brown owed the contractor the daily rate for all 550 days. *Id.* at 766. Any construction of the contract that cut short the 550-day period would have been inconsistent "with the apparent intent of the parties. Any other construction would render the term conditions meaningless." *Id.* at 767. *Wagner & Brown* demonstrates that drilling contractors rely on the specific period of time during which they agree to provide their services. *Id.* at 769.

Here, Sanchez induced Nabors to perform post-petition services by entering into or amending the Work Orders for Rigs X-23 and X-41 after filing for bankruptcy. Nabors' post-petition services benefitted the estate because the availability of the Rigs helped allow Sanchez to satisfy its annual drilling commitments. If Sanchez failed to honor its drilling commitments, it

might have suffered significant financial penalties.[1]  The availability of the Rigs directly benefitted the estate.  Additionally, Sanchez benefitted from Nabors' agreement to accept lower amended daily standby rates.  Those concessions by Nabors provided a clear benefit to the estate, allowing the estate to procure services and equipment on more favorable terms.  *See Whistler Energy II*, 931 F.3d at 444.

Sanchez realized significant benefits from the availability of Rigs X-23 and X-41.  By contracting with Nabors post-petition, Sanchez secured the exclusive availability of each Rig for the entirety of the contract term.  This helped Sanchez to meet its required drilling obligations.  In return, Sanchez promised to compensate Nabors for both the exclusive use of the Rigs and the services provided.  The standby rates were customary costs under the Master Drilling Agreement.  Sanchez promised, post-petition, to pay those rates.

The fact that Nabors removed both Rigs from the well sites at Sanchez's direction does not mean that the Rigs were no longer on standby.  Nothing in the Master Drilling Agreement or either Work Order required Nabors to leave the Rigs on site.  Sanchez does not cite any authority requiring that rigs remain on site for standby rates to apply.  On the contrary, *Wagner & Brown* upheld standby rates after a rig was removed from the well site.  702 S.W.2d at 765.  Sanchez points out that Nabors' Pleasanton facility was about 100 miles away from each well site, so the Rigs would not have been immediately available for re-deployment.  However, Sanchez has not shown that Nabors would have been unwilling or unable to promptly re-deploy the Rigs to the well sites had Sanchez requested that Nabors do so.  And, if Neighbors failed to re-deploy the Rigs from stand-by, Sanchez would have had a breach of contract suit against Nabors.

---

[1] The Debtor and its affiliates are required to complete sixty wells on a substantial portion of its assets each year, failing which, the Debtor must pay a $200,000.00 penalty per promised but uncompleted well. (ECF No. 1296 at 8).

This Court has previously held that "downtown charges," similar to the standby day rates here, can be entitled to administrative status. *In re ATP*, 2014 WL 1047818 at *3. Sanchez distinguishes *In re ATP* by noting that there, the downtime was only temporary and drilling ultimately resumed. Whereas in this case, drilling never resumed before the work orders expired. For two reasons, the Court cannot accept that argument. First, it is irreconcilable with *Wagner & Brown*, which made clear that the suspension of drilling does not cut short a term drilling contract. 702 S.W.2d at 766. Second, it would allow a hypothetical debtor to escape from post-petition obligations by suspending work prior to the end of a term, then paying cents on the dollar for any outstanding rates or damages. That practice would cause service providers like Nabors to hesitate before agreeing to provide vital post-petition services to future debtors. This harm might impact future debtors' ability to obtain necessary services and cause future creditors to go unpaid after being induced to perform work by the promise of administrative priority.

Nabors is entitled to an allowed administrative claim for the standby day rate charges incurred after Sanchez suspended its drilling program. Texas law supports upholding the terms of the Master Drilling Agreement and Work Orders. To assure that debtors can acquire post-petition services on market terms, bankruptcy law generally requires debtors to honor their post-petition contracts.

## CONCLUSION

A separate order will be entered.

SIGNED 03/09/2021

Marvin Isgur
United States Bankruptcy Judge