United States Bankruptcy Court
Southern District of Texas
**ENTERED**
July 22, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 19-34508 |
| **SANCHEZ ENERGY CORPORATION,** *et al.*, | § § | |
| Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

In Phase 3 of the Lien-Related Litigation, the Creditor Representative and DIP Lenders alerted the Court to outstanding Phase 1 issues. The Court delayed the evidentiary portion of the Phase 3 hearing to assess these Phase 1 issues, including the definition of "proceeds" in the Final DIP Order and whether the DIP Lenders have liens under Section 10(b) of the Final DIP Order. For the reasons set forth below, the "proceeds" of Avoidance Actions include "property recovered or unencumbered." Neither Sections 10(a) nor 10(c) grant liens on the proceeds of Avoidance Actions. The DIP Lenders do have liens under Section 10(b), but the applicability of those liens to the proceeds of Avoidance Actions cannot be determined unless there is an avoidance under § 550 of the Bankruptcy Code. If there is an avoidance, the value of the Section 10(b) liens, if any, may depend on the Creditor Representative's election of remedies.

## BACKGROUND

Prior to the petition date, Sanchez Energy Corporation granted certain Senior Noteholders a first-priority lien on substantially all of its assets, including deeds of trust on the Hausser, Harrison, and Koenning oil and gas leases (the "HHK Leases" and the "Senior Noteholders HHK Liens"). (ECF No. 1847 at 2). Several deeds of trust, including those pertaining to the HHK Leases, contain inaccuracies. (ECF No. 1847 at 16). The Senior Noteholders engaged Cinco

Energy Management Group to file Correction Affidavits for those deeds of trust in June and July 2019.  (ECF No. 1847 at 16–17).

On August 11, 2019, Sanchez and its affiliates filed petitions under chapter 11 of the Bankruptcy Code.  (ECF No. 1).  Certain Senior Noteholders agreed to provide debtor-in-possession ("DIP") financing (the "DIP Lenders"), which the Court approved on January 22, 2020 via the Final DIP Order.  (ECF Nos. 865; 1847 at 3).  Specifically, the Final DIP Order approves access to "a $200 million superpriority, priming, senior secured delayed-draw term loan credit facility including $150 million in New Money Loans and $50 million in Roll-Up Loans." (ECF Nos. 1486 at 12; 865 at 2).

The Final DIP Order grants the DIP Lenders certain superpriority claims.  (ECF No. 865 at 20).  Under Section 9(a), "all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties."   (ECF No. 865 at 20).  The DIP Obligations are the "DIP loans made to and guarantees issued by the Loan Parties . . . and . . . any Loan Obligations (as defined in the DIP Credit Agreement) of the Loan Parties . . . ." (ECF No. 865 at 10–11).  The "Loan Parties" are Sanchez and certain subsidiaries.  (*See* ECF No. 865 at 2).

Section 9(b) states:

> Notwithstanding anything in paragraph 9(a) to the contrary (but, for the avoidance of doubt, without limiting the payment priority of the First-Out Obligations), the DIP Superpriority Claims shall have no recourse to the Loan Parties' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions (collectively, "**Avoidance Actions**") or the proceeds thereof, except that the DIP Superpriority Claims shall have recourse (subject to paragraph 14 and solely with respect to New Money Loans) to up to fifty percent (50%) of each dollar of the first $100 million of proceeds or property recovered or unencumbered by Avoidance Actions against parties other than the Prepetition Secured Parties (in their capacities as such) (such amount of proceeds or property, the "**Available Avoidance Proceeds**").

(ECF No. 865 at 21).

Broken into its constituent parts, Paragraph 9(b) establishes that:

- With one exception, the holders of DIP superpriority claims have no recourse to Avoidance Actions;

- The holders of DIP superpriority claims have recourse against 50% of the first $100 million of proceeds or property recovered or unencumbered by Avoidance Actions against parties other than the Senior Noteholders;

- Proceeds or property recovered by Avoidance Actions against parties other than the Senior Noteholders are "Available Avoidance Proceeds"; and

- The DIP superpriority claims are not payable from any portion of the Available Avoidance Proceeds with respect to Roll-Up DIP Obligations.

The Final DIP Order separately grants the DIP Lenders certain liens against property of Sanchez and certain subsidiaries as collateral for the DIP financing (the "DIP Collateral"). (ECF No. 865 at 22). These liens are defined in Sections 10(a), 10(b), and 10(c). (ECF No. 865 at 22).

Section 10(a) identifies the unencumbered property that will secure the DIP Obligations:

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to either (x) valid, perfected and non-avoidable liens as of the Petition Date, or (y) valid and non-avoidable liens in existence at the time of the Petition Date that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), in each case other than the Avoidance Actions and proceeds thereof (except, with respect to New Money Loans, the Available Avoidance Proceeds).

Broken into its constituent parts, unencumbered property:

- Includes property that, as of the petition date, was not subject to valid, perfected, and non-avoidable liens;

- Includes property that, as of the petition date, was not subject to valid and non-avoidable liens that were perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code;

- Excludes Avoidance Actions;

- Excludes the proceeds of Avoidance Actions.[1]

In Section 10(b), the Final DIP Order provides a priming lien on certain property that was already secured by certain prepetition liens:

> [A] valid, binding, continuing, enforceable, fully-perfected senior priming security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party, whether existing on the Petition Date or thereafter acquired, that secure the obligations of the Loan Parties under the Secured Notes Indenture (the "**Primed Liens**"), *provided* that such DIP Liens shall be junior to (i) the First-Out Obligations, (ii) valid and perfected Permitted Liens that were senior to the Prepetition Liens as of the Petition Date, and (iii) valid and non-avoidable liens in existence at the time of the Petition Date that are perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code.

(ECF No. 865 at 23). The Secured Notes Indenture is the agreement by which the Senior Noteholders acquired the Senior Noteholder HHK Liens. (ECF Nos. 865 at 3–4; 1486 at 9). The DIP Lenders have Section 10(b) liens on property over which the Senior Noteholders had prepetition liens pursuant to the Senior Notes Indenture. (ECF No. 865 at 23). Section 10(b) liens contain no qualifications with respect to Avoidance Actions.[2] (ECF No. 865 at 23).

The Court confirmed the Sanchez chapter 11 plan of reorganization on April 30, 2020. (ECF No. 1212). The plan establishes "Lien-Related Litigation"[3] in order to resolve disputes between the DIP Lenders, Senior Noteholders, and unsecured creditors regarding certain

---

[1] The exception for New Money Loans is not relevant here.

[2] Section 10(c) is not relevant here.

[3] Lien-Related Litigation is defined as "[A]ll litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the [Senior Noteholders] or the priority or scope of the liens and/or claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims . . . (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution of value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 522 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets." (ECF No. 1212 at 36).

challenged leases. Unsecured creditors were permitted to select a "Lien-Related Litigation Creditor Representative." (ECF No. 1212 at 36). The plan grants that Creditor Representative "standing to pursue, prosecute, and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint . . . ."[4] (ECF No. 1212 at 53). Article IV.D of the plan outlines the three phases of the Lien-Related Litigation:

> *Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date . . . to determine the interpretation of the Final DIP Order. . . .
>
> *Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues . . . .
>
> *Phase 3:* If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. . . .

(ECF No. 1212 at 50). In Phase 1, the parties submitted questions of law seeking interpretations of the Final DIP Order. The Court addressed these questions on August 14, 2020. (ECF No. 1599). Among other things, the Court determined that (i) the proceeds of Avoidance Actions "remain in the Creditor Representative's bundle of rights" so long as they are traceable and (ii) the DIP Lenders gave up their rights to the Avoidance Actions except when an Avoidance Action is against parties other than the Senior Noteholders. (ECF No. 1599 at 5). The Court did not precisely address the meaning of "proceeds" in Sections 9 and 10 in the Phase 1 hearing. (*See* ECF No. 1599).

---

[4] The plan defines the term "Lien Challenge Complaint" as "the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057)." (ECF No. 1212 at 36).

In Phase 2, the parties litigated the existence, validity, perfection, and avoidance of liens on certain challenged leases. The Court ruled that the Senior Noteholders HHK Liens are avoidable. (ECF No. 1847 at 38). The Correction Affidavits cured the reference errors in the Senior Noteholders HHK Liens and brought them into compliance with the Statute of Frauds. (ECF No. 1847 at 39). However, the Correction Affidavits constituted transfers of Sanchez's property within 90 days of the bankruptcy petition. (ECF No. 1847 at 39). The Court deferred the determination of whether the Correction Affidavits are preferential transfers to Phase 3. (ECF No. 1847 at 41).

During the Phase 3 oral argument, the Court realized that Phase 1 issues remain. Thus, the Court writes this memorandum opinion to interpret "proceeds" in Sections 9 and 10 of the Final DIP Order. (ECF No. 2365 at 172–73). The Court also reconsiders any Phase 1 statements concerning lien rights pertaining to Avoidance Actions. (ECF No. 2365 at 173).

Additional facts are set forth in the memorandum opinion issued March 9, 2021. (*See* ECF No. 1847).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(K). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 54(b), the Court may revise any order or decision that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" before "the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b). An interlocutory order is any order other than a final order. *QuarterNorth*

*Energy LLC v. Atlantic Mar. Servs. LLC (In re Fieldwood Energy LLC)*, 637 B.R. 712, 715 n.2 (Bankr. S.D. Tex. 2022). A final order is dispositive of the entire case. *Id.* The Phase 1 ruling adjudicated fewer than all the claims of the parties. Thus, the Phase 1 ruling is an interlocutory order.

"The standard of review for reconsideration of interlocutory orders is 'as justice requires.'" *Lexington Ins. Co. v. ACE Am. Ins. Co.*, 192 F. Supp. 3d 712, 714 (S.D. Tex. 2016) (quoting *Contango Operators, Inc. v. U.S.*, 965 F. Supp. 2d 791, 800 (S.D. Tex. 2013)). The Court may reconsider an interlocutory order *sua sponte*. *Oracle Oil, LLC v. EPI Consultants*, 391 F. Supp. 3d 634, 636 n.3 (E.D. La. 2019); *McKethan v. Tex. Farm Bureau*, 996 F.2d 734, 738 n.6 (5th Cir. 1993) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)) ("[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.").

## DISCUSSION

The Court examines two issues: (i) the meaning of "proceeds" in Sections 9 and 10 and (ii) whether the DIP Lenders have Section 10(b) liens.

### I. "PROCEEDS" IN SECTIONS 9 AND 10.

This Court is the proper court to interpret the Final DIP Order. *See, e.g.*, *Colonial Auto Ctr. v. Tomlin (In re Tomlin),* 105 F.3d 933, 941 (4th Cir. 1997) ("The bankruptcy court was in the best position to interpret its own orders."). The Court interprets the Final DIP Order using ordinary principles of contract interpretation. *See VSP Labs, Inc. v. Hillair Cap. Invs., L.P. (In re PFO Glob., Inc.)*, 26 F.4th 245, 254 (5th Cir. 2022) ("[T]he district court properly relied on ordinary principles of contract interpretation when analyzing the Lift Stay Order."); *U.S. v.*

*Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998) ("General principles of contract interpretation govern the interpretation of a consent decree.").

The Plan mandates that Texas law governs any "rights and obligations arising hereunder." (ECF No. 1212 at 41). The Plan created the Lien-Related Litigation. (ECF No. 1212 at 50). Texas law controls this dispute.

In Texas, "objective intent is the alpha and omega of contract interpretation . . . ." *Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*, 31 F.4th 305, 310 (5th Cir. 2022). If determinable from the text, the parties' unambiguous[5] expression of objective intent governs. *Id.* (quoting *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020)); *see Heatcraft Refrigeration Prods. LLC v. Freezing Equip. Co., LLC*, No. 3:20-CV-1689-L, 2022 WL 975611, at *12 (N.D. Tex. Mar. 31, 2022) (quoting *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019)) ("The primary concern in construing a written contract is to 'effectuate the parties' intent as expressed by the words chosen to memorialize their agreement.'"). Contract terms should be "given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning." *See Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001) (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)) (applying Texas contract law to interpret an insurance policy).

If a provision is unambiguous, then contract interpretation principles are never brought to bear. *See Tex. Comptroller of Pub. Accts. v. Amber's Stores, Inc. (In re Amber's Stores, Inc.)*, 205 B.R. 828, 830–31 (Bankr. N.D. Tex. 1997) (quoting *Raines v. Sugg*, 930 S.W.2d 912, 913

---

[5] An unambiguous writing is reasonably susceptible to a single meaning while an ambiguous writing is reasonably susceptible to more than one meaning. *Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449, 457 (5th Cir. 2012); *Piranha Partners*, 596 S.W.3d at 743–44 ("That the parties interpret an agreement differently does not make it ambiguous; ambiguity exists only if both parties' interpretations are reasonable."); *see Crose v. Humana Ins. Co.*, 823 F.3d 344, 348 (5th Cir. 2016) (citing *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007)) (finding that if a contractual term has "a definite or certain legal meaning," it is not ambiguous).

(Tex.App.—Fort Worth 1996, no writ)) ("[W]hen a statute is clear and unambiguous, no construction by the court is necessary . . . . [G]eneral rules for construction of written instruments, such as contracts, apply to the construction of legislative acts."); 17A AM. JUR. 2D *Contracts* § 324 (2022) (explaining that courts apply the rules of contract construction if a contract is ambiguous in some respect); *D.S. Ameri Const. Corp. v. Simpson*, 611 S.E.2d 103, 104 (Ga. 2005) ("Where contract language is unambiguous, construction is unnecessary . . . ."). *But see Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.) ("When the contract is unambiguous, the court should apply the pertinent rules of construction, apply the plain meaning of the contract language, and enforce the contract as written.").

It is inappropriate to use contract interpretation principles to *create* an ambiguity when no ambiguity exists. *See In re El Paso Refinery, L.P.*, 244 B.R. 613, 622 (Bankr. W.D. Tex. 2000) (citing *Praeger v. Wilson*, 721 S.W.2d 597, 601 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.)) ("[C]ourts are prohibited from construing a writing in a manner that would require insertion of a qualifying word or phrase if such a construction would alter the ordinary meaning of the writing."); *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) ("[C]ourts must avoid interpreting contracts to contain superfluous words. The canon is one among many tools for dealing with ambiguity, not a tool for *creating* ambiguity in the first place."); *N.Y. Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 324 (S.D.N.Y. 2019), *aff'd*, No. 20-1093-CV, 2021 WL 3136078 (2d Cir. July 26, 2021) ("[C]onsistent with the general principle that interpretive tools need not be deployed when the contract is unambiguous, *expressio unius* should not be applied to create ambiguity where none would otherwise exist."); ALLAN D. WINDT, 2 INSURANCE CLAIMS AND DISPUTES § 6:2 (6th ed. 2022) ("[A] rule of construction cannot be used to create an ambiguity that is not justified by the policy language."). *See also Tex. v. Am. Tobacco Co.*, 463 F.3d 399,

9 / 15

407 (5th Cir. 2006) (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732–33 (Tex. 1982)) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity."); *Montco Oilfield Contractors, LLC v. Black Elk Energy Offshore Operations, LLC (In re Montco Offshore, Inc.)*, 595 B.R. 524, 544 (Bankr. S.D. Tex. 2018) (same); *Heatcraft*, 2022 WL 975611, at *12 (quoting *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020)) ("Consideration of surrounding circumstances can sometimes be helpful to understand the words chosen by the parties, but extrinsic evidence such as this cannot be used to create an ambiguity or justify interpreting contractual "language [to] say what it unambiguously does not say.'").

This memorandum opinion interprets the word "proceeds" as it is used in Section 10 of the Final DIP Order. The term is not defined in the document, but is a well-worn term with well-known meaning.

The Oxford English Dictionary defines "proceeds" as "[t]hat which proceeds, is derived, or results from something else; that which is obtained or gained by any transaction or process; an outcome; *esp.* the money obtained from an event, activity, or enterprise." *Proceed*, OXFORD ENGLISH DICTIONARY (3d ed. 2007). Similarly, Black's Law Dictionary defines "proceeds" as "[t]he value of land, goods, or investment when converted into money; the amount of money received from a sale" and "[s]omething received upon selling, exchanging, collecting, or otherwise disposing of collateral." *Proceeds,* BLACK'S LAW DICTIONARY (11th ed. 2019). The UCC also defines "proceeds" broadly:

> "Proceeds," except as used in Section 9.609(b), means the following property:
>
>> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
>> (B) whatever is collected on, or distributed on account of, collateral;
>> (C) rights arising out of collateral;

>> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to the collateral; or
>> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to the collateral.

TEX. BUS. & COM. CODE ANN. § 9.102(a)(65).  Other courts have recognized the broad definition.  *Garner v. Knoll, Inc. (In re Tusa-Expo Holdings, Inc.)*, 811 F.3d 786, 799 (5th Cir. 2016) ("The definition of 'proceeds' in the UCC is broad."); *Sweetwater Prod. Credit Ass'n v. O'Briant*, 764 S.W.2d 230, 232 (Tex. 1988) (finding that "the word 'proceeds'" has "a flexible and broad scope" in the UCC); *see In re Wright*, 545 B.R. 541, 555 (Bankr. S.D. Tex. 2016) (using the Oxford English Dictionary and Black's Law Dictionary definitions); *Graham v. Huntington Nat'l Bank (In re Medcorp. Inc.)*, 472 B.R. 444, 453 (Bankr. N.D. Ohio 2012) (defining proceeds as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.").

Section 9(b) states that the DIP Lenders' superpriority claims have no recourse to Avoidance Actions or their proceeds.  (ECF No. 865 at 21).  Section 9(b) also states that Avoidance Actions may result in proceeds or the recovery or encumbrance of property.  (ECF No. 865 at 21).  The definition of "Available Avoidance Proceeds" confirms that Avoidance Actions may create "proceeds or [the recovery or unencumbrance of] property." (ECF No. 865 at 21).

Sections 10(a) and 10(c) reference Avoidance Actions and the "proceeds thereof," but do not mention "property recovered or unencumbered."  (*See* ECF No. 865 at 21, 23).  The DIP Lenders invite the Court to find that Section 9's unnecessary clarification should inform the unambiguous Section 10.  The Court declines the invitation.  The plain meaning of "proceeds" in Section 10 is unambiguous.  An interpretation that follows the plain meaning but makes some words surplusage is preferable to an interpretation that avoids surplusage but creates ambiguity.

*See Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) ("Where there are two ways to read the text—either attorney is surplusage, in which case the text is plain; or attorney is nonsurplusage (*i.e.*, it refers to an ambiguous component in § 330(a)(1)), in which case the text is ambiguous—applying the rule against surplusage is, absent other indications, inappropriate."); *TMW*, 619 F.3d at 578 (applying *Lamie* in the context of an insurance policy); *Verizon Va., LLC v. XO Commc'ns., LLC*, 144 F. Supp. 3d 850, 864 (E.D. Va. 2015) (applying *Lamie* in the context of tariff interpretation).

The Final DIP Order is replete with defined terms, yet it does not define "proceeds." Avoidance Actions and Available Avoidance Proceeds are defined terms, and those terms should be interpreted consistently throughout the Final DIP Order. *See Am. Nat. Gen. Ins. Co.*, 274 F.3d at 323 (finding that contract terms may be defined as something other than their plain, ordinary meaning when the contract shows that the parties intended the terms to have a different, technical meaning); *see also Van Buren v. U.S.*, 141 S. Ct. 1648, 1657 (2021) (citing *Tanzin v. Tanvir*, 141 S.Ct. 486, 490 (2020)) (applying statutory interpretation principles to determine that "when 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.'"). Because "proceeds" is not a defined term, the Court will not treat it as one. Thus, the Court gives "proceeds" its ordinary meaning. *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 236 n.4 (Bankr. N.D. Tex. 2009) ("It has been held in other contexts that when a term is not defined courts will give it its ordinary meaning.").

If Avoidance Actions result in the recovery or unencumbrance of property, and "proceeds" means "that which . . . is derived, or results from something else" or "whatever is acquired upon the . . . disposition of collateral," then the property recovered or unencumbered is properly categorized as "proceeds." To hold otherwise would be inconsistent with the plain, ordinary definitions of "proceeds." Section 9 limits which proceeds are available for the payment of

superpriority claims. Section 9 does not change the meaning of the term "proceeds" in Section 10. Section 9 could be used to sow confusion, but one need not till that soil unless there is ambiguity in Section 10. There is none.

The DIP Lenders argue that the Available Avoidance Proceeds definition indicates "proceeds" should be interpreted as distinct from "property recovered or unencumbered." (ECF No. 2369 at 4). The DIP Lenders' argument focuses on (i) the Available Avoidance Proceeds' division of "property" and "proceeds" with "or" and (ii) the fact that Section 9(b) references "proceeds or property" while Sections 10(a) and (c) only reference "proceeds."

This argument violates the fundamental axiom that statutory interpretation principles do not create ambiguity when none exists. In addition, the DIP Lenders paradoxically argued in the Phase 3 hearing that Sections 9 and 10 operate independently: "9(b) and 10 don't have to be harmonized. 9(b) is about recourse on an unsecured claim. 10 is a lien. They're two different things in two different paragraphs for a reason." (ECF No. 2365 at 168). The Court agrees and will not view Sections 10(a) and (c) through the lens of an undefined term in Section 9(b).

Without the mandate of a defined term, the Court declines to scrutinize beyond the parties' unambiguous expression of objective intent. The plain reading of Section 10 indicates that "proceeds"—an undefined term ordinarily broadly construed—includes property recovered or unencumbered by Avoidance Actions.[6]

---

[6] The Final DIP Order indicates that the proceeds of Avoidance Actions include property recovered or unencumbered. The Court does not determine whether successful Avoidance Actions on the Senior Noteholders HHK Liens will result HHK Leases becoming unencumbered.

## II.   THE DIP LENDERS HAVE SECTION 10(B) DIP LIENS.

Section 10(b) grants DIP priming liens on property encumbered by the Senior Noteholders' prepetition liens. (ECF No. 865 at 23). The Senior Noteholders HHK Liens still exist.[7] Thus, the DIP Lenders have priming liens over the HHK Leases under Section 10(b).[8]

The parties request that the Court decide whether the DIP Lenders maintain Section 10(b) liens if the Creditor Representative succeeds in the Avoidance Actions. (*See* ECF Nos. 2369; 2370). The Senior Noteholder's Section 10(b) liens on the HHK Leases exist. They will continue to exist if the Creditor Representative succeeds in the Avoidance Actions via one or more of the sections applicable to § 550(a). Under § 550(a), if a transfer is avoided under certain sections,[9] "the trustee may recover . . . the property transferred, or . . . the value of such property." 11 U.S.C. § 550(a). Section 550 does not provide for the destruction of a lien. Thus, if the Creditor Representative succeeds in the Avoidance Actions under one or more of the Bankruptcy Code

---

[7] The Creditor Representative also argues that there can be no Section 10(b) liens because there is no claim that the Section 10(b) liens would secure. (ECF No. 2370 at 5). The argument relies on Section 9(b)'s determination that superpriority claim holders have no recourse to the Avoidance Actions or their proceeds. (ECF No. 2370 at 5). A lien may secure a non-recourse claim. *See, e.g.*, *Phoenix Mut. Life. Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1276 (5th Cir. 1991) ("[Appellant] lent $8,800,000, evidenced by a non-recourse promissory note secured by a first lien . . . ."). The fact that the claim has no recourse does not mean that the claim does not exist; it also does not mean that the claim has no security. The Creditor Representative cites to *United States v. Phillips* for the proposition that "[i]n the absence of an obligation to be secured there can be no lien." *U.S. v. Phillips*, 267 F.2d 374, 377 (5th Cir. 1959). Simply because the DIP Lenders have no recourse to Avoidance Actions and their proceeds does not mean the superpriority claims are not obligations to be secured. The DIP Liens are defined in Section 10, which states that the DIP Liens are granted "as security for the DIP Obligations." (ECF No. 865 at 22). The DIP Obligations, which are "DIP loans made to and guarantees issued by the Loan Parties . . . and . . . any Loan Obligations (as defined in the DIP Credit Agreement) of the Loan Parties . . ." constitute superiority claims. (ECF No. 865 at 10–11, 20). Even if the DIP Lenders have no recourse to Avoidance Actions and their proceeds, the DIP Lenders Section 10(b) liens still secure the DIP Obligations.

[8] In the Phase 2 opinion, the Court held that "[the HHK Leases] did not become DIP Collateral." (ECF No. 1847 at 41). The Court had not considered Section 10(b) in making this ruling. The more accurate statement is that the HHK Leases did not become DIP Collateral under Section 10(a).

[9] Section 550 references transfers avoided under §§ 544, 545, 547, 548, 549, 553(b), and 724(a).

sections applicable to § 550, the Creditor Representative[10] may recover the Senior Noteholders HHK Liens or the value of the Senior Noteholders HHK Liens. The DIP Lenders maintain their Section 10(b) liens.

The Court will await a determination of whether the liens are avoidable. If they are avoidable, the Court will determine what remedy to award the Creditor Representative.[11]

## CONCLUSION

The parties will continue the Phase 3 oral argument on August 31, 2022 at 1:30 p.m.

SIGNED 07/22/2022

_____
Marvin Isgur
United States Bankruptcy Judge

---

[10] The Creditor Representative has "standing to pursue, prosecute[, and settle] Causes of Action referenced and asserted in the Lien Challenge Complaint . . . ." (ECF No. 1212 at 53). As defined in the Plan, Causes of Action include "claims pursuant to section[] . . . 550 . . . of the Bankruptcy Code . . . ." (ECF No. 1212 at 31–32). Thus, the Creditor Representative may pursue remedies under § 550.

[11] Under § 550(a), the Court may order the recovery of the value of the transferred property.