United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 11, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 19-34508** |
| **SANCHEZ ENERGY CORPORATION,** *et* | § | |
| *al.*, | § | |
| Debtors. | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION

The Ad Hoc Group of Senior Secured Noteholders and DIP Lenders believes that the Lien-Related Litigation is over because (i) Sanchez Energy Corporation's Plan forecloses the relief the Creditor Representative seeks and (ii) the Creditor Representative's claims have been waived. The Creditor Representative disagrees. So does the Court.

## BACKGROUND

Sanchez Energy Corporation was an exploration and production company focused on acquiring and developing onshore oil and natural gas resources. (ECF No. 1 at 5). Sanchez and its affiliated debtors filed for bankruptcy on August 11, 2019 after years of volatile oil prices. (ECF Nos. 1; 1124 at 10).

### I.   PREPETITION LIENS

Sanchez incurred two prepetition secured debt obligations: (i) a Credit Facility with Royal Bank of Canada as administrative agent and lender ("RBC"); and (ii) $500 million of Senior Secured Notes (the holders of the Senior Secured Notes are the "Senior Secured Noteholders").[1] (ECF No. 1124 at 11–12; Adv. Pro. No. 20-03057, ECF No. 1 at 8–9). RBC was also the original Collateral Trustee of the Senior Secured Notes. (Adv. Pro. No. 20-03057, ECF No. 1 at 9).

---

[1] Sanchez also issued $600 million of 7.75% senior unsecured notes due June 2021 and $1,150 million of 6.125% senior unsecured notes due January 2023. (ECF No. 1124 at 12).

Wilmington Trust, National Association succeeded RBC as Collateral Trustee of the Senior Secured Notes.  (Adv. Pro. No. 20-03057, ECF No. 1 at 8; ECF No. 2540-1 at 3).  The Credit Facility and Senior Secured Notes were purportedly secured by liens on substantially all of Sanchez's assets, including deeds of trusts on the Hausser, Harrison, and Koenning oil and gas leases (the "HHK Leases").  (ECF No. 2501 at 1; Adv. Pro. No. 20-03057, ECF No. 1 at 9–10).  Several deeds of trust, including those pertaining to the HHK Leases, were inaccurate.  (ECF No. 2501 at 1).  The Senior Secured Noteholders engaged Cinco Energy Management Group to file Correction Affidavits for those deeds of trust in June and July 2019.  (ECF Nos. 1703-24 at 1; 2501 at 1–2).

## II.    LIEN CHALLENGE COMPLAINT

On March 10, 2020, Sanchez filed a complaint (the "Lien Challenge Complaint") against RBC, Wilmington Savings Fund Society ("WSFS"), and Wilmington Trust.  (Adv. Pro. No. 20-03057, ECF No. 1).  The Lien Challenge Complaint asserts that the defendants failed to create or perfect their liens in Sanchez's property.  (Adv. Pro. No. 20-03057, ECF No. 1 at 2).  Among other things, Sanchez sought to avoid and recover the Correction Affidavits under 11 U.S.C. §§ 547(b) and 550 because they were transferred within 90 days of the petition date.  (Adv. Pro. No. 20-03057, ECF No. 1 at 4–5, 15–16).  In its prayer for relief, Sanchez seeks "a judgment finding that all transfers described in this Complaint are avoided and the Debtors are thus entitled to recovery under § 550 . . . ."  (Adv. Pro. No. 20-03057, ECF No. 1 at 24).

## III.    PLAN OF REORGANIZATION AND CONFIRMATION ORDER

On January 22, 2020, the Court approved debtor-in-possession financing from certain lenders (the "DIP Lenders").[2]  The Final DIP Order approved "a $200 million superpriority,

---

[2] Most of the DIP Lenders are also Senior Secured Noteholders.  (ECF Nos. 865; 1220 at 21; 2501 at 2; 2539 at 5).

priming, senior secured delayed-draw term loan credit facility including $150 million in New Money Loans and $50 million in Roll-Up Loans."  (ECF Nos. 1486 at 12; 865 at 2).  Sanchez borrowed $100 million of new money under the DIP facility and $50 million in Roll-Up Loans.[3] (ECF Nos. 1088 at 4; 1126 at 16, 18–19; 1205 at 7; 1220 at 24).  In return for the DIP loans, the DIP Lenders received a priming lien on property encumbered by the Senior Secured Noteholders' prepetition liens, including the HHK Leases.  (ECF No. 2501 at 14).

Sanchez filed its first plan of reorganization on April 6, 2020.  (ECF No. 1109).  It filed the solicitation version of the plan on April 9, 2020.[4]  (ECF No. 1119).  Sanchez filed an Amended Plan on April 26, and a Second Amended Plan (the "Plan") on April 30, 2020.[5]  (ECF Nos. 1149; 1198; 1205).

## A.    Lien-Related Litigation Structure

In the process of negotiating the final version of the Plan, the principal parties agreed to abate the Lien Challenge Complaint adversary proceeding until after the April 30, 2020 confirmation hearing.  (Adv. Pro. No. 20-03057, ECF No. 9).  The Lien Challenge Complaint was

---

[3] Prior to confirmation, the Debtors defaulted under the DIP Credit Agreement, which suspended the DIP Lenders' obligation to advance the remaining $50 million in new money.  (ECF Nos. 1099 at 5; 1220 at 26; 1486 at 2). DIP Claims are:

[A]ll Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise.

(ECF No. 1205 at 7).

[4] Following the April 8, 2020 hearing, Sanchez amended the voting rights of Classes 4 and 5 from "Deemed to Reject" to "Entitled to Vote."  (ECF Nos. 1109 at 18; 1119 at 18; 1126 at 43–44).

[5] Sanchez filed two Second Amended Plans on April 30, 2020.  (ECF Nos. 1198; 1205).  ECF No. 1205 removed provisions about the "Fee Examiner" from ECF No. 1198 and adjusted the start date of the Lien–Related Litigation.  (ECF No. 1205-1 at 8–9, 17–18, 25).  The Court refers to the Second Amended Plan at ECF No. 1205 as the "Plan" for the balance of this opinion.

then folded into the "Lien-Related Litigation" in Sanchez's main case.  The Plan defines Lien-

Related Litigation as:

> [L]itigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) **all Causes of Action referenced and asserted in the Lien Challenge Complaint**, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) **the value of Causes of Action**, and (ix) the relative value of encumbered and unencumbered assets.

(ECF No. 1205 at 10) (emphasis added).  Causes of Action are:

> [A]ny Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) **claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code**;[6]  and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

(ECF No. 1205 at 5–6) (emphasis added).  The plaintiff in the Lien-Related Litigation is a "Lien-

Related Litigation Representative" selected by the Creditors' Committee (the "Creditor

---

[6] Exhibit D of the Plan Supplement confirms that the Lien Challenge Complaint contains Causes of Action: "For the avoidance of doubt, the Causes of Action within the scope of the Lien-Related Litigation include those set forth in the complaint filed in *Sanchez Energy Corp. et al. v. Royal Bank of Canada et al.*, Adv. Pro. No. 20-03057 (Bankr. S.D. Tex.)."  (ECF No. 1148 at 10).

Representative"). The Creditor Representative has standing to "pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan." (ECF No. 1205 at 10, 27).

The Court confirmed the Plan on April 30, 2020. (ECF No. 1212). Under the Confirmation Order, the Lien-Related Litigation will be adjudicated according to the procedures outlined in the Plan. (ECF No. 1212 at 7). The Confirmation Order reaffirms that (i) "[a]ny and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by this Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code;" and (ii) the allocation may include "the consideration of the value . . . of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims." (ECF No. 1212 at 7). In agreeing to the Plan, the Debtors, the DIP Lenders, the Creditors' Committee, and the Unsecured Noteholder Ad Hoc Group stipulated to an $85 million "Enterprise Value" of the Reorganized Debtors. (ECF No. 1212 at 3). This Enterprise Value is binding for the Lien-Related Litigation and does not include the value of the Debtors' Causes of Action. (ECF Nos. 1212 at 3–4; 1220 at 18).

### B. Mesquite Stock Distribution

Under the Plan, certain parties have or will receive shares of the Reorganized Debtor's New Common Stock in full satisfaction of their claims.[7] (ECF No. 1205 at 5, 10). The DIP

---

[7] Sanchez reorganized into Mesquite Energy, Inc. "New Common Stock" is the "common stock of Reorganized SN to be issued pursuant to the Plan." (ECF No. 1205 at 10). "Authorized Plan Distribution Shares" are "the shares of New Common Stock available for distribution under the Plan on account of Claims." (ECF No. 1205 at 5).

Lenders received 20% of the common stock on the Effective Date.  (ECF Nos. 1205 at 7, 19; 1220 at 28).  The remaining 80% (the "Post-Effective Date Equity Distribution") is to be issued to "Holders of Allowed Claims in Classes 3 [DIP claims], 4 [Secured Notes claims] and/or 5 [General Unsecured claims] as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation."[8]  (ECF No. 1205 at 11).  Under the Plan, distributions to Classes 3, 4, and 5 must be consistent with the priorities set forth in 11 U.S.C. §§ 1129(b) and 726.  (ECF No. 1205 at 19–20, 25).

## IV.   PROCEDURAL HISTORY OF THE LIEN-RELATED LITIGATION

The Plan outlines three phases of Lien-Related Litigation:

*Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

*Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, ***other than as to the valuation of Causes of Action***, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading ***filed by the Lien-Related Litigation Creditor Representative*** on or before the 35th day following the Effective Date.

*Phase 3:* ***If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary*** as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading ***filed by the Lien-Related***

---

[8] The holders of DIP Claims (Class 3) received the 20% of Mesquite stock on the Plan's effective date and:

100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

(ECF No. 1205 at 19).  The DIP Lenders agreed to equitize their claims.  (ECF Nos. 1220 at 30; 1486 at 2–3).

> ***Litigation Creditor Representative*** not more than 30 days after the Bankruptcy
> Court's determination of issues presented in Phase 2.

(ECF No. 1205 at 24) (emphasis added).  The Court may issue a final ruling as to the allocation of

the Post-Effective Date Equity Distribution at the end of any of the three phases.  (ECF No. 1205

at 24).

In Phase 1, the parties[9] submitted questions of law seeking interpretations of the Final DIP

Order.[10]  The Court determined that (i) the proceeds of Avoidance Actions "remain in the Creditor

Representative's bundle of rights" so long as they are traceable; and (ii) the DIP Lenders gave up

their rights to the proceeds of Avoidance Actions other than 50% of the first $100 million of

proceeds of Avoidance Actions against parties other than the Prepetition Secured Parties.  (ECF

Nos. 1599 at 4–5; 865 at 7).  The Court did not precisely address the meaning of "proceeds" in

Sections 9 and 10 of the Final DIP Order in the Phase 1 hearing.  (*See* ECF No. 1599).

In Phase 2, the Secured Ad Hoc Group and the Creditor Representative litigated the

existence, validity, perfection, and avoidance of certain liens.  The Court ruled that the Senior

Secured Noteholders' HHK Liens are avoidable.  (ECF No. 1847 at 38).  The Correction Affidavits

cured the flaws in the Senior Secured Noteholders' HHK Liens and brought them into compliance

with the Statute of Frauds.  (ECF No. 1847 at 39).  However, the Correction Affidavits constituted

---

[9] "The ad hoc group . . . of certain unaffiliated funds, accounts, and/or managers of funds or accounts, as beneficial holders of Secured Notes Claims, and as lenders . . . under the DIP Credit Agreement") (the "Secured Ad Hoc Group") and the Creditor Representative submitted Phase 1 briefs.  (ECF Nos. 1485; 1486).

[10] In its Phase 1 brief, the Secured Ad Hoc Group argues that "[t]he Lien-Related Litigation process described in the Plan provides for the ***valuation of Causes of Action*** (which were not valued at confirmation or included in the Enterprise Value) and the final determination of certain remaining challenges to the DIP Claims and Secured Notes Claims."  (ECF No. 1486 at 3–4) (emphasis added).  Indeed, the Secured Ad Hoc Group interprets the Plan to grant Secured Notes and General Unsecured claimants stock "only if the ***value of Causes of Action*** (to be determined in Phase 3 of the Lien-Related Litigation) plus the Enterprise Value exceeds the sum of all Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, Statutory Fees, Other Secured Claims, Other Priority Claims, and the DIP Claims."  (ECF No. 1486 at 7) (emphasis added).

transfers of Sanchez's property within 90 days of the bankruptcy petition.  (ECF No. 1847 at 39).  The Court deferred the determination of whether the Correction Affidavits are preferential transfers to Phase 3.  (ECF No. 1847 at 41).

During the Phase 3 oral argument, the Court realized that Phase 1 issues remained.  On July 22, 2022, the Court reconsidered Phase 1 and ruled that the DIP Lenders hold priming liens on the HHK leases under Section 10(b) of the Final DIP Order.   (ECF No. 2501 at 14).  Additionally, the DIP Lenders' superpriority claims do not have recourse to the proceeds of Avoidance Actions against the Prepetition Secured Parties,[11] which include property recovered or unencumbered by those Avoidance Actions.  (ECF No. 2501 at 11, 13).

Following the Phase 1 Reconsideration Opinion, the Court held a hearing on August 31, 2022 and asked the parties to brief two issues: (i) whether the plan forecloses the relief the Creditor Representative seeks regarding a hypothetical valuation of the § 550 action; and (ii) whether the Creditor Representative's claims have been waived.[12]  (ECF No. 2535 at 126–129).  The parties

---

[11] DIP Superpriority Claims have no recourse to Avoidance Actions against "Prepetition Secured Parties." (ECF No. 865 at 21).  The Final DIP Order includes "Secured Notes Parties" and "Credit Agreement Parties" in the definition of "Prepetition Secured Parties."  (ECF No. 865 at 7).  Senior Secured Noteholders, WSFS as Successor Notes Trustee, RBC as Collateral Trustee, and any successor to RBC as Successor Collateral Trustee are Secured Notes Parties.  (ECF No. 865 at 4).  RBC as administrative agent and collateral agent and any lenders under the Credit Facility are Credit Agreement Parties.  (ECF No. 865 at 7).

The Creditor Representative's Avoidance Actions are grounded in the Lien Challenge Complaint.  (ECF No. 1205 at 27).  The Lien Challenge Complaint names RBC (as lender and administrative agent under the Credit Facility), WSFS (as Successor Notes Trustee), and Wilmington Trust (as Successor Collateral Trustee) as defendants.  (Adv. Pro. No. 20-03057, ECF No. 1 at 1).  Because the Creditor Representative's Avoidance Actions are against Prepetition Secured Parties and the DIP Superpriority Claims have no recourse to Avoidance Actions against Prepetition Secured Parties, the DIP Superpriority Claims have no recourse to the proceeds of the Creditor Representative's Avoidance Actions.

[12] "One, I want to set a deadline for the filing of 10-page briefs to analyze what does the plan require with respect to [the DIP Lenders'] position that this relief is foreclosed by the plan" and "[COUNSEL FOR SECURED AD HOC GROUP]: [W]e'd also like to establish that these claims were waived before the plan effective date. So I'd like 20 pages so I can cover both those topics. THE COURT: 20 pages is fine."  (ECF No. 2535 at 126, 129).

submitted briefs, and the Court took the matter under advisement.  (ECF Nos. 2539; 2540; 2542; 2543).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(H).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

The Court uses ordinary principles of contract interpretation in interpreting the Plan. *Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449, 457 (5th Cir. 2012) ("[C]ourts regularly apply principles of contract interpretation to clarify the meaning of the language in reorganization plans.").  The Plan mandates that Texas law governs any "rights and obligations arising hereunder."  (ECF No. 1205 at 15).

In Texas, "objective intent is the alpha and omega of contract interpretation . . . ." *Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*, 31 F.4th 305, 310 (5th Cir. 2022).  If determinable from the text, the parties' unambiguous[13] expression of objective intent governs.  *Id.* (quoting *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020)); *see Heatcraft Refrigeration Prods. LLC v. Freezing Equip. Co., LLC*, No. 3:20-CV-1689-L, 2022 WL 975611, at *12 (N.D. Tex. Mar. 31, 2022) ("The primary concern in construing a written contract is to 'effectuate the parties' intent as expressed by the words chosen to memorialize their agreement.'" (quoting *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019))).

---

[13] An unambiguous writing is reasonably susceptible to a single meaning while an ambiguous writing is reasonably susceptible to more than one meaning. *MPF Holdings*, 701 F.3d at 457; *Piranha Partners*, 596 S.W.3d at 743–44 ("That the parties interpret an agreement differently does not make it ambiguous; ambiguity exists only if both parties' interpretations are reasonable."); *see Crose v. Humana Ins. Co.*, 823 F.3d 344, 348 (5th Cir. 2016) (citing *Tex. Indus., Inc. v. Factory Mut. Ins. Co.,* 486 F.3d 844, 846 (5th Cir. 2007)) (finding that if a contractual term has "a definite or certain legal meaning," it is not ambiguous).

Contract terms should be "given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning." *See Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001) (applying Texas contract law to interpret an insurance policy (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984))).

The Secured Ad Hoc Group advances multiple arguments responsive to the Court's questions. None justify the present termination of the Lien-Related Litigation.

## I.   PLAN PROVISIONS

The Creditor Representative argues that the Lien-Related Litigation is meant to "apportion[] ownership of the Reorganized Debtors based on . . . the preferential transfers to the Senior Noteholders" without "actually litigating the Debtors' adversary proceeding to judgment." (ECF No. 2539 at 4, 7). The Secured Ad Hoc Group advances three arguments that the Plan forecloses on allocating stock without the Creditor Representative actually augmenting the estate:

A.   Neither the Plan nor the Final DIP Order permit issuing New Common Stock with a non-final estimation of the value of Causes of Action (ECF Nos. 2540 at 15–18; 2542 at 7);

B.   Section § 1129(b) of the Bankruptcy Code prevents the issuance of New Common Stock to unsecured creditors unless they augment the estate (ECF Nos. 2540 at 18–19; 2542 at 5–6); and

C.   The Court does not have the power to determine the value of hypothetical Causes of Action (ECF No. 2540 at 19).

The Court addresses these arguments in turn.

### A.   Non-Final Estimation

The Secured Ad Hoc Group argues that "nothing in the Plan permits the Court to project or hypothetically determine the recovery on any claim in the Lien-Related Litigation" and "the Final DIP Order releases all challenges to the SSN's liens that do not result in a final non-appealable order." (ECF No. 2540 at 15). Relying on the presence of "adjudication," "resolution,"

"outcome," "determined," and "resolve" and the absence of "estimate," "hypothetical," and "project" in the Plan, the Secured Ad Hoc Group contends that lien-related Causes of Action must be "actually determined" instead of merely valued.  (ECF No. 2540 at 16–17).

The Confirmation Order and the Plan state that the Court will determine any issues regarding the allocation of the Post-Effective Date Equity Distribution.  (ECF No. 1212 at 7; 1205 at 25).  The Court's determination may include "the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan . . . ."  (ECF No. 1212 at 7; 1205 at 25).  Neither the Confirmation Order nor the Plan require the Court to "actually determine" Causes of Action.  Instead, they require the Court to consider the "value" of Causes of Action.  The Plan does not list "value" among its defined terms.  The Court will interpret "value" consistent with its normal definition.  *See Value*, OXFORD ENGLISH DICTIONARY (3d ed. 2011) (defining "value" as "[w]orth or quality as measured by a standard of equivalence.").  The Secured Ad Hoc Group invites the Court to look beyond the plain meaning of "value."  The Court declines.

The Court's determination of the value of Causes of Action may result in a Final Order. The Plan defines "Final Order" as:

> [A]n order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; provided that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

(ECF No. 1205 at 9).  This definition does not prevent the Court from allocating shares of the Reorganized Debtor based on the Court's determination of the value of Causes of Action.  As the

Creditor Representative argues, "[m]ost contested matters are adjudicated or settled, leading to some sort of 'outcome' or 'resolution.'" (ECF No. 2543 at 10). Unless the parties settle, an adjudication or resolution will come in the form of an allocation of the Reorganized Debtor's New Common Stock based on: (i) the stipulated Enterprise Value; (ii) the value of Creditor Representative's Causes of Action in the Lien-Related Litigation; and (iii) the proceeds of any other Causes of Action the Reorganized Debtors pursue. The Plan requires nothing more.

### B.    11 U.S.C. § 1129(b)

The Confirmation Order and the Plan reference that New Common Stock will be distributed in accordance with the priorities set forth in 11 U.S.C. §§ 1129(b) and 726. (ECF Nos. 1205 at 25; 1212 at 7). The Secured Ad Hoc Group argues that this requires the Creditor Representative to augment the estate: "Section 1129(b) precludes recoveries to holders of junior liens or unsecured creditors unless the claims of secured and senior creditors are satisfied in full." (ECF No. 2540 at 19). "[U]nless additional value is actually added to the estate, the only effect of giving New Common Stock to the CR is to shift a chunk of the stipulated enterprise value from the DIP Lenders to the CR. This is illegal under § 1129(b)." (ECF No. 2542 at 6).

Plans of reorganization must comply with 11 U.S.C. § 1129. Section 1129(a) lays out the requirements for confirming a consensual plan. Section 1129(b) lays out the requirements for confirming a nonconsensual plan. Section 1129(b)(2) describes "fair and equitable" treatment for classes of secured claims, unsecured claims, and interests. Under the absolute priority rule, a class of unsecured claimants will receive property of a value equal to the amount of their claims or "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re*

*Patrician St. Joseph Partners Ltd. P'ship)*, 169 B.R. 669, 682 (D. Ariz. 1994) ("The absolute priority rule requires that the holder of an *unsecured* claim must receive the full amount of its allowed claim unless all junior claims and interests will receive no property and retain no interest under the plan.").

Under Section 1129(b)(2)(A), a plan is fair and equitable with respect to a class of dissenting secured creditors if it provides: (i) that the secured creditors will retain their liens and receive sufficient deferred payments to satisfy their claims in full; (ii) for the creditors' liens to attach to the proceeds of the sale of the collateral; or (iii) the creditors with the indubitable equivalent of their claims. 11 U.S.C. § 1129(b)(2)(A). The absolute priority rule does not apply to secured classes.[14] *In re Bashas' Inc.*, 437 B.R. 874, 928 (Bankr. D. Ariz. 2010) ("[T]he statute

---

[14] The Secured Ad Hoc Group assumes that holders of unsecured claims are a junior class to the holders of secured claims. That incorrect assumption creates a fatal flaw in their argument. Holders of unsecured claims are junior with respect to the collateral that secures the DIP Lenders' claim. They are not junior as to any assets that do not collateralize the DIP Lenders' claim. Some examples may clarify this issue (to which there is a somewhat common misunderstanding).

First, the Bankruptcy Code recognizes and enforces intercreditor subordination agreements. 11 U.S.C. § 510(a). If one creditor agrees to subordinate its distribution to another, that subordination agreement controls. In this case, the DIP Lenders agreed that they would not collect, with one exception, the proceeds of Avoidance Actions. There is no junior/senior dichotomy.

Second, it is not uncommon for a secured loan to be "non-recourse." A non-recourse loan requires the holder of the secured claim to look solely to its collateral for repayment. If a sale of the collateral results in a deficiency, the secured claimant does not receive a general unsecured claim. *See* 11 U.S.C. § 1111(b). If the property is not sold, the secured claimant may elect continued non-recourse treatment (but have a secured claim for the full claim notwithstanding § 506). *Id.* If the secured claimant does not make the § 1111(b) election when the property is retained, the secured claimant receives a deficiency claim for the amount by which it is undersecured, and the holders of general unsecured claims share with the undersecured claimant in the recovery from assets that do not collateralize the deficiency claim. If the secured claimant makes the § 1111(b) election, holders of general unsecured claims receive 100% of the recovery from assets that do not collateralize the deficiency claim. Accordingly, the structure of § 1111(b) makes clear that there is no junior/senior relationship between the holders of deficiency claims and other unsecured claims.

Third, assume a hypothetical full-recourse loan of $1,000,000 with collateral valued at $700,000. The $300,000 shortfall will be treated as a general unsecured claim. Assume that the debtor also has (i) a $100,000 cash balance that is not security for any obligation; and (ii) total general unsecured claims of $600,000 (exclusive of the $300,000 deficiency claim). The secured creditor will receive payment of its $700,000 secured claim plus $33,333.33 of the cash (representing 1/3 of the $900,000 of total unsecured claims). Holders of the other general unsecured claims will share in $66,666.67 of the cash (representing 2/3 of the $900,000 of total unsecured claims). The relationship as to the $100,000 of cash between unsecured claims is one of proportionality. There is no junior/senior relationship with the undersecured portion of a recourse loan.

13 / 29

expressly contains the solitary expression of this rule in the section that *only* deals with *unsecured* creditors. . . . The only statutory cramdown section that applies to the rights accorded to secured creditors is found in § 1129(b)(2)(A), and an 'absolute priority' protection is nowhere to be located within that statute."); *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 502 (Bankr. S.D. Ohio 2011).

The Secured Ad Hoc Group equates the $85 million Enterprise Value with the value of the Post-Effective Date Equity Distribution.  The Post-Effective Date Equity Distribution is the stock to be distributed following the Lien-Related Litigation.  (ECF No. 1205 at 11).  The Lien-Related Litigation requires ascertaining the value of the Reorganized Debtors' and the Creditor Representative's Causes of Action.  (ECF No. 1212 at 7).  Any Post-Effective Date Equity Distribution must account for the value of the Creditor Representative's Causes of Action *in addition to* the Enterprise Value when the Enterprise Value specifically excludes the value of Causes of Action.  (ECF No. 1212 at 3–4).  Stated differently, the Enterprise Value is only a part of the calculation for determining the Post-Effective Date Equity Distribution split; the Reorganized Debtors' and the Creditor Representative's Causes of Action are another part.  The Post-Effective Date Equity Distribution may ultimately have a fair market value that is worth more or less than the $85 million.[15]

Although the DIP Lenders have DIP Claims of at least $150 million, they stipulated to value their collateral at $85 million.  The DIP Lenders have an $85 million secured claim.  In determining their share of the Post-Effective Date Equity Distribution, the DIP Lenders will start with $85 million.  Thus, they will receive the full value of their secured claim in the Reorganized

---

[15] Under the Plan, the parties took the risks of changes in market value and of their proportionate share holdings.

Debtor's stock—an outcome for which they bargained. *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.04 (16th 2022) ("Compliance with any of the three clauses of 11 U.S.C. § 1129(b)(2)(A) entails payment in full of the secured claim.").

What happens to the remaining $65 million of unsecured DIP Claims is another matter. The Final DIP Order states that the DIP claims are "allowed superpriority administrative expense claims with priority over any and all claims against the Loan Parties." (ECF No. 865 at 20). However, the Final DIP Order also states that:

> [The DIP Claims] have no recourse to the Loan Parties' claims and causes of action [including] avoidance actions . . . or the proceeds thereof, except that the DIP Superpriority Claims shall have recourse . . . up to fifty percent (50%) of each dollar of the first $100 million of proceeds or property recovered or unencumbered by Avoidance Actions against parties other than the Prepetition Secured Parties . . . .

(ECF No. 865 at 21). At most, the DIP Lenders will get $50 million (50% of a maximum $100 million of proceeds recovered by Avoidance Actions against parties other than the Prepetition Secured Parties) of value for purposes of distributing shares on account of the $65 million of unsecured priority DIP claims. If Avoidance Actions against parties other than the Prepetition Secured Parties generate no proceeds, the DIP Lenders will receive (i) no stock on account of the unsecured portion of the priority DIP Claims; and (ii) a pro rata amount of stock on account of the $85 million Enterprise Value. The actual percentages of the Post-Effective Date Equity Distribution remain to be determined. Because the Lien-Related Litigation is meant to allocate New Common Stock based in part on the values of Causes of Action, and the DIP Lenders will receive the full value of their stipulated $85 million secured claim, "actual" augmentation of the estate is not necessary to comply with § 1129(b).

### C.      Hypothetical Causes of Action

The Secured Ad Hoc Group argues that the Court has exclusive jurisdiction over the Creditor Representative's Causes of Action, and so the Court should not issue an advisory opinion about what the Court believes to be the value of claims when it would otherwise have to determine the value following a trial.  (ECF No. 2540 at 19).  It is correct that either (i) the matter will be settled; or (ii) the Court will decide the value of the Creditor Representative's Causes of Action following a trial.  That valuation will merely be part of the Court's fact finding.  The value will be utilized to determine the percentage ownership of the shares.  The percentage ownership of the shares will be declared in the order issued when this litigation terminates; the value of the Causes of Action will not be in the order itself (which will be issued separately from any opinion that contains a valuation).  However, as discussed above, the Plan and Confirmation Order require less than the Secured Ad Hoc Group infers—the Plan simply describes "valuation" of the Causes of Action followed by the allocation of the Post-Effective Date Equity Distribution based on that valuation:

> Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation . . . which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims.

(ECF No. 1205 at 11, 24).  The Plan and Confirmation Order do not require that the Creditor Representative or the Reorganized Debtors prosecute Causes of Action.  The Secured Ad Hoc

Group's arguments to the contrary do not adhere to the plain meanings of the terms of the Plan or Confirmation Order.

The Plan states that the Court may determine issues regarding allocation of the Post-Effective Date Equity Distribution by considering value "among other things." One obvious (and currently pending) "other thing" is the determination of the stock allocation based on the settlement proceeds from potential Causes of Action against certain persons formerly in control of the Sanchez entities (the "Sanchez Parties"). (*See* ECF No. 2533). If the Court approves a settlement of the claims against the Sanchez Parties at any amount less than $100 million, the DIP Lenders are entitled to 50% of the value of that settlement. The Court could allocate the settlement proceeds without conducting a "valuation."

In a Rule 9019 proposed settlement, the business judgment rule may govern. If the Court approves the settlement, the proceeds would be allocated between the parties, but no "valuation" by the Court would occur. The "among other things" language demonstrates that the Court may use something other than a "valuation" to allocate the shares. This reinforces the purpose of this aspect of the Lien-Related Litigation: not to augment the Reorganized Debtors, but to determine relative ownership.

The parties bargained for this process pre-confirmation. The Court is now following the process the Plan requires. The Court will issue the Post-Confirmation Date Equity Distribution order in accordance with the Plan.

## II.   WAIVER

The Secured Ad Hoc Group advances three arguments that the Creditor Representative waived its claims prior to the effective date:

A.    Wilmington Trust is not a viable defendant because the Debtors released Wilmington Trust from liability concerning the Correction Affidavits pursuant to the Final DIP Order (ECF Nos. 2540 at 10–11; 2542 at 9);

B.    Wilmington Trust is not a viable defendant because it did not have the requisite dominion and control over the Senior Secured Noteholders' liens (ECF Nos. 2540 at 11–13; 2542 at 9–10); and

C.    Neither the Debtors nor the Creditor Representative preserved a monetary recovery under § 550(a) (ECF No. 2540 at 13–15).

The Court addresses these arguments in turn.

### A.    Releases In The Final DIP Order

The Debtors filed the Lien-Challenge Complaint against RBC as lender and administrative agent under the Credit Facility, Wilmington Trust as the Successor Collateral Trustee under the Senior Secured Notes, and WSFS as the Successor Notes Trustee under the Senior Secured Notes. (Adv. Pro. No. 20-03057, ECF No. 1 at 1).

The Secured Ad Hoc Group argues that the Debtors released claims against Wilmington Trust relating to the Correction Affidavits.  (ECF No. 2540 at 11).  "[I]n the agreement by which Wilmington Trust became the Successor Collateral Trustee after the Court approved the Final DIP Order, the Debtors released [Wilmington Trust] from any liability relating to events or circumstances occurring before [Wilmington Trust] took over."  (ECF No. 2540 at 11).  The Secured Ad Hoc Group contends that the Court authorized the Debtors to release Wilmington Trust under Paragraph 7 of the Final DIP Order.  (ECF No. 2540 at 11).   Paragraph 7 concerns the "Discharge of First-Out Obligations."  (ECF No. 865 at 17).  The last sentence of Paragraph 7 states that "[t]he Debtors are authorized to execute any documents or agreements, and pay any fees, required to effectuate the foregoing."  (ECF No. 865 at 19).

In the Successor Collateral Trustee Agreement, the Debtors agreed to release Wilmington Trust from all liability concerning the Correction Affidavits:

> [T]he Company hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges . . . the Successor Collateral Trustee [Defined as Wilmington Trust, National Association] . . . of and from all demands, actions, causes of action, suits, damages and any and all other claims, counterclaims and liabilities whatsoever, . . . in each case solely to the extent relating to facts, acts, omissions or circumstances arising or occurring on or prior to the date of this Agreement and solely to the extent relating to the Indenture . . . and the other First Lien Documents and the dealings of the parties hereto with respect to the First Lien Documents.

(ECF No. 2540-1 at 5). The "First Lien Documents" are defined in the Collateral Trust Agreement as "the Note Documents and any additional indenture, credit agreement or other agreement pursuant to which any other First Lien Debt is incurred and secured in accordance with the terms of each applicable Priority Lien Document and the Security Documents related thereto . . . ."[16] (ECF No. 1705-2 at 12). In sum, the Secured Ad Hoc Group believes that the Debtors released Wilmington Trust from any liability concerning the Correction Affidavits, and they were empowered to do so under Paragraph 7 of the Final DIP Order. (ECF No. 2540 at 11).

The Court never approved the release contained in the Successor Collateral Trustee Agreement. If the release merely means that—because of the nature of the Lien-Related Litigation—Wilmington Trust will never have to pay any money on account of that litigation, the "release" language is an inconsequential statement of reality. If the release means that the Lien-Related Litigation cannot be pursued for the purposes of obtaining a valuation, it conflicts with the explicit terms of the Final DIP Order. In that event, the Final DIP Order (and not the Successor Collateral Trustee Agreement) controls. Under either scenario, the Lien-Related Litigation remains.

---

[16] The Successor Collateral Trustee Agreement references the Collateral Trust Agreement for undefined capitalized terms. (ECF No. 2540-1 at 2).

Under Paragraph 23 of the Final DIP Order, parties in interest could bring claims during a specified "Challenge Period." (ECF No. 865 at 43–44). The Challenge Period was for parties who "seek[] to assert or prosecute any action for preferences, fraudulent transfers, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses" against various defendants, including the "Prepetition Secured Parties" and their successors. (ECF No. 865 at 44). The Final DIP Order includes "Secured Notes Parties" in the definition of the Prepetition Secured Parties. (ECF No. 865 at 7). The Secured Notes Parties include RBC as Collateral Trustee and any successor to RBC as Collateral Trustee. (ECF No. 865 at 3–4). Wilmington Trust is RBC's "respective successor[] . . . in [its] respective capacity as such . . . ." (ECF No. 865 at 44). Thus, parties could bring claims against Wilmington Trust during the Challenge Period. The attempt to release claims against Wilmington Trust under the general language of Paragraph 7 is inconsistent with the explicit creation of the Challenge Period by which any party in interest could bring claims against Wilmington Trust. The Court gives deference to this specific provision of the Final DIP Order providing for the creation of a Challenge Period over the general language of Paragraph 7.

The Final DIP Order states that the Debtors may "execute any documents or agreements, and pay any fees . . . ." (ECF No. 865 at 19). Executing an agreement is a far cry from releasing claims. The specific provision to pay fees indicates that the Court would have specifically empowered the Debtors to release claims if it meant to so empower them. When the Challenge Period exists a few pages away, the absence of a specific provision empowering the Debtors to release claims is unsurprising.[17] The Court rejects Secured Ad Hoc Group's contention that the

---

[17] Sanchez apparently did not believe it released Wilmington Trust of claims relating to the Correction Affidavits on January 31, 2020 when it named Wilmington Trust as a Lien Challenge Complaint defendant on March 10, 2020. (ECF No. 2540-1 at 2; Case 20-03057, ECF No. 1 at 1).

Debtors were empowered to release claims under the Successor Collateral Trustee Agreement through Paragraph 7 of the Final DIP Order. If there were any doubt, the subsequently confirmed Plan maintains the Lien-Related Litigation as part of its fundamental structure. That could not have occurred if the Lien-Related Litigation had previously been released. In any event, even if a conflict exists, the Plan would control, and in no event will Wilmington Trust have an obligation to pay any money as a consequence of the Lien-Related Litigation.[18]

### B.    "Dominion and Control" As An Initial Transferee Under 11 U.S.C. § 550(a)

The Secured Ad Hoc Group argues that Wilmington Trust is not a viable defendant because it did not have dominion and control over the Senior Secured Noteholders' liens. (ECF No. 2540 at 11–13). As Successor Collateral Trustee, Wilmington Trust only had authority to act with the direction of the Controlling Priority Lien Representative and was thus a "mere conduit" for the true transferees. (ECF No. 2540 at 5, 13). Because the Debtors sued RBC and WSFS in unrelated capacities, the Secured Ad Hoc Group contends that the Creditor Representative's Causes of Action lack a proper defendant and have no value. (ECF Nos. 2540 at 13; 2542 at 9).

If a transfer is avoided under § 547, a trustee may recover the property (or value of the property) transferred from (i) "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or (ii) "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). The parties do not dispute that the Fifth Circuit has adopted the "dominion and control" test for an initial transferee under § 550: "[A] party that receives a transfer directly

---

[18] Although the Secured Ad Hoc Group argues that the agreement to release Wilmington Trust from any liability relating to the Correction Affidavits was "disclosed in the [Disclosure Statement] at page 40," the Disclosure Statement only references that the Successor Collateral Trustee Agreement exists: "Subsequently, Wilmington Trust, National Association, was appointed by WSFS (as permitted under the CTA) to replace RBC as the collateral trustee under the Indenture pursuant to the Successor Collateral Trustee Agreement, dated as of January 31, 2020, between the Company, WSFS and Wilmington Trust, National Association." (ECF No. 1124 at 40). The Disclosure Statement does not state that the Debtors released claims against Wilmington Trust.

from the debtor will not be considered the initial transferee unless that party gains actual dominion or control over the funds." *Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir. 1993) (citing *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890 (7th Cir. 1988)); *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 946 (5th Cir. 2019) ("To recover, the bankruptcy trustee must show the alleged transferee had dominion and control over the transferred funds." (citing *Coutee*, 984 F.2d at 141)).

In *Bonded*, the Seventh Circuit determined that a bank was not the initial transferee when it received no benefit from the transfer. 838 F.2d at 893. The bank processed a check to make funds available for another account and was not free to "put the money to [its] own purposes." *Id.* In a subsequent case, the Seventh Circuit determined that another bank was the initial transferee as the trustee of a pool of securitized assets. *See Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 690–92 (7th Cir. 2010). In *Paloian*, trustee LaSalle Bank argued that it was "simply a conduit for placing the money in the trust" and not the appropriate target of an avoidance action. *Id.* at 691. The Seventh Circuit disagreed: the function of an avoidance action is "to recoup money from the real recipient of preferential transfers." *Id.* If LaSalle Bank were required to give money to the bankruptcy estate following an avoidance action, it would "draw that money from the corpus of the trust." *Id.* at 692. Thus, the money would ultimately come from the trust's investors—the persons for whose benefit the transfer was made. *Id.* A single suit against the trustee instead of many suits against trust's investors "create[d] the appropriate economic incidence":

> Instead of requiring the bankruptcy trustee to sue thousands of investors who may have received interest payments that were increased, slightly, by money from the Hospital's coffers, a single suit suffices. If the Hospital had made a preferential transfer to Exxon, it would be appropriate to recover that transfer from Exxon rather than the millions of people who hold stock in Exxon. Similarly with a preferential transfer to a hedge fund.

*Id.* The Seventh Circuit also agreed that an entity that passes funds to investors in a pool according to a formula may still appropriately be considered an initial transferee:[19]

> [L]ots of decisions hold that an entity that receives funds for use in paying down a loan, or passing money to investors in a pool, is an 'initial transferee' even though the recipient is obliged by contract to apply the funds according to a formula. All of these courts say that they are adopting and applying the approach that this circuit devised in *Bonded Financial Services.* We agree with that assessment . . . .

*Id.* (citations omitted).

In *Coutee*, a law firm transferred funds from its trust account to a bank who had made a loan to the firm's client. *Coutee*, 984 F.2d at 141. The law firm had no right to put the funds to its own use and was required to keep the funds in its trust account: "The firm's role with respect to the received money was to accept the funds in settlement of its client's case, deposit the money in trust, keep as fees only what the Coutees agreed to, and pay the rest to the bank on behalf of the Coutees in satisfaction of their loan." *Id.* The Fifth Circuit found that the law firm was a mere conduit and not an initial transferee. *Id.*

In this case, the Collateral Trust Agreement governs the liens securing the Credit Facility and Senior Secured Notes and the rights of parties with respect to prepetition collateral. (ECF No. 1705-2). Under Collateral Trust Agreement, RBC is both First-Out Representative and the original Collateral Trustee. (ECF No. 1705-2 at 1). The Final DIP Order discharged the Credit Facility and replaced RBC with Wilmington Trust as Collateral Trustee. (ECF No. 865 at 18). Under the

---

[19] The Secured Ad Hoc Group cites to a footnote in *Janvey v. Barr* for the proposition that *Paloian* relied in part on LaSalle Bank's discretion. *See* No. 3:10-CV-0725-N, 2015 WL 12681608, at *3 (N.D. Tex. Aug. 5, 2015) ("Also apparently relevant to the court's decision in *Paloian* was the fact that although the bank owed certain duties to the investors, it retained some discretion in how the funds would be invested." (citing *Paloian*, 619 F.3d at 691–92)); (ECF No. 2542 at 10). The Seventh Circuit does not explicitly identify what discretion LaSalle Bank had as trustee. *See Paloian*, 619 F.3d at 691–92 ("Although LaSalle Bank has duties to the trust's beneficiaries (the investors) concerning the application of funds, the assets' owner remains the appropriate subject of a preference-avoidance action."). Unlike *Janvey* and as explained below, the Collateral Trustee has significant discretion under the Collateral Trust Agreement.

Successor Collateral Trustee Agreement, Wilmington Trust obtained RBC's "powers, rights, **discretion** and privileges" as the Collateral Trustee, and WSFS became the Controlling Priority Lien Representative.  (ECF No. 2540-1 at 2, 4) (emphasis added).

The Collateral Trust Agreement outlines the terms on which the Senior Secured Noteholders and Credit Facility Lenders appointed the Collateral Trustee to "receive, hold, maintain, administer and distribute the Collateral at any time delivered to the Collateral Trustee or the subject of the Security Documents, and to enforce the Security Documents and all interests, rights, powers and remedies of the Collateral Trustee with respect thereto or thereunder and the proceeds thereof."  (ECF No. 1705-2 at 5).  Section 3.1(a) of the Collateral Trust Agreement outlines the undertakings of the Collateral Trustee:

(1) accept, enter into, hold, maintain, administer and enforce all Security Documents, including all Collateral subject thereto, and all Liens created thereunder, perform its obligations hereunder and under the Security Documents and protect, exercise and enforce the interests, rights, powers and remedies granted or available to it under, pursuant to or in connection with the Security Documents (including in connection with any Enforcement Action or Insolvency or Liquidation Proceeding);

(2) take all lawful and commercially reasonable actions permitted under the Security Documents that it may deem necessary or advisable to protect or preserve its interest in the Collateral subject thereto and such interests, rights, powers and remedies;

(3) deliver and receive notices pursuant to this Agreement and the Security Documents;

(4) sell, assign, collect, assemble, foreclose on, institute legal proceedings with respect to, take any Enforcement Action, or otherwise exercise or enforce the rights and remedies of a secured party (including a mortgagee, trust deed beneficiary and insurance beneficiary or loss payee) with respect to the Collateral under the Security Documents and its other interests, rights, powers and remedies;

(5) remit as provided in Section 3.4 all cash proceeds received by the Collateral Trustee from an Enforcement Action under the Security Documents or

any of its other interests, rights, powers or remedies or otherwise received by it in accordance with this Agreement;

(6) execute and deliver (i) amendments and supplements to the Security Documents as from time to time authorized pursuant to Section 7.1 accompanied by an Officers' Certificate and Opinion of Counsel to the effect that the amendment or supplement was permitted under Section 7.1 and (ii) acknowledgements of Collateral Trust Joinders delivered pursuant to Section 3.8 or 7.18 hereof;

(7) release or subordinate any Lien granted to it by any Security Document upon any Collateral if and as required by Section 3.2, Section 4.1 or Section 4.2; and

(8) enter into and perform its obligations and protect, exercise and enforce its interest, rights, powers and remedies under the Intercreditor Agreement, if any.

(ECF No. 1705-2 at 27–28) (emphasis removed). Section 3.5 of the Collateral Trust Agreement outlines the powers of the Collateral Trustee:

(a) The Collateral Trustee is irrevocably authorized and empowered to enter into and perform its obligations and protect, perfect, exercise and enforce its interest, rights, powers and remedies under the Security Documents (including in connection with any Enforcement Action and in any Insolvency or Liquidation Proceeding) and applicable law and in equity and to act as set forth in this Article 3 or, subject to the other provisions of this Agreement, as requested in any lawful written directions given to it from time to time in respect of any matter by the Controlling Priority Lien Representative.

(ECF No. 1705-2 at 34). Clearly, the Collateral Trustee Agreement bestows significant responsibility with the Collateral Trustee concerning the collateral securing the Credit Facility and the Senior Secured Notes.

The Secured Ad Hoc Group argues that the Collateral Trustee is bound by the Controlling Party Lien Representative's directives: "[T]he Collateral Trustee's sole authority to act with respect to the collateral was at the written direction of others." (ECF No. 2540 at 13). To engage in an Enforcement Action, the Collateral Trustee must "act[] on the written instructions of the Controlling Priority Lien Representative and in accordance with the applicable Security

Documents . . . ."  (ECF No. 1705-2 at 29).   Indeed, in many instances the Collateral Trust Agreement mandates that the Collateral Trustee act under the direction of the Controlling Priority Lien Representative.

Despite these directives, the Collateral Trustee is no mere conduit or courier; this case is closer to *Paloian* than *Coutee*.   First, Wilmington Trust is the legal owner of the liens and correction affidavits.   Wilmington Trust succeeded RBC in owning the Correction Affidavits. (ECF Nos. 1703-24 at 1; 2540-1 at 3).   This factor undoubtedly plays a role in determining whether a transferee has dominion over transferred property.   *See, e.g., Paloian*, 619 F.3d at 691–92 ("Although LaSalle Bank has duties to the trust's beneficiaries (the investors) concerning the application of funds, ***the assets' owner*** remains the appropriate subject of a preference-avoidance action.") (emphasis added); *Rigby v. Masto (In re Mastro)*, 465 B.R. 576, 616 (Bankr. W.D. Wash. 2011) (placing a "strong emphasis on legal title" under the dominion test).[20]

Second, Wilmington Trust has discretion as the Collateral Trustee.   Once empowered to pursue Enforcement Actions, the Collateral Trustee appears to be left to its own devices.[21]   The Collateral Trustee has the broad power to "protect, exercise and enforce the interests, rights,

---

[20] The Ninth Circuit views the dominion and control tests as separate and distinct tests.  *See Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1071 (9th Cir. 2006) ("The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit. *See Bonded Fin. Servs.,* 838 F.2d at 893–94. The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question. *In re Chase & Sanborn Corp.,* 848 F.2d at 1199. Since we have explicitly adopted the 'more restrictive "dominion test," ' set out in *Bonded Financial Services, In re Cohen,* 300 F.3d at 1102 n. 2, we take care not to apply the more lenient 'control test' put forth in *In re Chase & Sanborn Corp.*").  This view differs from other Circuits.  *See Mastro,* 465 B.R. at 612 n.19 ("In *Incomnet,* the Ninth Circuit expressly rejected the 'control test,' as espoused by the Eleventh Circuit, and more gently rejected other courts' attempts to blend or hybridize the separate and distinct 'dominion' and 'control' tests.").  Notably, after the Ninth Circuit handed down *Incomnet, Paloian* declined to "create a conflict among the circuits on the question how to interpret one of our own opinions." *Paloian,* 619 F.3d at 692 (citing *Incomnet* as one of the opinions "adopting and applying the approach that this circuit devised in *Bonded Financial Services*.").

[21] Once left to its own devices, the decisions of the Collateral Trustee are not to be second-guessed: Secured Parties under the Senior Secured Notes and the Credit Facility may not contest, protest, or object to "any other exercise by the Collateral Trustee of any rights and remedies relating to the Collateral . . . ."  (ECF No. 1705-2 at 29).

powers and remedies granted or available to it under, pursuant to or in connection with the Security

Documents" once permitted to do so by the Controlling Priority Lien Representative.  (ECF No.

1705-2 at 27).  How it goes about protecting, exercising, and enforcing those interests is up to

Wilmington Trust.

       The fact that the Collateral Trustee is obligated to administer any proceeds of Enforcement

Actions pursuant to Section 3.4 (laying out the priority for the application of proceeds of any

Enforcement Action) is of no moment.  *See Paloian*, 619 F.3d at 692 ("[L]ots of decisions hold

that an entity that receives funds for use in paying down a loan, or passing money to investors in

a pool, is an 'initial transferee' ***even though the recipient is obliged by contract to apply the funds***

***according to a formula***.") (emphasis added).  Moreover, it is the Collateral Trustee, not the

Controlling Priority Lien Representative, who decides how to make allocations consistent with

Section 3.4 following an Enforcement Action: "In making the determinations and allocations in

accordance with Section 3.4(a), the Collateral Trustee may . . . ."  (ECF No. 1705-2 at 34).  The

Collateral Trustee is not a simple intermediary on a wire transfer or a law firm passing funds

through a trust account.  *See Mervyn's Holdings*, 426 B.R. at 103; *Coutee*, 984 F.2d at 141.

       Finally, the first priority for disbursing the proceeds of Enforcement Actions within Section

3.4 of the Collateral Trust Agreement is for "liabilities of any kind incurred by the Collateral

Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security

Document . . . ."  (ECF No. 1705-2 at 31).  Were this a normal § 550 action in which Wilmington

Trust were obliged to hand over the value of the preferential transfers to the bankruptcy estate,

Wilmington Trust would draw that money from Enforcement Action proceeds.  The Senior

Noteholders would end up paying through the diminution of pool of Enforcement Action proceeds

from realization upon their collateral.  In that scenario, the money would come from the "persons 'for whose benefit [the] transfer was made.'"  *See Paloian*, 619 F.3d at 692.

The Court reemphasizes that Wilmington Trust will never actually be ordered to pay any amounts as the initial transferee.  The Lien-Related Litigation is meant to determine the value of Causes of Action in order to allocate the Reorganized Debtor's stock between the DIP Lenders, Senior Secured Noteholders, and unsecured creditors.  Wilmington Trust is simply a defendant for purposes of valuing the Creditor Representative's Causes of Action.

Wilmington Trust is the appropriate target of a preferential transfer recovery as an initial transferee.[22]  The Creditor Representative's Causes of Action will not fail for lack of a proper defendant.

### C.        Preservation of a Monetary Recovery

The Secured Ad Hoc Group argues that neither the Debtors nor the Creditor Representative preserved a monetary recovery under § 550(a) (ECF No. 2540 at 13–15).  The Secured Ad Hoc Group cites to filings of the Creditors' Committee and the Lien Challenge Complaint for the proposition that the Debtors did not assert a claim to augment the estate: "Although it includes a claim for 'recovery of avoided transfers' pursuant to § 550(a), it does not plead or request that the Court award the ***value*** of any avoidable liens but seeks only 'the property transferred'—*i.e.*, the liens." (ECF No. 2540 at 13–14).

Item J within the Prayer for Relief of the Lien Challenge Complaint states, "On Count X [for the recovery of avoided transfers], entering a judgment finding that all transfers described in

---

[22] It is also worth noting that RBC believed it had significant control over the liens when it was the Collateral Trustee.  (ECF No. 293 at 5) ("Under the Collateral Trust Agreement, ***the Collateral Trustee exercises substantial control over the Prepetition Collateral*** and acts on behalf and for the benefit of the Prepetition Secured Parties pursuant to the structure set forth in the Collateral Trust Agreement. . . . [T]he Collateral Trustee may take 'any action' to enforce its security interests, or take any other action in respect of the Prepetition Collateral, as directed by the Controlling Priority Lien Representative.") (emphasis added).

this Complaint are avoided and the Debtors are thus entitled to recovery under § 550 . . . ."  (Adv. Pro. No. 20-03057, ECF No. 1 at 24).  The Lien Challenge Complaint seeks recovery under § 550, which is not limited to the Court awarding "the property transferred."

The Secured Ad Hoc Group's final argument is that the Disclosure Statement should have referenced the Creditor Representative's Causes of Action and its purported $338 million worth. (ECF No. 2540 at 13).  The Disclosure Statement contains Financial Projections.  (ECF No. 1124 at 154).  The Financial Projections assume "$2.6M for causes of action, which is an estimate provided by Counsel; Actual recoveries may materially differ with an estimated range of $0 - $5M."  (ECF No. 1124 at 157).  The Secured Ad Hoc Group argues that the Disclosure Statement is thus misleading.  (ECF No. 2540 at 14).  The Lien-Related Litigation is about allocating stock, not recovering money.  The Lien-Related Litigation should not affect the Disclosure Statement's Financial Projections.   Additionally, the Disclosure Statement references the Lien-Related Litigation: "The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date."  (ECF No. 1124 at 26).

The Disclosure Statement arguably could have contained a more complete estimate and statement of the value of the litigation.  But that issue does not affect this claim.  The purpose of the Disclosure Statement was to allow the solicitation of votes on the Plan.  No party challenges the validity of confirmation.  The issue has no bearing on the present dispute.

## CONCLUSION

A separate order will be issued.

SIGNED 01/11/2023

_____

Marvin Isgur

United States Bankruptcy Judge