United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 03, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-34508** |
| **SANCHEZ ENERGY CORPORATION,** *et al.*, | § | |
| | § | |
| Debtors. | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION

Following hard-fought litigation between sophisticated parties, the Lien-Related Litigation is at an end. In Phase 3 of the Lien-Related Litigation, the Secured Ad Hoc Group (consisting of prepetition secured creditors who became DIP lenders) and the Creditor Representative (representing unsecured creditors) jockeyed for ownership of Mesquite Energy, Inc.—the reorganized Sanchez Energy Corporation.

Under the confirmed Plan, the pivotal issue respecting the allocation of ownership is the value of the Creditor Representative's Causes of Action. The Secured Ad Hoc Group argues that the Creditor Representative's Causes of Action are worthless, and the Court should allocate all the remaining allocable Mesquite stock to it. The Creditor Representative argues that its Causes of Action are worth approximately $210 million, and the Court should allocate most of Mesquite's stock to it.

Upon review of the relevant facts, the testimony of expert witnesses, and Sanchez's Plan, the Creditor Representative prevails. The Court allocates 69.73% of Mesquite's stock to the holders of Allowed Class 4 and Allowed Class 5 Claims (and their successors and assigns) and 30.27% of Mesquite's stock to the holders of Allowed Class 3 Claims (and their successors and assigns).

## BACKGROUND

Sanchez Energy Corporation was an exploration and production company focused on acquiring and developing onshore oil and natural gas resources.  (ECF No. 1 at 5).  Sanchez and its affiliated debtors filed for bankruptcy after years of volatile oil prices.  (ECF Nos. 1; 1124 at 10).

## I.    PREPETITION LIENS

Before filing for bankruptcy, Sanchez incurred secured and unsecured debt.  Sanchez had unsecured obligations of: (i) $600 million of 7.75% Senior Unsecured Notes due June 2021 (the "7.75% Unsecured Notes"); and (ii) $1.150 billion of 6.125% Senior Unsecured Notes due January 2023 (the "6.125% Unsecured Notes").  (ECF No. 2672 at 2).  In secured debt, Sanchez had: (i) a $25 million Credit Facility with Royal Bank of Canada ("RBC") as administrative agent and lender (the "Credit Facility"); and (ii) $500 million of 7.25% Senior Secured Notes due 2023 (the "Senior Secured Notes").  (ECF No. 2672 at 3).  Sanchez and various of its subsidiaries[1] guaranteed these obligations (collectively, the "Guarantors").

Only the documents pertaining to the Senior Secured Notes are relevant to the Lien-Related Litigation.  The principal documents are: (i) the 7.25% Senior Secured First Lien Notes Due 2023 Indenture (the "Indenture"); (ii) the Collateral Trust Agreement; (iii) the Second Amended and Restated Security and Pledge Agreement with Sanchez and the Other Debtors (the "Security Agreement"); and (iv) 18 Deeds of Trust.  (ECF Nos. 1703-4; 1705; 1705-2; 1709).

Delaware Trust Company served as the original Indenture Trustee for the Senior Secured Notes.  (ECF No. 2672 at 10).  Wilmington Savings Fund Society, FSB ("WSFS") succeeded

---

[1] SN Palmetto, LLC ("SN Palmetto"), SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC ("SN Catarina"), Rockin L Ranch Company, LLC, SN Payables, LLC, and SN EF Maverick, LLC.  (ECF No. 2672 at 2).

Delaware Trust Company as Indenture Trustee.  (ECF No. 2672 at 10).  Under the Collateral Trust Agreement, RBC was the original Collateral Trustee and the Controlling Priority Lien Representative.  (ECF No. 2672 at 3).  Under the Successor Collateral Trustee Agreement, (i) WSFS succeeded RBC as the Successor Controlling Priority Lien Representative; and (ii) Wilmington Trust, National Association succeeded RBC as Collateral Trustee of the Senior Secured Notes.  (ECF No. 2540-1 at 3).

Sanchez and the Senior Secured Noteholders intended to secure the obligations under the Credit Facility and Senior Secured Notes through liens on substantially all of the Guarantors' assets.  Eighteen Deeds of Trusts, including Deeds of Trust on the Hausser, Harrison, and Koenning oil and gas leases (the "HHK Leases"), were intended to grant the Senior Secured Noteholders real property liens over the oil and gas leases in which the Guarantors had interests.  (ECF No. 2501 at 1; Adv. Pro. No. 20-03057, ECF No. 1 at 9–10).  Each Deed of Trust states that it is an "Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement, and Assignment of Production."  (ECF No. 1703-4 at 1).  The granting clause of each Deed of Trust states that the Sanchez affiliate:

> has MORTGAGED, GRANTED, BARGAINED, SOLD, PLEDGED, ASSIGNED, CONVEYED, TRANSFERRED and SET OVER and by these presents does hereby MORTGAGE, GRANT, BARGAIN, SELL, PLEDGE, ASSIGN, CONVEY, TRANSFER and SET OVER unto Trustee and Trustee's substitutes or successors, and his and their assigns, for the benefit of the Mortgagee, ***all of Grantor's right, title and interest in and to the following items of real and personal property and interests, whether now owned or hereafter acquired by Grantor under applicable Law (as defined below) or in equity (collectively, the "Mortgaged Property")***, the inclusion of certain specific types and items of property and interests in one or more of the following paragraphs is not intended in any way to limit the effect of the more general descriptions:

(ECF No. 1703-4 at 3) (emphasis added). All of Sanchez's property, both real and personal, was designated as "Mortgaged Property." Immediately following this granting clause is Paragraph A, which states:

> All those certain oil, gas and mineral leases and the estates created thereby, royalty interests, overriding royalty interests, production payments, net profits interests, fee interests, carried interests, reversionary interests and ***all other rights, titles, interests or estates described on <u>Exhibit A</u> attached hereto and made a part hereof***, whether such rights, titles, interests or estates are completely and accurately described therein or not (***all of which rights, titles, interests and estates described in this Paragraph A are hereinafter, together with the rights, title, interests and estates described in the following Paragraph B, collectively referred to as the "<u>Subject Interests</u>"***). The terms "oil, gas and mineral leases" and "leases", as used in this instrument and in Exhibit A, each includes, in addition to oil, gas and mineral leases, oil and gas leases, oil, gas and sulphur leases, other mineral leases, co-lessor's agreements and extensions, amendments, ratifications and subleases of all or any of the foregoing, all as may be appropriate.

(ECF No. 1703-4 at 3–4) (emphasis added). Paragraph A applies to oil, gas, and mineral leases, and it explains that each Deed of Trust creates a lien on property described in Exhibit A. Paragraph B pertains to present and future unitization and pooling agreements "which include, belong or appertain to the Subject Interests." (ECF No. 1703-4 at 4). "Subject Interests" are rights, titles, interests, and estates described in Paragraphs A and B. Thus, Subject Interests are rights, titles, interests, and estates in: (i) oil, gas, and mineral leases; and (ii) unitization and pooling agreements. Of the remaining granting paragraphs, Paragraphs C and E are relevant. Paragraph C concerns hydrocarbons:

> ***All present and future oil, gas, casinghead gas, condensate, drip gasoline, natural gasoline, distillate, all other liquid or gaseous hydrocarbons produced or to be produced in conjunction with the Subject Interests***, all products, by-products and all other substances derived therefrom or the processing thereof; and all other similar minerals now or hereafter accruing to, attributable to, or produced from, the Subject Interests or to which Grantor now or hereafter maybe entitled as a result of, or by virtue of, Grantor's ownership of the Subject Interests (collectively, "<u>Hydrocarbons</u>").

(ECF No. 1703-4 at 4) (emphasis added).  Paragraph E concerns personal property and fixtures, including wells:

> ***All present and future oil and gas wells***, disposal and injection wells, rigs, platforms, improvements, fixtures, machinery, pipe and other equipment, inventory and articles of personal property, now owned or hereafter acquired by Grantor ***found in, on, or under any of the Subject Interests***, including, without limitation, connection apparatus and flow lines from wells to tanks, wells, pipelines, gathering lines, flow lines, compressor, dehydration and pumping equipment, pumping plants, gas plants, processing plants, pumps, dehydration units, separators, heater treaters, valves, gauges, meters, derricks, rig substructures, buildings, tanks, reservoirs, tubing, rods, liquid extractors, engines, boilers, tools, appliances, cables, wires, tubular goods, machinery, supplies and any and all other equipment, inventory and articles ***of personal property of any kind or character whatsoever appurtenant to, or used or held for use in connection with, the production of Hydrocarbons or Other Minerals from the Subject Interests***, or now or hereafter ***located on any of the lands (the "___Lands___") encumbered by any of the Subject Interests***, or used on or about the Lands in connection with the operations thereon, together with all present and future improvements or products of; accessions, attachments and other additions to, tools, parts and equipment used in connection with, and substitutes and replacements for, all or any part of the foregoing (all of the types or items of property and interests described in this Paragraph E are hereinafter collectively referred to as the "___Personal Property and Fixtures___").

(ECF No. 1703-4 at 4–5) (emphasis added).  Following the final granting paragraph, the Deed of Trust purports to grant a:

> [F]irst and prior security interest in and to all of the Grantor's right, title, and interest in and to the following types and items of property and interests (all of which are included with the term "___Mortgaged Property___"): (a) all present and future Personal Property and Fixtures, Subject Contracts and Accounts; (b) all present and future Hydrocarbons, Other Minerals and as-extracted collateral insofar as the same accrue to, attribute to or are produced from the Subject Interests and consist of minerals or the like (including oil and gas) . . . .

(ECF No. 1703-4 at 6).  The Deeds of Trust end with "Exhibit A."  The Introduction to Exhibit A aims to provide an "explanation of the terminology, format and information contained in ___Exhibit A___ . . . ." (ECF No. 1703-4 at 23).  Each Introduction states that "[t]his instrument covers the Grantor's entire interest in each of the land parcels, mineral servitudes, mineral leases, mineral

royalties and other mineral rights described in Exhibit A" and that "well names and well arabic numbers [in Exhibit A] are generally for descriptive purposes."  (ECF No. 1703-4 at 23).

The body of Exhibit A consists of two lists: (i) leases; and (ii) wells.  (ECF No. 1703-4 at 23–47).  The wells are not specifically associated with any leases despite the statement in the Introduction that "[t]he leases listed below each well or group of wells relate to one or more of such listed wells."  (*See* ECF No. 1703-4 at 23–47).

At no time did the Senior Secured Noteholders, RBC, the Collateral Trustee, or the Indenture Trustee foreclose on any liens on the HHK Leases.  (ECF No. 2672 at 4).  Indeed, Sanchez: (i) operated the wells on the HHK Leases; (ii) extracted oil, gas, and other hydrocarbons from the wells on the HHK Leases; (iii) provided for the gathering, transportation, processing, and marketing of the oil, gas, and other hydrocarbons extracted from the wells on the HHK Leases; and (iv) collected the proceeds of the sale of the oil, gas, and other hydrocarbons.  (ECF No. 2672 at 4).

Around June 2019, it was discovered that several Deeds of Trust, including those pertaining to the HHK Leases, were inaccurate.  (ECF Nos. 2501 at 1; 2672 at 5).  The Senior Secured Noteholders engaged Cinco Energy Management Group to file Correction Affidavits for those Deeds of Trust.  Cinco filed the Correction Affidavits between June 27, 2019 and July 24, 2019.  (ECF Nos. 1703-24 at 1; 2501 at 1–2; 2672 at 5).  At the time of the filing of the Correction Affidavits, Sanchez was insolvent.  (ECF No. 2672 at 5).

Beyond the Deeds of Trust purporting to grant liens on the leases, the Senior Secured Noteholders were secured by liens on all of the Guarantors' personal property under the Security Agreement.  The Security Agreement states that it grants a security interest for the performance of the "Secured Obligations," which are ultimately defined by the Collateral Trust Agreement.  (ECF

No. 1709 at 10, 11).  The Collateral Trust Agreement defines Priority Lien Obligations to include "Priority Lien Debt," which is defined as "First Out Debt and First Lien Debt."  (ECF No. 1705-2 at 18, 19; 1709 at 5).  First Lien Debt includes the "Initial First Lien Notes," which are defined in the Collateral Trust Agreement as the Senior Secured Notes.  (ECF No. 1705-2 at 11).  Thus, the Security Agreement grants a security interest for the performance of the Senior Secured Notes. Under the Security Agreement, each Guarantor granted a security interest in:

> (a) all Accounts, (b) all Documents; (c) all Equipment; (d) all General Intangibles; (e) all Governmental Approvals; (f) all Instruments; (g) all Inventory; (h) all Investment Property; (i) all Securities Collateral; (j) all rights, claims and benefits of such Debtor against any Person arising out of, relating to or in connection with Inventory or Equipment purchased by such Debtor, including any such rights, claims or benefits against any Person storing or transporting such Inventory or Equipment; (k) *all other tangible and intangible personal property and fixtures of such Debtor*, including all cash, products, rents, revenues, issues, profits, royalties, income, benefits, commercial tort claims, letter-of-credit rights, supporting obligations, accessions to, substitutions and replacements for any and all of the foregoing, any indemnity, warranty or guarantee payable by any reason of loss or damage to or otherwise with respect to any of the foregoing, and all causes of action, claims and warranties now or hereafter held by such Debtor in respect of any of the items listed above; (l) all books, correspondence, credit files, records, invoices and other papers, including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Debtor or any computer bureau or service company from time to time acting for such Debtor; and (m) *all Proceeds of the collateral described in the foregoing clauses (a) through (l)*.

(ECF No. 1709 at 11–12) (emphasis added).

On February 14, 2018, the Collateral Trustee filed "all asset" UCC-1 financing statements for each of the Debtors to perfect the Senior Secured Noteholders' liens in the Guarantors' personal property.  (*See* ECF Nos. 1702-2–1702-10).  These were filed only with the Texas Secretary of State or the Delaware Department of State.  None were filed in the Texas counties in which the leases existed.

## II.   BANKRUPTCY PROCEEDINGS

Sanchez and its affiliated debtors filed for bankruptcy on August 11, 2019.  (ECF No. 1).

Sanchez was insolvent on the Petition Date, but neither the Senior Secured Noteholders nor the

Indenture Trustee had declared an event of default.  (ECF No. 2672 at 5).

### A.   DIP Process

The Creditor Representative alleges that the Senior Secured Noteholders were able to

utilize their (apparently) fully secured position to leverage a superior position during the

negotiations over Debtor-in-Possession ("DIP") financing proposals.  The DIP process is relevant

to those allegations.

Sanchez began a process to solicit proposals for DIP financing in June 2019.  Various

groups submitted indications of interest, including 18 financial institutions, the Secured Ad Hoc

Group (consisting of the overwhelming majority of the Senior Secured Noteholders),[2] and a group

of Sanchez's unsecured creditors (the "Unsecured Notes Ad Hoc Group").  (ECF No. 2672 at 6).

The Secured Ad Hoc Group offered the opportunity to participate in DIP financing to all beneficial

holders of the Senior Secured Notes.  Some beneficial holders elected not to participate in the DIP

financing.  (ECF No. 2672 at 6).  Sanchez initially received only one post-petition financing

proposal.  It was from the Secured Ad Hoc Group.  (ECF No. 2672 at 6).  The other potential

financing parties did not proceed with financing proposals due to discomfort with the potential

collateral package and their unwillingness to receive anything less than a superpriority or priming

lien on the vast majority, if not all, of the Debtors' assets.  (ECF No. 2672 at 6–7).  Those parties

---

[2] The parties agree that "[t]he investment advisors or managers of the funds or accounts who actually became DIP Lenders also advised or managed funds or accounts beneficially holding approximately 91% of the Senior Secured Notes."  (ECF No. 2672 at 6).

were similarly unwilling to engage in a priming dispute with the Senior Secured Noteholders over the priority of the Senior Secured Notes.  (ECF No. 2672 at 7).

On August 13, 2019, the Unsecured Notes Ad Hoc Group objected to Sanchez's motion for DIP financing.  (ECF No. 74).  Two days later, the Court approved an Interim DIP Order under which Sanchez gained access to $50 million in new money.  (ECF No. 2672 at 7).  As indicated by the title of the Order, this was only interim relief.

On August 21, 2019, the Unsecured Notes Ad Hoc Group sent its own DIP financing term sheet to Sanchez.  (ECF No. 2672 at 7).  Under their DIP proposal, the Unsecured Notes Ad Hoc Group would obtain senior priming liens on all collateral securing the Senior Secured Notes (including the HHK Leases).  (ECF No. 2672 at 7).  RBC (as Collateral Trustee) and the Senior Secured Noteholders did not consent to this priming.  (ECF No. 2672 at 7–8).

On September 12, 2019, the Unsecured Notes Ad Hoc Group again objected to Sanchez's DIP Motion (this time seeking final rather than interim relief) seeking to adopt the Secured Ad Hoc Group's proposal.  (ECF No. 299).  The Court held an evidentiary hearing on September 19, 2019.  The Court denied the Secured Ad Hoc Group's motion for DIP financing on a final basis. (ECF No. 359 at 274–75).  Although it occurs occasionally, it is unusual for a bankruptcy court to deny final approval of DIP Financing.

Stakeholders (chiefly (i) Sanchez; (ii) the Senior Secured Noteholders who declined to participate as DIP Lenders; (iii) the Secured Ad Hoc Group; and (iv) the Unsecured Notes Ad Hoc Group) then negotiated a framework for DIP financing resulting in an agreed DIP financing from the Secured Ad Hoc Group.  (ECF No. 2672 at 8).  After receiving no objections, the Court approved the Final DIP Order on January 22, 2020.  (ECF No. 865).

Under the Final DIP Order, Sanchez obtained access to "a $200 million superpriority, priming, senior secured delayed-draw term loan credit facility including $150 million in New Money Loans and $50 million in Roll-Up Loans."  (ECF Nos. 1486 at 12; 865 at 2; 2672 at 8).  Sanchez borrowed $100 million of new money under the DIP Facility and rolled up $50 million of Senior Secured Notes.  (ECF Nos. 865 at 19; 2672 at 9).  Sanchez then paid off the balance of the $25 million credit facility with RBC using funds it received under the Final DIP Order.  (ECF No. 2672 at 7).[3]

Under the Final DIP Order, Sanchez was ordered to pay the fees, costs, and expenses of the Credit Agreement Parties, the DIP Agent, and the DIP Lenders (including their professionals).  (ECF No. 2672 at 9).  Sanchez was also ordered to pay the fees and expenses of the counsel and advisors to the Secured Ad Hoc Group, counsel to RBC, and counsel to any Successor Collateral Trustee.  (ECF No. 2672 at 9).  Sanchez paid: (i) $14 million to the advisors and counsel to the Credit Agreement Parties, the DIP Agent, the DIP Lenders, and the Secured Ad Hoc Group; and (ii) $1 million to the counsel for the Unsecured Ad Hoc Group.  (ECF No. 2672 at 9).

Between January 2020 and March 2020, the COVID pandemic's effect on Sanchez was disastrous.  On March 27, 2020, Sanchez defaulted under the DIP Credit Agreement, which suspended the DIP Lenders' obligation to advance the remaining $50 million in new money.  (ECF No. 2672 at 9).

### B.    Lien Challenge Complaint

On March 10, 2020, Sanchez filed a complaint (the "Lien Challenge Complaint") in an adversary proceeding against RBC (as lender and administrative agent under the Credit Facility),

---

[3] The Senior Secured Noteholders consented to the priming of their prepetition liens under the Final DIP Order, and as discussed below, the Court found that the DIP Liens primed the Senior Secured Noteholders' liens. (ECF Nos. 2501 at 14; 2672 at 8).

WSFS (as Successor Notes Trustee), and Wilmington Trust (as Successor Collateral Trustee). (Adv. Pro. No. 20-03057, ECF No. 1). The Lien Challenge Complaint asserts that the defendants failed to create or perfect their pre-petition liens in Sanchez's property. (Adv. Pro. No. 20-03057, ECF No. 1 at 2). Among other things, Sanchez sought to avoid and recover the Correction Affidavits under 11 U.S.C. §§ 547(b) and 550 because they were transferred within 90 days of the petition date. (Adv. Pro. No. 20-03057, ECF No. 1 at 4–5, 15–16). In its prayer for relief, Sanchez seeks "a judgment finding that all transfers described in this Complaint are avoided and the Debtors are thus entitled to recovery under § 550 . . . ." (Adv. Pro. No. 20-03057, ECF No. 1 at 24).

### C.    Plan of Reorganization and Confirmation Order

Sanchez filed its first plan of reorganization on April 6, 2020. (ECF No. 1109). It filed the solicitation version of the plan on April 9, 2020.[4] (ECF No. 1119). Sanchez filed an amended plan on April 26, and a Second Amended Plan (the "Plan") on April 30, 2020.[5] (ECF Nos. 1149; 1198; 1205). On April 30, 2020, the Court approved Sanchez's Disclosure Statement and confirmed the Plan. (ECF No. 1212).

The Plan is unusual. After the commencement of the COVID pandemic, oil and gas prices plunged. At one brief point, prices fell below $0.00. This created extreme liquidity problems for Sanchez and an environment in which assets could not be readily sold. The Plan, approved on an emergency basis, allowed Sanchez to exit the bankruptcy case and its attendant inefficiencies and expenses. Rather than resolving disputes that would normally occur prior to confirmation, the

---

[4] Following the April 8, 2020 hearing, Sanchez amended the voting rights of Classes 4 and 5 from "Deemed to Reject" to "Entitled to Vote." (ECF Nos. 1109 at 18; 1119 at 18; 1126 at 43–44).

[5] Sanchez filed two Second Amended Plans on April 30, 2020. (ECF Nos. 1198; 1205). ECF No. 1205 removed provisions about the "Fee Examiner" from ECF No. 1198 and adjusted the start date of the Lien–Related Litigation. (ECF No. 1205-1 at 8–9, 17–18, 25). The Court refers to the Second Amended Plan at ECF No. 1205 as the "Plan" throughout this opinion.

Plan deferred resolution until after Plan confirmation.  All major parties consented to this unusual arrangement.

### (1)    Lien-Related Litigation Structure

In the process of negotiating the final version of the Plan, the principal parties agreed to abate the Lien Challenge Complaint adversary proceeding until after the April 30, 2020 confirmation hearing.  (Adv. Pro. No. 20-03057, ECF No. 9).  The Lien Challenge Complaint was then folded into the "Lien-Related Litigation" in Sanchez's main case:

> [L]itigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) *all Causes of Action referenced and asserted in the Lien Challenge Complaint*, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) *the value of Causes of Action*, and (ix) the relative value of encumbered and unencumbered assets.

(ECF No. 1205 at 10) (emphasis added).  Causes of Action are:

> [A]ny Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) *claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code*;[6]  and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

---

[6] Exhibit D of the Plan Supplement confirms that the Lien Challenge Complaint contains Causes of Action: "For the avoidance of doubt, the Causes of Action within the scope of the Lien-Related Litigation include those set

(ECF No. 1205 at 5–6) (emphasis added).  The plaintiff in the Lien-Related Litigation is a "Lien-Related Litigation Creditor Representative" selected by the Creditors' Committee (the "Creditor Representative").  (ECF No. 1205 at 10).  The Creditor Representative has standing to "pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan."  (ECF No. 1205 at 10, 27).

Under the Confirmation Order, the Lien-Related Litigation was to be adjudicated according to the procedures outlined in the Plan.  (ECF No. 1212 at 7).  The Confirmation Order also reaffirms that:

> (i)    "[a]ny and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by this Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code;" and
>
> (ii)   the allocation may include "the consideration of the value . . . of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims."

(ECF No. 1212 at 7).  In agreeing to the Plan, the Debtors, the DIP Lenders, the Creditors' Committee, and the Unsecured Noteholder Ad Hoc Group stipulated to an $85 million "Enterprise Value" of the Reorganized Debtors.  (ECF No. 1212 at 3).  This Enterprise Value is binding for the purposes of the Lien-Related Litigation.  It excludes the value of the Debtors' Causes of Action.  (ECF Nos. 1212 at 3–4; 1220 at 18).  In negotiating the Plan, the DIP Lenders agreed to fully equitize their DIP claims instead of receiving payment in full in cash.  (*See* ECF Nos. 1220 at 30;

---

forth in the complaint filed in *Sanchez Energy Corp. et al. v. Royal Bank of Canada et al.*, Adv. Pro. No. 20-03057 (Bankr. S.D. Tex.)."  (ECF No. 1148 at 10).

2672 at 11). The Secured Ad Hoc Group and the Creditor Representative stipulated that the DIP Lenders' claims totaled at least $150 million, and at least $85 million of that $150 million was secured. (ECF No. 2672 at 11).

### (2)    Mesquite Stock Distribution

Under the Plan, certain parties have received or will receive shares of the Reorganized Debtors' New Common Stock in full satisfaction of their claims.[7] (ECF No. 1205 at 5, 10). The DIP Lenders received 20% of the common stock on the Effective Date. (ECF Nos. 1205 at 7; 1220 at 28). The remaining 80% (the "Post-Effective Date Equity Distribution") was to be issued to "Holders of Allowed Claims in Classes 3 [DIP claims], 4 [Secured Notes claims] and/or 5 [General Unsecured claims] as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation."[8] (ECF No. 1205 at 11). On August 13, 2021, the Creditor Representative began an adversary proceeding alleging that the DIP Lenders impermissibly diluted the 80% of Mesquite stock that was reserved under the Plan. (Adv. Pro. No. 23862, ECF No. 1). The Court abated that adversary proceeding pending the outcome of the Lien-Related Litigation.[9] (Adv. Pro. No. 23862, ECF No. 154 at 3).

---

[7] Sanchez reorganized into Mesquite Energy, Inc. "New Common Stock" is the "common stock of Reorganized SN to be issued pursuant to the Plan." (ECF No. 1205 at 10). "Authorized Plan Distribution Shares" are "the shares of New Common Stock available for distribution under the Plan on account of Claims." (ECF No. 1205 at 5).

[8] The holders of DIP Claims (Class 3) received the 20% of Mesquite stock on the Effective Date and:

100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

(ECF No. 1205 at 19).

[9] The Secured Ad Hoc Group also commenced an adversary proceeding against the Creditor Representative concerning the source of funding for the Creditor Representative's counsel. (Adv. Pro. No. 22-3145, ECF No. 1). That adversary proceeding has not moved forward during the pendency of the Lien-Related Litigation. (Adv. Pro. No. 22-3145, ECF No. 61).

### III.    PROCEDURAL HISTORY OF THE LIEN-RELATED LITIGATION

The Plan outlines three phases of Lien-Related Litigation:

*Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date[10] to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

*Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, ***other than as to the valuation of Causes of Action***, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading ***filed by the Lien-Related Litigation Creditor Representative*** on or before the 35th day following the Effective Date.

*Phase 3: **If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary*** as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading ***filed by the Lien-Related Litigation Creditor Representative*** not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

(ECF No. 1205 at 24) (emphasis added).  The Court may issue a final ruling allocating the Post-

Effective Date Equity Distribution at the end of any of the three phases.  (ECF No. 1205 at 24).

In Phase 1, the parties[11] submitted questions of law seeking interpretations of the Final DIP

Order.[12]  The Court determined that: (i) the proceeds of Avoidance Actions "remain in the Creditor

---

[10] The Effective Date is June 30, 2020.  (ECF No. 1417).

[11] "The ad hoc group . . . of certain unaffiliated funds, accounts, and/or managers of funds or accounts, as beneficial holders of Secured Notes Claims, and as lenders . . . under the DIP Credit Agreement") (the Secured Ad Hoc Group) and the Creditor Representative submitted Phase 1 briefs.  (ECF No. 1485; 1486).

[12] In its Phase 1 brief, the Secured Ad Hoc Group argues that "[t]he Lien-Related Litigation process described in the Plan provides for the ***valuation of Causes of Action*** (which were not valued at confirmation or included in the Enterprise Value) and the final determination of certain remaining challenges to the DIP Claims and Secured Notes Claims."  (ECF No. 1486 at 3–4) (emphasis added).  Indeed, the Secured Ad Hoc Group interprets the Plan to grant Secured Notes and General Unsecured claimants stock "only if the ***value of Causes of Action*** (to be determined in Phase 3 of the Lien-Related Litigation) plus the Enterprise Value exceeds the sum of all Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, Statutory Fees, Other Secured Claims, Other Priority Claims, and the DIP Claims."  (ECF No. 1486 at 7) (emphasis added).

Representative's bundle of rights" so long as they are traceable; and (ii) the DIP Lenders gave up their rights to the proceeds of Avoidance Actions other than 50% of the first $100 million of proceeds of Avoidance Actions against parties other than the Prepetition Secured Parties.  (ECF No. 1599 at 5).  The Court did not precisely address the meaning of "proceeds" in Sections 9 and 10 of the Final DIP Order in the Phase 1 hearing.  (*See* ECF No. 1599).

In Phase 2, the Secured Ad Hoc Group and the Creditor Representative litigated the existence, validity, perfection, and avoidance of certain liens.  The Court ruled that the Senior Secured Noteholders' HHK Liens were avoidable.  (ECF No. 1847 at 38).  The Correction Affidavits cured the errors in the Senior Secured Noteholders' HHK Liens and brought them into compliance with the Statute of Frauds.  (ECF No. 1847 at 39).  However, the Correction Affidavits constituted transfers of Sanchez's property within 90 days of the Petition Date.  (ECF No. 1847 at 39).  The Court deferred the determination of whether the Correction Affidavits were preferential transfers to Phase 3.  (ECF No. 1847 at 41).

During the Phase 3 oral argument, the Court realized that Phase 1 issues remained.  On July 22, 2022, the Court reconsidered Phase 1 and ruled that the DIP Lenders held priming liens on the HHK leases under Section 10(b) of the Final DIP Order.  (ECF No. 2501 at 14).  The Court also ruled that the DIP Lenders' superpriority claims did not have recourse to the proceeds of Avoidance Actions against the Senior Secured Noteholders,[13] which include property recovered or unencumbered by the Avoidance Actions.  (ECF No. 2501 at 11, 13).  Notably, the holders of DIP superpriority claims had recourse to 50% of the first $100 million of proceeds or property recovered or unencumbered by Avoidance Actions against parties other than the Senior Secured

---

[13] The Creditor Representative's claims are Avoidance Actions.  (ECF No. 1205 at 5).

Noteholders.  (ECF No. 2501 at 3).  As of the date of this opinion, Avoidance Actions against parties other than the Senior Secured Noteholders have resulted in proceeds of $2 million.[14]

Following the Phase 1 Reconsideration Opinion, the Court held a hearing on August 31, 2022 and asked the parties to brief two issues: (i) does the Plan foreclose the relief the Creditor Representative seeks regarding a hypothetical valuation of the § 550 action; and (ii) did the Creditor Representative waive its claims before the Plan's effective date.  (ECF No. 2535 at 126–129).  The parties submitted briefs and the Court took the matter under advisement.  (ECF Nos. 2539; 2540; 2542; 2543).  On January 11, 2023, the Court issued an opinion finding that the Plan did not foreclose the relief the Creditor Representative seeks concerning a hypothetical valuation of the § 550 action and the Creditor Representative did not waive its claims before the Effective Date.  (ECF No. 2627).  The Court also clarified that the purpose of the Lien-Related Litigation is to value Avoidance Actions so as to determine the proper allocation of the Post-Effective Date Equity Distribution.  (ECF No. 2627 at 15).  The purpose is not to award money damages or to augment the Reorganized Debtor under § 550.

The Phase 3 hearing spanned across March 27, March 28, and April 19, 2023.  (ECF Nos. 2704; 2710; 2730).   The Court heard testimony from the Creditor Representative's expert witnesses—Aaron Terry and Andrew Scruton—and from the Secured Ad Hoc Group's expert witnesses—Professor Daniel Fischel, John Young, Jr., and Dr. J.B. Heaton—concerning the value of the HHK Liens.

For the reasons explained below, it is critical to understand the impact that the Deeds of Trust had on the market value of Sanchez's secured and unsecured debt.  Some of the experts

---

[14] On September 15, 2022, the Debtors filed a motion seeking approval of a settlement that would release all claims against members of the Sanchez family and Gerald Willinger for a cash payment of $2 million.  (ECF No. 2672 at 13).  On February 21, 2023, the Court approved the settlement.  (ECF No. 2650).

focused solely on the value of the underlying collateral. Others testified about market trading value of the debt as the best proxy for value. As of the date of the Correction Affidavits, Sanchez had $500 million of secured debt and $1.750 billion of unsecured debt. Between June 27, 2019 and July 24, 2019, Sanchez's secured debt traded at approximately 78% of stated value. (ECF No. 2696-38). During the same time period, Sanchez's unsecured debt traded at approximately 5% of stated value. (ECF No. 2696-38). Sanchez's enterprise value at the time the Correction Affidavits were filed, calculated as its secured and unsecured debts multiplied by their trading values, was $477.5 million.[15]

The Court heard closing arguments on May 4, 2023 and took the matter under advisement after the parties submitted post-trial briefs on May 25, 2023. (ECF Nos. 2764; 2785; 2786).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(F). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

The Plan requires the Court to value the Creditor Representative's § 550 Cause of Action for the purpose of allocating the Post-Effective Date Equity Distribution. In its post-trial briefing, the Secured Ad Hoc Group advances six arguments that the Creditor Representative's § 550 Cause of Action is worthless. (*See* ECF No. 2786). If those arguments fail, the Secured Ad Hoc Group advances additional arguments that the actual value of the § 550 Cause of Action should still be

---

[15] ($500 million * 78%) + ($1.750 billion * 5%) = $390 million + $87.5 million = $477.5 million. No party alleges that Sanchez's stock had any material value.

sufficiently low as to allocate the majority of the Post-Effective Date Equity Distribution to the DIP Lenders.  (*See* ECF No. 2786).

I.    **VIABILITY OF CAUSES OF ACTION**

The Court first examines the six arguments, which, if decided in favor of the Secured Ad Hoc Group, would mean that the Creditor Representative's § 550 Cause of Action is worthless: (i) the HHK Liens did not enable the Senior Secured Noteholders to receive anything, so the Correction Affidavits cannot be avoidable preferences under § 547(b)(5); (ii) there was no loss to the estate, so no value can be awarded under § 550; (iii) the estate already recovered the HHK Liens, so no value can be awarded under § 550; (iv) the Senior Secured Noteholders did not cause any depreciation, so no value can be awarded under § 550; (v) return of the HHK Liens, and not their value, is the only appropriate remedy when their value is not easily determinable; and (vi) the Creditor Representative did not assert its claims against a creditworthy defendant, so the § 550 Cause of Action is worthless.

A.    **11 U.S.C. § 547(b)(5)**

For the Creditor Representative's § 550 Cause of Action to have value, the Creditor Representative must first show that the transfer of the Correction Affidavits is an avoidable transfer.  *See* 11 U.S.C. § 550(a) ("[T]o the extent that a transfer is avoided under section . . . 547 . . . of this title, the transfer may recover . . . the property transferred, or . . . the value of such property . . . .").  The Creditor Representative is pursuing avoidance under 11 U.S.C. § 547(b). (*See, e.g.*, ECF No. 2785 at 8).  Section 547(b) has five elements:

[T]he trustee may . . . avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). "If a trustee establishes each of the requirements of § 547(b), the transfer is a preference . . . ." *Garner v. Knoll (In re Tusa-Expo Holdings, Inc.)*, 811 F.3d 786, 791–92 (5th Cir. 2016).

The parties only contest the final element of § 547(b). The Secured Ad Hoc Group argues that "[a] lien that does not enable a creditor to receive anything on its claim cannot be an avoidable preference." (ECF No. 2786 at 11). The Senior Secured Noteholders did not receive payment on account of their claims when their liens were primed and rendered worthless by the COVID-related decline in hydrocarbon prices after the Court entered the Final DIP Order in January 2020. (ECF No. 2786 at 12). Moreover, the HHK Liens were released in the Plan. (ECF No. 2786 at 12). The Secured Ad Hoc Group bases its argument on the premise that § 547(b)(5) requires a comparison "of two values: what the transfer actually '*enables* such creditor *to receive*' and what 'such creditor

*would receive if* the case proceeded under Chapter 7 and the transfer had not occurred." (ECF No. 2786 at 12).

The Secured Ad Hoc Group's understanding of § 547(b)(5) is not consistent with Fifth Circuit precedent.  In *Tusa-Expo Holdings*, the Fifth Circuit explained the typical test for the final element of § 547(b):

> The instant dispute concerns the last of the § 547(b) requirements, namely, subsection (b)(5). "This is the requirement that before a trustee in bankruptcy can avoid a preferential transfer, the trustee must establish that the transfer enabled the creditor to receive more than the creditor would have received upon liquidation under Chapter 7 of the Bankruptcy Code."
>
> To determine whether a trustee has established this requirement, a court typically uses the so-called "hypothetical Chapter 7 liquidation analysis" inherent in § 547(b)(5) itself. To do so, the court (1) constructs a hypothetical Chapter 7 liquidation in which the creditor retains the disputed transfers, *viz.,* the transfers-*retained* hypothetical, and (2) constructs another in which the creditor returns those transfers, *viz.,* the transfers-*returned* hypothetical. To establish the requirement of § 547(b)(5) under this analysis, the sum of (1) the disputed transfers and (2) the creditor's distribution in the transfers-retained hypothetical must be "more" than the creditor's distribution in the transfers-returned hypothetical.

*Tusa-Expo Holdings*, 811 F.3d at 792 (cleaned up).  Importantly, the comparison between the transfers-retained and transfers-returned hypothetical is made as of the petition date.  *Abramson v. St. Regis Paper Co. (In re Abramson)*, 715 F.2d 934, 939 n.9 (5th Cir. 1983) ("[T]he preferential effect of a payment to a creditor is to be determined from the perspective of the date of the filing of bankruptcy." (citing *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229 (1936))); *see also Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819, 822 (6th Cir. 1986) ("*Palmer Clay* stands for no more than that a payment should be tested as of the date the petition in bankruptcy is filed.").

The Correction Affidavits perfecting the HHK Liens placed the Senior Secured Noteholders in a position to receive more in the transfers-retained hypothetical than in the

transfers-returned hypothetical.  At the Phase 3 trial, Mr. Young testified as an expert for the Senior Secured Noteholders.  He stated that there would be between $45 million and $70 million of net distributable value in a hypothetical chapter 7 liquidation if the HHK Liens were made enforceable by leaving the Correction Affidavits intact.  (ECF Nos. 2742 at 145–46; 2700-50 at 17).  Mr. Young testified that all of Sanchez's value would go to the Senior Secured Noteholders, and nothing would go to unsecured noteholders.  (ECF No. 2742 at 147–48).  Mr. Young also testified that if the Correction Affidavits were set aside in a hypothetical chapter 7 liquidation, the Senior Secured Noteholders would receive between $36 and $53 million.  (ECF No. 2742 at 148; Apr. 19, 2023 hearing at 11:55:10 a.m.–11:56:27 a.m.).  The Court asked Mr. Young whether there "[i]s there any amount, any value anywhere . . . where the answer would not be that the secured creditors got more as a result of having the liens versus not having the liens?"  (ECF No. 2742 at 150).  Mr. Young credibly answered that he "cannot think of a scenario where that would not be true."  (ECF No. 2742 at 150).

In the transfers-retained hypothetical, the Senior Secured Noteholders would hold perfected liens on substantially all of Sanchez's assets, thereby securing their $500 million Senior Secured Notes claim.  There would be no DIP financing in a chapter 7 case; the Senior Secured Noteholders would have the only liens on Sanchez's assets.  If Sanchez lacked property sufficient to pay the Senior Secured Noteholders claims in full, Sanchez's unsecured creditors would receive nothing.

In the transfers-returned hypothetical, the Senior Secured Noteholders' HHK Liens would be unperfected, as already determined in the Phase 2 Litigation.  Because the Deeds of Trust lack reasonable certainty to satisfy the Statute of Frauds, the Senior Secured Noteholders lack sufficient documentation for their security interests in the HHK Leases.  A hypothetical trustee could avoid

the defective Deeds of Trust under 11 U.S.C. § 544(a)(3). *See* 5 COLLIER ON BANKRUPTCY ¶ 544.05 (16th ed. 2023) ("[T]he trustee is given the rights and powers of a bona fide purchaser of real property from the debtor if at the time of the commencement of the title 11 case a hypothetical purchaser could have obtained bona fide purchaser status, so the trustee can avoid any liens or conveyances that a bona fide purchaser could avoid."). The Senior Secured Noteholders would only share pro rata with Sanchez's unsecured creditors, meaning that the Senior Secured Noteholders would receive a higher distribution in the transfers-retained hypothetical. This is all § 547(b)(5) requires.

The Secured Ad Hoc Group's argument that there was no preferential transfer because the Senior Secured Noteholders received no payment on account of their liens is of no moment. (ECF No. 2786 at 12). This argument does not affect the hypothetical Chapter 7 liquidation analysis, but to the extent it goes to the "unenumerated" § 547(b) requirement that an avoidable transfer "must have diminished the debtor's estate," there is ample evidence that the transfer of the Correction Affidavits diminished Sanchez's estate. *See In re Tusa-Expo*, 811 F.3d at 792 n.6. For instance, the transfer hamstrung Sanchez's ability to negotiate DIP financing. As the Court stated in the DIP hearings, it is generally better to avoid priming fights: "I really do think a priming fight is usually a very bad idea, and I understand why the Debtors don't want one." (ECF No. 359 at 277). The filing of the Correction Affidavits meant that the Senior Secured Noteholders were presumed to hold perfected security interests on all of Sanchez's assets. As confirmed by Sanchez's former CFO (and Mesquite's current CEO) and Sanchez's investment banker, the specter of a priming fight or lending on a junior or unsecured basis discouraged third parties from entering into DIP financing with Sanchez. (ECF Nos. 2330-9 at 5; 2672 at 6–7; 2720 at 218–220). As of the Petition Date, Sanchez only had one DIP financing proposal: that of the Secured Notes

Ad Hoc Group, which included $175 million of new money and a roll-up of $175 million of Senior

Secured Notes debt.  (ECF Nos. 16 at 33; 2672 at 6).  After the Court approved interim DIP

financing, the unsecured creditors proposed an alternative DIP financing.  (ECF No. 2672 at 7).

Sanchez declined to proceed with the alternative DIP financing.  Yet on September 19, 2019, the

Court denied Sanchez's motion to proceed on a final basis with the Secured Ad Hoc Group's DIP

financing:

> At a time when there is no urgency for new money, the Debtors have chosen to make a precipitous decision to borrow with a priming lien on a loan that isn't always inferior to its alternatives. The only reason that the Debtors have given for doing that is to avoid the priming fight. But in every other way the Debtors have acknowledged that the alternative DIP is superior to the DIP that the Debtors choose to take. And the provisions that are substantially preferential in the alternative DIP reflect that the provisions in the DIP the Debtors have chosen to take are substantially harmful to the estate. They tie the hands of the Unsecured Creditors Committee by giving the Committee virtually no money to conduct an investigation. They limit the ability of the Unsecured Creditors Committee to investigate the first lien lender with any reasonable time frame given the complexity of the transactions. And they require the estate to give up various bankruptcy rights. The decision, however, to avoid the priming fight may still be the correct decision. I'm not saying it isn't. But the Debtors have not met their burden of proof by demonstrating it is the right decision. We are in a situation where there is no time pressure and the Debtor has not done its analysis yet.

(ECF No. 359 at 274–75).  Without the Correction Affidavits, Sanchez could very well have been

able to obtain superior DIP financing.  Sanchez's limitation in attracting third-party DIP financing

proposals due to the Correction Affidavits injured the estate.

    In the end, the members of the Secured Ad Hoc Group managed to secure their position as

DIP Lenders.  Paragraph 19(c) of the Final DIP Order governs the interest Sanchez was to pay to

the Indenture Trustee.  (ECF No. 865 at 36).  Sanchez paid approximately $36 million in interest

to the Indenture Trustee.  (ECF No. 2672 at 8).  Paragraph 19(e) of the Final DIP Order governs

the fees and expenses Sanchez was to pay to the counsel and advisors to: (i) the Secured Ad Hoc

Group; (ii) the Notes Trustee; (iii) RBC (in its various capacities under the Collateral Trust

Agreement and Prepetition Credit Agreement).   (ECF No. 865 at 37–38).   Sanchez paid approximately $14 million to the advisors and counsel of the Credit Agreement Parties, DIP Agent, the DIP Lenders, and the counsel and advisors to the Secured Ad Hoc Group.   (ECF No. 2672 at 9).   Finally, Sanchez agreed to roll-up $50 million of Senior Secured Notes debt.   (ECF No. 865 at 69).   These benefits to the Secured Ad Hoc Group diminished Sanchez's estate.

The Secured Ad Hoc Group relies heavily on *In re Broumas*.   *Koch v. Rogers (In re Broumas)*, 1998 WL 77842 (4th Cir. Feb. 24, 1998).   In fact, the Secured Ad Hoc Group claims *Broumas* is the only § 547(b)(5) case on point because the alleged preferential transfer was a lien instead of cash.   (ECF No. 2774 at 63; Secured Ad Hoc Group's Closing Demonstrative at 6).   Yet *Broumas* is distinguishable.   First, *Broumas*, an unpublished opinion, is a chapter 7 case; this is a chapter 11 case.   1998 WL 77842, at *1.   Second, *Broumas* rests partly on the finding that the transferees were "no better off vis-a-vis the other creditors of the Debtors' estate than they would have been had they not received the transfers of the Deeds of Trust and waited for liquidation and distribution of the assets of the Debtors' estate."   *Id.* at *4.   As discussed above, the Senior Secured Noteholders greatly benefitted from the Correction Affidavits in the DIP financing process.   The benefits they received exist notwithstanding that the Senior Secured Noteholders: (i) never foreclosed on the HHK Liens to satisfy the $500 million Sanchez owed; and (ii) released the HHK Liens in the Plan.[16]

---

[16] The Secured Ad Hoc Group contends that "[a] simple hypothetical proves" the folly of the position that "the preference determination for a lien should be made as of the transfer date without regard to what actually happens after":

> Suppose the debtor gives a creditor a second-position lien on property on the eve of bankruptcy. At the time of the transfer, the lien is worthless because the property is not valuable enough to cover the first-position lien. But the property appreciates during the bankruptcy and, when it is sold, the second-position lien is entitled to some payment. Under the [Creditor Representative's] test, the second-position lien would not be a preference because it did not entitle the lienholder to more than it would otherwise get *as of the transfer date*. This, of course, cannot be right.

The Correction Affidavits satisfy 11 U.S.C. § 547(b)(5).  With no other contested elements of 11 U.S.C. § 547, the Correction Affidavits are avoidable preferential transfers under § 547.

### B.        Returning the Estate to the Pre-Transfer Position

Section 550 permits the Trustee to recover the property or value of property transferred and avoided under various sections of the Bankruptcy Code, including § 547.  Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.  *Trout v. Rodriguez (In re Trout)*, 609 F.3d 1106, 1112 (10th Cir. 2010) (quoting *Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009)); *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010) (quoting *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 883 (9th Cir. 2008)); *Bishop v. FedChex, LLC (In re Bishop)*, No. 2:12-AP-01302-RK, 2017 WL 3623917, at *7 (B.A.P. 9th Cir. Aug. 23, 2017) ("Section 550's purpose 'is to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.'" (quoting *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1111 (9th Cir. 2010))); *Parks v. Brooks (In re Brooks)*, 452 B.R. 809, 816–17 (Bankr. D. Kan. 2011) ("[Section] 550(a) does not mandate that the trustee receive the value of an avoided lien, but rather provides the bankruptcy court with the discretion to fashion relief that places the estate in the position it would have occupied had the avoided transfer not occurred."); 5 COLLIER ON BANKRUPTCY ¶ 550.02 (16th ed. 2023) (describing the goal of restoration as "putting the estate back where it would have been but for the transfer.").  However, § 550(a) "does not define 'value' nor indicate at what time 'value' is to be determined."  *Weinman*

---

(ECF No. 2786 at 14).  The Court disagrees.  The hypothetical chapter 7 liquidation analysis does not disregard what happens after the transfer.  On the contrary, assuming the facts of the Secured Ad Hoc Group's hypothetical, the second-position lien holder receives a higher distribution in the transfers-retained hypothetical than in the transfers-returned hypothetical.  The second-position lien is a preference.

*v. Fidelity Cap. Appreciation Fund (In re Integra Realty Res., Inc.)*, 354 F.3d 1246, 1266 (10th Cir. 2004) (quoting *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998)) (cleaned up).  But in determining the value of the property at the time of the transfer, the Court "has discretion on how to value the property so as to put the estate in its pretransfer position."  *Taylor*, 599 F.3d at 890 (citing *Joseph v. Madray* (*In re Brun*), 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007)).

To determine how to return the estate back to the pre-transfer position, the Court must ascertain Sanchez's pre-transfer position.  Before the transfer, Sanchez had various debts: a $25 million credit facility; and $500 million in secured, but unperfected, debt; and $1.750 billion of unsecured debt.  If Sanchez had filed bankruptcy pre-transfer, Sanchez would have been able to avoid the Senior Secured Notes under § 544(a)(3), and the Senior Secured Noteholders would share from the unsecured creditors' recovery.  In essence, Sanchez would have $2.250 billion of unsecured debt below a $25 million credit facility.  But as a result of the Correction Affidavits, Sanchez had a $25 million credit facility; and $500 million of perfected secured debt; and $1.750 billion of unsecured debt.  The difference between the two scenarios is plain: $500 million of debt was elevated above the $1.750 billion of unsecured debt.

The Court is mindful of the fact that the Senior Secured Noteholders did not get much in the way of benefit from their security.  They agreed to release their liens in the course of negotiating the Plan.  The parties agree that the Senior Secured Notes are prioritized below the DIP liens.  In fact, the holders of the Senior Secured Notes  have not formally participated in the Lien-Related Litigation.  Yet the Secured Ad Hoc Group argues that no value can be awarded under § 550(a) without a loss to the estate.  (ECF No. 2786 at 15).  Pointing to the intent of § 550 as a restorative measure, the Secured Ad Hoc Group argues that the Court cannot award more than the estate lost,

and here, Sanchez's estate lost nothing.  (ECF No. 2786 at 15–16).  Thus, no award of value is necessary to restore the estate to its pretransfer position.  (ECF No. 2786 at 21).

The Court does not agree that the value to be awarded under § 550 should focus on what the estate lost; rather, the Court should determine how to put the estate back in its pre-transfer position.  Restoration of the pre-transfer position includes the restoration of the relative priorities of the holders of claims against Sanchez and the Estate.  The Secured Ad Hoc Group asks the Court to assume that Sanchez's "change in position" must have injured the Estate.  That is not what is required.  Sanchez's "change in position" artificially elevated one creditor group against another based on the change of making Sanchez liable for more secured debt.  Preference recoveries are allowed when the transfer results in a "change of position" that benefits one group of creditors to the detriment of another group.

The Secured Ad Hoc Group has repeatedly requested that the Court examine the Tenth Circuit's analysis in *In re Trout*.  609 F.3d 1106.  The Secured Ad Hoc Group is correct that *Trout* is somewhat similar to this case.  But *Trout* makes two points of particular importance: (i) § 550 is meant to restore the estate to the financial condition that would have existed had the transfer never occurred;[17] and (ii) there may be situations in which the avoidance of the lien will not suffice to restore the estate to the pretransfer position.  *Id.* at 1112.

In *Trout*, the debtors purchased a vehicle with a loan, and the lenders' failure to timely perfect their lien rendered the lien a preferential transfer.  *Id.* at 1108.  The Trustee sought to avoid and recover the value of the avoided lien under §§ 547 and 550(a) as well as preserve the lien for the benefit of the estate under 11 U.S.C. § 551.  *Id.*  The bankruptcy court granted summary judgment on the § 551 claim.  *Id.*  Thus, the Tenth Circuit examined whether the Trustee could

---

[17] The Court notes that *Trout* does not contain any permutation of the word "loss."

also recover the value of the lien under § 550(a). *Id.* at 1111. In returning the estate to its pre-transfer position, "there may be circumstances where [avoiding the preferential lien] will be insufficient and recovery under § 550 [is necessary]." *Id.* Where the property transferred was the perfected security interest, the underlying collateral—the vehicle—was never transferred. *Id.* at 1112. The Tenth Circuit held that:

> The bankruptcy estate would have had an asset which was declining in value *regardless* of whether the debtor transferred the lien during the preference period. Rather, by virtue of the transferred security interest, a creditor obtained a leg-up over unsecured creditors in the impending bankruptcy; when that lien was avoided and preserved for the benefit of the estate, that creditor had to take its place with the general unsecured creditors, and, having obtained § 547 and § 551 relief, the Trustee gained priority over any junior liens on the same collateral.

*Id.* As a result of the perfected security interest, the secured creditor improved its position relative to unsecured creditors. But because the avoidance of the lien under § 551 placed that secured creditor back on equal footing with unsecured creditors, the trustee did then not need to recover the value of the perfected lien. *Id.* The Tenth Circuit ends with:

> Before the transfer of the security interest here, the estate had a depreciating asset and an obligation to an unsecured creditor. After the transfer, the estate still had the asset but a creditor had a secured priority interest in that asset. After avoidance of the lien, the estate once again had a depreciating asset and an unsecured obligation to the lender. Thus, as the BAP and the bankruptcy court concluded, on these facts, nothing more was required to put the estate back in its pre-transfer position.

*Id.* at 1114. This case differs where the simple avoidance of the liens on the HHK Leases would not put the estate back in the pre-transfer position. Indeed, the failure to award the value of the property transferred because the Senior Secured Notes were primed by the DIP liens would grant the DIP Lenders, who are largely a subset of the Senior Secured Noteholders, a windfall. This windfall would be a direct result of their own conduct—the preferential transfer resulting in the perfection of the liens. By awarding the value of the transferred property under § 550, the Court will return Sanchez's estate to its pre-transfer position.

### C.    Double Recovery

The Secured Ad Hoc Group contends that awarding the value of the property transferred would be an impermissible double recovery under 11 U.S.C. § 550(d).  (ECF No. 2786 at 21–25). Section 550(d) simply states: "The trustee is entitled to only a single satisfaction under subsection (a) of this section."  The Senior Secured Noteholders released the HHK Liens in the Plan:

> Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, ***all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors,*** or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.
>
> The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

(ECF No. 1205 at 40) (emphasis added).  Because the Senior Secured Noteholders agreed to release the HHK Liens, the Secured Ad Hoc Group argues that allowing the Creditor Representative to receive the value of the HHK Liens would allow it to recover the value of property that has already been returned to the estate.  (ECF No. 2786 at 22).

Section 550(d) prevents a double recovery under § 550(a). The Fifth Circuit has confirmed that trustees are only entitled to a single satisfaction for avoidable transactions. *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019). This single recovery is meant to ensure that the estate is placed in the pre-transfer position without receiving a windfall. *Id.* (quoting *Kapila v. SunTrust Mortg., Inc.* (*In re Pearlman*), 515 B.R. 887, 896 (Bankr. M.D. Fla. 2014)). Indeed, the Fifth Circuit references the definition of "recover" ("to get back or regain in full or in equivalence") in holding that a trustee may only "recover" property transferred once. *Id.* Obtaining the duplicate of property already obtained is not a recovery; "it's getting a windfall." *Id.* To the extent avoiding a transfer places the estate back in the pre-transfer position, the trustee is not entitled to recover more.

Here, the Senior Secured Noteholders' agreement to release the HHK Liens did not put the estate back in the pre-transfer position, and the estate did not "recover" the property it transferred. The Secured Ad Hoc Group has taken the position that the Senior Secured Noteholders' HHK Liens have no value due to the priming DIP liens. (*See, e.g.*, ECF No. 2312 at 67). Accepting the simple release of the worthless Senior Secured Noteholders' HHK Liens as a recovery under § 550(a), which would preclude the Creditor Representative's Causes of Action for the value of the transferred property, does nothing to return the estate to its pre-transfer position. Indeed, allocating all of the Mesquite stock to the DIP Lenders because a group of which they are the vast majority decided to release worthless liens would be a windfall to the DIP Lenders. Moreover, the HHK Liens were released as part of the transaction that resulted in the initial distribution of the 20% interest in Mesquite. The liens were not released as an eleemosynary gesture. The Senior Secured Noteholders effectively released liens to themselves. This did not put Sanchez's estate back in the pre-transfer position.

The Plan's main focus is the Lien-Related Litigation.  It expressly preserves the Creditor Representative's capacity to pursue the claims the Debtors originally made in the Lien Challenge Complaint.  It makes little sense for a document which chiefly concerns the preservation of the Lien-Related Litigation to contain a mechanism simultaneously destroying the Creditor Representative's Cause of Action.  The Secured Ad Hoc Group's argument would render the main point of the Plan, and the last few years of litigation, meaningless.  This was not the Court's understanding when it approved the Plan, and the Court will not interpret the Plan to neuter the Plan's chief concern.  *See In re Sullivan*, 234 F.3d 705 (5th Cir. 2000) ("Chapter 11 plans are construed as contracts. A court should examine an entire contract to harmonize its provisions and avoid rendering some of them meaningless.").  Releases of claims do not occur *sub rosa*[18] in a bankruptcy case.  The essence of the Secured Ad Hoc Group's argument is that the release of liens effected a resolution of any claim under § 550.  The Court was not informed that the transfer would result in a release or settlement.  The Court did not approve a release or settlement.  There was no motion to approve a release or settlement.  The Court declines the opportunity to create a release and settlement based on a *sub rosa* theory.

### D.    Decline in Value of the HHK Leases

The Secured Ad Hoc Group next argues that the Creditor Representative cannot recover the decline in the market value of the HHK Leases between the transfer dates and the Confirmation Date.  (ECF No. 2786 at 25).  The decline in the value of the HHK Leases is the incorrect focus for determining the value of the property to be returned.  The Senior Secured Noteholder's principal expert witness, Daniel R. Fischel, persuasively argued that the Court should evaluate the value of the lien itself; not the value of the underlying collateral to the lien.

---

[18] In English, "under the rose."

This only makes sense.  A lien holder cannot recover collateral with a value that exceeds the amount of its lien.  A change in collateral value *may* affect the value of the lien, but the lienholder only received the lien; it is not entitled to collateral value that exceeds the debt secured by the lien.

In this case, the value of the lien itself can be separated from the value of the collateral. Both the secured debt and the unsecured debt Sanchez owed was traded on the public markets. With some minor interest rate adjustments, the difference between the trading price of Sanchez's unsecured debts and the secured debts reflects the market's estimation of the value of the lien itself. Professor Fischel advocates this view.  (ECF No. 2720 at 201–205).

The Court will value the HHK Liens on the days the Correction Affidavits were filed.  It does not appear that the Creditor Representative is attempting to recover the depreciation of the HHK Leases between the transfer dates and the Confirmation Date.  Instead, the Creditor Representative is attempting to recover the value of the HHK Liens as of the transfer dates, and doing so would not make the DIP Lenders or Senior Secured Noteholders "*de facto* insurers of the collateral's value." (*See* ECF No. 2786 at 28).  The fact that the HHK Leases became less valuable after the transfer date because of the global shutdown at the beginning of the COVID pandemic is irrelevant to the Court's objective to value the HHK Liens as of the transfer dates.

### E.     Ascertainable Value of Property

The Secured Ad Hoc Group's fourth § 550(a) argument is that the Court should return the property, not the value of the property transferred, when the value of the property cannot be easily determined.  (ECF No. 2786 at 28).  Various courts have held that the default remedy is to return the property, and value should not be awarded if it cannot be easily or readily determined.  *See, e.g.*, *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 892 (9th Cir. 2010) ("Where

the value of the property cannot be easily or readily determined—as is the case here—the correct remedy is to return the property, not award an estimate of the value of the property." (citing 5 COLLIER ON BANKRUPTCY ¶ 550.02(3)(a) (15th ed. re 2008))); *Island Leasing, LLC v. Kane*, No. CV 19-00655 LEK-WRP, 2020 WL 6326101, at *7 (D. Haw. Oct. 28, 2020); *Bishop*, 2017 WL 3623917, at *7; *Redeye II, LLC v. MorrisAnderson & Assoc. Ltd. (In re Swift Air, L.L.C.)*, 624 B.R. 694, 719 (D. Ariz. 2020); *see In re Lee (Lee v. Walro)*, 567 B.R. 802, 809 (S.D. Ind. 2017) ("Ordering a return of the property itself is most appropriate when: (a) the record is devoid of evidence on the property's value, or (b) there is conflicting evidence on the value of the transferred property." (citing *Trout*, 609 F.3d at 1112)).

There are instances where it is difficult or impossible to return the property and the Court should order the return of the value of the property transferred:

> [A]llowing the Trustee to recover the pre-transfer value of the property is most appropriate when: (a) the property is unrecoverable, (b) the property's value has been diminished by conversion or depreciation since the transfer, or (c) the value of the property is readily determinable and a monetary award would work a savings for the estate.

*Walro*, 567 B.R. at 809.  As noted above, the value of the collateral sharply declined after the Petition Date.  The collateral became encumbered by the DIP lien.  The collateral was included in the $85 million unencumbered value of the Estate.  To pursue a § 550(a) action, the Creditor Representative's only option is to seek the value of the property.  Additionally, when the value of the property is ascertainable (whether easy or not), the Court acts within its discretion to award the value of the property.  In any event, as set forth below in Section II.B, the value of the transferred HHK Liens is readily ascertainable.  But even if that were not true, the Court is not required order the return of the property simply because it may be difficult to ascertain the value; if value is ascertainable, nothing in § 550(a) prohibits the Court from awarding that value.  It would be an

injustice for the Court to shy from the labor of determining the value of the property transferred because it may not be easy.

### F.        Proper Defendant Preserved

The Secured Ad Hoc Group once again argues that the Creditor Representative's § 550 Cause of Action is worthless because there is no creditworthy defendant.  (ECF No. 2786 at 41–43).  Consistent with its previous ruling on this issue, the Court declines to follow the Secured Ad Hoc Group's reasoning.  (*See* ECF No. 2627 at 18–21).  The Lien-Related Litigation does not require that any party actually augment the assets to be distributed; this carefully negotiated distribution scheme only requires a valuation of the hypothetical Causes of Action.  Of course, if the Creditor Representative truly could not proceed against any defendant, even hypothetically, the § 550 Cause of Action would be worth $0.  But the Creditor Representative could hypothetically recover against Wilmington Trust as the Successor Collateral Trustee of the Senior Secured Notes.  Settlements which the Secured Ad Hoc Group alleges the Final DIP Order authorized do not change this outcome.  (ECF No. 2627 at 18–21).

Moreover, the Creditor Representative could hypothetically proceed against the Senior Secured Noteholders themselves.[19]  Section 550(a) permits the trustee to recover against "the entity for whose benefit such transfer was made . . . ."  The Correction Affidavits were made for the benefit of the Senior Secured Noteholders.  The Plan provides the Creditor Representative with the "standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint . . . ."  (ECF No. 1205 at 27).  Causes of Action include

---

[19] The Secured Ad Hoc Group argues that the Creditor Representative cannot recover from anyone else because the Collateral Trust Agreement does not require the Senior Secured Noteholders to indemnify the Collateral Trustee for claims against the trust's assets.  (ECF No. 2786 at 42).  But § 550(a) does not require that the Senior Secured Noteholders be indemnitors of the Collateral Trustee; the Creditor Representative could hypothetically proceed against them directly as intended beneficiaries of the avoidable transfer.

"claims pursuant to section[] . . . 550 . . . of the Bankruptcy Code . . . ."  (ECF No. 1205 at 6).

Thus, the Creditor Representative has the standing to pursue a § 550 claim so long as it is

"referenced and asserted in the Lien Challenge Complaint."  In the Lien Challenge Complaint, the

Debtors seek to "recover, for the benefit of the estates, the property transferred and avoided under

sections 544, 547, and 548 from the initial transferee of such transfer or *the entity for whose benefit*

*such transfer was made*."  (Adv. Pro. No. 20-3057, ECF No. 1 at 6) (emphasis added).   In the

prayer for relief of the Lien Challenge Complaint, the Debtors seek "a judgment finding that all

transfers described in this Complaint are avoided and the Debtors are thus entitled to recovery

under § 550 . . . ."  (Adv. Pro. No. 20-3057, ECF No. 1 at 6).   The Creditor Representative may

pursue its hypothetical § 550 claim against the Senior Secured Noteholders when the Debtors

originally sought to recover from "the entity for whose benefit such transfer was made."  Although

the Senior Secured Noteholders are not presently named parties, the deadline for naming additional

persons for a § 550 recovery is within one year of the date of the avoidance of the transfer.   11

U.S.C. § 550(f)(1).   Because the avoidance deadline is being determined on entry of the judgment

in this proceeding, the recovery against the Senior Secured Noteholders may be brought for the

next year.[20]

---

[20] In an earlier supplemental brief, the Secured Ad Hoc Group states that "the Plan and Disclosure Statement . . . approved by the Court confirm that no one could add defendants to the Lien Related Litigation . . . ."  (ECF No. 2540 at 10).   The Ad Hoc Group then cites to the Disclosure Statement and an earlier version of the Plan which contains language absent from the final version of the Plan.  (ECF No. 2540 at 10–11).   Based on this inaccurate citation, the Secured Ad Hoc Group concludes that "there is no longer any viable [value cause of action] against any [Senior Secured Notes] holder."  (ECF No. 2540 at 11).   The Plan's interpretation provisions clarify that the Plan controls over the Disclosure Statement, and subsequent versions of the Plan, including the version the Court references in the Confirmation Order, obviously control over earlier versions.  (ECF Nos. 1205 at 15; 1212 at 1).   The Plan does not enjoin the Creditor Representative from pursuing a hypothetical § 550 action against the Senior Secured Noteholders.

## II.   VALUATION ANALYSIS

Having determined that: (i) the Creditor Representative's §§ 547 and 550 actions are viable; and (ii) it is appropriate to return the value of the property transferred, the Court must value the property transferred.   The trading data of secured and unsecured notes at the time of the transfers is the best evidence of the value of the property transferred.

### A.      Reliability of Trading Data

As stated by the Secured Ad Hoc Group's expert, Professor Fischel, "courts should rely more heavily on market prices when resolving validation disputes than has occurred to date." Daniel R. Fischel, *Market Evidence in Corporate Law*, 69 U. CHI. L. REV. 941, 941 (2002) [hereinafter *Market Evidence*].   Indeed, "market prices, when observable, should be the dominant valuation approach in corporate transactions and litigation [because of the approach's] conceptual clarity, simplicity, and objectivity."   *Id.* at 942.

Fair market value is "the price at which an asset would change hands in a transaction between a willing buyer and willing seller when neither is under any compulsion to buy or sell and both are reasonably informed."   *Id.*   Generally, this is what a market price represents so long as there is no compulsion and parties possess reasonable information.   *Id.*   Market prices lend further credibility through their objectivity: buyers and sellers in open markets will generally not artificially set prices too low or too high.   *Id.* at 943.   Market professionals with their wealth at stake create market prices, and their opinions are more reliable than the opinions of market professionals without their wealth at stake (such as expert witnesses in litigation).   *Id.* at 944–45.

The parties have presented varying valuations to the Court.   These valuations focus on the value of the collateral securing the HHK Liens (*i.e.*, the value of the HHK Leases themselves). But this is the wrong focus.   The Court is endeavoring to value the property transferred.   The HHK

*Liens*, not the HHK *Leases*, were transferred via the Correction Affidavits.  The market prices of the secured notes compared to the unsecured notes is the best method to value the HHK Liens. The market valuation data is what willing buyers and willing sellers, who acted without compulsion and were, by all accounts, reasonably informed, paid for owning a portion of Sanchez's secured and unsecured debts.  This method of valuation avoids skewing the valuation by "eliminating, or at least greatly reducing, the role of paid experts in litigation."  *Id.* at 944.

Another of the Secured Ad Hoc Group's expert witnesses—Dr. J.B. Heaton—wrote two articles in 2019 discussing the trading prices of Sanchez's debt.  (ECF No. 2742 at 280–81).  Dr. Heaton felt comfortable enough with the market for Sanchez's debt to utilize trading prices in concluding that Sanchez was insolvent.  (ECF No. 2742 at 280–81).  This further bolsters the quality of trading prices as a reliable measure of the value of the property transferred.

Mr. Scruton, an expert for the Creditor Representative, identified five days in which buyers and sellers exchanged the Senior Secured Notes between June 27, 2019 and July 24, 2019.  (ECF No. 2696-38).  According to Mr. Scruton, the prices for the Senior Secured Notes "were relatively stable" throughout June and July 2019.  (ECF No. 2721 at 179).  Indeed, the data shows that prices for the Senior Secured Notes varied from a low point of $0.7425 per dollar of face value to $0.8700 per dollar of face value in June and July 2019.  (ECF No. 2696-38).  Between June 27, 2019 and July 24, 2019, the prices varied only from $0.7425 per dollar to $0.8200 per dollar  across 12 trades over the course of five trading days.  (ECF No. 2696-38).  The volume of trades during those five trading days totals approximately $32 million.  (ECF No. 2696-38).  Regarding the 6.125% Unsecured Notes, prices varied from $0.0400 per dollar to $0.0662 per dollar across 27 trades over the course of seven trading days.  (ECF No. 2696-38).  The volume of trades during those seven trading days totals approximately $29 million.  (ECF No. 2696-38).   Regarding the 7.75%

Unsecured Notes, prices varied from $0.0498 per dollar to $0.0650 per dollar across 17 trades over the course of five trading days. (ECF No. 2696-38). The volume of trades during those five trading days totals approximately $11.5 million. (ECF No. 2696-38).

The Court has no evidence that the market knew of the deficiencies in the Deeds of Trust pertaining to the HHK Leases. On the contrary, Sanchez's 2018 10-K report states that the Senior Secured Notes are "secured by first-priority liens on substantially all of the Company's and any subsidiary guarantor's assets." (ECF No. 2340-10 at 132). Dr. Heaton agreed that "trades of the secured notes during the summer of 2019 were premised on the notion that the liens securing those notes were properly perfected." (ECF No. 2742 at 282–83). Professor Fischel likewise was "not surprised" about the different trading prices around the time the Correction Affidavits were filed, and he agreed that this difference was attributable to the priority the market believed the Senior Secured Noteholders had over the Guarantors' assets. (ECF No. 2720 at 185–86). The Court accepts this conclusion.

The Secured Ad Hoc Group argues the trading data analysis cannot be the basis for an award of value because it is not a reliable value of the HHK Liens. (ECF No. 2786 at 34). But at "the most basic level, the market price of an asset satisfies the willing buyer/willing seller standard and thus reflects the fair market value of the asset being traded." *Market Evidence* at 944. Here, there is no evidence that elements of the market were acting under duress or without reasonable information. Moreover, the Court is not persuaded that the market for Sanchez's debt is too illiquid to be a reasonable measure of value. (*See* ECF No. 2696-33 at 6). Indeed, it may be the case that "less liquid but more informed markets may produce more reliable market prices." *Market Evidence* at 945. In any event, Mr. Scruton credibly testified that "there was some liquidity in that market that I could rely on." (ECF No. 2720 at 99).

**B.      Trading Data Value**

The market valuation of Sanchez's enterprise value when the Correction Affidavits were filed was $477.5 million.  This is calculated by multiplying Sanchez's debts ($500 million in secured debt and $1.750 billion in unsecured debt) by the amounts at which they traded ($0.78 per dollar and $0.05 per dollar, respectively) and adding the products together.[21]

| | |
|---|---|
| Senior Secured Notes | $500,000,000 |
| Unsecured Notes | $1,750,000,000 |
| **Total Debt** | **$2,250,000,000** |

| | |
|---|---|
| Senior Secured Notes | $390,000,000 |
| Unsecured Notes | $87,500,000 |
| **Implied Enterprise Value** | **$477,500,000** |

If all of Sanchez's secured and unsecured debt ($2.250 billion) were pari passu (which would be the effect of treating the Senior Secured Notes as unsecured following avoidance of the Correction Affidavits), Sanchez's pari passu debt would have traded at $0.2122 per dollar in June and July of 2019.  At that trade amount, Sanchez's $500 million secured debt would have had a $106.10 million market value and Sanchez's $1.750 billion unsecured debt would have had a $371.35 million market value.

| | |
|---|---|
| Enterprise Value | $477,500,000 |
| Total Debt | $2,250,000,000 |
| **Enterprise Value to Total Debt** | **21.22%** |

| | |
|---|---|
| Senior Secured Notes | $106,111,111 |
| Unsecured Notes | $371,388,889 |
| **Pari Passu Hypothetical Market Value** | **$477,500,000** |

The value of the Senior Secured Noteholders' Liens is the difference between the secured debt actual value (*i.e.*, the market's expectation: the value of the Senior Secured Notes with

---

[21] The parties do not dispute that the Credit Facility would get paid in full in any scenario.

perfected liens) and the pari passu secured debt value (the value of the Senior Secured Notes when given the same treatment as the 7.75% Unsecured Notes and the 6.125% Unsecured Notes).  Thus, the value of the Senior Secured Noteholders' liens is approximately $284 million.

| | |
|---|---|
| Historic Market Value | $390,000,000 |
| Hypothetical Market Value | $106,111,111 |
| **Difference between Market and Hypothetical Values** | **$283,888,889** |

The Senior Secured Noteholders' liens cover more than just the HHK Leases.  To determine the value of the of the Senior Secured Noteholders' liens on the HHK Leases, the Court multiplies the value of the Senior Secured Noteholders' liens by the percentage of the liens comprised of the HHK Leases.  The Court is persuaded by Mr. Terry's thorough analysis that the HHK Leases cover 74% of the Guarantors' total assets.  (*See* ECF No. 2696-29 at 18).[22]  Thus, the value of the transfer of the liens on the HHK Leases is approximately $210 million.

| | |
|---|---|
| Difference in values | $283,888,889 |
| HHK Lease % compared to all Leases | 74.0% |
| **Value of preferential transfer (recording Correction Affidavits)** | **$210,077,778** |

But the Court's analysis is not done.  The Secured Ad Hoc Group argues that the $210 million figure cannot be an accurate value of the property transferred because the Senior Secured Noteholders retained liens on the wells in the HHK Leases and in the hydrocarbons once they were extracted from wells on the HHK Leases.  (*See* ECF No. 2312 at 56–63).  After taking those liens into account, the Secured Ad Hoc Group contends that the avoidable portion of the Senior Secured Noteholders' liens is between "5.8% and 22% of the total collateral value."  (ECF No. 2786 at 36). The Senior Secured Noteholders did not have perfected liens on extracted hydrocarbons or real

---

[22] Mr. Terry calculates the midpoint going concern valuation of just the HHK Leases as $326.3 million and the midpoint going concern valuation of the entire company at $440.4 million.  $326.3 million / $440.4 million = 74%. (ECF No. 2696-29 at 18).  Under Mr. Young's rebuttal report, he determines that the "Challenged Leases" under the "Lease Method," which assumes that "all value on the Challenged Leases is unencumbered even including wells that are accurately listed on Exhibit A," are worth 63.1% of the total enterprise value.  (ECF No. 2700-50 at 6–7).

property liens on the wells, but they did have perfected liens on personal property (exclusive of extracted hydrocarbons) associated with the HHK Leases.

### (1)   Liens on Real Property

The Secured Ad Hoc Group argues that the Senior Secured Noteholders obtained real property liens on the wells located in the HHK Leases, and they maintained these unavoidable liens even if the Senior Secured Noteholders' liens on the HHK Leases themselves are avoidable. (ECF Nos. 2312 at 56–62; 2786 at 36–40).  In particular, the Secured Ad Hoc Group alleges that the Deeds of Trust not only grant liens in the HHK Leases but also grant individual liens on the wells listed on Exhibit A in each Deed of Trust.  (ECF Nos. 2312 at 56; 2786 at 40).  The argument is fundamentally flawed.  Paragraph E in each Deed of Trust is the granting paragraph associated with oil and gas wells.  Paragraph E limits the grant to property "found in, on, or under any of the Subject Interests."  (ECF No. 1703-4 at 4).  The Subject Interests are the mineral leases.  The Subject Interests are not the wells themselves as the wells cannot both be the Subject Interests and be "in, on, or under" the Subject Interests.  Paragraph E, the only paragraph in the granting clauses to discuss wells, does not grant real property liens on wells that are located within the Subject Interests, especially when the liens on the Subject Interests are avoidable.

The Secured Ad Hoc Group also argues that Exhibit A grants real property liens on the wells.  (ECF No. 2786 at 37–38).  The Introduction to Exhibit A states that "well names and well arabic numbers are generally for descriptive purposes."  (ECF No. 1703-4 at 23).  This is not an express grant.  *See Anderson v. Tall Timbers Corp.*, 378 S.W.2d 16, 23 (Tex. 1964). ("There was no express grant here. The only reference in the deed to the easement tract is in the metes and bounds description of the land conveyed . . . . This reference, as well as the reference in the deed to the subdivision plat, was patently for descriptive purposes only." (citing *City of Hous. v. Cyrus*

*W. Scott Mfg. Co.*, 45 S.W.2d 270 (Tex. App.—El Paso 1931, writ ref'd)).  While the Introduction states that "[t]his instrument covers the Grantor's entire interest in each of the land parcels, mineral servitudes, mineral leases, mineral royalties, and other mineral rights described in <u>Exhibit A</u>," this is not an express grant of real property liens on wells either.  The Deeds of Trust do not grant real property liens on wells merely because they are listed in Exhibit A.

### (2)      *Liens on Personal Property*

The Secured Ad Hoc Group also argues that the Senior Secured Noteholders have liens on the Guarantors' personal property from the Deeds of Trust and the Security Agreement.  (ECF No. 2312 at 56–63).  If the Senior Secured Noteholders have liens on the Guarantors' personal property, including hydrocarbons extracted from the HHK Leases, the value of that personal property should not count towards the value of the property transferred under § 550.  (ECF No. 2786 at 36).

At the outset, the Court rejects the Secured Ad Hoc Group's contention that the Lien Challenge Complaint does not challenge personal property liens.  (ECF No. 2786 at 37).  The Lien Challenge Complaint seeks to avoid transfers of "Shared Collateral": the prayer for relief requests a "finding that any purposed liens securing the Shared Collateral . . . are avoidable . . . ."  (Adv. Pro. No. 20-3057, ECF No. 1 at 23).  Among other things, Shared Collateral includes: (i) the Guarantors' oil and natural gas properties; and (ii) "substantially all of [the Guarantors'] other material personal property."  (Adv. Pro. No. 20-3057, ECF No. 1 at 9–10).  The Creditor Representative is not barred from seeking to avoid liens on personal property because such a Cause of Action is absent from the Lien Challenge Complaint.

"In Texas, oil and gas, while in the ground, is real property, but when produced becomes personal property."  *DJH Minerals, LP v. SN Catarina, LLC (In re Sanchez Energy Corp.)*, No.

AP 20-03194, 2021 WL 3630000, at *6 (S.D. Tex. July 19, 2021) (quoting *Am. Nat'l Bank v. United States, (In re Hawn)*, 149 B.R. 450, 454 (Bankr. S.D. Tex. 1993), *aff'd in part sub nom. Hawn v. Am. Nat. Bank.*, No. 93–CV–102, 1996 WL 142521 (S.D. Tex. 1996)).  The Texas Uniform Commercial Code generally governs rights and interests in personal property.  *Id.* at *7. The UCC defines "as-extracted collateral" to be "(A) oil, gas, or other minerals that are subject to a security interest that: (i) is created by a debtor having an interest in the minerals before extraction; and (ii) attaches to the minerals as extracted; or (B) accounts arising out of the sale at the wellhead or minehead of oil, gas, or other minerals in which the debtor had an interest before extraction." Tex. Bus. & Com. Code § 9.102(a)(6); *see also id.* cmt. 4(c) ("Under this Article, oil, gas, and other minerals that have not been extracted from the ground are treated as real property, to which this Article does not apply. Upon extraction, minerals become personal property (goods) and eligible to be collateral under this Article.").

To perfect a security interest via a UCC filing, "the office in which to file a financing statement to perfect the security interest or agricultural lien is: (1) the office designated for the filing or recording of a record of a mortgage on the related real property, if: (A) the collateral is as-extracted collateral . . . ."  *Id.* at § 9.501.  Such a filing must also "provide a description of the real property to which the collateral is related sufficient to give constructive notice of a mortgage under the law of this state if the description were contained in a record of the mortgage of the real property . . . ."  *Id.* at § 9.502(b)(3).  To perfect a lien on as-extracted hydrocarbons with UCC filings, the lien must be recorded in the county in which the real property is located.  *See Sanchez*, 2021 WL 3630000, at *8 ("To perfect a security interest via UCC filings, Plaintiffs were required to file a financing statement in "the office designated for the filing or recording of a record of a mortgage on the related real property." 34 Tex. Bus. & Com. Code § 9.501(a)(1)(A). Here, that

would have been Dimmit, Webb, and LaSalle counties in Texas.").  Thus, to perfect a security interest in as-extracted collateral, perfecting documentation must have been in the counties where the HHK Leases are located and must have been sufficient to provide constructive notice of an interest in real property.

The UCC-1s do not appear to have been filed in any county, but instead with the Secretary of State of Texas and the Delaware Department of State.  (*See* ECF Nos. 1702-2–1702-11).  In addition, this Court already ruled in Phase 2 that a bona fide purchaser would not be on inquiry notice of the purported liens on the HHK Leases as listed in the Deeds of Trust because the HHK Leases are not sufficiently referenced in the Deeds of Trust.  Neither the UCC-1s nor the Deeds of Trust give inquiry notice that the Senior Secured Noteholders had perfected liens in extracted hydrocarbons, and so the value of extracted hydrocarbons should not be excluded from the amount to be allocated to the Creditor Representative.[23]

The Creditor Representative admits that the Senior Secured Noteholders would have personal property liens on the HHK Leases, and alleges, without proof, that the value of that personal property is $13 million.  (ECF Nos. 2310 at 11, 39; 2785 at 33, 36).[24]  The Court is not aware what value the Secured Ad Hoc Group associates with the personal property liens excluding extracted hydrocarbons.  Without evidence from the Secured Ad Hoc Group on the value of the personal property liens, the Court finds that there is no evidence of the value of the personal

---

[23] This outcome avoids the troubling situation in which a producer would have no incentive to bring hydrocarbons to the surface when a lienholder has rights to those hydrocarbons as soon as they are extracted although it had no rights prior to extraction.  When a lien on a mineral lease is avoided and returned to the estate, the estate would assume the rights and privileges of the leaseholder.

[24] The Creditor Representative also alleges, without citation, that its experts have allocated $13 million to the DIP Lenders on account of personal property associated with the HHK Leases (apparently excluding extracted hydrocarbons).  (ECF No. 2310 at 39, 45).  Without demonstrating precisely how this value has been allocated, the Court will not penalize the DIP Lenders.

property.  Because the Creditor Representative's position means that up to $13 million in value is

undisputed, the Court deducts $13,000,000 from the $210,077,778 to be allocated to the Creditor

Representative for a net of $197,077,778.

## III.   VALUATION CALCULATION

Having valued the Creditor Representative's § 550 Cause of Action, the Court must now

allocate the Post-Effective Date Equity Distribution, which is 80% of Mesquite's stock.  The Court

discussed the mechanics of the Post-Effective Date Equity Distribution in a previous opinion:

> Although the DIP Lenders have DIP Claims of at least $150 million, they stipulated
> to value their collateral at $85 million. The DIP Lenders have an $85 million
> secured claim. In determining their share of the Post-Effective Date Equity
> Distribution, the DIP Lenders will start with $85 million. Thus, they will receive
> the full value of their secured claim in the Reorganized Debtor's stock—an
> outcome for which they bargained. . . . At most, the DIP Lenders will get $50
> million (50% of a maximum $100 million of proceeds recovered by Avoidance
> Actions against parties other than the Prepetition Secured Parties) of value for
> purposes of distributing shares on account of the $65 million of unsecured priority
> DIP claims. If Avoidance Actions against parties other than the Prepetition Secured
> Parties generate no proceeds, the DIP Lenders will receive (i) no stock on account
> of the unsecured portion of the priority DIP Claims; and (ii) a pro rata amount of
> stock on account of the $85 million Enterprise Value. The actual percentages of the
> Post-Effective Date Equity Distribution remain to be determined.

(ECF No. 2627 at 14–15).

The value of the Creditor Representative's § 550 Cause of Action is $197,077,778.  In

addition, the parties settled a claim against former Sanchez insiders for $2 million.  (*See* ECF Nos.

2533 at 11; 2650).  The DIP Lenders maintain an $85 million credit from the stipulated Enterprise

Value.  The Creditor Representative is allocated 69.73% of Mesquite's stock.  The DIP Lenders

are allocated 30.27% of Mesquite's stock.

| Recovery | Allocated to Classes 4 and 5 Holders | Allocated to Class 3 Holders | Total |
|---|---|---|---|
| Value of Section 550 Causes of Action | $197,077,778 | $0 | $197,077,778 |
| Stipulated Value of Enterprise | $0 | $85,000,000 | $85,000,000 |
| Value of Other Causes of Action | $1,000,000 | $1,000,000 | $2,000,000 |
| Total Values | $198,077,778 | $86,000,000 | $284,077,778 |
| **Allocation** | 69.73% | 30.27% | 100.00% |

The Court notes that the Creditor Representative represents more than the holders of the 7.75% Unsecured Notes and the 6.125% Unsecured Notes. The total of estimated Class 5 Claims in the Disclosure Statement is $1,815,300,000. This includes both the $1,750,000,000 represented by the unsecured notes and other general unsecured creditors. The difference between $1,815,300,000 and $1,750,000,000 is $65,300,000.

Although the Court does not today determine whether $65,300,000 is precisely correct, the Court utilizes that estimate to demonstrate the effect of this opinion on the holders of claims and their successors and assigns.

There are also the Class 4 Claims of the holders of the Senior Secured Notes. As set forth below, those total $463,900,000.

The holders of the Class 4 Claims filed a proof of claim seeking $500,000,000 plus interest and other fees and charges. (Claim No. 216). The Official Creditors Committee objected to that claim. (ECF No. 1027). The determination of the amount of the Allowed Class 4 Claim is part of the Lien-Related Litigation. (*See* ECF No. 1205 at 10). A significant portion of the objection concerns whether the unliquidated make-whole claims should be allowed. (*See* ECF No. 1027 at 9–13). In light of *Ultra*, that part of the claim must be disallowed as disallowed unmatured interest under § 502(b)(2). *Ultra Petroleum Corp. v. Ad Hoc Comm. Of Opco Unsecured Creditors (In re Ultra Petroleum Corp.)*, 51 F.4th 138 (5th Cir. 2022), *cert. denied sub nom. Ultra Petroleum Corp.*

*v. Ad Hoc Comm. of Opco Unsecured Creditors*, 143 S. Ct. 2495 (2023).  The Committee also

seeks an offset for adequate protection payments made to the holders of Class 4 Claims.   (*See*

ECF No. 1027 at 13).  That objection ignores the fact that the assets securing the $500,000,000

claim substantially declined in value after the Petition Date.  There is no question that the adequate

protection payments are not subject to disgorgement. *See* 11 U.S.C. § 507(b).  But there are three

adjustments that must be made to the $500,000,000 claim.  First, $50,000,000 of the claim was

"rolled up" into the DIP Loan.  There should not be a double recovery of the rolled-up amount.

Second, the claim must be increased by pre-petition contractual interest totaling $17,700,000.

Finally, the claim must be decreased by $3,800,000 of unearned original issue discount.   (*See*

ECF No. 2348-41 at 24).  That leaves an Allowed Class 4 Claim of $463,900,000:

| | | |
|---|---|---:|
| Principal | $ | 500,000,000 |
| Unaccrued original issue discount as of the Petition Date | $ | (3,800,000) |
| Accrued interest through Petition Date | $ | 17,700,000 |
| DIP roll-up | $ | (50,000,000) |
| **Senior Secured Noteholders' claim** | **$** | **463,900,000** |

The deadline for objecting to claims has passed.  (ECF No. 1205 at 6, 38).  Based on the

$463,900,000 of Senior Secured Noteholders Claims, the $1,750,000,000 of unsecured noteholder

claims, and the $65,300,000 of estimated other general unsecured claims, any award to the holders

of unsecured claims would be allocated:

| Claimants | Claim Amount | Percentage Allocation |
|---|---|---:|
| Unsecured Noteholders | $ 1,750,000,000.00 | 76.78% |
| Senior Secured Noteholders | $ 463,900,000.00 | 20.35% |
| Other Unsecured Holders | $ 65,300,000.00 | 2.87% |
| Totals | $ 2,279,200,000.00 | 100.00% |

Although the allocation between the holders of Class 3 versus Classes 4 and 5 are fixed by

this opinion, the allocations within Classes 4 and 5 will be adjusted by the Reorganized Debtor

based on the actual amount of other unsecured claims.  Applying these estimated prorations, the actual distribution of equity would be:

| Claimants | Equity Allocation |
|---|---|
| DIP Lender Allocation | 30.27% |
| Unsecured Noteholder Allocation | 53.54% |
| Senior Secured Noteholder Allocation | 14.19% |
| Other Unsecured Holder Allocation | 2.00% |
| Totals | 100.00% |

## CONCLUSION

A separate order will be entered.

SIGNED 08/03/2023

Marvin Isgur
United States Bankruptcy Judge